**45D04-2011-PL-000758**

Filed: 11/2/2020 1:57 PM
Clerk

USDC IN/ND case 2:20-cv-00438-JEM document 1-1 filed 11/02/20 page 1 of 243
Lake Superior Court, Civil Division 4    Lake County, Indiana

Bond No.    1517337

# Document A312™ – 2010

**Payment Bond**

Conforms with The American Institute of Architects AIA Document 312

**CONTRACTOR:**
*(Name, legal status and address)*

Figg Bridge Builders, LLC

424 Calhoun St

Tallahassee, FL  32301

**SURETY:**
*(Name, legal status and principal place of business)*

Great American Insurance Company

301 East Fourth Street

Cincinnati, OH  45202
**Mailing Address for Notices**

This document has important legal consequences. Consultation with an attorney is encouraged with respect to its completion or modification.

Any singular reference to Contractor, Surety, Owner or other party shall be considered plural where applicable.

**OWNER:**
*(Name, legal status and address)*

Cline Avenue Bridge, LLC

219 Riley Road

East Chicago, IN  46312

**CONSTRUCTION CONTRACT**
Date:    June 8, 2017

Amount: $  110,278,912.00    One Hundred Ten Million Two Hundred Seventy Eight Thousand Nine Hundred Twelve Dollars and 00/100

Description:
*(Name and location)*

Cline Avenue Bridge (over Indiana Harbor and Ship Canal in East Chicago, Indiana)

**BOND**
Date:    June 14, 2017

*(Not earlier than Construction Contract Date)*

Amount: $  110,278,912.00    One Hundred Ten Million Two Hundred Seventy Eight Thousand Nine Hundred Twelve Dollars and 00/100

Modifications to this Bond:    ☐ None    ☒ See Section 18

| **CONTRACTOR AS PRINCIPAL** | **SURETY** |
|---|---|
| Company:    *(Corporate Seal)* | Company:    *(Corporate Seal)* |
| Figg Bridge Builders, LLC | Great American Insurance Company |
| Signature: _____ | Signature: _____ |
| Name and Title: | Name and Title:  Paula J. Teague  Attorney-in-Fact |

*(Any additional signatures appear on the last page of this Payment Bond.)*

*(FOR INFORMATION ONLY — Name, address and telephone)*

**AGENT or BROKER:**
L A Surety Solutions LLC

121 S. Sherrin Avenue

Louisville, KY  40207

502-895-9377
S-2149/AS 8/10

**OWNER'S REPRESENTATIVE:**
*(Architect, Engineer or other party:)*

EXHIBIT A

**§ 1** The Contractor and Surety, jointly and severally, bind themselves, their heirs, executors, administrators, successors and assigns to the Owner to pay for labor, materials and equipment furnished for use in the performance of the Construction Contract, which is incorporated herein by reference, subject to the following terms.

**§ 2** If the Contractor promptly makes payment of all sums due to Claimants, and defends, indemnifies and holds harmless the Owner from claims, demands, liens or suits by any person or entity seeking payment for labor, materials or equipment furnished for use in the performance of the Construction Contract, then the Surety and the Contractor shall have no obligation under this Bond.

**§ 3** If there is no Owner Default under the Construction Contract, the Surety's obligation to the Owner under this Bond shall arise after the Owner has promptly notified the Contractor and the Surety (at the address described in Section 13) of claims, demands, liens or suits against the Owner or the Owner's property by any person or entity seeking payment for labor, materials or equipment furnished for use in the performance of the Construction Contract and tendered defense of such claims, demands, liens or suits to the Contractor and the Surety.

**§ 4** When the Owner has satisfied the conditions in Section 3, the Surety shall promptly and at the Surety's expense defend, indemnify and hold harmless the Owner against a duly tendered claim, demand, lien or suit.

**§ 5** The Surety's obligations to a Claimant under this Bond shall arise after the following:

**§ 5.1** Claimants, who do not have a direct contract with the Contractor,

    **.1** have furnished a written notice of non-payment to the Contractor, stating with substantial accuracy the amount claimed and the name of the party to whom the materials were, or equipment was, furnished or supplied or for whom the labor was done or performed, within ninety (90) days after having last performed labor or last furnished materials or equipment included in the Claim; and

    **.2** have sent a Claim to the Surety (at the address described in Section 13).

**§ 5.2** Claimants, who are employed by or have a direct contract with the Contractor, have sent a Claim to the Surety (at the address described in Section 13).

**§ 6** If a notice of non-payment required by Section 5.1.1 is given by the Owner to the Contractor, that is sufficient to satisfy a Claimant's obligation to furnish a written notice of non-payment under Section 5.1.1.

**§ 7** When a Claimant has satisfied the conditions of Sections 5.1 or 5.2, whichever is applicable, the Surety shall promptly and at the Surety's expense take the following actions:

**§ 7.1** Send an answer to the Claimant, with a copy to the Owner, within sixty (60) days after receipt of the Claim, stating the amounts that are undisputed and the basis for challenging any amounts that are disputed; and

**§ 7.2** Pay or arrange for payment of any undisputed amounts.

**§ 7.3** The Surety's failure to discharge its obligations under Section 7.1 or Section 7.2 shall not be deemed to constitute a waiver of defenses the Surety or Contractor may have or acquire as to a Claim, except as to undisputed amounts for which the Surety and Claimant have reached agreement. If, however, the Surety fails to discharge its obligations under Section 7.1 or Section 7.2, the Surety shall indemnify the Claimant for the reasonable attorney's fees the Claimant incurs thereafter to recover any sums found to be due and owing to the Claimant.

**§ 8** The Surety's total obligation shall not exceed the amount of this Bond, plus the amount of reasonable attorney's fees provided under Section 7.3, and the amount of this Bond shall be credited for any payments made in good faith by the Surety.

**§ 9** Amounts owed by the Owner to the Contractor under the Construction Contract shall be used for the performance of the Construction Contract and to satisfy claims, if any, under any construction performance bond. By the Contractor furnishing and the Owner accepting this Bond, they agree that all funds earned by the Contractor in the performance of the Construction Contract are dedicated to satisfy obligations of the Contractor and Surety under this Bond, subject to the Owner's priority to use the funds for the completion of the work. .

§ 10 The Surety shall not be liable to the Owner, Claimants or others for obligations of the Contractor that are unrelated to the Construction Contract. The Owner shall not be liable for the payment of any costs or expenses of any Claimant under this Bond, and shall have under this Bond no obligation to make payments to, or give notice on behalf of, Claimants or otherwise have any obligations to Claimants under this Bond.

§ 11 The Surety hereby waives notice of any change, including changes of time, to the Construction Contract or to related subcontracts, purchase orders and other obligations.

§ 12 No suit or action shall be commenced by a Claimant under this Bond other than in a court of competent jurisdiction in the state in which the project that is the subject of the Construction Contract is located or after the expiration of one year from the date (1) on which the Claimant sent a Claim to the Surety pursuant to Section 5.1.2 or 5.2, or (2) on which the last labor or service was performed by anyone or the last materials or equipment were furnished by anyone under the Construction Contract, whichever of (1) or (2) first occurs. If the provisions of this Paragraph are void or prohibited by law, the minimum period of limitation available to sureties as a defense in the jurisdiction of the suit shall be applicable.

§ 13 Notice and Claims to the Surety, the Owner or the Contractor shall be mailed or delivered to the address shown on the page on which their signature appears. Actual receipt of notice or Claims, however accomplished, shall be sufficient compliance as of the date received.

§ 14 When this Bond has been furnished to comply with a statutory or other legal requirement in the location where the construction was to be performed, any provision in this Bond conflicting with said statutory or legal requirement shall be deemed deleted herefrom and provisions conforming to such statutory or other legal requirement shall be deemed incorporated herein. When so furnished, the intent is that this Bond shall be construed as a statutory bond and not as a common law bond.

§ 15 Upon request by any person or entity appearing to be a potential beneficiary of this Bond, the Contractor and Owner shall promptly furnish a copy of this Bond or shall permit a copy to be made.

§ 16 Definitions
§ 16.1 Claim. A written statement by the Claimant including at a minimum:
  .1   the name of the Claimant;
  .2   the name of the person for whom the labor was done, or materials or equipment furnished;
  .3   a copy of the agreement or purchase order pursuant to which labor, materials or equipment was furnished for use in the performance of the Construction Contract;
  .4   a brief description of the labor, materials or equipment furnished;
  .5   the date on which the Claimant last performed labor or last furnished materials or equipment for use in the performance of the Construction Contract;
  .6   the total amount earned by the Claimant for labor, materials or equipment furnished as of the date of the Claim;
  .7   the total amount of previous payments received by the Claimant; and
  .8   the total amount due and unpaid to the Claimant for labor, materials or equipment furnished as of the date of the Claim.

§ 16.2 Claimant. An individual or entity having a direct contract with the Contractor or with a subcontractor of the Contractor to furnish labor, materials or equipment for use in the performance of the Construction Contract. The term Claimant also includes any individual or entity that has rightfully asserted a claim under an applicable mechanic's lien or similar statute against the real property upon which the Project is located. The intent of this Bond shall be to include without limitation in the terms "labor, materials or equipment" that part of water, gas, power, light, heat, oil, gasoline, telephone service or rental equipment used in the Construction Contract, architectural and engineering services required for performance of the work of the Contractor and the Contractor's subcontractors, and all other items for which a mechanic's lien may be asserted in the jurisdiction where the labor, materials or equipment were furnished.

§ 16.3 Construction Contract. The agreement between the Owner and Contractor identified on the cover page, including all Contract Documents and all changes made to the agreement and the Contract Documents.

**§ 16.4 Owner Default.** Failure of the Owner, which has not been remedied or waived, to pay the Contractor as required under the Construction Contract or to perform and complete or comply with the other material terms of the Construction Contract.

**§ 16.5 Contract Documents.** All the documents that comprise the agreement between the Owner and Contractor.

**§ 17** If this Bond is issued for an agreement between a Contractor and subcontractor, the term Contractor in this Bond shall be deemed to be Subcontractor and the term Owner shall be deemed to be Contractor.

**§ 18** Modifications to this bond are as follows:

SEE ATTACHED DUAL OBLIGEE RIDER

*(Space is provided below for additional signatures of added parties, other than those appearing on the cover page.)*

| CONTRACTOR AS PRINCIPAL | | SURETY | |
|---|---|---|---|
| Company: | *(Corporate Seal)* | Company: | *(Corporate Seal)* |
| Signature: _____ | | Signature: _____ | |
| Name and Title: | | Name and Title: | |
| Address | | Address | |

S-2149/AS 8/10

## SUBCONTRACT AGREEMENT

THIS SUBCONTRACT AGREEMENT, is made as of January 4, 2019, by and between Figg Bridge Builders, LLC, 424 N. Calhoun Street, Tallahassee, Florida, 32301 ("Contractor"), and McLean Contracting Company, 6700 McLean Way, Glen Burnie, Maryland 21060 ("Subcontractor").

WHEREAS, the Contractor has entered into an Engineering, Procurement, and Construction Agreement with Cline Avenue Bridge, LLC ("Owner"), for construction of the Cline Avenue Bridge (the "Project") as attached as Exhibit G, as may be amended from time to time (the "Prime Agreement").

WHEREAS, Subcontractor has been furnished a copy of said Prime Agreement, including amendments, and all applicable contract documents, for its information and is aware of its terms and provisions, and

WHEREAS, Contractor desires to retain Subcontractor for the purpose of performing the Subcontract Work (defined herein).

WHEREAS, Subcontractor is agreeable to undertaking the Subcontract Work under the terms and conditions set forth herein.

NOW, THEREFORE, for and in consideration of the mutual covenants hereinafter stipulated to be kept and performed, it is agreed between the parties hereto as follows:

## ARTICLE 1 - SCOPE OF WORK.

1.1 MUTUAL UNDERSTANDING. Contractor and Subcontractor have reviewed the preliminary details of the design and construction of the Project together. The Subcontract pricing and terms were mutually agreed to in order to properly complete the needs of the Project and the Prime Agreement. This effort was accomplished to obtain a firm fixed lump sum price and agreed schedule subject to any agreed to Change Orders per Article 6. If a changed condition occurs, it is agreed by Subcontractor and Contractor that both parties will work together to resolve the item to minimize costs and impacts to the project schedule to the greatest extent possible. Notwithstanding references to changes in price and schedule or Subcontract Change Orders the only times that such provisions apply are in the following conditions:

1.1.1 Force Majeure as defined in, and when applicable and relief is granted under, the Prime Agreement, in which an equivalent time extension will be granted.

1.1.2 Contractor directed new scope of services for which a mutually equitable time extension and/or mutually equitable increase in the Subcontract Amount should be granted.

1.1.3 Delay resulting from Contractor's direction to Subcontractor to perform work out of sequence on the CPM Schedule or issuance of the "for construction drawings" beyond the time provided in the CPM Schedule, in which a mutually equitable time extension and/or mutually equitable increase in the Subcontract Amount shall occur.

Contractor and Subcontractor will work together with a focus on cost and schedule while achieving the standards of quality as provided in the plans and specifications. In the event of a conflict or ambiguity between the terms of this Section 1.1 and other terms of this Agreement, the terms of this Section 1.1 shall control and take precedence.

EXHIBIT B

1.1.4 Discovery of unforeseen conditions, or differing site conditions, affecting the scope and timing of the Work.

1.1.5 Adjustments to the Scope of Work as provided for under Additional Terms and Assumptions of Exhibit A.

1.1.6 Contractor-directed Suspensions of work.

1.1.7 Delays to the project critical path caused by third parties, and which are beyond the control of and without the fault of Subcontractor and which delay Subcontract Work.

1.2 SUBCONTRACT WORK. Contractor contracts with Subcontractor as an independent contractor to provide all labor, materials, equipment, and services necessary to complete the Subcontract Work as described in Exhibit A and consistent with the CPM Schedule, as may change from time to time in accordance with this Agreement. Subcontractor shall perform the Subcontract Work under Contractor's general direction and in accordance with the Subcontract Documents which are incorporated herein and made a part of this Agreement.

1.3 CONTRACTOR'S WORK. Contractor's Work is the construction and services required of Contractor to fulfill its obligations pursuant to the Prime Agreement with Owner (the "Work"). The "Subcontract Work" is a portion of Contractor's Work.

1.4 SUBCONTRACT DOCUMENTS. "Subcontract Documents" means this Agreement and its Exhibits, the Prime Agreement, the Development Agreement, the Exchange Agreement, amendments to this Agreement entered into in accordance with this Agreement, and Change Orders and Interim Directives issued in accordance with this Agreement. Only those portions of the such documents that have been previously provided to Subcontractor by Contractor shall be considered Subcontract Documents. Subcontractor shall provide copies of applicable portions of the Subcontract Documents to its proposed Subcontractors and suppliers. Subcontractor may request copies of the Subcontract Documents from Contractor at any time after this Agreement is executed provided that Contractor may redact information not applicable to the Subcontract Work.

1.5 CONFLICTS. In the event of a conflict between this Agreement and the other Subcontract Documents, this Agreement shall govern.

1.6 DEFINITIONS.  Any capitalized terms used herein and not defined herein shall have the meaning in the Prime Agreement.

1.6.1 "Agreement" means this Agreement by and between Contractor and Subcontractor, as modified in written and signed by both Parties in accordance with this Agreement, and the Exhibits attached hereto which are incorporated herein by this reference. The Exhibits are as follows:

Exhibit A:  The Subcontract Scope of Work
Exhibit B:  Subcontract Worksite
Exhibit C:  CPM Schedule
Exhibit D:  Schedule of Values
Exhibit E:  Insurance Provisions
Exhibit F:  Bond Provisions
Exhibit G:  Prime Agreement
Exhibit H:  Permits

1.6.2 "Business Day" means all Days, except weekends and official federal or state holidays where the Project is located.

1.6.3 "CPM Schedule" means the schedule for the Subcontract Work dated December 1, 2018 as set forth on Exhibit C.

1.6.4 "Day" means a calendar day.

1.6.5 "Design Professional" means Figg Bridge Engineers, Inc. and its subconsultants.

1.6.6 "Interim Directive" means a written order containing Work instructions or directing the Subcontractor to proceed with the Subcontract work in question. An Interim Directive may also be referenced in the Contract Documents as a Change Directive or other equivalent directive, and shall be treated as an Interim Directive.

1.6.7 "Parties" means collectively Contractor and Subcontractor.

1.6.8 "Permanent Materials" means concrete, reinforcing, and post tensioning materials.

1.6.9 "Prime Agreement" means that certain Engineering, Procurement, and Construction Agreement dated as of June 8, 2017, by and between Contractor and Owner, and attachments, exhibits and schedules thereto, as such agreement may be amended from time to time.

1.6.10 "Subcontract Change Order" is a written order signed by the Parties after execution of this Agreement, indicating changes in the scope of the Subcontract Work, the Subcontract Amount or Subcontract Time, including substitutions proposed by Subcontractor and accepted by Contractor.

1.6.11 "Subcontract Substantial Completion" means the final completion of all Subcontract Work including the final punch list items.

1.6.12 "Subcontract Substantial Completion Date" means the date shown as the Subcontract Substantial Completion Date on the CPM Schedule.

1.6.13 "Subcontract Time" means the time period on the CPM Schedule between commencing and completing the Subcontract Work.

1.6.14 "Subcontract Work" means the work described on Exhibit A.

1.6.15 "Subcontract Worksite" means the geographical area of the Project location where the Subcontract Work is to be performed as more particularly described on Exhibit B.


ARTICLE 2 SUBCONTRACTOR'S RESPONSIBILITIES.

2.1 OBLIGATIONS. To the extent the terms of the Prime Agreement apply to the Subcontract Work, (a) Contractor assumes toward Subcontractor all the obligations, rights, duties, and redress that Owner under the Prime Agreement assumes toward Contractor except to the extent modified by this Agreement, and (b) Subcontractor will perform the Subcontract Work in accordance with the provisions of the Prime Agreement applicable to the Subcontract Work. In the event of an inconsistency among the documents, the specific terms of this Agreement shall govern.

2.2 RESPONSIBILITIES. Subcontractor shall furnish its diligent efforts to perform the Subcontract Work in an expeditious manner and to cooperate with Contractor so that Contractor may fulfill its obligations to Owner. Subcontractor shall furnish all of the labor, materials, equipment, and services, including but not limited to competent supervision, shop drawings, samples, tools, and scaffolding as are necessary for the proper performance of the Subcontract Work, all of which shall be provided in full accord with and reasonably inferable from the Subcontract Documents. Notwithstanding the generality of the foregoing, with respect to Permanent Materials, Contractor shall contract for and pay for the Permanent Materials, and Subcontractor shall order and coordinate the delivery of the Permanent Materials consistent with the terms of Contractor's selected suppliers. Notwithstanding anything to the contrary herein, Subcontractor shall not be responsible for the quality of the Permanent Materials received from Contractor and the quality of the Permanent Materials received from Contractor shall be excluded from all warranties by Subcontractor.

2.3 SUBCONTRACTORS. Subcontractor shall provide Contractor a list of its proposed subcontractors and suppliers and obtain approval of same to extent required by the Prime Agreement.

2.4 INCONSISTENCIES, OMISSIONS, AND INCREASED QUANTITIES IN THE ISSUED FOR CONSTRUCTION DRAWINGS. Subcontractor shall examine and compare the drawings, specifications, other Subcontract Documents, the final issued for construction drawings and information furnished by Contractor relative to the Subcontract Work (collectively, the "Design Documents"). Should Subcontractor discover any errors, inconsistencies, or omissions in the issued for construction Subcontract Documents or changes in the quantities of materials compared to the final Design Documents provided to Subcontractor prior execution of this Subcontract Agreement, Subcontractor shall promptly report such discoveries to Contractor in writing. Following receipt of written notice, Contractor shall promptly instruct Subcontractor as to the measures to be taken, and Subcontractor shall comply with Contractor's instructions. Subcontractor shall be entitled to additional costs and time because of clarifications or instructions arising out of Subcontractor's reports described in this section, but only to the extent Contractor is provided additional costs or time by Owner under the Prime Agreement for the Subcontract Work. Nothing in this section shall relieve Subcontractor of responsibility for its own errors, inconsistencies, and omissions.

2.5 SUBCONTRACT WORKSITE VISITATION. Before commencing the Subcontract Work, Subcontractor shall examine and compare the Subcontract Documents pertaining to its Work, relevant field measurements made by Subcontractor or shared by Contractor, and any visible conditions at the Subcontract Worksite affecting the Subcontract Work. If Subcontractor discover any errors, omissions, or inconsistencies in the Subcontract Documents or between its Subcontract Worksite observations and the Subcontract Documents, such discrepancies shall be promptly reported to Contractor as provided in Section 2.4.

2.6 NOT USED.

2.7 COMMUNICATIONS. Except as otherwise provided in the Subcontract Documents or for emergencies, Contractor shall direct communications to Owner.

2.8 SUBMITTALS.

2.8.1 Submittals shall be submitted in electronic form if Submittals are required. Subcontractor shall be responsible to Contractor for the accuracy and conformity of its submittals to the Subcontract Documents. Subcontractor shall prepare and deliver its submittals to Contractor in a manner consistent with the CPM Schedule and in such time and sequence so as not to delay Contractor or others in the performance of the Work. Subcontractor's submittals shall identify in writing for each submittal all changes, deviations, or substitutions from the requirements of the Subcontract

Documents. The approval of any Subcontractor submittal shall not be deemed to authorize changes, deviations, or substitutions in the requirements of the Subcontract Documents unless express written approval is obtained from Contractor and Owner authorizing such change, deviation, or substitution. Such approval shall be promptly memorialized in a Subcontract Change Order within seven (7) Days following approval by Contractor. If the Subcontract Documents do not contain submittal requirements pertaining to the Subcontract Work, Subcontractor agrees upon request to submit in a timely fashion to Contractor for approval any shop drawings, samples, product data, manufacturers' literature, or similar submittals as may reasonably be required by Contractor or Owner.

2.8.2 Contractor, Design Professional, and Owner are entitled to rely on the adequacy, accuracy, and completeness of any professional certifications required by the Subcontract Documents concerning the performance criteria of systems, equipment, or materials, including all relevant calculations and any governing performance requirements.

2.8.3 Subcontractor is entitled to rely on the adequacy, accuracy, and completeness of any professional certifications provided by Contractor or its designers and/or engineers concerning the performance criteria of systems, equipment, or materials, including all relevant calculations and any governing performance requirements.

2.9 COORDINATION. Subcontractor shall: (a) cooperate with Contractor and others whose work may interface with the Subcontract Work, (b) specifically note and immediately advise Contractor of any such interface with the Subcontract Work, and (c) participate in preparing coordination drawings and work schedules in congested areas.

2.10    SUBCONTRACTOR'S REPRESENTATIVE/KEY PERSONNEL. Subcontractor's authorized representatives are Joseph Hoffmann, Project Manager (off-site), and Jason Hall, Erection Superintendent (on-site). Each person shall possess full authority to receive and act upon instructions, orders, or directions.  These persons shall be approved by Owner, deemed Key Personnel under the Prime Agreement, and will be dedicated to the Project for the duration of the Subcontract Work. If Subcontractor desires to change its representatives, or the representatives' authority, Subcontractor shall immediately notify Contractor in writing and obtain Contractor's approval which approval will not be unreasonably withheld but shall be contingent upon Contractor receiving Owner's approval under the Prime Agreement.

2.11    TESTS AND INSPECTIONS. Subcontractor shall schedule and cooperate with Contractor's performance of all required tests, approvals, and inspections of the Subcontract Work at appropriate times so as not to delay the progress of the Work or other work related to the Project and consistent with the Prime Agreement. Subcontractor shall give reasonable prior written notice to Contractor of the need for scheduled tests and inspections so Contractor can perform the tests and inspections. In addition to the foregoing, Subcontractor shall give all notices required by and consistent with the Prime Agreement.

2.12    WARRANTIES. Subcontractor hereby provides the warranties of the Subcontract Work to Contractor as Contractor warrants to Owner in the Prime Agreement for the Subcontract Work. In addition to the foregoing, Subcontractor warrants that all materials and equipment that it provides (not including Contractor-provided materials and equipment) shall be new unless otherwise agreed to in writing by Contractor and Owner, of good quality, in conformance with the Subcontract Documents. Subcontractor further warrants that the Subcontract Work shall be free from defects in workmanship and free from defects in materials provided by Subcontractor, and fit for use for the intended function. Upon request by Contractor, Subcontractor shall furnish satisfactory evidence of the quality and type of materials and equipment furnished by Subcontractor. Subcontractor further warrants that it will

perform the Subcontract Work in accordance with good business practices associated with constructing facilities similar to the Project and the Subcontract Work shall meet the requirements of the Subcontract Documents.

2.13     CLEANUP. Subcontractor shall at all times during its performance of the Subcontract Work keep the Subcontract Worksite clean and free from debris resulting from the Subcontract Work. Before discontinuing the Subcontract Work in an area, Subcontractor shall clean the area and remove all of its rubbish and its construction equipment, tools, machinery, waste, and surplus materials. Surplus Permanent Materials shall be returned to Contractor or disposed of as instructed by Contractor. Subcontractor shall make provisions to minimize and confine dust and debris resulting from its construction activities. Subcontractor shall not be held responsible for unclean conditions caused by others. If Subcontractor fails to commence compliance with cleanup duties within two (2) Business Days after written notification from Contractor of non-compliance, Contractor may implement appropriate cleanup measures without further notice and shall deduct the reasonable costs from any amounts due or to become due Subcontractor in the next payment period.

2.14     SAFETY PROGRAMS. Subcontractor is required to perform the Subcontract Work in a safe and reasonable manner. Subcontractor shall prevent against injury, loss, or damage to persons or property by taking reasonable steps to protect: (a) employees and other persons at the Subcontract Worksite; (b) materials and equipment stored on or off the Subcontract Worksite for performing the Subcontract Work; and (c) all property and structures located at the Subcontract Worksite and adjacent.

2.14.1     Subcontractor shall give all required notices and comply with all applicable rules, regulations, orders, and other lawful requirements established to prevent injury, loss, or damage to persons or property.

2.14.2     Subcontractor shall implement appropriate safety programs pertaining to the Subcontract Work and the Project, including establishing safety rules, posting appropriate warnings and notices, erecting safety barriers, and establishing proper notice procedures to protect persons and property at the Subcontract Worksite and adjacent to the Subcontract Worksite from injury, loss, or damage, each in accordance with the Subcontract Documents.

2.14.3     Subcontractor shall exercise care in carrying out any of the Subcontract Work which involves dangerous methods of construction or hazardous procedures, materials, or equipment. Subcontractor shall use properly qualified individuals or entities to carry out the Subcontract Work in a safe and reasonable manner so as to reduce the risk of bodily injury or property damage.

2.14.4     Damage or loss not insured under property insurance and to the extent caused by the negligent or intentionally wrongful acts or omissions of Subcontractor, or anyone for whose acts Subcontractor may be liable, shall be promptly remedied by Subcontractor. Damage or loss to the extent caused by the negligent or intentionally wrongful acts or omissions of Contractor, or anyone for whose acts Contractor may be liable, shall be promptly remedied by Contractor.

2.14.5     Subcontractor is required to designate an individual at the Subcontract Worksite in the employ of Subcontractor who shall act as Subcontractor's designated safety representative with a duty to prevent accidents. Unless otherwise identified by Subcontractor in writing to Contractor, the designated safety representative shall be Subcontractor's authorized representative designated in accordance with Section 2.10. Such safety representative shall attend Subcontract Worksite safety meetings as requested by Contractor.

2.14.6     Subcontractor has an affirmative duty not to overload the structures or conditions at the Subcontract Worksite and shall take reasonable steps not to load any part of the structures or

Subcontract Worksite so as to give rise to an unsafe condition or create an unreasonable risk of bodily injury or property damage. Subcontractor shall have the right to request, in writing, from Contractor loading information concerning the structures at the Subcontract Worksite.

2.14.7     Subcontractor shall give prompt written notice to Contractor of any accident involving bodily injury requiring a physician's care, any property damage exceeding five hundred dollars ($500.00) in value, or any failure that could have resulted in serious bodily injury, whether or not such an injury was sustained.

2.14.8     Prevention of accidents at the Subcontract Worksite is the responsibility of Subcontractor, and all other Subcontractors, persons, and entities at the Subcontract Worksite. Establishment of a safety program by Contractor shall not relieve Subcontractor or other parties of their safety responsibilities. Subcontractor shall establish its own safety program implementing safety measures, policies, and standards conforming to those required or recommended by governmental and quasi-governmental authorities having jurisdiction and by Contractor and Owner, including, but not limited to, a Traffic Control Plan, Safety Plan, and Security Plan, each in accordance with the requirements imposed by the Prime Agreement as it relates to the Subcontract Work and the Subcontract Worksite. Subcontractor shall comply with the reasonable recommendations of insurance companies having an interest in the Project and shall stop any part of the Subcontract Work that Contractor deems unsafe until corrective measures satisfactory to Contractor shall have been taken. Contractor's failure to stop Subcontractor's unsafe practices does not relieve Subcontractor of its responsibility. Subcontractor shall notify Contractor immediately following a reportable incident under applicable rules, regulations, orders, and other lawful requirements, and promptly confirm the notice in writing. A detailed written report shall be furnished if requested by Contractor. To the fullest extent permitted by Law, each Party to this Agreement shall indemnify the other Party from and against fines or penalties imposed as a result of safety violations, but only to the extent that such fines or penalties are caused by its failure to comply with applicable safety requirements.

2.15     PROTECTION OF THE WORK. Subcontractor shall take necessary precautions to properly protect the Subcontract Work and the work of others from damage caused by Subcontractor's operations. Should Subcontractor cause damage to the Subcontract Work or property of Owner, Contractor, or others, Subcontractor shall promptly remedy such damage to the satisfaction of Contractor, or Contractor may, after forty-eight (48) hours' written notice to Subcontractor, remedy the damage and deduct its cost from any amounts due or to become due Subcontractor, unless such costs are recovered under applicable property insurance.

2.16     EMERGENCIES. In an emergency affecting the safety of persons or property, Subcontractor shall act to prevent threatened damage, injury, or loss.

2.17     PERMITS AND TAXES. Subcontractor shall give timely notices required by Law pertaining to the Subcontract Work, and is responsible for all licenses and paying taxes on labor, incidentals and equipment rentals necessary to complete the Subcontract Work in accordance with the Subcontract Documents.  The permits listed on Exhibit H are the permits Contractor has identified are necessary for the Subcontract Work. Contractor shall be responsible for obtaining the permits on Exhibit H; provided that, Subcontractor agrees to provide in a timely manner the information needed by Contractor for any applications being prepared by Contractor.  Subcontractor shall be responsible for obtaining any permits required for its means and methods, other than the FAA permit for Subcontractor's crane, which shall be obtained by Contractor after Subcontractor advises Contractor of the model crane that Subcontractor intends to utilize.

2.18    HAZARDOUS MATERIALS. Subcontractor shall have the same rights and obligations as Contractor does under the Prime Agreement or Law regarding hazardous materials, to the extent the hazardous materials are brought onto the Subcontract Worksite by Subcontractor.  Notwithstanding anything to the contrary herein, Subcontractor shall not be responsible for removal, disposal or remediating hazardous materials not brought onto the Subcontract Worksite by Subcontractor or its subcontractors or suppliers.  In the event that Subcontractor encounters hazardous materials other than contaminated ground water that may be safely and legally be discharged onto the ground through a standard sediment filter bag or excavated soils that may be safely and legally used for backfill, Subcontractor shall immediately give notice to Contractor and discontinue work in the affected area until such hazardous materials are removed, disposed, or remediated by Contractor.  Subcontractor shall not be required to execute any hazardous waste manifests.  Subcontractor shall not be required to excavate any area of the Site other than as specifically shown in the plans and specifications for its Subcontract Work as of the execution of this Subcontract, and Subcontractor shall not be required to accept any change orders requiring such excavation.  Contractor shall indemnify, defend and hold Subcontractor harmless for all losses, costs or damages resulting from the presence of hazardous materials on the Worksite not brought onto the Worksite by Subcontractor, or its subcontractors or suppliers, including, without limitation, all attorneys' fees, court costs, and litigation expenses.

2.19    SAFETY DATA SHEETS (SDS). Subcontractor shall submit to Contractor all SDS required by Law for materials or substances necessary for the performance of the Subcontract Work. SDS sheets obtained by Contractor from other Subcontractors or sources shall be made available to Subcontractor by Contractor.

2.20    LAYOUT RESPONSIBILITY AND LEVELS. Contractor shall establish principal axis lines of the structure and Subcontract Worksite, and benchmarks, and provide survey layout for the Subcontract Work.  Subcontractor shall be responsible for the conformance of the Subcontract Work to the Contractor's survey layout and for any loss or damage to Contractor or others by reason of Subcontractor's failure to conform to the survey layout or perform Subcontract Work correctly. Subcontractor shall exercise prudence so that the actual final conditions and details shall result in alignment of finish surfaces.

2.21    CORRECTION OF SUBCONTRACT WORK.

2.21.1    If the Design Professional or Contractor rejects the Subcontract Work or the Subcontract Work is not in conformance with the Subcontract Documents, Subcontractor shall promptly correct the Subcontract Work whether it had been installed, or completed. Subcontractor shall be responsible for the costs of correcting such Subcontract Work, any additional testing, inspections, and compensation for services and expenses made necessary by the defective Subcontract Work.

2.21.2    In addition to Subcontractor's obligations under this Agreement, Subcontractor agrees to promptly correct, after receipt of a written notice from Contractor, all Subcontract Work which proves to be defective in workmanship or defective in materials provided by Subcontractor within a period of two years after the Final Completion Date or for a longer period of time as may be required by warranties in the Prime Agreement. If Subcontractor fails to correct defective or nonconforming Subcontract Work within a reasonable time after receipt of notice from Contractor, but in any event within the period allowed under the Prime Agreement, Contractor may correct such Subcontract Work.

2.21.3    If Subcontractor's correction or removal of Subcontract Work destroys or damages other completed or partially completed work or existing buildings, Subcontractor shall be responsible for destroyed or damaged work correction costs.

2.21.4    If portions of Subcontract Work which do not conform with the requirements of the Subcontract Documents are neither corrected by Subcontractor nor accepted by Contractor, Subcontractor shall remove such Subcontract Work from the Project Worksite if so directed by Contractor.

2.22    MATERIALS OR EQUIPMENT; CONSTRUCTION AND STORAGE LOCATION. If the scope of the Subcontract Work includes installation of materials or equipment furnished by others, Subcontractor is responsible for exercising proper care in handling and installing such items. Prior to or during erection, Subcontractor shall examine the items provided and report to Contractor in writing any items it may discover that do not conform to requirements of the Subcontract Documents. Subcontractor shall not proceed to install nonconforming items without further instructions from Contractor. Loss or damage due to acts or omissions of Subcontractor shall, upon two (2) Business Days' written notice to Subcontractor, be deducted from any amounts due or to become due Subcontractor. Subcontractor shall confine construction activities and storage primarily to the Subcontract Worksite. Any offsite storage of materials dedicated to the Project requires Contractor's prior approval and such materials must be clearly marked for the Project and shall be owned by Owner upon payment for such material, regardless of location.

2.23    SUBSTITUTIONS. No substitutions shall be made in the Subcontract Work unless permitted in the Prime Agreement, and only upon Subcontractor first receiving written approval from Contractor and all approvals required under the Prime Agreement for substitutions.

2.24    WORK FOR OTHERS. Until final completion of the Subcontract Work, Subcontractor agrees not to perform any work directly for Owner or deal directly with Owner's representatives in connection with the Subcontract Work, unless otherwise approved in writing by Contractor.

2.25    COMPLIANCE WITH LAWS. Subcontractor agrees to comply with the Law at its own cost. Subcontractor shall be liable to Contractor and Owner for all loss, cost, and expense attributable to any acts or omissions by Subcontractor, its employees, subcontractors, suppliers, and agents resulting from the failure to comply with the Law, including any fines, penalties, or corrective measures. To the extent Contractor receives reimbursement or additional time from Owner under the Prime Agreement, the Subcontract Amount or CPM Schedule shall be equitably adjusted for Change in Law affecting the performance of the Subcontract Work.

2.26    CONFIDENTIALITY. To the extent the Prime Agreement provides for the confidentiality of any of Owner's or Contractor's proprietary or otherwise confidential information disclosed in connection with the performance of this Agreement, Subcontractor is equally bound by Owner's or Contractor's respective confidentiality requirements.

2.27    ROYALTIES, PATENTS, AND COPYRIGHTS. Subcontractor shall pay all royalties and license fees which may be due on the inclusion of any patented or copyrighted materials, methods, or systems selected by Subcontractor and incorporated in the Subcontract Work.


ARTICLE 3 CONTRACTOR'S RESPONSIBILITIES.

3.1 CONTRACTOR'S REPRESENTATIVE. Contractor's authorized representatives are Jay Rohleder and Tom Jenkins. Contractor's representatives shall be the only person Subcontractor shall look to for instructions, orders, or directions, except in an emergency. If Contractor changes its representatives, Contractor shall promptly notify Subcontractor in writing.

3.2 APPLICATION FOR PAYMENT. Upon request, Contractor shall give Subcontractor a copy of the most current Contractor application for payment reflecting the amounts approved or paid by Owner for the Subcontract Work performed to date.

3.3 STORAGE AREAS. Contractor shall allocate adequate storage areas, if available, for Subcontractor's materials and equipment during the course of the Subcontract Work.

3.4 TIMELY COMMUNICATIONS. Contractor shall transmit to Subcontractor, with reasonable promptness, all submittals, transmittals, and written approvals relative to the Subcontract Work. Unless otherwise specified in the Subcontract Documents, if communications are not through Subcontractor, Contractor shall inform Subcontractor of the communications Contractor has with Subcontractor's subcontractors and suppliers.

3.5 USE OF SUBCONTRACTOR'S EQUIPMENT. Contractor, its agents, employees, other Subcontractors, or suppliers shall use Subcontractor's equipment only with the express written permission of Subcontractor's designated representative and in accordance with Subcontractor's terms and conditions for such use.

## ARTICLE 4 CPM SCHEDULE.

4.1 TIME IS OF THE ESSENCE. Time is of the essence with regard to the obligations of the Subcontract Documents.

4.2 SCHEDULE. Subcontractor shall use every reasonable effort to manage the Subcontract Work (Exhibit A) to achieve Substantial Completion in accordance with the CPM Schedule and Subcontract Amount in Article 5.1. All subsequent changes and additional details concerning the CPM Schedule shall be submitted to Subcontractor promptly and reasonably in advance of the required performance. Contractor shall have the right to determine and, if necessary, make reasonable changes to the time, order, and priority in which the various portions of the Work shall be performed and all other matters relative to the Subcontract Work.

4.3 CLAIMS FOR DELAYS. Subcontractor shall give Contractor written notice of all claims within five (5) Business Days of Subcontractor's knowledge of the facts giving rise to the claim; provided that, only claims allowed under the Prime Agreement and claims allowed under Sections 1.1 and 2.4. Thereafter, Subcontractor shall submit written documentation of its claim, including appropriate supporting documentation, within thirty (30) Days after giving notice, unless the Parties agree upon a longer period of time. If such documentation is not received by Contractor within thirty (30) Days Contractor may send a notice providing for more time to submit the documentation and if it is not submitted within such time the failure shall be a waiver of its rights to claim a change. Contractor shall respond in writing denying or approving, in whole or in part, Subcontractor's claim no later than fifteen (15) Business Days after receipt of Subcontractor's documentation. Contractor's failure to respond shall be deemed a denial of Subcontractor's claim. All unresolved claims, disputes, and other matters in question between the Parties shall be resolved as provided for in Article 10. Notwithstanding any provision herein, the CPM Schedule and the Subcontract Amount will be equitably adjusted in a Subcontract Change Order only to the extent an adjustment is obtained by Contractor under the Prime Agreement relating thereto, except that such condition shall not apply for claims pursuant to Sections 1.1 and 2.4.

4.4 LIMITED MUTUAL WAIVER OF CONSEQUENTIAL DAMAGES. Except for any (a) liquidated damages that Owner is entitled to recover against Contractor under the Prime Agreement (which are limited as to Subcontractor as provided in Section 4.5), the Parties mutually waive all claims against

each other for consequential damages, including but not limited to, damages for loss of business, loss of financing, loss of profits not related to this Project, loss of bonding capacity, loss of reputation, or insolvency. Similarly, Subcontractor shall obtain in contracts with its Subcontractors mutual waivers of consequential damages that correspond to Subcontractor's waiver of consequential damages. The provisions of this subsection shall also apply to and survive this Agreement.

4.5 LIQUIDATED DAMAGES. If Liquidated Damages are assessed by Owner under Section 12.3 of the Prime Agreement, Subcontractor shall be assessed a share of the damages in proportion to Subcontractor's share of the responsibility for the causation of the delay to Substantial Completion (as defined in the Prime Agreement), not to exceed $5,000 per calendar day; provided, however, such damages shall only be assessed if Subcontractor fails to perform the Subcontract Work in accordance with Article 4.2. The amount of such assessment shall not exceed the amount assessed against Contractor.


ARTICLE 5 SUBCONTRACT AMOUNT.

5.1 As full compensation for performance of this Agreement, Contractor agrees to pay Subcontractor for the satisfactory performance of the Subcontract Work the fixed-price of twelve million, nine hundred twenty nine thousand and five hundred dollars ($12,929,500.00) (the "Subcontract Amount").

5.2 In the event Contractor receives an early completion payment pursuant to Section 12.3.3 of the Prime Agreement and Subcontractor achieved Subcontract Substantial Completion on or before the Subcontract Substantial Completion Date, Contractor will pay to Subcontractor within thirty (30) days of receiving the early completion payment (the "Early Completion Bonus") from Owner an amount equal to the product of the Early Completion Bonus Contractor received multiplied by a fraction the numerator of which is the Subcontract Amount and the denominator is Cost of the Work. Nothing herein entitles Subcontractor to the right to receive an early completion payment if Contractor does not receive the early completion payment from Owner regardless of the reason Contractor does not receive such payment.


ARTICLE 6 CHANGES.

6.1 SUBCONTRACT CHANGE ORDERS. Subcontractor may request or Contractor may order changes in the Subcontract Work or the timing or sequencing of the Subcontract Work. A change in the Subcontract Work shall be formalized in a Subcontract Change Order and processed in accordance with this article.  For changes in the Subcontract Work as contemplated in Section 1.1.1, 1.1.2, 1.1.3, 1.1.4, 1.1.6 or 1.1.7, the Parties shall negotiate in good faith an appropriate adjustment to the Subcontract Amount, if applicable or the CPM Schedule, and shall conclude these negotiations as expeditiously as possible.  For changes in the Subcontract Work as contemplated in Section 1.1.5, appropriate adjustment to the Subcontract Amount, if applicable, or the CPM Schedule, if applicable, shall be included in a Subcontract Change Order as stipulated in Exhibit A.  Notwithstanding anything herein, Subcontract Change Orders will be approved only to the extent the change is approved by the Owner under the Prime Agreement or to the extent allowed under Sections 1.1 and 2.4.

6.2 CHANGE DIRECTIVES. Contractor may issue a written Interim Directive directing Subcontractor to proceed with changes in the Subcontract Work. If such Interim Directive is issued as a result of Owner's issuance of a Change Directive, then the applicable provisions of the Prime Agreement shall govern. Otherwise, Subcontractor shall separately submit its costs for the resulting change consistent with Section 1.1.1, 1.1.2, 1.1.3, 1.1.4, 1.1.6 or 1.1.7, beginning with its next regularly scheduled application for payment submitted after the issuance of the Interim Directive. If there is a cost dispute, the payment

and resolution shall be determined pursuant to the Prime Agreement. Undisputed amounts may be included in applications for payment and shall be paid in accordance with the Subcontract Documents.

6.3  ADJUSTMENTS IN SUBCONTRACT AMOUNT. An adjustment in the Subcontract Amount resulting from a Subcontract Change Order shall be determined by one of the following methods:

6.3.1  mutual acceptance of an itemized lump sum;

6.3.2  unit prices as indicated in the Subcontract Documents or as subsequently agreed to by the Parties; or

6.3.3  costs as determined in the Subcontract Documents or in a manner otherwise acceptable to the Parties, and a mutually acceptable fixed or percentage fee.

6.4  SUBSTANTIATION OF ADJUSTMENT. If Subcontractor does not respond promptly or disputes the method of adjustment, the method and the adjustment shall be determined by Contractor on the basis of reasonable expenditures and savings of those performing the Work attributable to the change, including, in the case of an increase in the Subcontract Amount, an allowance for overhead and profit of the percentage provided in Section 9.6 of the Prime Agreement. Subcontractor shall maintain for Contractor's review and approval an appropriately itemized and substantiated accounting of the following items attributable to the Subcontract Change Order:

6.4.1  labor costs, including Social Security, health, welfare, retirement, and other fringe benefits as normally required, and state workers' compensation insurance;

6.4.2  costs of materials, supplies, and equipment, whether incorporated in the Subcontract Work or consumed, including transportation costs;

6.4.3  costs of renting machinery and equipment other than hand tools;

6.4.4  costs of bond and insurance premiums, permit fees, and taxes attributable to the change; and

6.4.5  costs of additional supervision and field office personnel services necessitated by the change.

6.5  NO OBLIGATION TO PERFORM. Subcontractor shall not be obligated to perform changes in the Subcontract Work until a Subcontract Change Order has been executed or written instructions have been issued in accordance with this Article 6.

6.6  CONTRACTOR'S AUDIT RIGHTS.  The Subcontractor shall keep full and detailed records and accounts related to the actual costs of erection labor and crane rental that may be the subject of any Change Order under Article 1.1.5 and exercise such controls as may be necessary for proper financial management under this Subcontract and to substantiate all such costs incurred. The accounting and control systems shall be satisfactory to the Contractor. The Contractor or its representatives shall, during regular business hours and upon reasonable notice, be afforded access to, and shall be permitted to audit and copy, the Subcontractor's records and accounts related to such costs, including complete documentation supporting accounting entries, books, correspondence, instructions, drawings, receipts, subcontracts, Subcontractor's proposals, purchase orders, vouchers, memoranda and other data relating to this Subcontract.

<u>ARTICLE 7 PAYMENT.</u>

7.1 SCHEDULE OF VALUES. The schedule of values for the Subcontract Work is set forth on Exhibit D (the "Schedule of Values").

7.2 PROGRESS PAYMENTS.

    7.2.1     APPLICATIONS. Subcontractor's applications for payment shall be itemized and supported by substantiating data as required by the Subcontract Documents. Subcontractor's application for payment shall be notarized and if allowed under the Subcontract Documents may include a properly authorized Interim Directive. Subcontractor's application for payment for the Subcontract Work performed in the preceding payment period shall be submitted for approval by Contractor in accordance with the Schedule of Values no later than the 5th Day of each payment period for the Subcontract Work indicating work completed during the preceding payment period together with the Monthly Deliverables required under the Prime Agreement. Contractor shall incorporate the approved amount of Subcontractor's application for payment into Contractor's application for payment to Owner for the same period and submit it to Owner in a timely fashion. Contractor shall promptly notify Subcontractor of any changes in the amount requested on behalf of Subcontractor.

    7.2.2     RETAINAGE. The rate of retainage shall be five percent (5%).  Retainage under this Agreement will be released to Subcontractor within thirty (30) days of Contractor's receipt of the corresponding payment from Owner of such retained amount for Subcontract Work; provided that if the Subcontract Work has been completed consistent with the CPM Schedule, upon Subcontract Substantial Completion Contractor agrees to submit a request consistent with Section 10.1.7.1 of the Prime Agreement for release of retainage for the Subcontract Work.

    7.2.3     TIME OF PAYMENT. Progress payments to Subcontractor for satisfactory performance of the Subcontract Work shall be made no later than thirty (30) Days after receipt by Contractor of payment from Owner for the Subcontract Work.

    7.2.4     PAYMENTS WITHHELD. Contractor may reject a Subcontractor application for payment in whole or in part or withhold amounts from a previously approved Subcontractor application for payment, as may reasonably be necessary to protect Contractor from loss or damage for which Contractor may be liable and without incurring an obligation for late payment interest based upon:

        7.2.4.1 Subcontractor's repeated failure to perform the Subcontract Work as required by this Agreement;

        7.2.4.2 except as accepted by the insurer providing Builders Risk or other property insurance covering the Project, loss or damage arising out of or relating to this Agreement and caused by Subcontractor to Owner, Contractor, or others to whom Contractor may be liable;

        7.2.4.3 Subcontractor's failure to properly pay for either labor, materials, equipment, or supplies furnished in connection with the Subcontract Work, provided that Contractor is making payments to Subcontractor for that portion of the Subcontract Work in accordance with this Agreement;

        7.2.4.4 rejected or defective Subcontract Work which has not been corrected in a timely fashion;

        7.2.4.5 reasonable evidence of delay in performance of the Subcontract Work such that the Subcontract Work will not be completed within the Subcontract Time, and that the unpaid

balance of the Subcontract Amount is not sufficient to offset the liquidated damages or actual damages that may be sustained by Contractor as a result of the anticipated delay caused by Subcontractor;

7.2.4.6   reasonable evidence demonstrating that the unpaid balance of the Subcontract Amount is insufficient to cover the cost to complete the Subcontract Work; and

7.2.4.7   uninsured third-party claims involving Subcontractor or reasonable evidence demonstrating that third-party claims are likely to be filed unless and until Subcontractor furnishes Contractor with adequate security in the form of a surety bond, letter of credit, or other collateral or commitment sufficient to discharge such claims if established.

No later than ten (10) Days after receipt of an application for payment, Contractor shall give written notice to Subcontractor, at the time of disapproving or nullifying all or part of an application for payment, stating its specific reasons for such disapproval or nullification, and the remedial actions to be taken by Subcontractor in order to receive payment. When the above reasons for disapproving or nullifying an application for payment are removed, payment will be promptly made for the amount previously withheld.

7.2.5       SUBSTANTIAL COMPLETION.

7.2.5.1   Upon Subcontract Substantial Completion, Contractor shall assume responsibility for security and protection of the Subcontract Work pending the achievement of Substantial Completion of the Project.

7.2.5.2   The warranty period applicable to the Subcontract Work shall commence upon the achievement of Subcontract Substantial Completion and continue until the end of the warranty period provided under the terms of the Prime Agreement.

## 7.3 FINAL PAYMENT.

7.3.1   APPLICATION. Upon acceptance of the Subcontract Work by Owner and Contractor and receipt from Subcontractor of evidence of fulfillment of Subcontractor's obligations in accordance with the Subcontract Documents and the subsection below, Contractor shall incorporate Subcontractor's application for final payment into Contractor's next application for payment to Owner without delay, or notify Subcontractor if there is a delay and the reasons for the delay.

7.3.2   REQUIREMENTS. Before Contractor shall be required to incorporate Subcontractor's application for final payment into Contractor's next application for payment, Subcontractor shall submit to Contractor:

(a) An affidavit that all payrolls, bills for materials and equipment, and other indebtedness connected with the Subcontract Work have been paid, satisfied, or are to be paid with the proceeds of final payment, so as not to encumber Owner's property, Contractor, or Contractor's surety;

(b) As-built drawings, manuals, copies of warranties, startup and testing, and all close-out documents and satisfaction of close-out procedures if required by the Subcontract Documents.

(c) Release of any liens, conditioned on final payment being received, and in such form as may be required by the Subcontract Documents;

(d) Consent of surety to final payment, if required;

(e) A report of any outstanding known and unreported accidents or injuries experienced by Subcontractor at the Subcontract Worksite;

(f) Other data, if required, such as receipts and releases.

7.3.3    TIME OF PAYMENT. Final payment of the balance due of the Subcontract Amount shall be made to Subcontractor within thirty (30) Days after receipt by Contractor of final payment from Owner for such Subcontract Work.

7.3.4    WAIVER OF CLAIMS. Final payment shall constitute a waiver of all claims by Subcontractor relating to payment for the Subcontract Work, but shall in no way relieve Subcontractor of liability for the obligations, or for faulty or defective work or services discovered after final payment, nor relieve Contractor for claims made in writing by Subcontractor as required by the Subcontract Documents before its application for final payment as unsettled at the time of such payment.

7.4    CONTINUING OBLIGATIONS. Provided Contractor is making payments in accordance with this Agreement, Subcontractor shall reimburse Contractor for costs and expenses for any claim, obligation, or lien asserted before or after final payment is made that arises from the performance of the Subcontract Work. Subcontractor shall reimburse Contractor for costs and expenses including attorneys' fees and costs and expenses incurred by Contractor in satisfying, discharging, or defending against any such claims, obligation, or lien, including any action brought or judgment recovered.

7.5    PAYMENT USE RESTRICTION. Payments received by Subcontractor shall be used to satisfy the indebtedness owed by Subcontractor to any person furnishing labor or materials, or both, for use in performing the Subcontract Work through the most current period applicable to progress payments received from Contractor before it is used for any other purpose. This applies to this Agreement only, and is not for the benefit of third parties. Moreover, this section does not restrict commingling funds nor require separate accounts for deposits.

7.6    PAYMENT VERIFICATION. If Contractor has reason to believe that Subcontractor is not complying with payment terms in this Agreement, Contractor may contact Subcontractor's subcontractors and suppliers to ascertain whether they are being paid by Subcontractor in accordance with this Agreement.

7.7    PARTIAL LIEN WAIVERS AND AFFIDAVITS. As a prerequisite for payments, Subcontractor shall provide, in a form satisfactory to Owner and Contractor and consistent with the Prime Agreement, partial lien and claim waivers in the amount of the application for payment and affidavits covering its Subcontractors and suppliers for completed Subcontract Work. Such waivers shall be conditional upon payment. In no event shall Subcontractor be required to provide an unconditional waiver of lien or claim, before receiving payment or in an amount in excess of what it has been paid.

7.8    SUBCONTRACTOR PAYMENT FAILURE. Upon payment by Contractor, Subcontractor shall promptly pay its Subcontractors and suppliers the amounts to which they are entitled. If Contractor has reason to believe that labor, material, or other obligations incurred in the performance of the Subcontract Work are not being paid, Contractor may give written notice of a potential claim or lien to Subcontractor and may take any steps deemed necessary to assure that progress payments are utilized to pay such obligations, including but not limited to the issuance of joint checks. If upon receipt of notice, Subcontractor does not (a) supply evidence to the satisfaction of Contractor that payment owed has been paid; or (b) post a bond indemnifying Owner, Contractor, Contractor's surety, if any, and the

premises from a claim or lien, Contractor shall have the right to withhold from any payments due or to become due to Subcontractor a reasonable amount to protect Contractor from any and all loss, damage, or expense including attorneys' fees that may arise out of or relate to any such claim or lien.

7.9 SUBCONTRACTOR ASSIGNMENT OF PAYMENTS. Subcontractor shall not assign any payment due or to become due under this Agreement, without the written consent of Contractor.

7.10    PAYMENT NOT ACCEPTANCE. Payment to Subcontractor does not constitute or imply acceptance of any portion of the Subcontract Work.

7.11    TANGIBLE NET WORTH CRITERIA. If requested by Contractor, Subcontractor shall provide financial information to Contractor to support the Tangible Net Worth Criteria under the Prime Agreement, including quarterly financial information.

## ARTICLE 8 INDEMNITY, INSURANCE, BONDS, AND GUARANTY

8.1 INDEMNITY.

8.1.1    SUBCONTRACTOR'S INDEMNITY. To the fullest extent permitted by law, Subcontractor shall indemnify, defend, and hold harmless Contractor, Design Professional, Owner, and their respective directors, employees, officers, managers, members, shareholders, agents, contractors, and affiliates (the "Indemnitees") under the same conditions as Contractor provides an indemnification pursuant to Section 14.9.1 of the Prime Agreement, but only for such portion of loss or damages incurred by Indemnitees as is caused by Subcontractor's negligence, omission, or breach of this Subcontract. Indemnification claims shall be administered in accordance with the terms of the Prime Agreement.

8.1.2    CONTRACTOR'S INDEMNITY.  To the fullest extent permitted by law, Contractor shall indemnify, defend, and hold harmless Subcontractor, and its directors, employees, officers, managers, members, shareholders, agents, contractors, and affiliates (the "Subcontractor Indemnitees") under the same conditions as Owner provides an indemnification pursuant to Section 14.9.4 of the Prime Agreement.  Indemnification claims shall be administered in accordance with the terms of the Prime Agreement.

8.1.3    NO LIMITATION ON LIABILITY. In any claim against the Indemnitees by any employee of Subcontractor, anyone directly or indirectly employed by Subcontractor or anyone for whose acts Subcontractor may be liable, the indemnification obligation shall not be limited in any way by any limitation on the amount or type of damages, compensation, or benefits payable by or for Subcontractor under workers' compensation acts, disability benefit acts or other employee benefit acts.

8.2 INSURANCE.

8.2.1    SUBCONTRACTOR'S INSURANCE. Before commencing the Subcontract Work, and as a condition precedent to payment, Subcontractor shall purchase and maintain insurance that will protect it from the claims arising out of its operations under this Agreement, whether the operations are by Subcontractor, or any of its consultants or Subcontractors or anyone directly or indirectly employed by any of them for whose acts Subcontractor may be liable.

8.2.2    MINIMUM INSURANCE. Subcontractor shall procure and maintain in force at all times insurance set forth in Exhibit E and shall ensure that Contractor and Owner are listed as loss payee

and/or additional insured with respect to all such insurance at all times and deliver insurance certificates and endorsements, as applicable, to that effect.

8.2.3    BUILDER'S RISK INSURANCE.  Contractor shall provide to Subcontractor a copy of the Builder's Risk policy of insurance for the Project procured by Contractor in which Subcontractor is an insured party.  Such Builder's Risk policy shall name Subcontractor as an additional insured and be endorsed to waive all rights of subrogation against Subcontractor.

## 8.3 BONDS.

8.3.1    Subcontractor shall provide to Contractor Subcontractor's payment and performance bond prior to the Subcontract Work commencing, consistent with the terms in Exhibit F

8.3.2    If Subcontractor shall fail to promptly provide any required bonds, Contractor may terminate this Agreement and enter into a subcontract for the balance of the Subcontract Work with another Subcontractor. All Contractor costs and expenses incurred by Contractor as a result of said termination shall be paid by Subcontractor.

## ARTICLE 9 SUSPENSION, NOTICE TO CURE, AND TERMINATION

## 9.1 FAILURE OF PERFORMANCE AND TERMINATION.

9.1.1    NOTICE TO CURE A DEFAULT. If Subcontractor persistently fails to supply enough qualified workers, proper materials, or equipment to maintain the CPM Schedule, or fails to make prompt payment to its workers, subcontractors, or suppliers, or disregards a Law or orders of any public authority having jurisdiction, failure of any of the conditions set forth in Section 14.1 of the Prime Agreement, or otherwise is guilty of a material breach of a provision of this Agreement, Subcontractor shall be deemed in default of this Agreement. If Subcontractor fails within three (3) Business Days after written notification to commence and continue satisfactory correction of the default with diligence and promptness, then Contractor shall give a second notice to Subcontractor and surety, if any, to correct the default within a two (2) Business Day period. If Subcontractor fails to promptly commence and continue satisfactory correction of the default following receipt of such second notice, Contractor without prejudice to any other rights or remedies, shall have the right to any or all of the following remedies:

9.1.1.1   supply workers, materials, equipment, and facilities as Contractor deems necessary for the completion of the Subcontract Work or any part which Subcontractor has failed to complete or perform after written notification, and charge Subcontractor costs and expenses, including reasonable overhead, profit, and attorneys' fees that are due or to become due. Subcontractor shall be liable for the payment of any amount by which such expense may exceed the unpaid balance of the Subcontract Amount. At Subcontractor's request, Contractor shall provide a detailed accounting of the costs to finish the Subcontract Work;

9.1.1.2   contract with one or more additional contractors to perform such part of the Subcontract Work as Contractor determines will provide the most expeditious completion of the Work, and charge the cost to Subcontractor as provided under the subsection above;

9.1.1.3   withhold any payments due or to become due Subcontractor pending corrective action in amounts sufficient to cover losses and compel performance to the extent required by and to the satisfaction of Contractor. In the event of an emergency affecting the safety of

persons or property, Contractor may proceed as above without notice, but Contractor shall give Subcontractor notice promptly after the fact as a precondition of cost recovery; or

9.1.1.4  terminate the Agreement by written notice.

9.1.2      USE OF SUBCONTRACTOR'S MATERIALS/SUPPLIES. If Contractor performs work under this article, either directly or through other subcontractors, Contractor or other subcontractors shall have the right to take and use any materials or supplies for which Contractor or other subcontractors have paid and located at the Subcontract Worksite for the purpose of completing any remaining Subcontract Work.

## 9.2 BANKRUPTCY.

9.2.1      TERMINATION ABSENT CURE. If Subcontractor files a petition under the Bankruptcy Code, this Agreement shall terminate if: (a) Subcontractor or Subcontractor's trustee rejects the Agreement, (b) a default has occurred, and Subcontractor is unable to give adequate assurance of required performance; or (c) Subcontractor is otherwise unable to comply with the requirements for assuming this Agreement under the applicable provisions of the Bankruptcy Code.

9.2.2      INTERIM REMEDIES. If Subcontractor is not performing in accordance with the CPM Schedule at the time a petition in bankruptcy is filed, or at any subsequent time, Contractor, while awaiting the decision of Subcontractor or its trustee to reject or to assume this Agreement and provide adequate assurance of its ability to perform, may avail itself of such remedies under this article as are reasonably necessary to maintain the CPM Schedule. Contractor may offset against any sums due or to become due Subcontractor all costs incurred in pursuing any of the remedies provided including, but not limited to, reasonable overhead, profit, and attorneys' fees. Subcontractor shall be liable for the payment of any amount by which costs incurred may exceed the unpaid balance of the Subcontract Amount.

## 9.3 SUSPENSION BY OWNER FOR CONVENIENCE. Should Owner suspend the Work or any part which includes the Subcontract Work for the convenience of Owner and such suspension is not due to any act or omission of Contractor, or any other person or entity for whose acts or omissions Contractor may be liable, Contractor shall notify Subcontractor in writing and, upon receiving notification, Subcontractor shall immediately suspend the Subcontract Work. To the extent provided for under the Prime Agreement and to the extent Contractor recovers such on Subcontractor's behalf, the Subcontract Amount and the Subcontract Time shall be equitably adjusted by Subcontractor Change Order for the cost and delay resulting from any such suspension. Contractor agrees to cooperate with Subcontractor, at Subcontractor's expense, in the prosecution of any Subcontractor claim arising out of an Owner suspension and to permit Subcontractor to prosecute the claim, in the name of Contractor, for the use and benefit of Subcontractor.

## 9.4 TERMINATION BY OWNER. Should Owner terminate its contract with Contractor or any part which includes the Subcontract Work, Contractor shall notify Subcontractor in writing within three (3) Business Days of the termination and, upon written notification, this Agreement shall be terminated and Subcontractor shall immediately stop the Subcontract Work, follow all of Contractor's instructions, and mitigate all costs. In the event of Owner termination, Contractor's liability to Subcontractor shall be limited to the extent of Contractor's recovery on Subcontractor's behalf under the Subcontract Documents. Contractor agrees to cooperate with Subcontractor, at Subcontractor's expense, in the prosecution of any Subcontractor claim arising out of Owner termination and to permit Subcontractor to prosecute the claim, in the name of Contractor, for the use and benefit of Subcontractor, or assign the claim to Subcontractor. If Owner terminates Contractor for cause, through no fault of Subcontractor,

Subcontractor shall be entitled to recover from Contractor its reasonable costs arising from the termination of this Agreement, including reasonable overhead and profit on Work not performed.

9.5 CONTINGENT ASSIGNMENT OF THIS AGREEMENT. Contractor's contingent assignment of this Agreement to Owner, as provided in the Prime Agreement, is effective when Owner has terminated the Prime Agreement for cause and has accepted the assignment by notifying Subcontractor in writing. This contingent assignment is subject to the prior rights of a surety that may be obligated under Contractor's bond, if any. Subcontractor consents to such assignment and agrees to be bound to the assignee by the terms of this Agreement, provided that the assignee fulfills the obligations of Contractor.

9.6 SUSPENSION BY CONTRACTOR. Contractor may order Subcontractor in writing to suspend all or any part of the Subcontract Work for such period of time as may be determined to be appropriate for the convenience of Contractor. Phased Work or interruptions of the Subcontract Work for short periods of time shall not be considered a suspension. Subcontractor, after receipt of Contractor's order, shall notify Contractor in writing in sufficient time to permit Contractor to provide timely notice to Owner in accordance with the Prime Agreement of the effect of such order upon the Subcontract Work. The Subcontract Amount or Subcontract Time shall be adjusted by Subcontract Change Order for any increase in the time or cost of performance of this Agreement caused by such suspension. No claim under this section shall be allowed for any costs incurred more than fourteen (14) Days before Subcontractor's notice to Contractor. Neither the Subcontract Amount nor the CPM Schedule shall be adjusted for any suspension, to the extent that performance would have been suspended, due in whole or in part to the fault or negligence of Subcontractor or by a cause for which Subcontractor would have been responsible. The Subcontract Amount shall not be adjusted for any suspension to the extent that performance would have been suspended by a cause for which Subcontractor would have been entitled only to a time extension under this Agreement.

9.7 WRONGFUL EXERCISE. If Contractor wrongfully exercises any option under this article, Contractor shall be liable to Subcontractor solely for the reasonable value of Subcontract Work performed by Subcontractor (in accordance with the schedule of values) before Contractor's wrongful action, including reasonable overhead and profit on the Subcontract Work performed, less prior payments made, together with reasonable overhead and profit on the Subcontract Work not executed, and other reasonable costs incurred by such action, including reasonable attorneys' fees.

9.8 TERMINATION BY SUBCONTRACTOR. If the Subcontract Work has been abandoned or suspended for an unreasonable period of time not due to the fault or neglect of Subcontractor, then Subcontractor may terminate this Agreement upon giving Contractor seven (7) Days' written notice. Upon such termination, Subcontractor shall be entitled to recover from Contractor payment for all Subcontract Work satisfactorily performed and payment for any Permanent Materials purchased by Subcontractor which have been incorporated into the Project but not yet paid for, including reasonable overhead, profit, and attorneys' fees related to termination, costs, and expenses.


ARTICLE 10 DISPUTE RESOLUTION.

10.1 DISPUTE RESOLUTION. Any dispute, claim or controversy arising out of or in connection with this Agreement, including any dispute regarding the existence, validity or termination of this Agreement (the "Dispute"), shall be resolved in accordance with the following procedures:

    (a)    Direct Negotiations. The Parties shall consult in good faith in an attempt to reach an amicable settlement in relation to the Dispute. The Party alleging the existence of a Dispute shall give to the other Party written notice setting out the particulars of the Dispute (the

"Notice of Dispute"). If the Dispute is not settled amicably between the Parties within thirty (30) calendar days from the receipt of the Notice of Dispute (or within such longer period of time as the Parties may mutually agree in writing), such Dispute shall be finally settled by arbitration.

(b)     <u>Arbitration</u>. (i) Any Dispute that is not amicably settled under Section 10.1(a) shall be finally resolved through arbitration under the Construction Industry Arbitration Rules of the American Arbitration Association (the "AAA") then in effect, including the Procedures for Large, Complex Construction Disputes, as applicable, except for Rule L-5(d), which shall have no application (the "Arbitration Rules").

(ii)     If the amount in dispute is less than or equal to $1,000,000.00, the Dispute shall be resolved by a single arbitrator, chosen by mutual agreement of the Parties to the Arbitration. If the amount in dispute exceeds $1,000,000.00, the Dispute shall be resolved by three (3) arbitrators (the "Arbitral Tribunal") selected in accordance with the Arbitration Rules.

(iii)     The Arbitral Tribunal shall resolve the Dispute in accordance with the laws of the State of Indiana.

(iv)     The place or seat of arbitration shall be Indianapolis, Indiana. The Parties may agree to hold hearings in another location. The arbitration shall be conducted in the English language.

(v)     The award issued by the Arbitral Tribunal (the "Award") shall be final and binding upon the Parties and shall be subject to appeal in accordance with applicable law and the applicable Arbitration Rules.

(vi)     The Parties irrevocably submit to the jurisdiction of any court with jurisdiction over the Parties or their assets for purposes of recognizing and enforcing the Award.

(vii)     The Parties shall have the right to seek the consolidation of arbitration proceedings and the joinder of parties to an arbitration proceeding

10.2     QUALIFIED TO ACT. The arbitrators selected as the Arbitral Tribunal shall have at least fifteen (15) years' experience in complex construction, engineering or toll facility disputes.

10.3 CONFIDENTIALITY. Save and except as may be necessary in the course of the enforcement of arbitration awards, the Arbitral Tribunal and all Persons participating therein shall be responsible for ensuring the confidentiality of each Party's proprietary and confidential information.

10.4 PROVISIONAL REMEDIES. No Party shall be precluded from initiating a proceeding in a court of competent jurisdiction for the purpose of obtaining any emergency, equitable or provisional remedy to protect its rights which may be necessary and which is not otherwise available under this Agreement, including temporary and preliminary injunctive relief and restraining orders. Venue for any provisional remedies action arising out of the Governing Documents shall lie in U.S. District Court for the Northern District of Indiana or the United States Court of Appeals for the Seventh Circuit.

10.5 CONTINUING PERFORMANCE. At all times during the Term, notwithstanding the existence of any Dispute, Contractor and Subcontractor shall continue to perform their respective obligations in a diligent manner and without delay in accordance with the provisions of this Agreement without

prejudice to the right to contest, dispute and challenge the relevant matter in accordance with the provisions of this Agreement.

10.6  PARTICIPATION IN OTHER PROCEEDINGS. Subcontractor agrees that at Owner's request, Subcontractor will allow itself to be joined as a participant in any arbitration or other proceeding that involves Owner, any of its officers, directors, employees or agents and any other participant in the Work. This provision is for the benefit of Owner and its officers, directors, employees and agents and not for the benefit of any other Party.

10.7  CLAIMS FOLLOWING TERMINATION. Notwithstanding anything contained in this Agreement, the dispute resolution procedure set forth in this Article 10 shall no longer apply to disputes between the Parties after the expiration of the warranty period or other termination of this Agreement which have not been resolved on a final and binding basis prior to such expiration or other termination and save as aforesaid, the Parties shall be entitled after the expiration of the EPC Contractor's warranty period or other termination of this Agreement to commence legal proceedings seeking any recourse available to it or them at law or in equity.

10.8  WAIVER OF LIEN RIGHTS. So long as Contractor is not in default under the terms of this Agreement, except to the extent prohibited by Law, Subcontractor hereby waives and relinquishes the right and ability to impose, file, attach or enact a lien against the Site, the Project or the Work.


ARTICLE 11 – GENERAL PROVISIONS.

11.1  HEADINGS. All section headings herein are for convenience of reference only and are not part of this Agreement, and no construction or inference shall be derived therefrom.

11.2  SURVIVAL. Termination of this Agreement for any reason whatsoever shall not affect any right or obligation of any party which is accrued or vested prior to such termination, and any provision of this Agreement relating to any such right or obligation shall be deemed to survive the termination of this Agreement.  The indemnities, confidentiality obligations, and insurance requirements provisions set forth herein shall survive termination or expiration of this Agreement, in addition to any other provisions which by their nature should, or by their express terms do, survive or extend beyond termination or expiration of this Agreement.

11.3  GOVERNING LAW. This Agreement shall be construed and governed in accordance with the laws of the Prime Agreement, without regard to conflict of law principles.

11.4  ENTIRE AGREEMENT AND AMENDMENTS. This Agreement, including the recitals hereto and the Exhibits referred to herein each of which is incorporated herein, constitutes the entire Agreement between the parties relating to the transaction described herein and supersedes any and all prior oral or written understandings. No amendment of any provision hereof shall be binding upon the parties, and neither party shall be deemed to have waived any provision or any remedy available to it unless such amendment or waiver is in writing and signed by a duly authorized officer of each party.

11.5  COUNTERPARTS; DELIVERY. This Agreement may be signed in counterparts and delivered via electronic mail which together will have the same effect as a single original copy signed by all of the parties.

[Signature Page Follows]

IN WITNESS WHEREOF, the parties hereto have subscribed their names and affixed their signatures on the date by their respective names to be effective as of the day and year first above written.

FIGG BRIDGE BUILDERS, LLC

Linda Figg
President/CEO/Manager
Date: 1/4/19

MCLEAN CONTRACTING COMPANY

By:  Michael Filipczak
Title:  President and CEO
Date:  1/4/19

Exhibit A:  The Subcontract Scope of Work
Exhibit B:  Subcontract Worksite
Exhibit C:  CPM Schedule
Exhibit D:  Schedule of Values
Exhibit E:  Insurance Provisions
Exhibit F:  Bond Provisions
Exhibit G:  Prime Agreement
Exhibit H:  Permits

EXHIBIT A

THE SUBCONTRACT SCOPE OF WORK

GENERAL

The Contractor, Figg Bridge Builders, LLC, is responsible for design and construction of a new two-lane, fixed span, precast concrete segmental toll bridge In East Chicago, Indiana (Figure 1). The new facility, the Cline Avenue Bridge (CAB), will carry State Road 912 (SR 912) over Riley Road, the Indiana Harbor Canal, several railroad tracks and Dickey Road along the same alignment as the previous structure, which was demolished in 2012.



Figure 1 – Location Map

The Subcontractor, McLean Contracting Company, will erect the precast concrete segmental superstructure for the new 6,236 feet long bridge (Figure 2). This consists of Spans 1 through 28 with lengths varying from 103 feet to 316 feet, and end Span 29 which is 26 feet long. There are 685 precast superstructure segments to be erected. Clearances over the Indiana Harbor Canal are 230 foot horizontal and 100 foot vertical. The erection work includes stressing and grouting the longitudinal post-tensioning. Certain items, such as precast segments, post-tensioning materials, erection towers, lifting frames and closure pour construction will be provided by the Contractor, as detailed below.



**Figure 2 – New Bridge Key Plan and Elevation**

## SUBCONTRACTOR RESPONSIBILITIES

Subcontractor will construct the items included in the project scope of work as described herein. The construction will be performed in accordance with the project documents including the project permits, plans, specifications, project special provisions, the Construction Quality Control Plan, and applicable portions of the INDOT Standard Construction Specifications. Construction of the project will only utilize plans, specifications, and erection procedures that have been Released For Construction (RFC) by the Contractor. Copies of the project documents are available on the project ftp site that Subcontractor will have access to.

Subcontractor will provide and be responsible for the following items:

- Safety of Subcontractor's work in accordance with the Subcontract Agreement
- Provide four (4) supervisory staff members with past experience for superstructure balanced cantilever erection, including all related living expenses for a ten (10) month period
- Moving superstructure erection towers (including disassemble, lowering, relocating, and reassembly), applying epoxy to the segment joints, lifting and installing (erecting) balanced cantilever segments that are delivered by Contractor to each span, and performing initial removal of epoxy squeezed from joints
- Participating in superstructure closure pour tasks that include: providing support crane assistance, installing forms with temporary closure beams, jacking apart cantilevers and removing temporary support works at closure pours

- Setting end span segments on abutment falsework to complete erection of Span 1
- Installing bearings, including moving from on-site storage to pier location, setting on the pier/abutment seat, making final adjustments, setting bearing offsets, and forming and grouting connections
- Provide cranes and related operators
- Managing subcontractors that provide the erection labor
- Installing, stressing and grouting longitudinal superstructure post-tensioning bars and tendons
- Installing post-tensioning anchorage protection per Special Provisions

Prior to starting construction work, a copy of Subcontractor's job-specific Health and Safety Manual to be utilized on the project will be provided to Contractor as part of the overall project Health and Safety Manual.

Quality control and quality assurance (QC/QA) during construction of the project will be performed by Contractor. Subcontractor will cooperate with the QC/QA process, including allowing reasonable time and access for quality sampling, testing, inspections and any corrections necessary.

## CONTRACTOR RESPONSIBILITIES

Contractor will provide and be responsible for the following items:

1. Precast segments, ready for installation
2. Delivery of precast segments to erection locations
3. Permanent materials suitable for incorporation into the project as follows:

   - Concrete for closure joints and expansion joint installation
   - Reinforcing steel (pre-bent) at closure and expansion joints
   - Expansion joints at ends and mid-span joint locations (5 joints total)
   - Mid-span expansion joint beams
   - Longitudinal post-tensioning materials
   - Post-tensioning tendon grout
   - Epoxy for segment joining
   - Bearings

   Materials for the work will be ordered by Contractor from suppliers pre-arranged by Contractor to provide the materials. Subcontractor will be responsible for coordinating material procurement with Contractor to ensure timely availability of needed materials.

4. Temporary support towers for segment erection

5.   General equipment for post-tensioning strand installation and grouting, including post-tensioning bar and multi-strand stressing jacks with pumps and calibrated pressure gages

6.   Alignment beams and forms for cast-in-place span closures

7.   Segment lifting frames / manipulator and stressing platforms

8.   General equipment to consist of manlifts, generators, air compressors, fork lifts and temporary lighting

9.   Preassembly of longitudinal tendons

10.  Sealing of segment joints at top deck if needed after spans have been erected

11.  Labor for the following superstructure closure pour tasks (With McLean support crane assistance as needed): pre-tying reinforcement cages, performing adjustments to cages after installation in the forms, placing and finishing the cast-in-place concrete pour

12.  Patching and finishing clean-up of segments as needed after erection

13.  Erection geometry control (erection geometry, monitoring and direction on pier table setting, direction on shimming, mid-span closure alignment and other corrective actions if needed)

14.  Maintenance of traffic at Riley Road

15.  Railroad flagging and insurance

16.  Construction Quality Control and Quality Assurance

17.  Cleanup and general housekeeping


## ADDITIONAL TERMS AND ASSUMPTIONS

A.   The labor crew workforce for erection and prestressing operations will be subcontracted and managed by Subcontractor.

B.   The budgeted labor crew for the first month of erection operations includes two (2) ironworker foremen, ten (10) ironworkers, three (3) laborers, two (2) crane operators and two (2) oilers.

C.   The budgeted labor crew for full erection production over the remaining projected eight (8) months after the initial month includes three (3) ironworker foremen, twenty (20) ironworkers, six (6) laborers, three (3) crane operators and three (3) oilers.

D.   Subcontractor shall use best efforts to obtain the lowest rates for the labor and cranes to be utilized in performing this Agreement.

E.   A change order will be executed at the end of each month to reconcile the actual erection labor and crane costs incurred by McLean that are less or more than the budgeted amounts shown in Attachment A to this Exhibit for the labor crews described above and the cranes listed in Attachment A. The amount of any Change Order increasing the total cost for that month shall not exceed ten (10) percent of the total monthly budget for that month as shown in Attachment 1 to this Exhibit, unless approved in writing by the

Contractor's Project Manager prior to Subcontractor incurring the expenditure for labor and/or equipment.

F.  A Change Order for any additional months of erection labor beyond the originally projected nine months (one month single heading plus eight dual heading) will be negotiated on a similar cost component basis to that shown in Attachment 1 to this Exhibit using the anticipated crew numbers and sizes for the additional services.

G.  The cost for any additional or reduced months of crane rental beyond the originally projected nine months (one month single heading plus eight dual heading) will be negotiated on a similar cost component basis to that shown in Attachment 1 to this Exhibit.

H.  If more than ten (10) months are needed for the four (4) supervisory staff members, additional services will be added by Change Order. The rate for such additional services for the four (4) staff will be based on the rate shown in Exhibit D, Schedule of Values, prorated for the number of days the staff are actually on-site for that month. Any change Orders for fewer than the four staff will be negotiated on a similar cost component basis to that used for rate for the four staff members.

## EXCLUSIONS

The following items are expressly excluded from this Scope of Work:

1.  Crane trestle materials

2.  Barge rental, if needed, for erection of the main span over the Harbor Canal

Attachment P to Exhibit A

**McLean**

12/17/2018

## Cline Avenue Bridge Project Segment Erection Cost Breakdown - Attachment "B" REV 2

**Item 20    Monthly Costs: Start Up and Single Heading Erection**

Duration =  1  Mo

| | Resource Description | Supplied By | Hrs / Mo | Ave Hrly Cost | Total Cost | MCC MU (10%) | Price/Mo | Months | Grand Total |
|---|---|---|---|---|---|---|---|---|---|
| LABOR | Ironworker Foreman | Risch | 500 | $ 106.25 | $ 53,125.00 | $ 5,312.50 | $ 58,437.50 | 1 | $ 58,437.50 |
| | Crane Operator | LaGrange | 500 | $ 172.25 | $ 86,125.00 | $ 8,612.50 | $ 94,737.50 | 1 | $ 94,737.50 |
| | Oiler / Fireman | LaGrange | 500 | $ 73.50 | $ 36,750.00 | $ 3,675.00 | $ 40,425.00 | 1 | $ 40,425.00 |
| | Ironworker | Risch | 2,450 | $ 99.10 | $ 242,795.00 | $ 24,279.50 | $ 267,074.50 | 1 | $ 267,074.50 |
| | Skilled Laborer | Mid States | 725 | $ 75.50 | $ 54,737.50 | $ 5,473.75 | $ 60,211.25 | 1 | $ 60,211.25 |
| EQUIPMENT | 100 Ton Crane | LaGrange | 250 | $ 98.50 | $ 24,625.00 | $ 2,462.50 | $ 27,087.50 | 1 | $ 27,087.50 |
| | 300 Ton Crane | LaGrange | 250 | $ 296.50 | $ 74,125.00 | $ 7,412.50 | $ 81,537.50 | 1 | $ 81,537.50 |
| | Crane Move In Est Cost | LaGrange | 1.00 | $ 52,500.00 | $ 52,500.00 | $ 5,250.00 | $ 57,750.00 | 1 | $ 57,750.00 |
| | 185 CFM Compressor | By Others | 0 | $ 11.00 | $ - | $ - | $ - | 1 | $ - |
| | 50 kW Generator | By Others | 0 | $ 26.50 | $ - | $ - | $ - | 1 | $ - |
| | 120 ft Man-lift | By Others | 0 | $ 87.00 | $ - | $ - | $ - | 1 | $ - |
| | Fork Lift - 15 Ton Capacity | By Others | 0 | $ 50.00 | $ - | $ - | $ - | 1 | $ - |
| | Small Tools / Consumables | Various | 4,675 | $ 5.00 | $ 23,375.00 | $ 2,337.50 | $ 25,712.50 | 1 | $ 25,712.50 |
| | | | | | | | Item Subtotal | $ | 712,973.25 |
| | | | | | | | Cost / Month | $ | 712,973.25 |
| | | | | | | | **Call** | $ | **713,000.00** |

**Item 30    Monthly Costs:  Additional Mob, Two Heading Erection, Demobilization**

Duration =  8  Mo

| | Resource Description | Supplied By | Hrs / Mo | Ave Hrly Cost | Total Cost | MCC MU (10%) | Price/Mo | Months | Grand Total |
|---|---|---|---|---|---|---|---|---|---|
| LABOR | Ironworker Foreman | Risch | 740 | $ 106.25 | $ 78,625.00 | $ 7,862.50 | $ 86,487.50 | 8 | $ 691,900.00 |
| | Crane Operator | LaGrange | 740 | $ 172.25 | $ 127,465.00 | $ 12,746.50 | $ 140,211.50 | 8 | $ 1,121,692.00 |
| | Oiler / Fireman | LaGrange | 740 | $ 73.50 | $ 54,390.00 | $ 5,439.00 | $ 59,829.00 | 8 | $ 478,632.00 |
| | Ironworker | Risch | 4,900 | $ 99.10 | $ 485,590.00 | $ 48,559.00 | $ 534,149.00 | 8 | $ 4,273,192.00 |
| | Skilled Laborer | Mid States | 1,450 | $ 75.50 | $ 109,475.00 | $ 10,947.50 | $ 120,422.50 | 8 | $ 963,380.00 |
| EQUIPMENT | 100 Ton Crane | LaGrange | 232 | $ 98.50 | $ 22,852.00 | $ 2,285.20 | $ 25,137.20 | 8 | $ 201,097.60 |
| | 300 Ton Crane | LaGrange | 465 | $ 296.50 | $ 137,872.50 | $ 13,787.25 | $ 151,659.75 | 8 | $ 1,213,278.00 |
| | Crane Move In-Out Est Cost | LaGrange | 1.00 | $ 154,000.00 | $ 154,000.00 | $ 15,400.00 | $ 169,400.00 | 1 | $ 169,400.00 |
| | 185 CFM Compressor | By Others | 0 | $ 11.00 | $ - | $ - | $ - | 8 | $ - |
| | 50 kW Generator | By Others | 0 | $ 26.50 | $ - | $ - | $ - | 8 | $ - |
| | 120 ft Man-lift | By Others | 0 | $ 87.00 | $ - | $ - | $ - | 8 | $ - |
| | Fork Lift - 15 Ton Capacity | By Others | 0 | $ 50.00 | $ - | $ - | $ - | 8 | $ - |
| | Small Tools / Consumables | Various | 8,570 | $ 5.00 | $ 42,850.00 | $ 4,285.00 | $ 47,135.00 | 8 | $ 377,080.00 |
| | | | | | | | Item Subtotal | $ | 9,489,651.60 |
| | | | | | | | Cost / Month | $ | 1,186,206.45 |
| | | | | | | | **Call** | $ | **1,190,000.00** |

### SUMMARY

| Line | Description | Qty | U/M | Unit Price | Total |
|---|---|---|---|---|---|
| 10 | Supervision supplied by McLean | 10 | Mo | $ 260,000.00 | $ 2,600,000.00 |
| 20 | Start Up and Single Heading Erection | 1 | Mo | $ 713,000.00 | $ 713,000.00 |
| 30 | Additional Mob, Two Heading Erection, Demobilization | 8 | Mo | $ 1,190,000.00 | $ 9,520,000.00 |
| | | | | | **$ 12,833,000.00** |

<u>EXHIBIT B</u>

<u>SUBCONTRACT WORKSITE</u>

The attached description of the worksite corresponds to the property owned by Cline Avenue Bridge, LLC. Except for site access through adjacent property and locations where easements for the permanent bridge exist, the Subcontract Work will be performed within this area.

# PROPERTIES

## CAB Property

A Part of the Southeast quarter of Section 11 and a part of the Southwest quarter of Section 12, Township 5 North, Range 4 East, Jackson County, Indiana and intended to be a more accurate and corrective surveyed description of that land described in Instrument #200704028 in the records of the Jackson County Recorder's Office, described as follows:

Commencing at an Iron Pipe at the Southwest corner of said Section 12; thence North 00 degrees 29 minutes 28 seconds East with the West line of the Southwest quarter of said Section 12, 1285.71 feet to a 5/8" rebar set with orange cap inscribed "Daniel S. Blann, PLS #20300053" on the Northerly Right of Way of Highway 50 and the Point of Beginning; thence with said Northerly right of way line along a curve to the right having a radius of 1954.86 feet an arc length of 66.26 feet and bearing a chord of North 49 degrees 35 minutes 06 seconds East, 66.25 feet to a right of way marker; thence North 49 degrees 18 minutes 23 seconds East with said Right of Way line, 156.45 feet to a 5/8" rebar with "J. Isaacs" cap: thence North 33 degrees 18 minutes 03 seconds West, 318.87 feet to a 5/8" rebar with "J. Isaacs" cap; thence South 73 degrees 28 minutes 25 seconds West, 158.66 feet to a found iron pin. in the Brownstown Honeytown Road; thence South 13 degrees 00 minutes 39 seconds West along said road, 185.22 feet to a mag nail set with washer with said inscription; thence South 04 degrees 18 minutes 21 seconds West along said road, 62.32 feet to a mag nail set with said washer; thence South 35 degrees 52 minutes 16 seconds East (passing through a 5/8" rebar set at 25.00 feet), 231.25 feet to a 5/8" Rebar set with said cap on the Northerly Right of Way of Highway 50; thence with said Right of Way line along a curve to the right having a radius of 1954.86 feet an arc length of 93.89 feet and bearing chord of North 47 degrees 14 minutes 17 seconds East, 93.88 feet to the Point of Beginning, containing 2.43 Acres, more or less, and subject to all rights of way, and easements of record.

## PARCEL SUMMARY COMPRISING TIF AREA

### Parcel 2 (see Parcel 17)
Parcel 2 is a duplicate of Parcel 17 and was acquired as Parcel 3 under Proj MM-850(22)

### Parcel 3
Right-of-way conveyed to the State of Indiana by Fothas Buildings Corporation, via Warranty Deed (with no Reversionary Rights) dated June 9, 1978.

| | |
|---|---|
| Parcel 3: 0.587 ac | Sta 87+00 |

### Parcel 4
Right-of-way conveyed to the State of Indiana by Inland Steel Company, via Warranty Deed (with no Reversionary Rights) dated July 15, 1980.

| | |
|---|---|
| Parcel 4: 0.063 ac | Sta 100+50 |
| Parcel 4A: 2.173 ac | Sta 120+00 |
| Parcel 4B: 16.906 ac | Sta 150+00 |

### Parcel 5
Right-of-way conveyed to the State of Indiana by Amsted Industries Incorporated, via Warranty Deed (with no Reversionary Rights) dated August 1, 1978.

| | |
|---|---|
| Parcel 6: 4.978 ac | Sta 130+00 |

### Parcel 6
Right-of-way conveyed to the State of Indiana by Youngstown Sheet and Tube Company, via Warranty Deed (with no Reversionary Rights) dated May 28, 1980.

| | |
|---|---|
| Parcel 6: 3.959 ac | Sta 160+00 |

### Parcel 7
Right-of-way conveyed to the State of Indiana by Inland Steel Company, by Warranty Deed (with no Reversionary Rights) dated July 3, 1984.

| | |
|---|---|
| Parcel 7: 0.114 ac | Sta 42+00 (Line S-1-E/Riley Road) |
| Parcel 7A: 0.020 ac | Sta 40+00 (Line S-1-E/Riley Road) |
| Parcel 7B: 3.843 ac | Sta 175+00 |

### Parcel 14
Easement for Road conveyed to the State of Indiana by the Department of the Army (Indiana Harbor Canal) via Easement for Road or Street dated March 10, 1978

| | |
|---|---|
| Parcel 14: 1.214 ac | Sta 139+50 |

### Parcel 15
Right-of-way conveyed to the State of Indiana by Amoco Oil Company, by Warranty Deed (with no Reversionary Rights) dated April 20, 1981.

| | |
|---|---|
| Parcel 15B: 0.578 ac | Sta 174+00 |

### Parcel 16

Right-of-way conveyed to the State of Indiana by Indiana Harbor Belt Railroad, via Agreed Finding and Judgment filed November 5, 1982.

| | |
|---|---|
| Parcel 16: 1.532 ac | Sta 159+00 |
| Parcel 16 Excess land: 0.637 ac | Sta 56+00 (Line S-1-E/Riley Road) |
| Parcel 16A: 1.350 ac | Sta 166+00 |
| Parcel 16B: 1.156 ac | Sta 165+00 |
| Parcel 16C: 0.124 ac | Sta 42+00 (Line S-1-E/Riley Road) |
| Parcel 16D: 0.352 ac | Sta 171+00 |
| Parcel 16E: 0.056 ac | Sta 169+00 |
| Parcel 16F: 0.074 ac | Sta 170+00 |

### Parcel 17

Right-of-way conveyed to the State of Indiana by Consolidated Rail Corporation, via Agreed Finding and Judgment filed January 4, 1982 (Cause C82-5345)

| | |
|---|---|
| Parcel 17: 1.894 ac | Sta 160+00 |
| Parcel 17 Excess Land: 0.247 ac | Sta 56+00 (Line S-1-E/Riley Road) |
| Parcel 17A: 0.057 ac | Sta 63+00 (Line S-1-E/Riley Road) |
| Parcel 17B: 0.546 ac | Sta 165+00 |
| Parcel 17C: 0.248 ac | Sta 172+00 |
| Parcel 17D: 0.073 ac | Sta 60+00 (Line S-1-E/Riley Road) |
| Parcel 17E: 0.012 ac | Sta 171+00 |

### Parcel 19

Right-of-way conveyed to the State of Indiana by Penn Central Corporation, via Agreed Finding and Judgment filed January 22, 1983 (Cause CP-82-366)

| | |
|---|---|
| Parcel 19: 2.050 ac | Sta 95+00 |
| Parcel 19A: 0.038 ac | Sta 100+00 |
| Parcel 19B: 0.866 ac | Sta 107+00 |
| Parcel 19B Excess Land: 1.017 ac | Sta 118+00 |

2 easements described for as Railroad R/W purpose

The Parties acknowledge that Parcel 7B contains real property that is not necessary to construct the New Bridge and should be retained by INDOT as public right of way. The Parties agree to use good faith efforts to mutually determine which portion of Parcel 7B will be retained by INDOT as public right of way on or before the Closing Date.



Bridge Abutment
86+50

Watling St

Michigan Ave

Dickey Road

Indiana Harbor Canal

Cline Ave

Dock St

Riley Road

Canal St

Canal St

Bridge Abutment
173+25

0   500'   1000'
SCALE: 1"=1000'

# RIGHT-OF-WAY EXHIBIT

AMERICAN
**STRUCTUREPOINT**
INC.

7260 SHADELAND STATION
INDIANAPOLIS, IN 46256-3957
TEL 317.547.5580   FAX 317.543.0270
www.structurepoint.com

DATE: 06.04.2012

DRAWN BY: NDH

JOB NO.   2011.01681

SHEET NO.
1
of
1

DESC. FILE: .

PLOT SCALE: 1:1   EDIT DATE: 6/4/12 – 12:30 PM   EDITED BY: NHARRIS   DRAWING FILE:

Exhibit B - 5

**Steel Structure as an Improvement to the INDOT Property**

A portion of the INDOT Property consisting of the Steel Structure to which INDOT has assigned the number 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.

<u>EXHIBIT C</u>

<u>CPM SCHEDULE</u>

<u>[See Attached]</u>

Exhibit C - 1



| Activity ID | Activity Name | Original Duration | Remaining Duration | Actual Duration | Activity % Complete | Start | Finish | BL1 Start | BL1 Finish | Actual Start | Actual Finish | Total Float |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Project Wide** | | | | | | | | | | | | |
| **Major Milestones / Mobilization** | | | | | | | | | | | | |
| A1000 | Notice to Proceed | 0 | 0 | 0 | 100% | 10-Jul-17A | | 10-Jul-17 | | 10-Jul-17 | | |
| A1111 | Mobilize Key FBB Site Staff / Equipment | 40 | 0 | 42 | 100% | 11-Jul-17A | 21-Aug-17A | 19-Aug-17 | 11-Jul-17 | 21-Aug-17 | | |
| A1112 | Subcontractor NTP (Kenny) | 0 | 0 | 0 | 100% | 05-Sep-17A | | 05-Sep-17 | | 05-Sep-17 | | |
| A4000 | All Columns & Caps Substantially Complete (Kenny) | 0 | 0 | 0 | 0% | | 14-Mar-19 | | 12-Dec-18 | | | 292 |
| M9000 | Bridge Construction Complete | 0 | 0 | 0 | 0% | | 07-Nov-19 | | 08-Nov-19 | | | 0 |
| M9900 | Initial Punchlist | 31 | 31 | 0 | 0% | 09-Dec-19 | 08-Jan-20 | 10-Dec-19 | 09-Jan-20 | | | 0 |
| M9910 | Substantial Completion / Open to Traffic | 0 | 0 | 0 | 0% | | 08-Jan-20 | | 09-Jan-20 | | | 0 |
| M9950 | Final Punchlist | 122 | 122 | 0 | 0% | 09-Jan-20 | 09-May-20 | 10-Jan-20 | 10-May-20 | | | 0 |
| M9999 | Project Complete | 0 | 0 | 0 | 0% | | 09-May-20 | | 10-May-20 | | | 0 |
| **Contract Milestones** | | | | | | | | | | | | |
| MS001 | Start Pier Construction / First Lift of Pier Concrete Poured | 0 | 0 | 0 | 100% | 29-Dec-17A | | 04-Jan-18 | | 29-Dec-17 | | |
| MS002 | Cast First Precast Superstructure Segment | 0 | 0 | 0 | 100% | 25-Jan-18A | | 16-Feb-18 | | 25-Jan-18 | | |
| MS003 | Start Superstructure Erection / First Pier Segments Set | 0 | 0 | 0 | 0% | 01-Mar-19 | | 15-Apr-19 | | | | 436 |
| MS004 | Complete Casting 50% of Pier Columns | 0 | 0 | 0 | 100% | 16-May-18/ | | 01-Jun-18 | | 16-May-18 | | |
| MS005 | Completion of Foundations / All Pier Footings Cast | 0 | 0 | 0 | 0% | 15-Jan-19 | | 17-Jul-18 | | | | 481 |
| MS006 | Complete Precasting 50% of Superstructure Segments (342) | 0 | 0 | 0 | 0% | 09-Jan-19 | | 01-Nov-18 | | | | 487 |
| MS007 | Begin New Overlay on Steel Bridge Deck / First Overlay | 0 | 0 | 0 | 0% | 03-Apr-19 | | 13-May-19 | | | | 403 |
| MS008 | Pier Construction Complete / All Pier Columns and Caps Cast | 0 | 0 | 0 | 0% | 01-Apr-19 | | 21-Nov-18 | | | | 405 |
| MS010 | Superstructure Erection Complete | 0 | 0 | 0 | 0% | 12-Sep-19* | | 08-Oct-19 | | | | 26 |
| **Non-EPC Decision Milestones** | | | | | | | | | | | | |
| MS101 | Steel Bridge Rehabilitation - Contract Award Deadline | 0 | 0 | 0 | 100% | 17-Aug-18A | | 23-Nov-18 | | 17-Aug-18 | | |
| MS102 | WestApp Roadway Modifications - Contract Award Deadline | 0 | 0 | 0 | 0% | 02-Apr-19* | | 02-Apr-19 | | | | 133 |
| MS103 | EastApp Roadway Modifications - Contract Award Deadline | 0 | 0 | 0 | 0% | 10-May-19* | | 10-May-19 | | | | 135 |
| MS104 | Electronic Toll Collection System - Contract Award Deadline | 0 | 0 | 0 | 0% | 31-May-18/ | | 01-Apr-19 | | 31-May-18 | | |
| MS105 | Access Ramps @ Indianapolis Blvd - Contract Award Deadline | 0 | 0 | 0 | 0% | 01-Jan-19* | | 26-Oct-18 | | | | 105 |
| **Winter Segment Erection Shutdown** | | | | | | | | | | | | |
| A2222 | PC Segment Erection Shutdown - Winter 2017/2018 | 120 | 0 | 119 | 100% | 01-Nov-18A | 28-Feb-18A | 30-Apr-18 | 01-Nov-17 | 28-Feb-18 | | |
| A3333 | PC Segment Erection Shutdown - Winter 2018/2019 | 120 | 90 | 30 | 25% | 01-Nov-18A | 28-Feb-19 | 01-Nov-18 | 28-Feb-19 | 01-Nov-18 | | |
| **Bridge Plans** | | | | | | | | | | | | |
| A1250 | Finalize Concrete Superstructure Outline | 20 | 0 | 37 | 100% | 10-Jul-17A | 15-Aug-17A | 10-Jul-17 | 04-Aug-17 | 10-Jul-17 | 15-Aug-17 | |
| A1252 | Final Design Drawings | 85 | 31 | 456 | 63.53% | 01-Sep-17A | 31-Dec-18 | 01-Sep-17 | 04-Jan-18 | 01-Sep-17 | | 164 |
| FC1100 | IFC Drawings - Piling | 60 | 0 | 60 | 100% | 01-Sep-17A | 07-Sep-17A | 01-Sep-17 | 30-Oct-17 | 01-Sep-17 | 07-Sep-17 | |
| FC1200 | IFC Drawings - Abutment 1 | 68 | 0 | 9 | 100% | 10-Sep-17A | 18-Sep-17A | 07-Nov-17 | 10-Sep-17 | 18-Sep-17 | | |
| FC1300 | IFC Drawings - Footings 2-10 | 82 | 0 | 82 | 100% | 10-Sep-17A | 29-Sep-17A | 21-Nov-17 | 10-Sep-17 | 29-Sep-17 | | |
| FC1400 | IFC Drawings - Piers 2-10 | 113 | 0 | 113 | 100% | 10-Jul-17A | 30-Oct-17A | 22-Dec-17 | 10-Jul-17 | 30-Oct-17 | | |
| FC1500 | IFC Drawings - Footings 11-16 | 141 | 0 | 159 | 100% | 10-Jul-17A | 01-Sep-17 | 19-Jan-18 | 10-Jul-17 | 15-Dec-17 | | |
| FC1600 | IFC Drawings - Piers 11-16 | 166 | 0 | 159 | 100% | 10-Jul-17A | 13-Feb-18 | 10-Jul-17 | 15-Dec-17 | | | |
| FC1800 | IFC Drawings - Pile Layout 19-29 | 83 | 0 | 165 | 100% | 22-Dec-17A | 30-Sep-17 | 10-Jul-17 | 22-Dec-17 | | | |
| FC2000 | IFC Drawings - Pier 19-23 Footings/Cols | 60 | 0 | 235 | 100% | 02-Mar-18A | 07-Sep-17 | 10-Jul-17 | 02-Mar-18 | | | |
| FC2100 | IFC Drawings - Pier 24-27 Footings/Cols | 60 | 0 | 249 | 100% | 16-Mar-18A | 07-Sep-17 | 10-Jul-17 | 16-Mar-18 | | | |
| FC2200 | IFC Drawings - Pier 17 & 18 Footings/Cols | 60 | 0 | 421 | 100% | 10-Jul-17A | 07-Sep-17 | 10-Jul-17 | 04-Sep-18 | | | |

Print Date/Time: 13-Dec-18 15:48    Data Date: 01-Dec-18

Cline Avenue Bridge - Contract Schedule - December 1, 2018 Data Date

1 of 15

Legend:
- Actual Work
- Remaining Work
- Critical Remaining Work
- ◆—◆ Milestone

**CLINE AVENUE BRIDGE CONSTRUCTION SCHEDULE NOVEMBER 2018 UPDATE**

FIGG BRIDGE BUILDERS



| Activity ID | Activity Name | Original Duration | Remaining Duration | Actual Duration | Activity % Complete | Start | Finish | BL1 Start | BL1 Finish | Actual Start | Actual Finish | Total Float |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IFC2300 | IFC Drawings - Pier 28 & 29 Straddle Bents | 60 | 0 | 445 | 100% | 10-Jul-17A | 28-Sep-18A | 10-Jul-17 | 07-Sep-17 | 10-Jul-17 | 28-Sep-18 | |
| **Construction Access** | | | | | | | | | | | | |
| A1005 | Site Security Setup (Barriers, Signage, Fencing) | 10 | 0 | 10 | 100% | 10-Jul-17A | 24-Jul-17A | 01-Sep-17 | 18-Sep-17 | 10-Jul-17 | 24-Jul-17 | |
| A1007 | Utility Relocations - NIPSCO (Casting Yard) | 42 | 0 | 160 | 100% | 10-Jul-17A | 30-Mar-18A | 01-Sep-17 | 06-Nov-17 | 10-Jul-17 | 30-Mar-18 | |
| A1170 | Prep/Submit Temporary Water Access Design and Permit | 20 | 0 | 19 | 100% | 23-Aug-17A | 29-Sep-17A | 01-Sep-17 | 29-Sep-17 | 23-Aug-17 | 20-Sep-17 | |
| A1175 | Review/Approve Temporary Water Access Design and Permit | 38 | 32 | 92 | 15.79% | 31-Aug-18A | 01-Jan-19 | 02-Apr-18 | 30-Aug-18 | 31-Aug-18 | | 135 |
| A1190 | Procure Temporary Water Access Material | 14 | 14 | 0 | 0% | 02-Jan-19 | 15-Jan-19 | 01-Aug-18 | 30-Jul-18 | | | 135 |
| A1200 | Install Temporary Erection Water Access @ Pier 17 | 10 | 10 | 0 | 0% | 17-Jan-19 | 01-Feb-19 | 31-Jul-18 | 21-Aug-18 | | | 83 |
| A1210 | Install Temporary Erection Water Access @ Pier 18 | 10 | 10 | 0 | 0% | 04-Feb-19 | 19-Feb-19 | 22-Aug-18 | 13-Sep-18 | | | 83 |
| A1600 | Sheeting Design/Procurement | 30 | 0 | 32 | 100% | 05-Sep-17A | 18-Oct-17A | 02-Oct-17 | 10-Nov-17 | 05-Sep-17 | 18-Oct-17 | |
| RR1000 | RR Right of Entry West | 40 | 0 | 119 | 100% | 05-Sep-17A | 02-Mar-18A | 12-Sep-17 | 10-Oct-17 | 05-Sep-17 | 02-Jan-18 | |
| RR1100 | RR Right of Entry East | 60 | 0 | 249 | 100% | 19-Jan-18A | 25-Sep-18A | 11-Jan-18 | 10-Mar-18 | 19-Jan-18 | 25-Sep-18 | |
| **Precast Yard** | | | | | | | | | | | | |
| **Major Milestones / Mobilization** | | | | | | | | | | | | |
| A1025 | Order / Fab / Deliver Segment Forms | 80 | 0 | 185 | 100% | 14-Sep-17A | 07-Jun-18A | 01-Sep-17 | 27-Dec-17 | 14-Sep-17 | 07-Jun-18 | |
| A1026 | Develop & Setup Precast Yard Building | 65 | 0 | 168 | 100% | 21-Aug-17A | 19-Apr-18A | 01-Sep-17 | 21-Aug-17 | 21-Aug-17 | 19-Apr-18 | |
| A1240 | Demob Precast Yard Operation | 20 | 20 | 0 | 0% | 03-Jul-19 | 29-Jul-19 | 05-Sep-19 | 02-Oct-19 | | | 123 |
| **Procurement / Assembly** | | | | | | | | | | | | |
| A1030 | Assemble Casting Bed #1 (Pier Segments) | 15 | 0 | 21 | 100% | 14-Dec-17A | 18-Jan-18A | 15-Dec-17 | 08-Jan-18 | 14-Dec-17 | 18-Jan-18 | |
| A1040 | Assemble Casting Bed #2 (Variable Depth Typical Segments) | 12 | 0 | 19 | 100% | 26-Mar-18A | 20-Apr-18A | 02-Apr-18 | 17-Apr-18 | 26-Mar-18 | 20-Apr-18 | |
| A1050 | Assemble Casting Bed #3 (Variable Depth Typical Segments) | 5 | 0 | 14 | 100% | 05-Apr-18A | 20-Apr-18A | 18-Apr-18 | 20-Apr-18 | 05-Apr-18 | 30-Apr-18 | |
| A1060 | Assemble Casting Bed #4 (Expansion Segments) | 13 | 0 | 35 | 100% | 20-Apr-18A | 08-Jun-18A | 23-Apr-18 | 09-May-18 | 20-Apr-18 | 08-Jun-18 | |
| **Pier Segment Casting** | | | | | | | | | | | | |
| A1070 | Pier 2 - Cast First Segment (Pier Segment) | 10 | 0 | 6 | 100% | 19-Jan-18A | 25-Jan-18A | 16-Jan-18 | 29-Jan-18 | 19-Jan-18 | 25-Jan-18 | |
| PC0020 | Pier 2 - Cast Second Pier Segment (1 EA) | 5 | 0 | 10 | 100% | 02-Feb-18A | 15-Feb-18A | 30-Apr-18 | 02-Feb-18 | 15-Feb-18 | | |
| PC0020B | Pier 2 - Precast Segment PS-2D (1 EA) | 4 | 0 | 5 | 100% | 24-Aug-18A | 30-Aug-18A | | | 24-Aug-18 | 30-Aug-18 | |
| PC0030 | Pier 3 - Cast Pier Segments (2 EA) | 8 | 0 | 7 | 100% | 21-Mar-18A | 30-Mar-18A | 26-Mar-18 | 04-Apr-18 | 21-Mar-18 | 30-Mar-18 | |
| PC0040 | Pier 4 - Cast Pier Segments (2 EA) | 8 | 0 | 7 | 100% | 09-Mar-18A | 20-Mar-18A | 16-Mar-18 | 26-Mar-18 | 09-Mar-18 | 20-Mar-18 | |
| PC0050 | Pier 5 - Cast Pier Segments (2 EA) | 8 | 0 | 3 | 100% | 05-Apr-18A | 10-Apr-18A | 12-Apr-18 | 11-Apr-18 | 05-Apr-18 | 10-Apr-18 | |
| PC0060 | Pier 6 - Cast Pier Segments (2 EA) | 8 | 0 | 4 | 100% | 25-Apr-18A | 01-May-18/ | 02-May-18 | 12-Apr-18 | 23-Apr-18 | 25-Apr-18 | 01-May-18 |
| PC0070 | Pier 7 - Cast Pier Segments (2 EA) | 8 | 0 | 7 | 100% | 02-May-18A | 11-May-18/ | 24-Apr-18 | 03-May-18 | 02-May-18 | 11-May-18 | |
| PC0080 | Pier 8 - Cast Pier Segments (2 EA) | 8 | 0 | 7 | 100% | 14-May-18A | 23-May-18/ | 04-May-18 | 15-May-18 | 14-May-18 | 23-May-18 | |
| PC0090 | Pier 9 - Cast Pier Segments (2 EA) | 8 | 0 | 6 | 100% | 24-May-18A | 02-Jun-18A | 16-May-18 | 25-May-18 | 24-May-18 | 02-Jun-18 | |
| PC0100 | Pier 10 - Cast Pier Segments (2 EA) | 8 | 0 | 13 | 100% | 19-Feb-18A | 05-Mar-18A | 05-Mar-18 | 14-Mar-18 | 19-Feb-18 | 08-Mar-18 | |
| PC0110 | Pier 11 - Cast Pier Segments (2 EA) | 8 | 0 | 8 | 100% | 04-Jun-18A | 13-Jun-18A | 29-May-18 | 07-Jun-18 | 04-Jun-18 | 15-Jun-18 | |
| PC0120 | Pier 12 - Cast Pier Segments (2 EA) | 8 | 0 | 7 | 100% | 16-Jun-18A | 27-Jun-18A | 06-Jun-18 | 18-Jun-18 | 18-Jun-18 | 27-Jun-18 | |
| PC0130 | Pier 13 - Cast Pier Segments (2 EA) | 8 | 0 | 6 | 100% | 28-Jun-18A | 17-Jul-18A | 19-Jun-18 | 28-Jun-18 | 28-Jun-18 | 07-Jul-18 | |
| PC0140 | Pier 14 - Cast Pier Segments (2 EA) | 8 | 0 | 7 | 100% | 09-Jul-18A | 17-Jul-18A | 02-Jul-18 | 12-Jul-18 | 09-Jul-18 | 17-Jul-18 | |
| PC0149 | Rework Pier Segment Machine for Tall Segments | 10 | 0 | 21 | 100% | 31-Aug-18A | 25-Sep-18A | | | 31-Aug-18 | 25-Sep-18 | |
| PC0150 | Pier 15 - Cast Pier Segments (2 EA) | 8 | 0 | 8 | 100% | 26-Sep-18A | 05-Oct-18A | 13-Jul-18 | 24-Jul-18 | 26-Sep-18 | 05-Oct-18 | |
| PC0160 | Pier 16 - Cast Pier Segments (2 EA) | 8 | 8 | 0 | 0% | 22-Jan-19 | 31-Jan-19 | 25-Jul-18 | 03-Aug-18 | | | 73 |
| PC0170 | Pier 17 - Cast Pier Segments (2 EA) | 8 | 0 | 9 | 100% | 01-Feb-19 | 11-Feb-19 | 06-Aug-18 | 15-Aug-18 | | | 91 |
| PC0180 | Pier 18 - Cast Pier Segments (2 EA) | 8 | 4 | 3 | 50% | 28-Nov-18A | 29-Nov-18A | 16-Aug-18 | 27-Aug-18 | 28-Nov-18 | | 27 |
| PC0190 | Pier 19 - Cast Pier Segments (2 EA) | 8 | 0 | 10 | 100% | 08-Oct-18A | 19-Oct-18A | 28-Aug-18 | 07-Sep-18 | 08-Oct-18 | 19-Oct-18 | |
| PC0200 | Pier 20 - Cast Pier Segments (2 EA) | 8 | 0 | 8 | 100% | 22-Oct-18A | 31-Oct-18A | 10-Sep-18 | 19-Sep-18 | 22-Oct-18 | 31-Oct-18 | |
| PC0210 | Pier 21 - Cast Pier Segments (2 EA) | 8 | 0 | 9 | 100% | 01-Nov-18A | 13-Nov-18A | 20-Sep-18 | 01-Oct-18 | 01-Nov-18 | 13-Nov-18 | |
| PC0220 | Pier 22 - Cast Pier Segments (2 EA) | 8 | 0 | 9 | 100% | 14-Nov-18A | 27-Nov-18A | 02-Oct-18 | 11-Oct-18 | 14-Nov-18 | 27-Nov-18 | |
| PC0230 | Pier 23 - Cast Pier Segments (2 EA) | 8 | 8 | 0 | 0% | 06-Dec-18 | 15-Dec-18 | 12-Oct-18 | 23-Oct-18 | | | 27 |

| Print Date/Time: 13-Dec-18 15:48 | | | Cline Avenue Bridge - Contract Schedule - December 1, 2018 Data Date | | | | | | | | | 3 of 15 |

| Activity ID | Activity Name | Original Duration | Remaining Duration | Actual Duration | Activity % Complete | Start | Finish | BL1 Start | BL1 Finish | Actual Start | Actual Finish | Total Float |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PC0240 | Pier 24 - Cast Pier Segments (2 EA) | 8 | 8 | 0 | 0% | 17-Dec-18 | 28-Dec-18 | 24-Oct-18 | 02-Nov-18 | | | 34 |
| PC0250 | Pier 25 - Cast Pier Segments (2 EA) | 8 | 8 | 0 | 0% | 02-Jan-19 | 11-Jan-19 | 05-Nov-18 | 14-Nov-18 | | | 42 |
| PC0260 | Pier 26 - Cast Pier Segments (2 EA) | 8 | 8 | 0 | 0% | 11-Jan-19 | 21-Jan-19 | 15-Nov-18 | 28-Nov-18 | | | 42 |
| PC0270 | Pier 27 - Cast Pier Segments (2 EA) | 8 | 0 | 15 | 100% | 18-Jul-18A | 04-Aug-18A | 29-Aug-18 | 10-Dec-18 | 18-Jul-18 | 04-Aug-18 | |
| PC0280 | Pier 28 - Cast Pier Segments (2 EA) | 8 | 0 | 6 | 100% | 06-Aug-18A | 13-Aug-18A | 11-Dec-18 | 20-Dec-18 | 06-Aug-18 | 13-Aug-18 | |
| PC0290 | Pier 29 - Cast Pier Segments (2 EA) | 8 | 0 | 8 | 100% | 14-Aug-18A | 23-Aug-18A | 07-Jan-19 | 14-Aug-18 | 23-Aug-18 | | |

**Cantilever Segment Casting**

| Activity ID | Activity Name | Original Duration | Remaining Duration | Actual Duration | Activity % Complete | Start | Finish | BL1 Start | BL1 Finish | Actual Start | Actual Finish | Total Float |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PC0020D | Pier 2 - Cast Downstation Cantilever Segments (10 EA) | 11 | 0 | 13 | 100% | 26-Jul-18A | 09-Aug-18A | 25-May-18 | 11-Jun-18 | 26-Jul-18 | 10-Aug-18 | |
| PC0020E | Pier 2 - Cast End Segments (3 EA) | 8 | 8 | 0 | 0% | 03-Jan-19 | 11-Jan-19 | 11-Jun-18 | 25-May-18 | | | 24 |
| PC0020U | Pier 2 - Cast Upstation Cantilever Segments (10 EA) | 11 | 0 | 17 | 100% | 22-Jun-18A | 16-Jul-18A | 29-May-18 | 12-Jun-18 | 22-Jun-18 | 16-Jul-18 | |
| PC0030D | Pier 3 - Cast Downstation Cantilever Segments (8 EA) | 9 | 0 | 16 | 100% | 19-Jun-18A | 11-Jul-18A | 19-May-18 | 19-Jun-18 | 11-Jul-18 | | |
| PC0030U | Pier 3 - Cast Upstation Cantilever Segments (8 EA) | 9 | 0 | 16 | 100% | 13-Jun-18A | 06-Jul-18A | 31-May-18 | 13-Jun-18 | 06-Jul-18 | | |
| PC0040D | Pier 4 - Cast Downstation Cantilever Segments (9 EA) | 19 | 0 | 36 | 100% | 21-Apr-18A | 13-Jun-18A | 16-Apr-18 | 10-May-18 | 21-Apr-18 | 13-Jun-18 | |
| PC0040U | Pier 4 - Cast Upstation Cantilever Segments (9 EA) | 19 | 0 | 31 | 100% | 01-May-18A | 14-Jun-18A | 23-Apr-18 | 17-May-18 | 01-May-18 | 14-Jun-18 | |
| PC0050D | Pier 5 - Cast Downstation Cantilever Segments (9 EA) | 10 | 0 | 13 | 100% | 09-Jul-18A | 24-Jul-18A | 12-Jun-18 | 25-Jun-18 | 09-Jul-18 | 24-Jul-18 | |
| PC0050U | Pier 5 - Cast Upstation Cantilever Segments (9 EA) | 10 | 0 | 13 | 100% | 17-Jul-18A | 01-Aug-18A | 14-Jun-18 | 17-Jul-18 | 01-Aug-18 | | |
| PC0060D | Pier 6 - Cast Downstation Cantilever Segments (9 EA) | 10 | 0 | 13 | 100% | 25-Jul-18A | 08-Aug-18A | 15-Jun-18 | 28-Jun-18 | 11-Jul-18 | 25-Jul-18 | |
| PC0060U | Pier 6 - Cast Upstation Cantilever Segments (9 EA) | 10 | 0 | 12 | 100% | 25-Jul-18A | 08-Aug-18A | 15-Jun-18 | 25-Jul-18 | 08-Aug-18 | | |
| PC0070D | Pier 7 - Cast Downstation Cantilever Segments (10 EA) | 11 | 0 | 12 | 100% | 13-Aug-18A | 29-Aug-18A | 27-Jun-18 | 12-Jul-18 | 10-Aug-18 | | |
| PC0070U | Pier 7 - Cast Upstation Cantilever Segments (10 EA) | 11 | 0 | 15 | 100% | 03-Aug-18A | 21-Aug-18A | 26-Jun-18 | 31-Jul-18 | 03-Aug-18 | 21-Aug-18 | |
| PC0080D | Pier 8 - Cast Downstation Cantilever Segments (9 EA) | 10 | 0 | 15 | 100% | 17-Aug-18A | 07-Sep-18A | 12-Jul-18 | 25-Jul-18 | 17-Aug-18 | 29-Aug-18 | |
| PC0080U | Pier 8 - Cast Upstation Cantilever Segments (9 EA) | 10 | 0 | 15 | 100% | 23-Aug-18A | 11-Sep-18A | 29-Jun-18 | 13-Jul-18 | 23-Aug-18 | 11-Sep-18 | |
| PC0090D | Pier 9 - Cast Downstation Cantilever Segments (7 EA) | 8 | 0 | 12 | 100% | 30-Aug-18A | 14-Sep-18A | 16-Jul-18 | 25-Jul-18 | 30-Aug-18 | 14-Sep-18 | |
| PC0090U | Pier 9 - Cast Upstation Cantilever Segments (7 EA) | 8 | 0 | 13 | 100% | 28-Aug-18A | 13-Sep-18A | 29-Jun-18 | 08-Aug-18 | 14-Sep-18 | 27-Sep-18 | |
| PC0100D | Pier 10 - Cast Downstation Cantilever Segments (9 EA) | 10 | 0 | 11 | 100% | 14-Sep-18A | 27-Sep-18A | 23-Jul-18 | 26-Jul-18 | | | |
| PC0100U | Pier 10 - Cast Upstation Cantilever Segments (9 EA) | 10 | 0 | 11 | 100% | 12-Sep-18A | 25-Sep-18A | 25-Jun-18 | 31-Jul-18 | 01-Aug-18 | 14-Sep-18 | |
| PC0100UE | Pier 10 - Cast Upstation Hinge (3 EA) | 6 | 6 | 0 | 0% | 18-Feb-19 | 25-Feb-19 | | | | | 25 |
| PC0110D | Pier 11 - Cast Downstation Cantilever Segments (5 EA) | 6 | 0 | 7 | 100% | 17-Sep-18A | 25-Sep-18A | 03-Oct-18A | 02-Aug-18 | 01-Aug-18 | 29-Sep-18 | 08-Oct-18 |
| PC0110DE | Pier 11 - Cast Downstation Hinge EJ Segments (3 EA) + 2 EA typ | 8 | 8 | 0 | 0% | 26-Feb-19 | 06-Mar-19 | | | | | 25 |
| PC0110U | Pier 11 - Cast Upstation Cantilever Segments (9 EA) | 10 | 0 | 15 | 100% | 27-Sep-18A | 15-Oct-18A | 07-Aug-18 | 20-Aug-18 | 27-Sep-18 | 15-Oct-18 | |
| PC0120D | Pier 12 - Cast Downstation Cantilever Segments (10 EA) | 11 | 0 | 18 | 100% | 18-Sep-18A | 03-Oct-18A | 09-Aug-18 | 22-Aug-18 | 18-Sep-18 | 03-Oct-18 | |
| PC0120U | Pier 12 - Cast Upstation Cantilever Segments (10 EA) | 11 | 0 | 18 | 100% | 16-Oct-18A | 06-Nov-18A | 21-Aug-18 | 05-Sep-18 | 16-Oct-18 | 06-Nov-18 | |
| PC0130D | Pier 13 - Cast Downstation Cantilever Segments (11 EA) | 12 | 0 | 19 | 100% | 04-Oct-18A | 26-Oct-18A | 24-Aug-18 | 11-Sep-18 | 04-Oct-18 | 26-Oct-18 | |
| PC0130U | Pier 13 - Cast Upstation Cantilever Segments (11 EA) | 12 | 0 | 19 | 100% | 09-Oct-18A | 31-Oct-18A | 22-Aug-18 | 07-Sep-18 | 09-Oct-18 | 31-Oct-18 | |
| PC0140D | Pier 14 - Cast Downstation Cantilever Segments (10 EA) | 11 | 11 | 0 | 0% | 20-Dec-18 | 15-Dec-18 | 06-Sep-18 | 20-Sep-18 | | | 24 |
| PC0140U | Pier 14 - Cast Upstation Cantilever Segments (10 EA) | 11 | 1 | 19 | 90.91% | 05-Oct-18A | 05-Dec-18 | 28-Aug-18 | 10-Sep-18 | 24-Sep-18 | 05-Nov-18 | 24 |
| PC0150D | Pier 15 - Cast Upstation Variable Depth Segments (7 EA) | 8 | 8 | 0 | 0% | 26-Mar-19 | 04-Apr-19 | 18-Sep-18 | 21-Sep-18 | | | 18 |
| PC0150DC | Pier 15 - Cast Upstation Constant Depth Segments (5 EA) | 6 | 6 | 0 | 0% | 05-Apr-19 | 11-Apr-19 | 25-Sep-18 | 02-Oct-18 | | | 18 |
| PC0150U | Pier 15 - Cast Upstation Variable Depth Segments (7 EA) | 8 | 8 | 0 | 0% | 20-Apr-19 | 29-Apr-19 | 19-Sep-18 | | | | 18 |
| PC0150UC | Pier 15 - Cast Upstation Constant Depth Segments (3 EA) | 4 | 4 | 0 | 0% | 01-May-19 | 06-May-19 | 03-Oct-18 | 16-Oct-18 | | | 11 |
| PC0150UC | Pier 15 - Cast Upstation Hinge EJ Segments (3 EA) | 6 | 6 | 0 | 0% | 06-May-19 | 13-May-19 | | | | | 11 |
| PC0160D | Pier 16 - Cast Downstation Variable Depth Segments (7 EA) | 8 | 8 | 0 | 0% | 12-Apr-19 | 22-Apr-19 | 03-Oct-18 | 03-Oct-18 | | | 18 |
| PC0160DC | Pier 16 - Cast Downstation Constant Depth Segments (6 EA) | 7 | 7 | 0 | 0% | 14-May-19 | 22-May-19 | 17-Oct-18 | 02-Nov-18 | | | 11 |
| PC0160DC | Pier 16 - Cast Downstation Hinge EJ Segments (6 EA) | 6 | 6 | 0 | 0% | 22-May-19 | 30-May-19 | | | | | 11 |
| PC0160U | Pier 16 - Cast Upstation Variable Depth Segments (7 EA) | 8 | 8 | 0 | 0% | 29-Apr-19 | 08-May-19 | 03-Oct-18 | 12-Oct-18 | | | 5 |
| PC0160UC | Pier 16 - Cast Upstation Constant Depth Segments (8 EA) | 9 | 9 | 0 | 0% | 21-May-19 | 31-May-19 | 25-Oct-18 | | | | 5 |
| PC0170D | Pier 17 - Cast Downstation Variable Depth Segments (7 EA) | 8 | 8 | 0 | 0% | 17-May-19 | 28-May-19 | 04-Oct-18 | 15-Oct-18 | | | 18 |
| PC0170DC | Pier 17 - Cast Downstation Constant Depth Segments (9 EA) | 10 | 10 | 0 | 0% | 29-May-19 | 10-Jun-19 | 16-Oct-18 | 29-Oct-18 | | | 18 |
| PC0170U | Pier 17 - Cast Upstation Variable Depth Segments (7 EA) | 8 | 8 | 0 | 0% | 03-Jun-19 | 12-Jun-19 | 26-Oct-18 | 06-Nov-18 | | | |

| | Print Date/Time: 13-Dec-18 15:48 | Data Date: 01-Dec-18 | | | Cline Avenue Bridge - Contract Schedule - December 1, 2018 Data Date | | | | | | | | 4 of 15 |

| Activity ID | Activity Name | Original Duration | Remaining Duration | Actual Duration | Activity % Complete | Start | Finish | BL1 Start | BL1 Finish | Actual Start | Actual Finish | Total Float |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PO170UC | Pier 17 - Cast Upstation Constant Depth Segments (9 EA) | 10 | 10 | 0 | 0% | 13-Jun-19 | 25-Jun-19 | 07-Nov-18 | 20-Nov-18 | | | 5 |
| PO180DC | Pier 18 - Cast Downstation Constant Depth Segments (7 EA) | 8 | 8 | 0 | 0% | 23-Apr-19 | 02-May-19 | 30-Oct-18 | 08-Nov-18 | | | 18 |
| PO180DC | Pier 18 - Cast Downstation Constant Depth Segments (10 EA) | 11 | 11 | 0 | 0% | 03-May-19 | 16-May-19 | 09-Nov-18 | 27-Nov-18 | | | 18 |
| PO180U | Pier 18 - Cast Upstation Variable Depth Segments (7 EA) | 8 | 8 | 0 | 0% | 22-May-19 | 31-May-19 | 09-Nov-18 | 20-Nov-18 | | | 5 |
| PO180UC | Pier 18 - Cast Upstation Constant Depth Segments (10 EA) | 11 | 11 | 0 | 0% | 03-Jun-19 | 15-Jun-19 | 28-Nov-18 | 12-Dec-18 | | | 9 |
| PO190D | Pier 19 - Cast Downstation Variable Depth Segments (7 EA) | 15 | 0 | 14 | 100% | 01-Nov-18A | 19-Nov-18A | 21-Nov-18 | 04-Dec-18 | 01-Nov-18 | 19-Nov-18 | |
| PO190DC | Pier 19 - Cast Downstation Constant Depth Segments (7 EA) | 8 | 2 | 7 | 75% | 09-Nov-18A | 03-Dec-18 | 05-Dec-18 | 14-Dec-18 | 20-Nov-18 | | 389 |
| PO190U | Pier 19 - Cast Upstation Variable Depth Segments (7 EA) | 15 | 0 | 10 | 100% | 12-Nov-18A | 27-Nov-18A | 21-Nov-18 | 12-Nov-18 | 27-Nov-18 | | 1 |
| PO190UC | Pier 19 - Cast Upstation Constant Depth Segments (7 EA) | 8 | 6 | 3 | 25% | 28-Nov-18A | 07-Dec-18 | 13-Dec-18 | 26-Dec-18 | 28-Nov-18 | | 1 |
| PO200D | Pier 20 - Cast Downstation Variable Depth Segments (7 EA) | 15 | 15 | 0 | 0% | 11-Jun-19 | 28-Jun-19 | 17-Dec-18 | 28-Dec-18 | | | 18 |
| PO200DC | Pier 20 - Cast Downstation Constant Depth Segments (9 EA) | 10 | 10 | 0 | 0% | 01-Jul-19 | 12-Jul-19 | 02-Jan-19 | 15-Jan-19 | | | 222 |
| PO200U | Pier 20 - Cast Upstation Variable Depth Segments (7 EA) | 15 | 15 | 0 | 0% | 26-Jun-19 | 16-Jul-19 | 25-Dec-18 | 14-Dec-18 | | | 5 |
| PO200UC | Pier 20 - Cast Upstation Constant Depth Segments (9 EA) | 10 | 10 | 0 | 0% | 17-Jul-19 | 29-Jul-19 | 17-Dec-18 | 03-Jan-19 | | | 5 |
| PO210D | Pier 21 - Cast Downstation Variable Depth Segments (7 EA) | 12 | 12 | 0 | 0% | 01-Dec-18 | 15-Dec-18 | 11-Jan-19 | | | | 18 |
| PO210DC | Pier 21 - Cast Downstation Constant Depth Segments (8 EA) | 9 | 9 | 0 | 0% | 17-Dec-18 | 02-Jan-19 | 14-Jan-19 | 24-Jan-19 | | | 24 |
| PO210U | Pier 21 - Cast Upstation Variable Depth Segments (7 EA) | 8 | 8 | 0 | 0% | 10-Dec-18 | 18-Dec-18 | 04-Jan-19 | 15-Jan-19 | | | 5 |
| PO210UC | Pier 21 - Cast Upstation Constant Depth Segments (8 EA) | 12 | 12 | 0 | 0% | 19-Dec-18 | 04-Jan-19 | 16-Jan-19 | 28-Jan-19 | | | 5 |
| PO220D | Pier 22 - Cast Downstation Variable Depth Segments (7 EA) | 8 | 8 | 0 | 0% | 17-Dec-18 | 28-Dec-18 | 05-Feb-19 | | | | 18 |
| PO220DC | Pier 22 - Cast Downstation Constant Depth Segments (7 EA) | 8 | 8 | 0 | 0% | 02-Jan-19 | 10-Jan-19 | 06-Feb-19 | 15-Feb-19 | | | 18 |
| PO220U | Pier 22 - Cast Upstation Variable Depth Segments (7 EA) | 8 | 8 | 0 | 0% | 09-Jan-19 | 17-Jan-19 | 23-Jan-19 | | | | 5 |
| PO220UC | Pier 22 - Cast Upstation Constant Depth Segments (5 EA) | 6 | 6 | 0 | 0% | 19-Jan-19 | 25-Jan-19 | 29-Jan-19 | 13-Feb-19 | | | 19 |
| PO220UC | Pier 22 - Cast Upstation Hinge EJ Segments (3 EA) | 6 | 6 | 0 | 0% | 28-Jan-19 | 02-Feb-19 | | | | | 19 |
| PO230D | Pier 23 - Cast Downstation Variable Depth Segments (7 EA) | 8 | 8 | 0 | 0% | 11-Jan-19 | 21-Jan-19 | 28-Jan-19 | 06-Feb-19 | | | 19 |
| PO230DC | Pier 23 - Cast Downstation Constant Depth Segments (4 EA) | 5 | 5 | 0 | 0% | 04-Feb-19 | 08-Feb-19 | 14-Feb-19 | 28-Feb-19 | | | 23 |
| PO230DC | Pier 23 - Cast Downstation Hinge EJ Segments (3 EA) | 6 | 6 | 0 | 0% | 11-Feb-19 | 16-Feb-19 | | | | | 23 |
| PO230U | Pier 23 - Cast Upstation Variable Depth Segments (7 EA) | 8 | 8 | 0 | 0% | 19-Jan-19 | 29-Jan-19 | 07-Feb-19 | 18-Feb-19 | | | 5 |
| PO230UC | Pier 23 - Cast Upstation Constant Depth Segments (6 EA) | 7 | 7 | 0 | 0% | 30-Jan-19 | 06-Feb-19 | 19-Feb-19 | 27-Feb-19 | | | 5 |
| PO240D | Pier 24 - Cast Downstation Variable Depth Segments (7 EA) | 8 | 8 | 0 | 0% | 22-Jan-19 | 31-Jan-19 | 18-Feb-19 | 27-Feb-19 | | | 18 |
| PO240DC | Pier 24 - Cast Downstation Constant Depth Segments (7 EA) | 8 | 8 | 0 | 0% | 01-Feb-19 | 11-Feb-19 | 01-Mar-19 | 12-Mar-19 | | | 18 |
| PO240U | Pier 24 - Cast Upstation Variable Depth Segments (7 EA) | 8 | 8 | 0 | 0% | 07-Feb-19 | 15-Feb-19 | 28-Feb-19 | 11-Mar-19 | | | 5 |
| PO240UC | Pier 24 - Cast Upstation Constant Depth Segments (7 EA) | 8 | 8 | 0 | 0% | 18-Feb-19 | 27-Feb-19 | 12-Mar-19 | 22-Mar-19 | | | 5 |
| PO250D | Pier 25 - Cast Downstation Variable Depth Segments (7 EA) | 8 | 8 | 0 | 0% | 01-Feb-19 | 20-Feb-19 | 28-Feb-19 | 11-Mar-19 | | | 18 |
| PO250DC | Pier 25 - Cast Downstation Constant Depth Segments (7 EA) | 8 | 8 | 0 | 0% | 21-Feb-19 | 02-Mar-19 | 12-Mar-19 | 22-Mar-19 | | | 18 |
| PO250U | Pier 25 - Cast Upstation Variable Depth Segments (7 EA) | 8 | 8 | 0 | 0% | 19-Feb-19 | 08-Mar-19 | 13-Mar-19 | 22-Mar-19 | | | 5 |
| PO250UC | Pier 25 - Cast Upstation Constant Depth Segments (7 EA) | 8 | 8 | 0 | 0% | 11-Mar-19 | 19-Mar-19 | 25-Mar-19 | 03-Apr-19 | | | 23 |
| PO260D | Pier 26 - Cast Downstation Variable Depth Segments (6 EA) | 8 | 8 | 0 | 0% | 04-Mar-19 | 13-Mar-19 | 22-Mar-19 | 02-Apr-19 | | | 18 |
| PO260DC | Pier 26 - Cast Downstation Constant Depth Segments (6 EA) | 7 | 7 | 0 | 0% | 20-Mar-19 | 28-Mar-19 | 03-Apr-19 | 11-Apr-19 | | | 18 |
| PO260U | Pier 26 - Cast Upstation Variable Depth Segments (7 EA) | 8 | 8 | 0 | 0% | 11-Mar-19 | 19-Mar-19 | 02-Apr-19 | 02-Apr-19 | | | 5 |
| PO260UC | Pier 26 - Cast Upstation Constant Depth Segments (6 EA) | 7 | 7 | 0 | 0% | 20-Mar-19 | 28-Mar-19 | 04-Apr-19 | 12-Apr-19 | | | 5 |
| PO270D | Pier 27 - Cast Downstation Cantilever Segments (8 EA) | 9 | 9 | 0 | 0% | 14-Mar-19 | 25-Mar-19 | 12-Apr-19 | 24-Apr-19 | | | 5 |
| PO270U | Pier 27 - Cast Upstation Cantilever Segments (8 EA) | 9 | 9 | 0 | 0% | 29-Mar-19 | 09-Apr-19 | 03-Apr-19 | 15-Apr-19 | | | 5 |
| PO280D | Pier 28 - Cast Downstation Cantilever Segments (9 EA) | 10 | 10 | 0 | 0% | 29-Mar-19 | 11-Apr-19 | 13-Apr-19 | 26-Apr-19 | | | 23 |
| PO280U | Pier 28 - Cast Upstation Cantilever Segments (7 EA) | 8 | 8 | 0 | 0% | 29-Mar-19 | 09-Apr-19 | 03-Apr-19 | 15-Apr-19 | | | 5 |
| PO290U | Pier 29 - Cast Upstation Cantilever Segments (2 EA) | 3 | 3 | 0 | 0% | 11-Apr-19 | 15-Apr-19 | 25-Apr-19 | 29-Apr-19 | | | 23 |

### Mainline Structure West of Canal

### Substructure Mobilization

| Activity ID | Activity Name | Original Duration | Remaining Duration | Actual Duration | Activity % Complete | Start | Finish | BL1 Start | BL1 Finish | Actual Start | Actual Finish | Total Float |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A1500 | Pile Procurement (West Side) | 35 | 0 | 26 | 100% | 05-Sep-17A | 11-Oct-17A | 01-Sep-17 | 20-Oct-17 | 05-Sep-17 | 11-Oct-17 | |
| A2000 | Mobilization & Startup (Kenny) | 15 | 0 | 18 | 100% | 05-Sep-17A | 29-Sep-17A | 01-Sep-17 | 22-Sep-17 | 05-Sep-17 | 29-Sep-17 | |
| FORM100 | Procure Column Stem Forms | 29 | 0 | 31 | 100% | 01-Nov-17A | 15-Dec-17A | 01-Sep-17 | 12-Oct-17 | 01-Nov-17 | 15-Dec-17 | |



| Activity ID | Activity Name | Original Duration | Remaining Duration | Actual Duration | Activity % Complete | Start | Finish | BL1 Start | BL1 Finish | Actual Start | Actual Finish | Total Float |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FORM200 | Procure Column Flare Forms | 48 | 0 | 46 | 100% | 01-Nov-17A | 12-Jan-18A | 01-Sep-17 | 08-Nov-17 | 01-Nov-17 | 12-Jan-18 | |
| REBAR100 | Rebar Procurement Footings 2-10 | 8 | 0 | 33 | 100% | 08-Dec-17A | 31-Jan-18A | 03-Jan-18 | 12-Jan-18 | 08-Dec-17 | 31-Jan-18 | |
| REBAR200 | Rebar Procurement Columns 2-10 | 13 | 0 | 33 | 100% | 08-Dec-17A | 31-Jan-18A | 03-Jan-18 | 22-Jan-18 | 08-Dec-17 | 31-Jan-18 | |
| REBAR300 | Rebar Procurement Footings 11-16 | 20 | 0 | 33 | 100% | 08-Jan-18A | 31-Jan-18A | 03-Jan-18 | 08-Jan-18 | 08-Jan-18 | 31-Jan-18 | |
| REBAR400 | Rebar Procurement Columns 11-16 | 20 | 0 | 79 | 100% | 08-Jan-18A | 01-May-18✓ | 03-Jan-18 | 31-Jan-18 | 08-Jan-18 | 01-May-18 | |
| REBAR500 | Rebar Procurement Footings/Cols 19-23 | 20 | 0 | 50 | 100% | 19-Mar-18A | 29-May-18✓ | 05-Mar-18 | 30-Mar-18 | 19-Mar-18 | 29-May-18 | |
| REBAR600 | Rebar Procurement Footings/Cols 24-27 | 20 | 0 | 53 | 100% | 19-Mar-18A | 01-Jun-18 | 19-Mar-18 | 13-Apr-18 | 19-Mar-18 | 01-Jun-18 | |
| REBAR700 | Rebar Procurement Pier 17-18 Footings/Cols | 30 | 0 | 28 | 100% | 27-Aug-18A | 05-Oct-18 | 27-Aug-18 | 05-Oct-18 | 27-Aug-18 | 05-Oct-18 | |
| REBAR800 | Rebar Procurement Pier 28-29 Straddle Bents | 20 | 12 | 44 | 40% | 28-Sep-18A | 18-Dec-18 | 14-May-18 | 11-Jun-18 | 28-Sep-18 | | 82 |
| **Excavation & Sheeting** | | | | | | | | | | | | |
| EA1010 | Exc & Demo - Abutment 1 | 10 | 0 | 63 | 100% | 21-Feb-18A | 21-May-18✓ | 01-Feb-18 | 14-Feb-18 | 21-Feb-18 | 21-May-18 | |
| EA1030 | Sheet - Pier 3 | 5 | 0 | 2 | 100% | 29-Jan-18A | 31-Jan-18A | 01-Feb-18 | 07-Feb-18 | 29-Jan-18 | 31-Jan-18 | |
| EA1130 | Excavate & Demo - Pier 3 | 10 | 0 | 32 | 100% | 01-Feb-18A | 20-Mar-18A | 01-Feb-18 | 14-Feb-18 | 01-Feb-18 | 20-Mar-18 | |
| EA3000 | Dig & Core Footings for Pile | 25 | 0 | 93 | 100% | 26-Oct-17A | 16-Mar-18A | 11-Oct-17 | 14-Nov-17 | 26-Oct-17 | 16-Mar-18 | |
| **Foundations - Pile Driving** | | | | | | | | | | | | |
| CN1020 | Foundation - Pier 2 | 5 | 0 | 7 | 100% | 24-Jan-18A | 02-Feb-18A | 25-Jan-18 | 31-Jan-18 | 24-Jan-18 | 02-Feb-18 | |
| CN1030 | Foundation - Pier 3 | 5 | 0 | 5 | 100% | 29-Jan-18A | 01-Feb-18A | 07-Feb-18 | 13-Feb-18 | 29-Jan-18 | 05-Feb-18 | |
| CN1040 | Foundation - Pier 4 | 5 | 0 | 6 | 100% | 12-Jan-18A | 12-Jan-18A | 15-Jan-18 | 19-Jan-18 | 12-Jan-18 | 12-Jan-18 | |
| CN1050 | Foundation - Pier 5 | 5 | 0 | 4 | 100% | 15-Jan-18A | 18-Jan-18A | 09-Jan-18 | 15-Jan-18 | 15-Jan-18 | 18-Jan-18 | |
| CN1060 | Foundation - Pier 6 | 5 | 0 | 6 | 100% | 19-Dec-17A | 28-Dec-17A | 04-Jan-18 | 10-Jan-18 | 19-Dec-17 | 28-Dec-17 | |
| CN1070 | Foundation - Pier 7 | 5 | 0 | 6 | 100% | 15-Dec-17A | 22-Dec-17A | 22-Dec-17 | 03-Jan-18 | 15-Dec-17 | 22-Dec-17 | |
| CN1080 | Foundation - Pier 8 | 5 | 0 | 6 | 100% | 07-Dec-17A | 14-Dec-17A | 15-Dec-17 | 21-Dec-17 | 07-Dec-17 | 14-Dec-17 | |
| CN1090 | Foundation - Pier 9 | 5 | 0 | 5 | 100% | 06-Dec-17A | 12-Dec-17A | 08-Dec-17 | 14-Dec-17 | 06-Dec-17 | 12-Dec-17 | |
| CN1100 | Foundation - Pier 10 | 5 | 0 | 3 | 100% | 06-Dec-17A | 09-Dec-17A | 06-Dec-17 | 12-Dec-17 | 06-Dec-17 | 09-Dec-17 | |
| CN1110 | Foundation - Pier 11 | 5 | 0 | 15 | 100% | 19-Oct-17A | 09-Nov-17A | 05-Dec-17 | 11-Dec-17 | 19-Oct-17 | 09-Nov-17 | |
| CN1120 | Foundation - Pier 12 | 5 | 0 | 19 | 100% | 26-Oct-17A | 22-Nov-17A | 07-Dec-17 | 13-Dec-17 | 26-Oct-17 | 22-Nov-17 | |
| CN1130 | Foundation - Pier 13 | 5 | 0 | 16 | 100% | 27-Oct-17A | 20-Nov-17A | 11-Dec-17 | 15-Dec-17 | 27-Oct-17 | 20-Nov-17 | |
| CN1140 | Foundation - Pier 14 | 5 | 0 | 15 | 100% | 30-Oct-17A | 16-Nov-17A | 13-Dec-17 | 19-Dec-17 | 30-Oct-17 | 16-Nov-17 | |
| CN1150 | Foundation - Pier 15 | 5 | 0 | 2 | 100% | 30-Nov-17A | 04-Dec-17A | 15-Dec-17 | 21-Dec-17 | 30-Nov-17 | 04-Dec-17 | |
| CN1160 | Foundation - Pier 16 | 9 | 0 | 5 | 100% | 10-Apr-18A | 17-Apr-18A | 04-Apr-18 | 12-Apr-18 | 10-Apr-18 | 17-Apr-18 | |
| MOVE100 | Break Down Crane & Move Under OH Power Lines | 1 | 0 | 0 | 100% | 05-Dec-17A | 05-Dec-17A | 03-Jan-18 | 12-Jan-18 | 05-Dec-17 | | |
| **Foundations - Footings** | | | | | | | | | | | | |
| CN2370 | Abutment 1 | 15 | 0 | 201 | 100% | 12-Dec-17A | 02-Oct-18A | 16-Apr-18 | 04-May-18 | 12-Dec-17 | 02-Oct-18 | |
| FTG0200 | Footing - Pier 2 | 6 | 0 | 9 | 100% | 12-Feb-18A | 23-Feb-18A | 21-Feb-18 | 28-Feb-18 | 27-Feb-18 | 12-Mar-18 | |
| FTG0300 | Footing - Pier 3 | 5 | 0 | 11 | 100% | 20-Mar-18A | 04-Apr-18A | 13-Mar-18 | 19-Mar-18 | 20-Mar-18 | 04-Apr-18 | |
| FTG0400 | Footing - Pier 4 | 5 | 0 | 8 | 100% | 15-Feb-18A | 26-Feb-18A | 07-Feb-18 | 13-Feb-18 | 12-Feb-18 | 26-Feb-18 | |
| FTG0500 | Footing - Pier 5 | 8 | 0 | 9 | 100% | 29-Jan-18A | 09-Feb-18A | 01-Feb-18 | 08-Feb-18 | 29-Jan-18 | 09-Feb-18 | |
| FTG0600 | Footing - Pier 6 | 7 | 0 | 6 | 100% | 24-Jan-18A | 01-Feb-18A | 24-Jan-18 | 01-Feb-18 | 24-Jan-18 | 01-Feb-18 | |
| FTG0700 | Footing - Pier 7 | 6 | 0 | 2 | 100% | 18-Jan-18A | 23-Jan-18A | 23-Jan-18 | 13-Jan-18 | 18-Jan-18 | 23-Jan-18 | |
| FTG0800 | Footing - Pier 8 | 5 | 0 | 4 | 100% | 11-Jan-18A | 17-Jan-18A | 08-Jan-18 | 12-Jan-18 | 11-Jan-18 | 17-Jan-18 | |
| FTG0900 | Footing - Pier 9 | 5 | 0 | 7 | 100% | 22-Dec-17A | 11-Jan-18A | 11-Jan-18 | 17-Jan-18 | 22-Dec-17 | 08-Jan-18 | |
| FTG1000 | Footing - Pier 10 | 5 | 0 | 7 | 100% | 12-Dec-17A | 20-Dec-17A | 04-Jan-18 | 10-Jan-18 | 12-Dec-17 | 20-Dec-17 | |
| FTG1100 | Footing - Pier 11 | 5 | 0 | 7 | 100% | 26-Feb-18A | 07-Mar-18A | 01-Apr-18 | 07-Apr-18 | 26-Feb-18 | 07-Mar-18 | |
| FTG1200 | Footing - Pier 12 | 5 | 0 | 2 | 100% | 12-Mar-18A | 14-Mar-18A | 03-Mar-18 | 13-Mar-18 | 12-Mar-18 | 14-Mar-18 | |
| FTG1300 | Footing - Pier 13 | 5 | 0 | 4 | 100% | 12-Mar-18A | 16-Mar-18A | 02-Mar-18 | 08-Mar-18 | 12-Mar-18 | 16-Mar-18 | |
| FTG1400 | Footing - Pier 14 | 5 | 0 | 5 | 100% | 14-Mar-18A | 20-Mar-18A | 03-Mar-18 | 13-Mar-18 | 14-Mar-18 | 20-Mar-18 | |
| FTG1500 | Footing - Pier 15 | 6 | 0 | 5 | 100% | 16-Mar-18A | 23-Mar-18A | 30-Mar-18 | 16-May-18 | 16-Mar-18 | 23-Mar-18 | |
| FTG1600 | Footing - Pier 16 | 5 | 0 | 4 | 100% | 16-Apr-18A | 20-Apr-18A | 13-Apr-18 | 19-Apr-18 | 24-Apr-18 | 01-May-18 | |
| **Columns** | | | | | | | | | | | | |

| Print Date/Time: 13-Dec-18 15:48 | | Data Date: 01-Dec-18 | | | Cline Avenue Bridge - Contract Schedule - December 1, 2018 Data Date | | | | | | | | 6 of 15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

| Activity ID | Activity Name | Original Duration | Remaining Duration | Actual Duration | Activity % Complete | Start | Finish | BL1 Start | BL1 Finish | Actual Start | Actual Finish | Total Float |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CN2020 | Column - Pier 2 | 1 | 0 | 0 | 100% | 07-Mar-18A | 07-Mar-18A | 27-Mar-18 | 27-Mar-18 | 07-Mar-18 | 07-Mar-18 | |
| CN2030 | Column - Pier 3 | 2 | 0 | 1 | 100% | 05-Apr-18A | 06-Apr-18A | 05-Apr-18 | 06-Apr-18 | 05-Apr-18 | 06-Apr-18 | |
| CN2040 | Column - Pier 4 | 5 | 0 | 3 | 100% | 12-Mar-18A | 15-Mar-18A | 01-Apr-18 | 07-Apr-18 | 12-Mar-18 | 15-Mar-18 | |
| CN2050 | Column - Pier 5 | 1 | 0 | 6 | 100% | 09-Jan-18A | 06-Feb-18A | 14-Feb-18 | 14-Feb-18 | 09-Jan-18 | 06-Feb-18 | |
| CN2060 | Column - Pier 6 | 4 | 0 | 3 | 100% | 13-Feb-18A | 16-Feb-18A | 16-Feb-18 | 21-Feb-18 | 13-Feb-18 | 16-Feb-18 | |
| CN2070 | Column - Pier 7 | 5 | 0 | 11 | 100% | 31-Jan-18A | 15-Feb-18A | 01-Feb-18 | 07-Feb-18 | 31-Jan-18 | 15-Feb-18 | |
| CN2080 | Column - Pier 8 | 5 | 0 | 4 | 100% | 18-Jan-18A | 24-Jan-18A | 16-Jan-18 | 22-Jan-18 | 18-Jan-18 | 24-Jan-18 | |
| CN2090 | Column - Pier 9 | 5 | 0 | 4 | 100% | 09-Jan-18A | 15-Jan-18A | 09-Jan-18 | 12-Jan-18 | 09-Jan-18 | 15-Jan-18 | |
| CN2100 | Column - Pier 10 | 5 | 0 | 5 | 100% | 21-Dec-17A | 29-Dec-17A | 21-Dec-17 | 28-Dec-17 | 21-Dec-17 | 29-Dec-17 | |
| CN2110 | Column - Pier 11 | 5 | 0 | 4 | 100% | 23-Mar-18A | 28-Mar-18A | 28-Mar-18 | 03-Apr-18 | 23-Mar-18 | 29-Mar-18 | |
| CN2120 | Column - Pier 12 | 6 | 0 | 6 | 100% | 30-Mar-18A | 09-Apr-18A | 09-Apr-18 | 16-Apr-18 | 30-Mar-18 | 09-Apr-18 | |
| CN2130 | Column - Pier 13 (Lower) | 5 | 0 | 3 | 100% | 09-Apr-18A | 12-Apr-18A | 16-Apr-18 | 20-Apr-18 | 09-Apr-18 | 12-Apr-18 | |
| CN2132 | Column - Pier 13 (Upper) | 3 | 0 | 2 | 100% | 10-Apr-18A | 13-Apr-18A | 30-Apr-18 | 02-May-18 | 10-Apr-18 | 12-Apr-18 | |
| CN2140 | Column - Pier 14 (Lower) | 5 | 0 | 4 | 100% | 13-Apr-18A | 19-Apr-18A | 17-Apr-18 | 23-Apr-18 | 13-Apr-18 | 19-Apr-18 | |
| CN2142 | Column - Pier 14 (Upper) | 4 | 0 | 7 | 100% | 23-Apr-18A | 02-May-18A | 30-Apr-18 | 03-May-18 | 23-Apr-18 | 02-May-18 | |
| CN2150 | Column - Pier 15 (Lower) | 5 | 0 | 4 | 100% | 18-Apr-18A | 23-Apr-18A | 23-Apr-18 | 27-Apr-18 | 19-Apr-18 | 23-Apr-18 | |
| CN2152 | Column - Pier 15 (Upper) | 4 | 0 | 2 | 100% | 03-May-18A | 08-May-18A | 08-May-18 | 10-May-18 | 03-May-18 | 07-May-18 | |
| CN2160 | Column - Pier 16 (Lower) | 5 | 0 | 5 | 100% | 03-May-18A | 10-May-18A | 09-May-18 | 15-May-18 | 03-May-18 | 10-May-18 | |
| CN2162 | Column - Pier 16 (Upper) | 4 | 0 | 2 | 100% | 14-May-18A | 17-May-18A | 15-May-18 | 18-May-18 | 14-May-18 | 16-May-18 | |

**Cap Flares**

| Activity ID | Activity Name | Original Duration | Remaining Duration | Actual Duration | Activity % Complete | Start | Finish | BL1 Start | BL1 Finish | Actual Start | Actual Finish | Total Float |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CAP1020 | Cap Flare - Pier 2 | 12 | 0 | 4 | 100% | 30-Apr-18A | 04-May-18A | 02-May-18 | 17-May-18 | 30-Apr-18 | 04-May-18 | |
| CAP1030 | Cap Flare - Pier 3 | 10 | 0 | 6 | 100% | 12-Apr-18A | 20-Apr-18A | 25-Apr-18 | 08-May-18 | 12-Apr-18 | 20-Apr-18 | |
| CAP1040 | Cap Flare - Pier 4 | 10 | 0 | 6 | 100% | 29-Mar-18A | 06-Apr-18A | 22-Mar-18 | 04-Apr-18 | 29-Mar-18 | 06-Apr-18 | |
| CAP1050 | Cap Flare - Pier 5 | 12 | 0 | 6 | 100% | 20-Apr-18A | 27-Apr-18A | 01-May-18 | 16-May-18 | 20-Apr-18 | 27-Apr-18 | |
| CAP1060 | Cap Flare - Pier 6 | 10 | 0 | 6 | 100% | 09-Apr-18A | 17-Apr-18A | 14-May-18 | 25-May-18 | 09-Apr-18 | 17-Apr-18 | |
| CAP1070 | Cap Flare - Pier 7 | 10 | 0 | 10 | 100% | 16-Mar-18A | 30-Mar-18A | 08-Mar-18 | 21-Mar-18 | 16-Mar-18 | 30-Mar-18 | |
| CAP1080 | Cap Flare - Pier 8 | 10 | 0 | 7 | 100% | 05-Mar-18A | 14-Mar-18A | 14-Mar-18 | 05-Mar-18 | 14-Mar-18 | | |
| CAP1090 | Cap Flare - Pier 9 | 10 | 0 | 6 | 100% | 20-Feb-18A | 28-Feb-18A | 08-Feb-18 | 22-Feb-18 | 20-Feb-18 | 28-Feb-18 | |
| CAP1100 | Cap Flare - Pier 10 | 10 | 0 | 11 | 100% | 05-Feb-18A | 21-Feb-18A | 14-Feb-18 | 05-Feb-18 | 21-Feb-18 | | |
| CAP1110 | Cap Flare - Pier 11 | 10 | 0 | 6 | 100% | 03-May-18A | 10-May-18A | 11-May-18 | 24-May-18 | 03-May-18 | 10-May-18 | |
| CAP1120 | Cap Flare - Pier 12 | 10 | 0 | 5 | 100% | 17-May-18A | 24-May-18A | 01-Jun-18 | 17-May-18 | 24-May-18 | | |
| CAP1130 | Cap Flare - Pier 13 | 10 | 0 | 4 | 100% | 28-May-18A | 31-May-18A | 24-May-18 | 28-May-18 | | | |
| CAP1140 | Cap Flare - Pier 14 | 10 | 0 | 7 | 100% | 25-May-18A | 06-Jun-18A | 04-Jun-18 | 15-Jun-18 | 25-May-18 | 06-Jun-18 | |
| CAP1150 | Cap Flare - Pier 15 | 10 | 0 | 5 | 100% | 06-Jun-18A | 13-Jun-18A | 11-Jun-18 | 22-Jun-18 | 06-Jun-18 | 13-Jun-18 | |
| CAP1160 | Cap Flare - Pier 16 | 10 | 0 | 4 | 100% | 13-Jun-18A | 19-Jun-18A | 19-Jun-18 | 29-Jun-18 | 13-Jun-18 | 19-Jun-18 | |

**Post Tensioning (Substructure)**

| Activity ID | Activity Name | Original Duration | Remaining Duration | Actual Duration | Activity % Complete | Start | Finish | BL1 Start | BL1 Finish | Actual Start | Actual Finish | Total Float |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PT1020 | Post Tension - Pier 2 | 5 | 0 | 32 | 100% | 15-Jun-18A | 01-Aug-18A | 12-Jun-18 | 19-Jun-18 | 15-Jun-18 | 01-Aug-18 | |
| PT1030 | Post Tension - Pier 3 | 5 | 0 | 3 | 100% | 03-Aug-18A | 08-Aug-18A | 03-Jul-18 | 11-Jun-18 | 03-Aug-18 | 08-Aug-18 | |
| PT1040 | Post Tension - Pier 4 | 5 | 0 | 17 | 100% | 30-Apr-18A | 23-May-18A | 25-May-18 | 01-Jun-18 | 30-Apr-18 | 23-May-18 | |
| PT1050 | Post Tension - Pier 5 | 5 | 0 | 3 | 100% | 23-Jul-18A | 26-Jul-18A | 18-May-18 | 25-May-18 | 23-Jul-18 | 26-Jul-18 | |
| PT1060 | Post Tension - Pier 6 | 5 | 0 | 3 | 100% | 24-Jul-18A | 26-Jul-18A | 14-May-18 | 18-May-18 | 24-Jul-18 | 26-Jul-18 | |
| PT1070 | Post Tension - Pier 7 | 5 | 0 | 3 | 100% | 30-Apr-18A | 03-May-18A | 07-May-18 | 11-May-18 | 30-Apr-18 | 03-May-18 | |
| PT1080 | Post Tension - Pier 8 | 5 | 0 | 17 | 100% | 30-Apr-18A | 23-May-18A | 30-Apr-18 | 06-May-18 | 30-Apr-18 | 23-May-18 | |
| PT1090 | Post Tension - Pier 9 | 10 | 0 | 20 | 100% | 25-Apr-18A | 21-May-18A | 18-Apr-18 | 27-Apr-18 | 25-Apr-18 | 21-May-18 | |
| PT1100 | Post Tension - Pier 10 | 10 | 0 | 20 | 100% | 17-Apr-18A | 14-May-18A | 02-Apr-18 | 13-Apr-18 | 23-Apr-18 | 21-May-18 | |
| PT1110 | Post Tension - Pier 11 | 5 | 0 | 32 | 100% | 15-Jun-18A | 01-Aug-18A | 19-Jun-18 | 25-Jun-18 | 15-Jun-18 | 01-Aug-18 | |
| PT1120 | Post Tension - Pier 12 | 5 | 0 | 17 | 100% | 09-Jul-18A | 01-Aug-18A | 26-Jun-18 | 02-Jul-18 | 09-Jul-18 | 01-Aug-18 | |
| PT1130 | Post Tension - Pier 13 | 5 | 0 | 17 | 100% | 09-Jul-18A | 01-Aug-18A | 03-Jul-18 | 10-Jul-18 | 09-Jul-18 | 01-Aug-18 | |
| PT1140 | Post Tension - Pier 14 | 5 | 0 | 17 | 100% | 09-Jul-18A | 01-Aug-18A | 11-Jul-18 | 17-Jul-18 | 09-Jul-18 | 01-Aug-18 | |



Print Date/Time: 13-Dec-18 15:48    Data Date: 01-Dec-18

Cline Avenue Bridge - Contract Schedule - December 1, 2018 Data Date

7 of 15

| Activity ID | Activity Name | Original Duration | Remaining Duration | Actual Duration | Activity % Complete | Start | Finish | BL1 Start | BL1 Finish | Actual Start | Actual Finish | Total Float | Schedule |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PT1150 | Post Tension - Pier 15 | 5 | 0 | 17 | 100% | 09-Jul-18 A | 01-Aug-18 A | 18-Jul-18 | 24-Jul-18 | 09-Jul-18 | 01-Aug-18 | | Post Tension - Pier 15 |
| PT1160 | Post Tension - Pier 16 | 5 | 0 | 17 | 100% | 09-Jul-18 A | 01-Aug-18 A | 25-Jul-18 | 31-Jul-18 | 09-Jul-18 | 01-Aug-18 | | Post Tension - Pier 16 |
| **Segment Falsework** | | | | | | | | | | | | | |
| BR2619 | Procure/Deliver First Set of Segment Erection Falsework | 5 | 16 | 200 | 0% | 15-May-18 A | 16-Dec-18 | | 15-May-18 | | | 60 | Procure/Deliver First Set of Segment Erection Falsework |
| BR2619-2 | Erection Mobilize/Begin | 31 | 31 | 0 | 0% | 29-Jan-19 | 28-Feb-19 | | | | | 0 | Erection Mobilize/Begin |
| BR2620 | Span 1 - Install End Span Falsework | 5 | 5 | 0 | 0% | 04-Mar-19 | 08-Mar-19 | 22-Jun-18 | 28-Jun-18 | | | 26 | Span 1 - Install End Span Falsework |
| BR2625 | Span 1 - Remove End Span Falsework | 3 | 3 | 0 | 0% | 06-May-19 | 09-May-19 | 09-Aug-18 | 13-Aug-18 | | | 118 | Span 1 - Remove End Span Falsework |
| BR5020 | Pier 2 - Install Falsework Bracket | 2 | 2 | 0 | 0% | 28-Dec-18 | 31-Dec-18 | 19-Jun-18 | 21-Jun-18 | | | 32 | Pier 2 - Install Falsework Bracket |
| BR5025 | Pier 2 - Remove Falsework Bracket | 2 | 2 | 0 | 0% | 24-Apr-19 | 25-Apr-19 | 30-Jul-18 | 01-Aug-18 | | | 8 | Pier 2 - Remove Falsework Bracket |
| BR5030 | Pier 3 - Install Falsework Bracket | 2 | 2 | 0 | 0% | 21-Dec-18 | 27-Dec-18 | 12-Jun-18 | 14-Jun-18 | | | 32 | Pier 3 - Install Falsework Bracket |
| BR5035 | Pier 3 - Remove Falsework Bracket | 2 | 2 | 0 | 0% | 11-Apr-19 | 12-Apr-19 | 16-Jul-18 | 17-Jul-18 | | | 13 | Pier 3 - Remove Falsework Bracket |
| BR5040 | Pier 4 - Install Falsework Bracket | 3 | 3 | 0 | 0% | 17-Dec-18 | 20-Dec-18 | 05-Jun-18 | 06-Jun-18 | | | 32 | Pier 4 - Install Falsework Bracket |
| BR5045 | Pier 4 - Remove Falsework Bracket | 3 | 3 | 0 | 0% | 08-Apr-19 | 10-Apr-19 | 12-Jul-18 | 13-Jul-18 | | | 7 | Pier 4 - Remove Falsework Bracket |
| BR5050 | Pier 5 - Install Falsework Bracket | 1 | 1 | 0 | 0% | 11-Apr-19 | 11-Apr-19 | 16-Jul-18 | 16-Jul-18 | | | 7 | Pier 5 - Install Falsework Bracket |
| BR5055 | Pier 5 - Remove Falsework Bracket | 1 | 1 | 0 | 0% | 15-May-19 | 15-May-19 | 20-Aug-18 | 20-Aug-18 | | | 1 | Pier 5 - Remove Falsework Bracket |
| BR5060 | Pier 6 - Install Falsework Bracket | 1 | 1 | 0 | 0% | 15-Apr-19 | 15-Apr-19 | 19-Jul-18 | 19-Jul-18 | | | 13 | Pier 6 - Install Falsework Bracket |
| BR5065 | Pier 6 - Remove Falsework Bracket | 1 | 1 | 0 | 0% | 23-May-19 | 23-May-19 | 27-Aug-18 | 27-Aug-18 | | | 2 | Pier 6 - Remove Falsework Bracket |
| BR5070 | Pier 7 - Install Falsework Bracket | 1 | 1 | 0 | 0% | 26-Apr-19 | 26-Apr-19 | 02-Aug-18 | 02-Aug-18 | | | 8 | Pier 7 - Install Falsework Bracket |
| BR5075 | Pier 7 - Remove Falsework Bracket | 1 | 1 | 0 | 0% | 31-May-19 | 31-May-19 | 04-Sep-18 | 04-Sep-18 | | | 1 | Pier 7 - Remove Falsework Bracket |
| BR5080 | Pier 8 - Install Falsework Bracket | 1 | 1 | 0 | 0% | 16-May-19 | 16-May-19 | 21-Aug-18 | 21-Aug-18 | | | 1 | Pier 8 - Install Falsework Bracket |
| BR5085 | Pier 8 - Remove Falsework Bracket | 1 | 1 | 0 | 0% | 07-Jun-19 | 07-Jun-19 | 11-Sep-18 | 11-Sep-18 | | | 1 | Pier 8 - Remove Falsework Bracket |
| BR5090 | Pier 9 - Install Falsework Bracket | 1 | 1 | 0 | 0% | 24-May-19 | 24-May-19 | 28-Aug-18 | 28-Aug-18 | | | 2 | Pier 9 - Install Falsework Bracket |
| BR5095 | Pier 9 - Remove Falsework Bracket | 1 | 1 | 0 | 0% | 17-Jun-19 | 17-Jun-19 | 19-Sep-18 | 19-Sep-18 | | | 0 | Pier 9 - Remove Falsework Bracket |
| BR5100 | Pier 10 - Install Falsework Bracket | 1 | 1 | 0 | 0% | 03-Jun-19 | 03-Jun-19 | 05-Sep-18 | 05-Sep-18 | | | 1 | Pier 10 - Install Falsework Bracket |
| BR5105 | Pier 10 - Remove Falsework Bracket | 1 | 1 | 0 | 0% | 24-Jun-19 | 24-Jun-19 | 27-Sep-18 | 27-Sep-18 | | | 5 | Pier 10 - Remove Falsework Bracket |
| BR5110 | Pier 11 - Install Falsework Bracket | 1 | 1 | 0 | 0% | 10-Jun-19 | 10-Jun-19 | 13-Sep-18 | 13-Sep-18 | | | 13 | Pier 11 - Install Falsework Bracket |
| BR5115 | Pier 11 - Remove Falsework Bracket | 1 | 1 | 0 | 0% | 19-Jul-19 | 19-Jul-19 | 24-Oct-18 | 24-Oct-18 | | | 2 | Pier 11 - Remove Falsework Bracket |
| BR5120 | Pier 12 - Install Falsework Bracket | 1 | 1 | 0 | 0% | 18-Jun-19 | 18-Jun-19 | 20-Sep-18 | 20-Sep-18 | | | 0 | Pier 12 - Install Falsework Bracket |
| BR5125 | Pier 12 - Remove Falsework Bracket | 1 | 1 | 0 | 0% | 09-Jul-19 | 09-Jul-19 | 12-Oct-18 | 12-Oct-18 | | | 1 | Pier 12 - Remove Falsework Bracket |
| BR5130 | Pier 13 - Install Falsework Bracket | 1 | 1 | 0 | 0% | 25-Jun-19 | 25-Jun-19 | 05-Sep-18 | 05-Sep-18 | | | 5 | Pier 13 - Install Falsework Bracket |
| BR5135 | Pier 13 - Remove Falsework Bracket | 1 | 1 | 0 | 0% | 31-Jul-19 | 31-Jul-19 | 01-Nov-18 | 01-Nov-18 | | | 3 | Pier 13 - Remove Falsework Bracket |
| BR5140 | Pier 14 - Install Falsework Bracket | 1 | 1 | 0 | 0% | 10-Jul-19 | 10-Jul-19 | 28-Sep-18 | 28-Sep-18 | | | 0 | Pier 14 - Install Falsework Bracket |
| BR5145 | Pier 14 - Remove Falsework Bracket | 1 | 1 | 0 | 0% | 01-Aug-19 | 01-Aug-19 | 02-Nov-18 | 02-Nov-18 | | | 4 | Pier 14 - Remove Falsework Bracket |
| BR5150 | Pier 15 - Install Falsework Bracket | 1 | 1 | 0 | 0% | 22-Jul-19 | 22-Jul-19 | 25-Oct-18 | 25-Oct-18 | | | 2 | Pier 15 - Install Falsework Bracket |
| BR5155 | Pier 15 - Remove Falsework Bracket | 1 | 1 | 0 | 0% | 12-Aug-19 | 12-Aug-19 | 19-Mar-19 | 19-Mar-19 | | | 54 | Pier 15 - Remove Falsework Bracket |
| BR5160 | Pier 16 - Install Falsework Bracket | 1 | 1 | 0 | 0% | 15-Jul-19 | 15-Jul-19 | 15-Oct-18 | 15-Oct-18 | | | 0 | Pier 16 - Install Falsework Bracket |
| BR5165 | Pier 16 - Remove Falsework Bracket | 1 | 1 | 0 | 0% | 05-Sep-19 | 05-Sep-19 | 25-Apr-19 | 25-Apr-19 | | | 38 | Pier 16 - Remove Falsework Bracket |
| **Pier Table Segment Erection** | | | | | | | | | | | | | |
| BR2670 | Span 1 - Erect End Span Segments on Falsework (3 EA) | 3 | 3 | 0 | 0% | 01-Apr-19 | 04-Apr-19 | 06-Jul-18 | 10-Jul-18 | | | 12 | Span 1 - Erect End Span Segments on Falsework |
| BR5286 | Pier 2 - Set & Stress Split Pier Segments (2 EA) | 3 | 3 | 0 | 0% | 19-Mar-19 | 22-Mar-19 | 25-Jun-18 | 27-Jun-18 | | | 0 | Pier 2 - Set & Stress Split Pier Segments (2 EA) |
| BR5287 | Pier 2 - Erect First Cantilever Seg Pair & Grout Bearings (2 EA) | 5 | 5 | 0 | 0% | 25-Mar-19 | 29-Mar-19 | 28-Jun-18 | 05-Jul-18 | | | 0 | Pier 2 - Erect First Cantilever Seg Pair & Grout Bearings |
| BR5290 | Pier 3 - Set & Stress Split Pier Segments (2 EA) | 2 | 2 | 0 | 0% | 11-Mar-19 | 12-Mar-19 | 15-Jun-18 | 18-Jun-18 | | | 0 | Pier 3 - Set & Stress Split Pier Segments (2 EA) |
| BR5295 | Pier 3 - Erect First Cantilever Seg Pair & Grout Bearings (2 EA) | 4 | 4 | 0 | 0% | 13-Mar-19 | 18-Mar-19 | 19-Jun-18 | 22-Jun-18 | | | 0 | Pier 3 - Erect First Cantilever Seg Pair & Grout Bearings |
| BR5300 | Pier 4 - Set & Stress Split Pier Segments (2 EA) | 2 | 2 | 0 | 0% | 01-Mar-19 | 04-Mar-19 | 07-Jun-18 | 08-Jun-18 | | | 0 | Pier 4 - Set & Stress Split Pier Segments (2 EA) |
| BR5305 | Pier 4 - Erect First Cantilever Seg Pair & Grout Bearings (2 EA) | 3 | 3 | 0 | 0% | 05-Mar-19 | 08-Mar-19 | 11-Jun-18 | 14-Jun-18 | | | 0 | Pier 4 - Erect First Cantilever Seg Pair & Grout Bearings |
| BR5310 | Pier 5 - Set & Stress Split Pier Segments (2 EA) | 1 | 1 | 0 | 0% | 12-Apr-19 | 12-Apr-19 | 17-Jul-18 | 17-Jul-18 | | | 7 | Pier 5 - Set & Stress Split Pier Segments (2 EA) |
| BR5315 | Pier 5 - Erect First Cantilever Seg Pair & Grout Bearings (2 EA) | 2 | 2 | 0 | 0% | 15-Apr-19 | 16-Apr-19 | 18-Jul-18 | 20-Jul-18 | | | 7 | Pier 5 - Erect First Cantilever Seg Pair & Grout Bearings |
| BR5320 | Pier 6 - Set & Stress Split Pier Segments (2 EA) | 1 | 1 | 0 | 0% | 18-Apr-19 | 18-Apr-19 | 23-Jul-18 | 23-Jul-18 | | | 12 | Pier 6 - Set & Stress Split Pier Segments (2 EA) |
| BR5325 | Pier 6 - Erect First Cantilever Seg Pair & Grout Bearings (2 EA) | 2 | 2 | 0 | 0% | 19-Apr-19 | 22-Apr-19 | 24-Jul-18 | 25-Jul-18 | | | 12 | Pier 6 - Erect First Cantilever Seg Pair & Grout Bearings |

Print Date/Time: 13-Dec-18 15:48    Data Date: 01-Dec-18     Cline Avenue Bridge - Contract Schedule - December 1, 2018 Data Date     8 of 15

| Activity ID | Activity Name | Original Duration | Remaining Duration | Actual Duration | Activity % Complete | Start | Finish | BL1 Start | BL1 Finish | Actual Start | Actual Finish | Total Float |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BR5330 | Pier 7 - Set & Stress Split Pier Segments (2 EA) | 1 | 1 | 0 | 0% | 29-Apr-19 | 29-Apr-19 | 03-Aug-18 | 03-Aug-18 | | | 8 |
| BR5335 | Pier 7 - Erect First Cantilever Seg Pair & Grout Bearings (2 EA) | 2 | 2 | 0 | 0% | 30-Apr-19 | 01-May-19 | 06-Aug-18 | 07-Aug-18 | | | 8 |
| BR5340 | Pier 8 - Set & Stress Split Pier Segments (2 EA) | 1 | 1 | 0 | 0% | 17-May-19 | 17-May-19 | 22-Aug-18 | 22-Aug-18 | | | 1 |
| BR5345 | Pier 8 - Erect First Cantilever Seg Pair & Grout Bearings (2 EA) | 2 | 2 | 0 | 0% | 20-May-19 | 21-May-19 | 23-Aug-18 | 24-Aug-18 | | | 1 |
| BR5350 | Pier 9 - Set & Stress Split Pier Segments (2 EA) | 1 | 1 | 0 | 0% | 28-May-19 | 28-May-19 | 29-Aug-18 | 29-Aug-18 | | | 2 |
| BR5355 | Pier 9 - Erect First Cantilever Seg Pair & Grout Bearings (2 EA) | 2 | 2 | 0 | 0% | 29-May-19 | 30-May-19 | 30-Aug-18 | 31-Aug-18 | | | 2 |
| BR5360 | Pier 10 - Set & Stress Split Pier Segments (2 EA) | 1 | 1 | 0 | 0% | 04-Jun-19 | 04-Jun-19 | 06-Sep-18 | 06-Sep-18 | | | 1 |
| BR5365 | Pier 10 - Erect First Cantilever Seg Pair & Grout Bearings (2 EA) | 2 | 2 | 0 | 0% | 05-Jun-19 | 06-Jun-19 | 07-Sep-18 | 10-Sep-18 | | | 1 |
| BR5370 | Pier 11 - Set & Stress Split Pier Segments (2 EA) | 1 | 1 | 0 | 0% | 11-Jun-19 | 11-Jun-19 | 14-Sep-18 | 14-Sep-18 | | | 1 |
| BR5375 | Pier 11 - Erect First Cantilever Seg Pair & Grout Bearings (2 EA) | 2 | 2 | 0 | 0% | 13-Jun-19 | 14-Jun-19 | 17-Sep-18 | 18-Sep-18 | | | 1 |
| BR5380 | Pier 12 - Set & Stress Split Pier Segments (2 EA) | 1 | 1 | 0 | 0% | 19-Jun-19 | 19-Jun-19 | 21-Sep-18 | 21-Sep-18 | | | 0 |
| BR5385 | Pier 12 - Erect First Cantilever Seg Pair & Grout Bearings (2 EA) | 2 | 2 | 0 | 0% | 20-Jun-19 | 21-Jun-19 | 24-Sep-18 | 25-Sep-18 | | | 0 |
| BR5390 | Pier 13 - Set & Stress Split Pier Segments (2 EA) | 1 | 1 | 0 | 0% | 26-Jun-19 | 26-Jun-19 | 27-Sep-18 | 27-Sep-18 | | | 5 |
| BR5395 | Pier 13 - Erect First Cantilever Seg Pair & Grout Bearings (2 EA) | 2 | 2 | 0 | 0% | 27-Jun-19 | 28-Jun-19 | 28-Sep-18 | 01-Oct-18 | | | 5 |
| BR5400 | Pier 14 - Set & Stress Split Pier Segments (2 EA) | 1 | 1 | 0 | 0% | 11-Jul-19 | 11-Jul-19 | 02-Oct-18 | 02-Oct-18 | | | 0 |
| BR5405 | Pier 14 - Erect First Cantilever Seg Pair & Grout Bearings (2 EA) | 2 | 2 | 0 | 0% | 12-Jul-19 | 15-Jul-19 | 09-Oct-18 | 10-Oct-18 | | | 0 |
| BR5410 | Pier 15 - Set & Stress Split Pier Segments (2 EA) | 1 | 1 | 0 | 0% | 23-Jul-19 | 23-Jul-19 | 26-Oct-18 | 26-Oct-18 | | | 2 |
| BR5415 | Pier 15 - Erect First Cantilever Seg Pair & Grout Bearings (2 EA) | 2 | 2 | 0 | 0% | 24-Jul-19 | 25-Jul-19 | 29-Oct-18 | 30-Oct-18 | | | 2 |
| BR5420 | Pier 16 - Set & Stress Split Pier Segments (2 EA) | 1 | 1 | 0 | 0% | 02-Aug-19 | 02-Aug-19 | 01-Mar-19 | 01-Mar-19 | | | 0 |
| BR5425 | Pier 16 - Erect First Cantilever Seg Pair & Grout Bearings (2 EA) | 2 | 2 | 0 | 0% | 05-Aug-19 | 06-Aug-19 | 04-Mar-19 | 05-Mar-19 | | | 0 |
| **Cantilever Segment Erection** | | | | | | | | | | | | |
| BR5288 | Pier 2 - Erect Remaining Cantilever Segments - (18 EA) | 8 | 8 | 0 | 0% | 01-Apr-19 | 11-Apr-19 | 06-Jul-18 | 17-Jul-18 | | | 0 |
| BR5296 | Pier 3 - Erect Remaining Cantilever Segments - (14 EA) | 6 | 6 | 0 | 0% | 19-Mar-19 | 27-Mar-19 | 25-Jun-18 | 02-Jul-18 | | | 2 |
| BR5306 | Pier 4 - Erect Remaining Cantilever Segments - (16 EA) | 5 | 5 | 0 | 0% | 11-Mar-19 | 15-Mar-19 | 15-Jun-18 | 21-Jun-18 | | | 3 |
| BR5316 | Pier 5 - Erect Remaining Cantilever Segments - (16 EA) | 5 | 5 | 0 | 0% | 18-Apr-19 | 24-Apr-19 | 23-Jul-18 | 27-Jul-18 | | | 7 |
| BR5326 | Pier 6 - Erect Remaining Cantilever Segments - (16 EA) | 3 | 3 | 0 | 0% | 25-Apr-19 | 29-Apr-19 | 30-Jul-18 | 01-Aug-18 | | | 10 |
| BR5336 | Pier 7 - Erect Remaining Cantilever Segments - (16 EA) | 5 | 5 | 0 | 0% | 02-May-19 | 09-May-19 | 08-Aug-18 | 14-Aug-18 | | | 8 |
| BR5346 | Pier 8 - Erect Remaining Cantilever Segments - (16 EA) | 4 | 4 | 0 | 0% | 23-May-19 | 29-May-19 | 27-Aug-18 | 30-Aug-18 | | | 1 |
| BR5356 | Pier 9 - Erect Remaining Cantilever Segments - (12 EA) | 3 | 3 | 0 | 0% | 31-May-19 | 04-Jun-19 | 04-Sep-18 | 06-Sep-18 | | | 2 |
| BR5366 | Pier 10 - Erect Remaining Cantilever Segments - (17 EA) | 5 | 5 | 0 | 0% | 07-Jun-19 | 14-Jun-19 | 11-Sep-18 | 18-Sep-18 | | | 1 |
| BR5376 | Pier 11 - Erect Remaining Cantilever Segments - (17 EA) | 4 | 4 | 0 | 0% | 17-Jun-19 | 20-Jun-19 | 19-Sep-18 | 24-Sep-18 | | | 1 |
| BR5386 | Pier 12 - Erect Remaining Cantilever Segments - (18 EA) | 5 | 5 | 0 | 0% | 24-Jun-19 | 28-Jun-19 | 27-Sep-18 | 04-Oct-18 | | | 0 |
| BR5396 | Pier 13 - Erect Remaining Cantilever Segments - (20 EA) | 5 | 5 | 0 | 0% | 01-Jul-19 | 08-Jul-19 | 05-Oct-18 | 11-Oct-18 | | | 5 |
| BR5406 | Pier 14 - Erect Remaining Cantilever Segments - (18 EA) | 5 | 5 | 0 | 0% | 16-Jul-19 | 23-Jul-19 | 12-Oct-18 | 19-Oct-18 | | | 0 |
| BR5416 | Pier 15 - Erect Remaining Cantilever Segments - (23 EA) | 6 | 6 | 0 | 0% | 26-Jul-19 | 02-Aug-19 | 01-Mar-19 | 11-Mar-19 | | | 2 |
| BR5426 | Pier 16 - Erect Remaining Cantilever Segments - (29 EA) | 7 | 7 | 0 | 0% | 05-Aug-19 | 16-Aug-19 | 12-Mar-19 | 21-Mar-19 | | | 0 |
| **Mid-Span Segment Closures** | | | | | | | | | | | | |
| BR2760 | F/P/S Closure Segment + Continuity PT - Span 1 | 8 | 8 | 0 | 0% | 24-Apr-19 | 03-May-19 | 30-Jul-18 | 08-Aug-18 | | | 0 |
| BR2762 | F/P/S Closure Segment + Continuity PT - Span 2 | 7 | 7 | 0 | 0% | 12-Apr-19 | 23-Apr-19 | 18-Jul-18 | 27-Jul-18 | | | 0 |
| BR2764 | F/P/S Closure Segment + Continuity PT - Span 3 | 6 | 6 | 0 | 0% | 28-Mar-19 | 05-Apr-19 | 03-Jul-18 | 11-Jul-18 | | | 4 |
| BR2780 | F/P/S Closure Segment + Continuity PT - Span 4 | 6 | 6 | 0 | 0% | 06-May-19 | 14-May-19 | 09-Aug-18 | 17-Aug-18 | | | 0 |
| BR2800 | F/P/S Closure Segment + Continuity PT - Span 5 | 5 | 5 | 0 | 0% | 15-May-19 | 21-May-19 | 20-Aug-18 | 24-Aug-18 | | | 0 |
| BR2820 | F/P/S Closure Segment + Continuity PT - Span 6 | 5 | 5 | 0 | 0% | 23-May-19 | 30-May-19 | 27-Aug-18 | 31-Aug-18 | | | 0 |
| BR2830 | F/P/S Closure Segment + Continuity PT - Span 7 | 5 | 5 | 0 | 0% | 31-May-19 | 06-Jun-19 | 04-Sep-18 | 10-Sep-18 | | | 0 |
| BR2850 | F/P/S Closure Segment + Continuity PT - Span 8 | 5 | 5 | 0 | 0% | 07-Jun-19 | 14-Jun-19 | 11-Sep-18 | 18-Sep-18 | | | 0 |
| BR2870 | F/P/S Closure Segment + Continuity PT - Span 9 | 5 | 5 | 0 | 0% | 17-Jun-19 | 21-Jun-19 | 19-Sep-18 | 25-Sep-18 | | | 5 |
| BR2889 | Load EJ Beams in Cantilever - Span 10 | 2 | 2 | 0 | 0% | 21-Jun-19 | 24-Jun-19 | 27-Sep-18 | 28-Sep-18 | | | 4 |
| BR2890 | PT, Install Hinge Beams w Bearings - Span 10 | 7 | 7 | 0 | 0% | 09-Jul-19 | 18-Jul-19 | 12-Oct-18 | 23-Oct-18 | | | 2 |
| BR2910 | F/P/S Closure Segment + Continuity PT - Span 11 | 5 | 5 | 0 | 0% | 01-Jul-19 | 08-Jul-19 | 05-Oct-18 | 11-Oct-18 | | | 5 |

Print Date/Time: 13-Dec-18 15:48 | Data Date: 01-Dec-18 | Cline Avenue Bridge - Contract Schedule - December 1, 2018 Data Date | 9 of 15

| Activity ID | Activity Name | Original Duration | Remaining Duration | Actual Duration | Activity % Complete | Start | Finish | BL1 Start | BL1 Finish | Actual Start | Actual Finish | Total Float |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BR2930 | F/P/S Closure Segment + Continuity PT - Span 12 | 5 | 5 | 0 | 0% | 12-Aug-19 | 19-Aug-19 | 19-Mar-19 | 26-Mar-19 | | | 138 |
| BR2950 | F/P/S Closure Segment + Continuity PT - Span 13 | 5 | 5 | 0 | 0% | 24-Jul-19 | 30-Jul-19 | 24-Oct-18 | 30-Oct-18 | | | 0 |
| BR2980 | F/P/S Closure Segment + Continuity PT - Span 14 | 5 | 5 | 0 | 0% | 05-Aug-19 | 09-Aug-19 | 12-Mar-19 | 18-Mar-19 | | | 9 |
| BR2981 | Load EJ Beams in Cantilever - Span 15 | 2 | 2 | 0 | 0% | 05-Aug-19 | 06-Aug-19 | 27-Mar-19 | 28-Mar-19 | | | 146 |
| BR2982 | PT, Install Hinge Beams w Bearings - Span 15 | 7 | 7 | 0 | 0% | 26-Aug-19 | 04-Sep-19 | 15-Apr-19 | 24-Apr-19 | | | 0 |
| BR3010 | F/P/S Closure Segment + Continuity PT - Span 16 | 5 | 5 | 0 | 0% | 06-Sep-19 | 12-Sep-19 | 08-Apr-19 | 12-Apr-19 | | | 0 |

**Finish Work**

| Activity ID | Activity Name | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BR5501 | F/P/S Approach Slab - Abut 1 | 7 | 7 | 0 | 0% | 06-May-19 | 15-May-19 | 07-May-18 | 15-May-18 | | | 69 |
| BR5576 | Slipform/Place Conc Barrier & Transitions - West (Mob #1) | 7 | 7 | 0 | 0% | 07-Jun-19 | 18-Jun-19 | 11-Jun-19 | 20-Jun-19 | | | 48 |
| BR5586 | Bridge Lighting - West (Mob #1) | 20 | 20 | 0 | 0% | 19-Jun-19 | 18-Jul-19 | 21-Jun-19 | 22-Jul-19 | | | 51 |
| BR5596 | Grind and Groove - West (Mob #1) | 15 | 15 | 0 | 0% | 13-Sep-19 | 04-Oct-19 | 11-Jul-19 | 01-Aug-19 | | | 4 |
| EJ1010 | Install/Pourback Modular Exp Joint & Cover Plates - Abut 1 | 3 | 3 | 0 | 0% | 19-Jun-19 | 21-Jun-19 | 21-Jun-19 | 25-Jun-19 | | | 48 |
| EJ1020 | Install/Pourback Modular Exp Joint & Cover Plates - Span 10 | 5 | 5 | 0 | 0% | 19-Jul-19 | 25-Jul-19 | 26-Jun-19 | 02-Jul-19 | | | 31 |
| EJ1030 | Install/Pourback Modular Exp Joint & Cover Plates - Span 15 | 5 | 5 | 0 | 0% | 05-Sep-19 | 12-Sep-19 | 03-Jul-19 | 10-Jul-19 | | | 4 |

## Mainline Structure Over Canal

**Columns**

| Activity ID | Activity Name | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CN2170 | Column - Pier 17 (Lower) | 5 | 5 | 0 | 0% | 04-Feb-19 | 08-Feb-19 | 05-Jun-18 | 11-Jun-18 | | | 58 |
| CN2172 | Column - Pier 17 (Upper) | 5 | 5 | 0 | 0% | 08-Feb-19 | 14-Feb-19 | 11-Jun-18 | 15-Jun-18 | | | 58 |
| CN2180 | Column - Pier 18 (Lower) | 5 | 5 | 0 | 0% | 05-Mar-19 | 11-Mar-19 | 18-Jun-18 | 22-Jun-18 | | | 47 |
| CN2182 | Column - Pier 18 (Upper) | 5 | 5 | 0 | 0% | 12-Mar-19 | 18-Mar-19 | 22-Jun-18 | 28-Jun-18 | | | 47 |
| MW1030 | Recast Pier 17 Pedestal | 30 | 30 | 0 | 0% | 19-Dec-18 | 01-Feb-19 | | | | | 47 |
| MW1040 | Recast Pier 18 Pedestal | 30 | 30 | 0 | 0% | 18-Jan-19 | 04-Mar-19 | | | | | 47 |

**Cap Flares**

| Activity ID | Activity Name | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CAP1170 | Cap Flare - Pier 17 | 10 | 10 | 0 | 0% | 15-Feb-19 | 01-Mar-19 | 25-Jun-18 | 09-Jul-18 | | | 63 |
| CAP1180 | Cap Flare - Pier 18 | 10 | 10 | 0 | 0% | 19-Mar-19 | 01-Apr-19 | 23-Aug-18 | 06-Sep-18 | | | 47 |
| CAP1470 | Dry Finish Abut & Piers 1-17 | 15 | 15 | 0 | 0% | 13-May-19 | 22-Mar-19 | 11-Jul-18 | 18-Sep-18 | | | 286 |

**Post Tensioning (Substructure)**

| Activity ID | Activity Name | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PT1170 | Post Tension - Pier 17 | 5 | 5 | 0 | 0% | 04-Mar-19 | 08-Mar-19 | 01-Aug-18 | 07-Aug-18 | | | 73 |
| PT1180 | Post Tension - Pier 18 | 5 | 5 | 0 | 0% | 16-Apr-19 | 22-Apr-19 | 18-Sep-18 | 24-Sep-18 | | | 47 |

**Segment Falsework**

| Activity ID | Activity Name | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BR5170 | Pier 17 - Install Falsework Bracket | 1 | 1 | 0 | 0% | 02-Jul-19 | 02-Jul-19 | 05-Nov-18 | 05-Nov-18 | | | 9 |
| BR5175 | Pier 17 - Remove Falsework Bracket | 1 | 1 | 0 | 0% | 26-Aug-19 | 26-Aug-19 | 15-Apr-19 | 15-Apr-19 | | | 45 |
| BR5180 | Pier 18 - Install Falsework Bracket | 1 | 1 | 0 | 0% | 25-Jun-19 | 25-Jun-19 | 21-Mar-19 | 21-Mar-19 | | | 3 |
| BR5185 | Pier 18 - Remove Falsework Bracket | 1 | 1 | 0 | 0% | 13-Sep-19 | 13-Sep-19 | 21-May-19 | 21-May-19 | | | 33 |

**Pier Table Segment Erection**

| Activity ID | Activity Name | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BR5430 | Pier 17 - Set & Stress Split Pier Segments (2 EA) | 1 | 1 | 0 | 0% | 03-Jul-19 | 03-Jul-19 | 07-Mar-19 | 07-Mar-19 | | | 9 |
| BR5435 | Pier 17 - Erect First Cantilever Seg Pair & Grout Bearings (2 EA) | 2 | 2 | 0 | 0% | 05-Jul-19 | 08-Jul-19 | 08-Mar-19 | 11-Mar-19 | | | 9 |
| BR5440 | Pier 18 - Set & Stress Split Pier Segments (2 EA) | 1 | 1 | 0 | 0% | 26-Jun-19 | 26-Jun-19 | 22-Mar-19 | 22-Mar-19 | | | 3 |
| BR5445 | Pier 18 - Erect First Cantilever Seg Pair & Grout Bearings (2 EA) | 2 | 2 | 0 | 0% | 27-Jun-19 | 28-Jun-19 | 25-Mar-19 | 26-Mar-19 | | | 3 |

**Cantilever Segment Erection**

| Activity ID | Activity Name | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BR5436 | Pier 17 - Erect Remaining Cantilever Segments - (30 EA) | 10 | 10 | 0 | 0% | 22-Jul-19 | 02-Aug-19 | 22-Mar-19 | 05-Apr-19 | | | 1 |
| BR5446 | Pier 18 - Erect Remaining Cantilever Segments - (32 EA) | 11 | 11 | 0 | 0% | 09-Jul-19 | 19-Jul-19 | 28-Mar-19 | 23-Apr-19 | | | 1 |

**Mid-Span Segment Closures**

| Activity ID | Activity Name | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BR3020 | F/P/S Closure Segment + Continuity PT - Span 17 | 5 | 5 | 0 | 0% | 05-Sep-19 | 12-Sep-19 | 04-Jun-19 | 10-Jun-19 | | | 0 |

## Mainline Structure East of Canal

**Excavation & Sheeting**

| Activity ID | Activity Name | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| EX1260 | Excavate & Demo - Pier 26 | 5 | 0 | 3 | 100% | 28-Aug-18A | 31-Aug-18A | 09-Apr-18 | 04-May-18 | 28-Aug-18 | 31-Aug-18 | |

Print Date/Time: 13-Dec-18 15:48   Data Date: 01-Dec-18    Cline Avenue Bridge - Contract Schedule - December 1, 2018 Data Date    10 of 15

| Activity ID | Activity Name | Original Duration | Remaining Duration | Actual Duration | Activity % Complete | Start | Finish | BL1 Start | BL1 Finish | Actual Start | Actual Finish | Total Float |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| EX1261 | Excavate & Demo - Pier 27,28,29 | 20 | 0 | 29 | 100% | 08-Oct-18A | 16-Nov-18A | 17-May-18 | 23-May-18 | 08-Oct-18 | 16-Nov-18 | |
| EX1265 | Core Footings for Pile 26 | 5 | 0 | 3 | 100% | 28-Aug-18A | 31-Aug-18A | 09-Apr-18 | 20-Apr-18 | 28-Aug-18 | 31-Aug-18 | |
| EX1266 | Core Footings for Pile 27,28,29 | 10 | 0 | 11 | 100% | 26-Oct-18A | 12-Nov-18A | 17-May-18 | 21-May-18 | 26-Oct-18 | 12-Nov-18 | |
| SHT1260 | Sheet - Pier 26 | 5 | 0 | 1 | 100% | 07-Jun-18A | 08-Jun-18A | 20-Apr-18 | 20-Apr-18 | 07-Jun-18 | 08-Jun-18 | |
| SHT1261 | Sheet - Pier 27,28,29 | 15 | 0 | 4 | 100% | 10-Oct-18A | 16-Oct-18A | 11-May-18 | 16-May-18 | 10-Oct-18 | 16-Oct-18 | |
| **Foundations - Pile Driving** | | | | | | | | | | | | |
| ON1190 | Foundation - Pier 19 | 5 | 0 | 23 | 100% | 26-Feb-18A | 29-Mar-18A | 03-Apr-18 | 09-Apr-18 | 26-Feb-18 | 29-Mar-18 | |
| ON1200 | Foundation - Pier 20 | 5 | 0 | 19 | 100% | 26-Mar-18A | 10-Apr-18A | 09-Apr-18 | 16-Apr-18 | 27-Feb-18 | 10-Apr-18 | |
| ON1210 | Foundation - Pier 21 | 5 | 0 | 14 | 100% | 14-Feb-18A | 07-Mar-18A | 18-Apr-18 | 23-Apr-18 | 14-Feb-18 | 07-Mar-18 | |
| ON1220 | Foundation - Pier 22 | 5 | 0 | 34 | 100% | 15-Feb-18A | 05-Apr-18A | 24-Apr-18 | 30-Apr-18 | 15-Feb-18 | 05-Apr-18 | |
| ON1230 | Foundation - Pier 23 | 5 | 0 | 41 | 100% | 21-Feb-18A | 19-Apr-18A | 01-May-18 | 07-May-18 | 21-Feb-18 | 19-Apr-18 | |
| ON1240 | Foundation - Pier 24 | 5 | 0 | 31 | 100% | 12-Mar-18A | 24-Apr-18A | 13-May-18 | 19-May-18 | 12-Mar-18 | 24-Apr-18 | |
| ON1250 | Foundation - Pier 25 | 5 | 0 | 32 | 100% | 13-Mar-18A | 26-Apr-18A | 20-Apr-18 | 26-Apr-18 | 13-Mar-18 | 26-Apr-18 | |
| ON1260 | Foundation - Pier 26 | 5 | 0 | 17 | 100% | 08-Oct-18A | 31-Oct-18A | 30-Apr-18 | 04-May-18 | 08-Oct-18 | 31-Oct-18 | |
| ON1270 | Foundation - Pier 27 | 5 | 5 | 8 | 0% | 20-Dec-18 | 22-May-18 | 29-May-18 | 19-Nov-18 | | | 85 |
| ON1280 | Foundation - Pier 28 | 5 | 5 | 14 | 0% | 09-Nov-18A | 13-Dec-18 | 07-May-18 | 11-May-18 | 09-Nov-18 | | 75 |
| ON1290 | Foundation - Pier 29 | 5 | 4 | 18 | 20% | 05-Nov-18A | 14-May-18 | 18-May-18 | 05-Nov-18 | | | 70 |
| **Foundations - Footings** | | | | | | | | | | | | |
| FTG1900 | Footing - Pier 19 | 7 | 0 | 8 | 100% | 23-Jul-18A | 02-Aug-18A | 08-May-18 | 17-May-18 | 23-Jul-18 | 02-Aug-18 | |
| FTG2000 | Footing - Pier 20 | 7 | 0 | 5 | 100% | 15-May-18A | 22-May-18A | 18-May-18 | 25-May-18 | 15-May-18 | 22-May-18 | |
| FTG2100 | Footing - Pier 21 | 7 | 0 | 9 | 100% | 18-May-18A | 01-Jun-18A | 30-May-18 | 07-Jun-18 | 18-May-18 | 01-Jun-18 | |
| FTG2200 | Footing - Pier 22 | 7 | 0 | 12 | 100% | 22-May-18A | 11-Jun-18A | 08-Jun-18 | 18-Jun-18 | 22-May-18 | 11-Jun-18 | |
| FTG2300 | Footing - Pier 23 | 7 | 0 | 4 | 100% | 11-Jun-18A | 15-Jun-18A | 13-Jun-18 | 21-Jun-18 | 11-Jun-18 | 15-Jun-18 | |
| FTG2400 | Footing - Pier 24 | 5 | 0 | 8 | 100% | 13-Jun-18A | 28-Jun-18A | 28-Jun-18 | 05-Jul-18 | 13-Jun-18 | 25-Jun-18 | |
| FTG2500 | Footing - Pier 25 | 6 | 0 | 9 | 100% | 18-Jun-18A | 29-Jun-18A | 06-Jul-18 | 13-Jul-18 | 18-Jun-18 | 29-Jun-18 | |
| FTG2600 | Footing - Pier 26 | 5 | 5 | 7 | 0% | 20-Nov-18A | 07-Dec-18 | 16-Jul-18 | 20-Jul-18 | 20-Nov-18 | | 69 |
| FTG2700 | Footing - Pier 27 | 5 | 5 | 0 | 0% | 29-Jan-19 | 15-Jan-19 | 20-Aug-18 | 24-Aug-18 | | | 74 |
| FTG2800 | Footing - Pier 28 | 10 | 10 | 0 | 0% | 24-Dec-18 | 24-Jan-19 | 11-Jun-18 | 03-Aug-18 | | | 69 |
| FTG2900 | Footing - Pier 29 | 10 | 10 | 0 | 0% | 10-Dec-18 | 21-Dec-18 | 06-Aug-18 | 17-Aug-18 | | | 69 |
| **Columns** | | | | | | | | | | | | |
| ON2190 | Column - Pier 19 (Lower) | 5 | 0 | 3 | 100% | 07-Aug-18A | 10-Aug-18A | 06-Aug-18 | 07-Aug-18 | 07-Aug-18 | 10-Aug-18 | |
| ON2192 | Column - Pier 19 (Upper) | 5 | 0 | 3 | 100% | 10-Aug-18A | 15-Aug-18A | 06-Jul-18 | 12-Jul-18 | 07-Aug-18 | 15-Aug-18 | |
| ON2200 | Column - Pier 20 (Lower) | 5 | 0 | 10 | 100% | 24-May-18A | 04-Jun-18A | 13-Jul-18 | 19-Jul-18 | 24-May-18 | 04-Jun-18 | |
| ON2202 | Column - Pier 20 (Upper) | 5 | 0 | 10 | 100% | 18-Jun-18A | 29-Jun-18A | 15-Jun-18 | 25-Jul-18 | 24-May-18 | 04-Jun-18 | |
| ON2210 | Column - Pier 21 | 5 | 0 | 10 | 100% | 13-Jun-18A | 27-Jun-18A | 26-Jul-18 | 01-Aug-18 | 13-Jun-18 | 27-Jun-18 | |
| ON2220 | Column - Pier 22 | 5 | 0 | 5 | 100% | 19-Jun-18A | 11-Jul-18A | 02-Aug-18 | 08-Aug-18 | 19-Jun-18 | 11-Jul-18 | |
| ON2230 | Column - Pier 23 | 5 | 0 | 26 | 100% | 25-Jun-18A | 04-Jun-18A | 09-Aug-18 | 15-Aug-18 | 25-Jun-18 | 11-Jul-18 | |
| ON2240 | Column - Pier 24 | 5 | 0 | 7 | 100% | 29-Jun-18A | 09-Jul-18A | 16-Aug-18 | 22-Aug-18 | 27-Jun-18 | 09-Jul-18 | |
| ON2250 | Column - Pier 25 | 5 | 0 | 6 | 100% | 29-Jun-18A | 09-Jul-18A | 22-Aug-18 | 29-Aug-18 | 29-Jun-18 | 09-Jul-18 | |
| ON2260 | Column - Pier 26 | 5 | 5 | 0 | 0% | 14-Dec-18 | 14-Dec-18 | 30-Aug-18 | 06-Sep-18 | | | 89 |
| ON2270 | Column - Pier 27 | 5 | 5 | 0 | 0% | 16-Jan-19 | 23-Jan-19 | 07-Sep-18 | 13-Sep-18 | | | 74 |
| **Cap Flares** | | | | | | | | | | | | |
| CAP1190 | Cap Flare - Pier 19 | 10 | 0 | 6 | 100% | 14-Aug-18A | 22-Aug-18A | 30-Aug-18 | 13-Sep-18 | 14-Aug-18 | 22-Aug-18 | |
| CAP1200 | Cap Flare - Pier 20 | 10 | 0 | 6 | 100% | 29-Jun-18A | 10-Jul-18A | 07-Sep-18 | 20-Sep-18 | 29-Jun-18 | 10-Jul-18 | |
| CAP1210 | Cap Flare - Pier 21 | 10 | 0 | 11 | 100% | 30-Jul-18A | 14-Sep-18 | 14-Sep-18 | 27-Sep-18 | 30-Jul-18 | 10-Jul-18 | |
| CAP1220 | Cap Flare - Pier 22 | 10 | 0 | 5 | 100% | 08-Aug-18A | 31-Aug-18A | 21-Sep-18 | 04-Oct-18 | 08-Aug-18 | 10-Jul-18 | |
| CAP1230 | Cap Flare - Pier 23 | 10 | 0 | 6 | 100% | 08-Aug-18A | 16-Aug-18A | 11-Oct-18 | 08-Aug-18 | 16-Aug-18 | | |
| CAP1240 | Cap Flare - Pier 24 | 10 | 0 | 6 | 100% | 26-Jul-18A | 03-Aug-18A | 05-Oct-18 | 25-Oct-18 | 26-Jul-18 | 03-Aug-18 | |
| CAP1250 | Cap Flare - Pier 25 | 10 | 0 | 6 | 100% | 01-Aug-18A | 09-Aug-18A | 25-Oct-18 | 01-Aug-18 | 09-Aug-18 | | |





| | | | | | | |
|---|---|---|---|---|---|---|
| Print Date/Time: 13-Dec-18 15:48 | Data Date: 01-Dec-18 | | | Cline Avenue Bridge - Contract Schedule - December 1, 2018 Data Date | | 11 of 15 |

| Activity ID | Activity Name | Original Duration | Remaining Duration | Actual Duration | Activity % Complete | Start | Finish | BL1 Start | BL1 Finish | Actual Start | Actual Finish | Total Float |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CAP1260 | Cap Flare - Pier 26 | 10 | 10 | 0 | 0% | 17-Dec-18 | 31-Dec-18 | 19-Oct-18 | 01-Nov-18 | | | 89 |
| CAP1270 | Cap Flare - Pier 27 | 10 | 10 | 0 | 0% | 24-Jan-19 | 06-Feb-19 | 26-Oct-18 | 08-Nov-18 | | | 74 |
| CAP1280 | Straddle - Pier 28 | 25 | 25 | 0 | 0% | 09-Jan-19 | 13-Feb-19 | 30-Aug-18 | 04-Oct-18 | | | 69 |
| CAP1290 | Straddle - Pier 29 | 20 | 20 | 0 | 0% | 17-Feb-19 | 07-Mar-19 | 28-Sep-18 | 25-Oct-18 | | | 69 |
| CAP1370 | Dry Finish Piers 18-29 | 15 | 15 | 0 | 0% | 02-Apr-19 | 22-Apr-19 | 09-Nov-18 | 24-Dec-18 | | | 47 |
| **Post Tensioning (Substructure)** | | | | | | | | | | | | |
| PT1190 | Post Tension - Pier 19 | 5 | 0 | 1 | 100% | 29-Aug-18A | 30-Aug-18A | 25-Sep-18 | 01-Oct-18 | 29-Aug-18 | 30-Aug-18 | |
| PT1200 | Post Tension - Pier 20 | 5 | 0 | 1 | 100% | 14-Aug-18A | 15-Aug-18A | 02-Oct-18 | 08-Oct-18 | 14-Aug-18 | 15-Aug-18 | |
| PT1210 | Post Tension - Pier 21 | 5 | 0 | 1 | 100% | 14-Aug-18A | 15-Aug-18A | 09-Oct-18 | 15-Oct-18 | 14-Aug-18 | 15-Aug-18 | |
| PT1220 | Post Tension - Pier 22 | 5 | 0 | 1 | 100% | 14-Aug-18A | 15-Aug-18A | 16-Oct-18 | 22-Oct-18 | 14-Aug-18 | 15-Aug-18 | |
| PT1230 | Post Tension - Pier 23 | 5 | 0 | 1 | 100% | 29-Aug-18A | 30-Aug-18A | 23-Oct-18 | 29-Oct-18 | 29-Aug-18 | 30-Aug-18 | |
| PT1240 | Post Tension - Pier 24 | 5 | 0 | 1 | 100% | 14-Aug-18A | 15-Aug-18A | 30-Oct-18 | 05-Nov-18 | 14-Aug-18 | 15-Aug-18 | |
| PT1250 | Post Tension - Pier 25 | 5 | 0 | 1 | 100% | 29-Aug-18A | 30-Aug-18A | 06-Nov-18 | 12-Nov-18 | 29-Aug-18 | 30-Aug-18 | |
| PT1260 | Post Tension - Pier 26 | 5 | 5 | 0 | 0% | 02-Jan-19 | 08-Jan-19 | 13-Nov-18 | 19-Nov-18 | | | 89 |
| PT1270 | Post Tension - Pier 27 | 5 | 5 | 0 | 0% | 07-Feb-19 | 13-Feb-19 | 20-Nov-18 | 28-Nov-18 | | | 77 |
| PT1280 | Post Tension - Pier 28 | 5 | 5 | 0 | 0% | 14-Feb-19 | 21-Feb-19 | 05-Dec-18 | | | | 78 |
| PT1290 | Post Tension - Pier 29 | 5 | 5 | 0 | 0% | 08-Mar-19 | 14-Mar-19 | 06-Dec-18 | 12-Dec-18 | | | 69 |
| **Segment Falsework** | | | | | | | | | | | | |
| BR5190 | Pier 19 - Install Falsework Bracket | 3 | 3 | 0 | 0% | 12-Jul-19 | 16-Jul-19 | 26-Apr-19 | 26-Apr-19 | | | 10 |
| BR5195 | Pier 19 - Remove Falsework Bracket | 3 | 3 | 0 | 0% | 04-Sep-19 | 06-Sep-19 | 23-May-19 | 23-May-19 | | | 37 |
| BR5200 | Pier 20 - Install Falsework Bracket | 2 | 2 | 0 | 0% | 02-Aug-19 | 05-Aug-19 | 16-Apr-19 | 16-Apr-19 | | | 4 |
| BR5205 | Pier 20 - Remove Falsework Bracket | 2 | 2 | 0 | 0% | 04-Sep-19 | 05-Sep-19 | 04-Jun-19 | 04-Jun-19 | | | 38 |
| BR5210 | Pier 21 - Install Falsework Bracket | 2 | 2 | 0 | 0% | 03-Jan-19 | 04-Jan-19 | 23-May-19 | 23-May-19 | | | 32 |
| BR5215 | Pier 21 - Remove Falsework Bracket | 2 | 2 | 0 | 0% | 05-Apr-19 | 08-Apr-19 | 19-Jun-19 | 19-Jun-19 | | | 1 |
| BR5220 | Pier 22 - Install Falsework Bracket | 1 | 1 | 0 | 0% | 01-May-19 | 01-May-19 | 24-May-19 | 24-May-19 | | | 7 |
| BR5225 | Pier 22 - Remove Falsework Bracket | 1 | 1 | 0 | 0% | 14-May-19 | 14-May-19 | 27-Jun-19 | 27-Jun-19 | | | 1 |
| BR5230 | Pier 23 - Install Falsework Bracket | 1 | 1 | 0 | 0% | 01-Mar-19 | 01-Mar-19 | 05-Jun-19 | 05-Jun-19 | | | 19 |
| BR5235 | Pier 23 - Remove Falsework Bracket | 1 | 1 | 0 | 0% | 14-May-19 | 14-May-19 | 29-Jul-19 | 29-Jul-19 | | | 13 |
| BR5240 | Pier 24 - Install Falsework Bracket | 1 | 1 | 0 | 0% | 09-Apr-19 | 09-Apr-19 | 20-Jun-19 | 20-Jun-19 | | | 1 |
| BR5245 | Pier 24 - Remove Falsework Bracket | 1 | 1 | 0 | 0% | 02-May-19 | 02-May-19 | 18-Jul-19 | 18-Jul-19 | | | 1 |
| BR5250 | Pier 25 - Install Falsework Bracket | 1 | 1 | 0 | 0% | 03-May-19 | 03-May-19 | 28-Jun-19 | 28-Jun-19 | | | 1 |
| BR5255 | Pier 25 - Remove Falsework Bracket | 1 | 1 | 0 | 0% | 07-Jun-19 | 07-Jun-19 | 09-Aug-19 | 09-Aug-19 | | | 2 |
| BR5260 | Pier 26 - Install Falsework Bracket | 1 | 1 | 0 | 0% | 15-May-19 | 15-May-19 | 19-Jul-19 | 19-Jul-19 | | | 1 |
| BR5265 | Pier 26 - Remove Falsework Bracket | 1 | 1 | 0 | 0% | 07-Jun-19 | 07-Jun-19 | 12-Aug-19 | 12-Aug-19 | | | 8 |
| BR5270 | Pier 27 - Install Falsework Bracket | 1 | 1 | 0 | 0% | 15-May-19 | 15-May-19 | 30-Jul-19 | 30-Jul-19 | | | 13 |
| BR5275 | Pier 27 - Remove Falsework Bracket | 1 | 1 | 0 | 0% | 23-May-19 | 24-Jun-19 | 26-Aug-19 | 26-Aug-19 | | | 3 |
| BR5280 | Pier 28 - Install Falsework Bracket | 1 | 1 | 0 | 0% | 10-Jun-19 | 10-Jun-19 | 12-Aug-19 | 12-Aug-19 | | | 2 |
| BR5285 | Pier 28 - Remove Falsework Bracket | 1 | 1 | 0 | 0% | 11-Jul-19 | 11-Jul-19 | 13-Sep-19 | 13-Sep-19 | | | 10 |
| BR5291 | Pier 29 - Install Falsework Bracket | 1 | 1 | 0 | 0% | 10-Jul-19 | 10-Jul-19 | 13-Aug-19 | 13-Aug-19 | | | 8 |
| BR5292 | Pier 29 - Remove Falsework Bracket | 1 | 1 | 0 | 0% | 01-Jul-19 | 01-Jul-19 | 03-Sep-19 | 03-Sep-19 | | | 9 |
| **Pier Table Segment Erection** | | | | | | | | | | | | |
| BR5450 | Pier 19 - Set & Stress Split Pier Segments (2 EA) | 1 | 1 | 0 | 0% | 18-Jul-19 | 18-Jul-19 | 25-Sep-19 | 29-Apr-19 | | | 10 |
| BR5455 | Pier 19 - Erect First Cantilever Seg Pair & Grout Bearings (2 EA) | 2 | 2 | 0 | 0% | 19-Jul-19 | 22-Jul-19 | 30-Apr-19 | 01-May-19 | | | 10 |
| BR5460 | Pier 20 - Set & Stress Split Pier Segments (2 EA) | 1 | 1 | 0 | 0% | 06-Aug-19 | 06-Aug-19 | 02-May-19 | 02-May-19 | | | 4 |
| BR5465 | Pier 20 - Erect First Cantilever Seg Pair & Grout Bearings (2 EA) | 2 | 2 | 0 | 0% | 07-Aug-19 | 08-Aug-19 | 03-May-19 | 06-May-19 | | | 4 |
| BR5470 | Pier 21 - Set & Stress Split Pier Segments (2 EA) | 1 | 1 | 0 | 0% | 01-Mar-19 | 01-Mar-19 | 24-May-19 | 24-May-19 | | | 5 |
| BR5475 | Pier 21 - Erect First Cantilever Seg Pair & Grout Bearings (2 EA) | 2 | 2 | 0 | 0% | 04-Mar-19 | 05-Mar-19 | 29-May-19 | 29-May-19 | | | 5 |
| BR5480 | Pier 22 - Set & Stress Split Pier Segments (2 EA) | 1 | 1 | 0 | 0% | 07-Mar-19 | 07-Mar-19 | 30-May-19 | 30-May-19 | | | 5 |
| BR5485 | Pier 22 - Erect First Cantilever Seg Pair & Grout Bearings (2 EA) | 2 | 2 | 0 | 0% | 08-Mar-19 | 11-Mar-19 | 31-May-19 | 03-Jun-19 | | | 5 |

Print Date/Time: 13-Dec-18 15:48    Data Date: 01-Dec-18

Cline Avenue Bridge - Contract Schedule - December 1, 2018 Data Date

12 of 15

| Activity ID | Activity Name | Original Duration | Remaining Duration | Actual Duration | Activity % Complete | Start | Finish | BL1 Start | BL1 Finish | Actual Start | Actual Finish | Total Float |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BR5490 | Pier 23 - Set & Stress Split Pier Segments (2 EA) | 1 | 1 | 0 | 0% | 12-Mar-19 | 12-Mar-19 | 06-Jun-19 | 06-Jun-19 | | | 14 |
| BR5495 | Pier 23 - Erect First Cantilever Seg Pair & Grout Bearings (2 EA) | 2 | 2 | 0 | 0% | 13-Mar-19 | 14-Mar-19 | 07-Jun-19 | 10-Jun-19 | | | 14 |
| BR5500 | Pier 24 - Set & Stress Split Pier Segments (2 EA) | 1 | 1 | 0 | 0% | 10-Apr-19 | 10-Apr-19 | 21-Jun-19 | 21-Jun-19 | | | 1 |
| BR5505 | Pier 24 - Erect First Cantilever Seg Pair & Grout Bearings (2 EA) | 2 | 2 | 0 | 0% | 11-Apr-19 | 12-Apr-19 | 24-Jun-19 | 25-Jun-19 | | | 1 |
| BR5510 | Pier 25 - Set & Stress Split Pier Segments (2 EA) | 1 | 1 | 0 | 0% | 06-May-19 | 06-May-19 | 01-Jul-19 | 01-Jul-19 | | | 1 |
| BR5515 | Pier 25 - Erect First Cantilever Seg Pair & Grout Bearings (2 EA) | 2 | 2 | 0 | 0% | 07-May-19 | 09-May-19 | 02-Jul-19 | 03-Jul-19 | | | 1 |
| BR5520 | Pier 26 - Set & Stress Split Pier Segments (2 EA) | 1 | 1 | 0 | 0% | 20-May-19 | 20-May-19 | 22-Jul-19 | 22-Jul-19 | | | 1 |
| BR5525 | Pier 26 - Erect First Cantilever Seg Pair & Grout Bearings (2 EA) | 2 | 2 | 0 | 0% | 17-May-19 | 20-May-19 | 23-Jul-19 | 24-Jul-19 | | | 1 |
| BR5530 | Pier 27 - Set & Stress Split Pier Segments (2 EA) | 1 | 1 | 0 | 0% | 21-May-19 | 21-May-19 | 31-Jul-19 | 31-Jul-19 | | | 10 |
| BR5535 | Pier 27 - Erect First Cantilever Seg Pair & Grout Bearings (2 EA) | 2 | 2 | 0 | 0% | 23-May-19 | 24-May-19 | 01-Aug-19 | 02-Aug-19 | | | 10 |
| BR5540 | Pier 28 - Set & Stress Split Pier Segments (2 EA) | 1 | 1 | 0 | 0% | 11-Jun-19 | 11-Jun-19 | 13-Aug-19 | 13-Aug-19 | | | 2 |
| BR5545 | Pier 28 - Erect First Cantilever Seg Pair & Grout Bearings (2 EA) | 2 | 2 | 0 | 0% | 13-Jun-19 | 14-Jun-19 | 15-Aug-19 | 16-Aug-19 | | | 2 |
| BR5551 | Pier 29 - Erect First Cantilever Seg Pair & Grout Bearings (2 EA) | 1 | 1 | 0 | 0% | 17-Jun-19 | 17-Jun-19 | 19-Aug-19 | 19-Aug-19 | | | 1 |

**Cantilever Segment Erection**

| Activity ID | Activity Name | Original Duration | Remaining Duration | Actual Duration | Activity % Complete | Start | Finish | BL1 Start | BL1 Finish | Actual Start | Actual Finish | Total Float |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BR5456 | Pier 19 - Erect Remaining Cantilever Segments - (26 EA) | 7 | 7 | 0 | 0% | 05-Aug-19 | 13-Aug-19 | 03-May-19 | 13-May-19 | | | 1 |
| BR5466 | Pier 20 - Erect Remaining Cantilever Segments - (30 EA) | 8 | 8 | 0 | 0% | 15-Aug-19 | 26-Aug-19 | 14-May-19 | 24-May-19 | | | 1 |
| BR5476 | Pier 21 - Erect Remaining Cantilever Segments - (26 EA) | 7 | 7 | 0 | 0% | 07-Mar-19 | 15-Mar-19 | 30-May-19 | 07-Jun-19 | | | 1 |
| BR5486 | Pier 22 - Erect Remaining Cantilever Segments - (27 EA) | 7 | 7 | 0 | 0% | 18-Mar-19 | 27-Mar-19 | 11-Jun-19 | 19-Jun-19 | | | 1 |
| BR5496 | Pier 23 - Erect Remaining Cantilever Segments - (25 EA) | 6 | 6 | 0 | 0% | 28-Mar-19 | 05-Apr-19 | 20-Jun-19 | 27-Jun-19 | | | 1 |
| BR5506 | Pier 24 - Erect Remaining Cantilever Segments - (26 EA) | 7 | 7 | 0 | 0% | 15-Apr-19 | 24-Apr-19 | 28-Jun-19 | 09-Jul-19 | | | 1 |
| BR5516 | Pier 25 - Erect Remaining Cantilever Segments - (26 EA) | 7 | 7 | 0 | 0% | 10-May-19 | 20-May-19 | 10-Jul-19 | 19-Jul-19 | | | 1 |
| BR5526 | Pier 26 - Erect Remaining Cantilever Segments - (24 EA) | 6 | 6 | 0 | 0% | 21-May-19 | 30-May-19 | 25-Jul-19 | 01-Aug-19 | | | 1 |
| BR5536 | Pier 27 - Erect Remaining Cantilever Segments - (14 EA) | 4 | 4 | 0 | 0% | 31-May-19 | 05-Jun-19 | 05-Aug-19 | 08-Aug-19 | | | 7 |
| BR5546 | Pier 28 - Erect Remaining Cntlvr Segs except 8D+9(12 EA) | 4 | 4 | 0 | 0% | 17-Jun-19 | 20-Jun-19 | 19-Aug-19 | 22-Aug-19 | | | 1 |
| BR5556 | Pier 29 - Erect Final Two Cantilever Segment Pairs (4 EA) | 2 | 2 | 0 | 0% | 01-Jul-19 | 02-Jul-19 | 03-Sep-19 | 04-Sep-19 | | | 1 |

**Mid-Span Segment Closures**

| Activity ID | Activity Name | Original Duration | Remaining Duration | Actual Duration | Activity % Complete | Start | Finish | BL1 Start | BL1 Finish | Actual Start | Actual Finish | Total Float |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BR3045 | F/P/S Closure Segment + Continuity PT - Span 18 | 5 | 5 | 0 | 0% | 15-Aug-19 | 21-Aug-19 | 14-May-19 | 20-May-19 | | | 4 |
| BR3075 | F/P/S Closure Segment + Continuity PT - Span 19 | 5 | 5 | 0 | 0% | 27-Aug-19 | 03-Sep-19 | 21-May-19 | 03-Jun-19 | | | 1 |
| BR3095 | F/P/S Closure Segment + Continuity PT - Span 20 | 5 | 5 | 0 | 0% | 13-Sep-19 | 19-Sep-19 | 11-Jun-19 | 18-Jun-19 | | | 117 |
| BR3115 | F/P/S Closure Segment + Continuity PT - Span 21 | 5 | 5 | 0 | 0% | 28-Mar-19 | 04-Apr-19 | 20-Jun-19 | 27-Jun-19 | | | 1 |
| BR3134 | Load EJ Beams in Cantilever - Span 22 | 2 | 2 | 0 | 0% | 08-Apr-19 | 09-Apr-19 | 27-Jun-19 | 28-Jun-19 | | | 11 |
| BR3135 | PT, Install Hinge Beams w/ Bearings - Span 22 | 7 | 7 | 0 | 0% | 02-May-19 | 13-May-19 | 18-Jul-19 | 26-Jul-19 | | | 1 |
| BR3155 | F/P/S Closure Segment + Continuity PT - Span 23 | 5 | 5 | 0 | 0% | 25-Apr-19 | 01-May-19 | 10-Jul-19 | 16-Jul-19 | | | 1 |
| BR3175 | F/P/S Closure Segment + Continuity PT - Span 24 | 5 | 5 | 0 | 0% | 07-Jun-19 | 14-Jun-19 | 09-Aug-19 | 16-Aug-19 | | | 1 |
| BR3195 | F/P/S Closure Segment + Continuity PT - Span 25 | 5 | 5 | 0 | 0% | 31-May-19 | 06-Jun-19 | 02-Aug-19 | 08-Aug-19 | | | 1 |
| BR3215 | F/P/S Closure Segment + Continuity PT - Span 26 | 5 | 5 | 0 | 0% | 17-May-19 | 23-May-19 | 23-Aug-19 | 23-Aug-19 | | | 1 |
| BR3300 | F/P/S Closure Segment + Continuity PT - Span 27 | 5 | 5 | 0 | 0% | 03-Jul-19 | 10-Jul-19 | 05-Sep-19 | 12-Sep-19 | | | 10 |
| BR3310 | F/P/S Closure Segment + Continuity PT - Span 28 | 5 | 5 | 0 | 0% | 24-Jun-19 | 28-Jun-19 | 26-Aug-19 | 30-Aug-19 | | | 1 |

**Finish Work**

| Activity ID | Activity Name | Original Duration | Remaining Duration | Actual Duration | Activity % Complete | Start | Finish | BL1 Start | BL1 Finish | Actual Start | Actual Finish | Total Float |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BR3610 | Slipform/Place Conc Barrier & Transitions - East (Mob #2) | 7 | 7 | 0 | 0% | 13-Sep-19 | 23-Sep-19 | 13-Sep-19 | 23-Sep-19 | | | 0 |
| BR3620 | Bridge Lighting - East (Mob #2) | 20 | 20 | 0 | 0% | 24-Sep-19 | 24-Oct-19 | 24-Sep-19 | 24-Oct-19 | | | 7 |
| BR3630 | Grind and Groove - East (Mob #2) | 15 | 15 | 0 | 0% | 14-Oct-19 | 04-Nov-19 | 15-Oct-19 | 05-Nov-19 | | | 0 |
| BR5566 | Final Striping & Markings | 2 | 2 | 0 | 0% | 05-Nov-19 | 07-Nov-19 | 06-Nov-19 | 08-Nov-19 | | | 1 |
| EJ1040 | Install/Pourback Modular Exp Joint & Cover Plates - Span 22 | 9 | 9 | 0 | 0% | 17-Oct-19 | 29-Oct-19 | 10-Oct-19 | 22-Oct-19 | | | 1 |
| EJ1050 | Install/Pourback Modular Exp Joint & Cover Plates - Pier 30 | 3 | 3 | 0 | 0% | 08-Oct-19 | 11-Oct-19 | 10-Oct-19 | 14-Oct-19 | | | 1 |

**Steel Bridge Repairs**

**General**

| Activity ID | Activity Name | Original Duration | Remaining Duration | Actual Duration | Activity % Complete | Start | Finish | BL1 Start | BL1 Finish | Actual Start | Actual Finish | Total Float |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SR-A0010 | Notice to Proceed | 0 | 0 | 0 | 100% | 20-Aug-18 A | | 20-Aug-18 | | | | |

Subcontract Substantial Completion: September 19, 2019



Print Date/Time: 13-Dec-18 15:48   Data Date: 01-Dec-18 | Cline Avenue Bridge - Contract Schedule - December 1, 2018 Data Date | 13 of 15

| Activity ID | Activity Name | Original Duration | Remaining Duration | Actual Duration | Activity % Complete | Start | Finish | BL1 Start | BL1 Finish | Actual Start | Actual Finish | Total Float |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SR-A0020 | Substantial Completion | 0 | 0 | 0 | 0% | | 05-Jun-19 | | | | | 108 |
| SR-A0030 | Review SS EJ shop drawings | 20 | 0 | 20 | 100% | 28-Aug-18A | 26-Sep-18A | | | 28-Aug-18 | 26-Sep-18 | 108 |
| SR-A0040 | Procure SS EJs | 40 | 0 | 39 | 100% | 26-Sep-18A | 20-Nov-18A | | | 26-Sep-18 | 20-Nov-18 | 108 |
| SR-A0050 | Mobilize | 7 | 0 | 9 | 100% | 21-Aug-18A | 31-Aug-18A | | | 21-Aug-18 | 31-Aug-18 | |
| SR-A0070 | First Overlay Poured | 0 | 0 | 0 | 0% | | 03-Apr-19 | | | | | 117 |
| SR-A1100 | Repair Damages | 5 | 5 | 0 | 0% | 24-May-19 | 31-May-19 | | | | | 108 |
| SR-A1110 | Install Anchored Barrier | 1 | 1 | 0 | 0% | 03-Jun-19 | 03-Jun-19 | | | | | 108 |
| SR-A1120 | Install Gate | 1 | 1 | 0 | 0% | 04-Jun-19 | 04-Jun-19 | | | | | 108 |
| SR-A1130 | Install Impact Attenuator | 1 | 1 | 0 | 0% | 05-Jun-19 | 05-Jun-19 | | | | | 108 |
| SR-A1140 | Receive Direction on Parapet Work | 12 | 18 | 33 | 0% | 15-Oct-18A | 28-Dec-18 | | | 15-Oct-18 | | 165 |
| **Demolition** | | | | | | | | | | | | |
| SR-A2000 | Mill Deck | 5 | 0 | 3 | 100% | 29-Aug-18A | 31-Aug-18A | | | 29-Aug-18 | 31-Aug-18 | |
| SR-A2010 | ID & Mark Removals | 2 | 0 | 37 | 100% | 10-Sep-18A | 31-Oct-18A | | | 10-Sep-18 | 31-Oct-18 | |
| SR-A2020 | Sawcut for Removals | 2 | 0 | 3 | 100% | 14-Sep-18A | 19-Sep-18A | | | 14-Sep-18 | 19-Sep-18 | |
| SR-A2030 | Remove Impact Attenuator | 1 | 0 | 0 | 100% | 20-Aug-18A | 20-Aug-18A | | | 20-Aug-18 | 20-Aug-18 | |
| SR-A2040 | Remove Median Barrier | 12 | 0 | 20 | 100% | 28-Aug-18A | 26-Sep-18A | | | 28-Aug-18 | 26-Sep-18 | |
| SR-A2050 | Remove Parapet Patches "A" | 11 | 0 | 27 | 100% | 05-Sep-18A | 12-Oct-18A | | | 05-Sep-18 | 12-Oct-18 | |
| SR-A2055 | Remove Parapet Patches "B" | 5 | 5 | 0 | 0% | 02-Jan-19 | 08-Jan-19 | | | | | 165 |
| SR-A2060 | Remove EJ Deck and Barrier P30 | 3 | 0 | 10 | 100% | 04-Sep-18A | 18-Sep-18A | | | 04-Sep-18 | 18-Sep-18 | |
| SR-A2070 | Remove Expansion Joints | 15 | 12 | 23 | 20% | 29-Oct-18A | 18-Dec-18 | | | 29-Oct-18 | | 122 |
| SR-A2080 | Remove P30 Joint | 2 | 0 | 0 | 100% | 28-Sep-18A | 28-Sep-18A | | | 28-Sep-18 | 28-Sep-18 | |
| SR-A2090 | Remove P25 Joint | 1 | 0 | 0 | 100% | 30-Nov-18A | 30-Nov-18A | | | 30-Nov-18 | 30-Nov-18 | |
| SR-A2100 | Install Protective Shield | 3 | 0 | 0 | 100% | 21-Sep-18A | 21-Sep-18A | | | 21-Sep-18 | 21-Sep-18 | |
| SR-A2110 | Remove Median Deck and Drainage | 16 | 0 | 40 | 100% | 04-Sep-18A | 30-Oct-18A | | | 04-Sep-18 | 30-Oct-18 | |
| SR-A2120 | Remove Light Poles | 5 | 5 | 64 | 0% | 30-Aug-18A | | | | 30-Aug-18 | | 183 |
| SR-A2130 | Remove Protective Shield | 2 | 2 | 0 | 0% | 20-Dec-18 | 21-Dec-18 | | | | | 221 |
| SR-A2140 | Remove Light Pole Blisters & Deck | 14 | 14 | 0 | 0% | 09-Jan-19 | 28-Jan-19 | | | | | 165 |
| SR-A2150 | Partial and Full Depth Patch Removals Westbound | 10 | 0 | 9 | 100% | 18-Sep-18A | 28-Sep-18A | | | 18-Sep-18 | 28-Sep-18 | |
| SR-A2200 | Partial and Full Depth Patch Removals Eastbound | 20 | 15 | 19 | 25% | 02-Nov-18A | 21-Dec-18 | | | 02-Nov-18 | | 174 |
| **Concrete** | | | | | | | | | | | | |
| SR-A3000 | Install Slide Plate P25 | 1 | 1 | 0 | 0% | 03-Dec-18 | 03-Dec-18 | | | | | 227 |
| SR-A3010 | F/S Deck & Trench Drain 23 - 15 | 32 | 13 | 23 | 59.38% | 29-Oct-18A | 19-Dec-18 | | | 29-Oct-18 | | 208 |
| SR-A3060 | F/P/S SSEJ Pier 1 WB | 5 | 5 | 0 | 0% | 19-Dec-18 | 27-Dec-18 | | | | | 122 |
| SR-A3070 | F/P/S SSEJ Pier 1 EB | 5 | 5 | 0 | 0% | 22-Mar-19 | 28-Mar-19 | | | | | 122 |
| SR-A3080 | F/P/S SSEJ Pier 1 Ramp | 5 | 5 | 0 | 0% | 29-Mar-19 | 04-Apr-19 | | | | | 122 |
| SR-A3090 | F/P/S SSEJ Pier 4 WB | 3 | 3 | 0 | 0% | 28-Dec-18 | 03-Jan-19 | | | | | 122 |
| SR-A3100 | Drill & Epoxy Barrier Dowles | 20 | 20 | 0 | 0% | 03-Dec-18 | 02-Jan-19 | | | | | 203 |
| SR-A3110 | F/P/S SSEJ Pier 5 EB | 5 | 5 | 0 | 0% | 15-Mar-19 | 21-Mar-19 | | | | | 122 |
| SR-A3120 | Place Barrier Wall Concrete P25-14 | 5 | 5 | 0 | 0% | 04-Jan-19 | 10-Jan-19 | | | | | 203 |
| SR-A3130 | F/P/S P30 Joint | 3 | 3 | 0 | 0% | 03-Dec-18 | 05-Dec-18 | | | | | 186 |
| SR-A3140 | F/P/S P30 Curb | 1 | 1 | 0 | 0% | 05-Apr-19 | 05-Apr-19 | | | | | 135 |
| SR-A3150 | F/S Parapet Barrier P30 | 6 | 6 | 0 | 0% | 08-Apr-19 | 15-Apr-19 | | | | | 135 |
| SR-A3160 | Place Parapet Barrier P30 | 1 | 1 | 0 | 0% | 16-Apr-19 | 16-Apr-19 | | | | | 135 |
| SR-A3170 | E/S Overhangs & Edgeforms | 12 | 12 | 0 | 0% | 29-Jan-19 | 15-Feb-19 | | | | | 173 |
| SR-A3180 | F/S Parapet Barrier (27 Locations) | 5 | 5 | 0 | 0% | 14-Feb-19 | 20-Feb-19 | | | | | 173 |
| SR-A3190 | Place Parapet Barier (27 Locations) | 1 | 1 | 0 | 0% | 21-Feb-19 | 21-Feb-19 | | | | | 173 |
| SR-A3200 | F/P/S SSEJ Pier 7 WB | 5 | 5 | 0 | 0% | 04-Jan-19 | 10-Jan-19 | | | | | 122 |
| SR-A3210 | F/P/S SSEJ Pier 10 WB | 5 | 5 | 0 | 0% | 11-Jan-19 | 17-Jan-19 | | | | | 122 |
| SR-A3220 | F/S Overhangs at Light Pole Blisters | 4 | 4 | 0 | 0% | 29-Jan-19 | 01-Feb-19 | | | | | 165 |

EXHIBIT C 

Print Date/Time: 13-Dec-18 15:48    Data Date: 01-Dec-18 — Cline Avenue Bridge - Contract Schedule - December 1, 2018 Data Date — 14 of 15

| Activity ID | Activity Name | Original Duration | Remaining Duration | Actual Duration | Activity % Complete | Start | Finish | BL1 Start | BL1 Finish | Actual Start | Actual Finish | Total Float |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SR-A3230 | F/S Light Pole Blisters | 20 | 20 | 0 | 0% | 04-Feb-19 | 01-Mar-19 | | | | | 165 |
| SR-A3240 | Place Light Pole Blisters | 2 | 2 | 0 | 0% | 04-Mar-19 | 05-Mar-19 | | | | | 165 |
| SR-A3250 | F/P/S SSEJ Pier 10 EB | 5 | 5 | 0 | 0% | 08-Mar-19 | 14-Mar-19 | | | | | 122 |
| SR-A3260 | F/P/S SSEJ Pier 14 WB | 5 | 5 | 0 | 0% | 18-Jan-19 | 24-Jan-19 | | | | | 122 |
| SR-A3270 | F/P/S SSEJ Pier 14 EB | 5 | 5 | 0 | 0% | 01-Mar-19 | 07-Mar-19 | | | | | 122 |
| SR-A3280 | F/P/S SSEJ Pier 17 WB | 5 | 5 | 0 | 0% | 25-Jan-19 | 31-Jan-19 | | | | | 122 |
| SR-A3290 | F/P/S SSEJ Pier 17 EB | 5 | 5 | 0 | 0% | 22-Feb-19 | 28-Feb-19 | | | | | 122 |
| SR-A3300 | F/P/S SSEJ Pier 21 WB | 5 | 5 | 0 | 0% | 01-Feb-19 | 07-Feb-19 | | | | | 122 |
| SR-A3310 | F/P/S SSEJ Pier 21 EB | 5 | 5 | 0 | 0% | 15-Feb-19 | 21-Feb-19 | | | | | 122 |
| SR-A3320 | F/P/S SSEJ Pier 25 WB | 5 | 5 | 0 | 0% | 08-Feb-19 | 14-Feb-19 | | | | | 122 |
| **Substructure Repairs** | | | | | | | | | | | | |
| SR-A4000 | Remove Drain Pipes for Patching | 22 | 13 | 10 | 40.91% | 15-Nov-18A | 19-Dec-18 | | | 15-Nov-18 | | 176 |
| SR-A4020 | Remove Unsound Concrete | 60 | 48 | 10 | 20% | 15-Nov-18A | 15-Feb-19 | | | 15-Nov-18 | | 176 |
| SR-A4030 | Prep Patches, Sandblast, and Epoxy | 27 | 27 | 0 | 0% | 14-Jan-19 | 19-Feb-19 | | | | | 176 |
| SR-A4040 | Place Concrete Patches | 27 | 27 | 0 | 0% | 16-Jan-19 | 21-Feb-19 | | | | | 176 |
| SR-A4060 | Install New Drainage | 15 | 15 | 0 | 0% | 08-Feb-19 | 28-Feb-19 | | | | | 176 |
| SR-A4070 | Fatigue Retrofit | 15 | 15 | 0 | 0% | 03-Dec-18 | 21-Feb-18 | | | | | 221 |
| **Deck Overlay** | | | | | | | | | | | | |
| SR-A5010 | P1 - Set Up / Dry Run Bidwell | 2 | 2 | 0 | 0% | 01-Apr-19 | 02-Apr-19 | | | | | 108 |
| SR-A5020 | P1 - Place Microsilica Overlay | 1 | 1 | 0 | 0% | 03-Apr-19 | 03-Apr-19 | | | | | 117 |
| SR-A5030 | P1 - Cure and Protect Overlay | 1 | 1 | 0 | 0% | 04-Apr-19 | 04-Apr-19 | | | | | 117 |
| SR-A5090 | P2 - Set Up / Dry Run Bidwell | 2 | 2 | 0 | 0% | 03-Apr-19 | 04-Apr-19 | | | | | 108 |
| SR-A5100 | P2 - Place Microsilica Overlay | 1 | 1 | 0 | 0% | 05-Apr-19 | 05-Apr-19 | | | | | 116 |
| SR-A5110 | P2 - Cure and Protect Overlay | 1 | 1 | 0 | 0% | 08-Apr-19 | 08-Apr-19 | | | | | 116 |
| SR-A5130 | P3 - Set Up / Dry Run Bidwell | 2 | 2 | 0 | 0% | 05-Apr-19 | 08-Apr-19 | | | | | 108 |
| SR-A5140 | P3 - Place Microsilica Overlay | 1 | 1 | 0 | 0% | 09-Apr-19 | 09-Apr-19 | | | | | 115 |
| SR-A5150 | P3 - Cure and Protect Overlay | 1 | 1 | 0 | 0% | 10-Apr-19 | 10-Apr-19 | | | | | 115 |
| SR-A5170 | P4 - Set Up / Dry Run Bidwell | 2 | 2 | 0 | 0% | 09-Apr-19 | 10-Apr-19 | | | | | 108 |
| SR-A5180 | P4 - Place Microsilica Overlay | 1 | 1 | 0 | 0% | 11-Apr-19 | 11-Apr-19 | | | | | 114 |
| SR-A5190 | P4 - Cure and Protect Overlay | 1 | 1 | 0 | 0% | 12-Apr-19 | 12-Apr-19 | | | | | 114 |
| SR-A5210 | P5 - Set Up / Dry Run Bidwell | 2 | 2 | 0 | 0% | 11-Apr-19 | 12-Apr-19 | | | | | 108 |
| SR-A5220 | P5 - Place Microsilica Overlay | 1 | 1 | 0 | 0% | 15-Apr-19 | 15-Apr-19 | | | | | 113 |
| SR-A5230 | P5 - Cure and Protect Overlay | 1 | 1 | 0 | 0% | 16-Apr-19 | 16-Apr-19 | | | | | 113 |
| SR-A5250 | P6 - Set Up / Dry Run Bidwell | 2 | 2 | 0 | 0% | 15-Apr-19 | 16-Apr-19 | | | | | 108 |
| SR-A5260 | P6 - Place Microsilica Overlay | 1 | 1 | 0 | 0% | 17-Apr-19 | 17-Apr-19 | | | | | 112 |
| SR-A5270 | P6 - Cure and Protect Overlay | 1 | 1 | 0 | 0% | 18-Apr-19 | 18-Apr-19 | | | | | 112 |
| SR-A5290 | P7 - Set Up / Dry Run Bidwell | 2 | 2 | 0 | 0% | 17-Apr-19 | 18-Apr-19 | | | | | 108 |
| SR-A5300 | P7 - Place Microsilica Overlay | 1 | 1 | 0 | 0% | 19-Apr-19 | 19-Apr-19 | | | | | 111 |
| SR-A5310 | P7 - Cure and Protect Overlay | 1 | 1 | 0 | 0% | 22-Apr-19 | 22-Apr-19 | | | | | 111 |
| SR-A5330 | P8 - Set Up / Dry Run Bidwell | 2 | 2 | 0 | 0% | 19-Apr-19 | 22-Apr-19 | | | | | 108 |
| SR-A5340 | P8 - Place Microsilica Overlay | 1 | 1 | 0 | 0% | 23-Apr-19 | 23-Apr-19 | | | | | 110 |
| SR-A5350 | P8 - Cure and Protect Overlay | 1 | 1 | 0 | 0% | 24-Apr-19 | 24-Apr-19 | | | | | 110 |
| SR-A5370 | P9 - Set Up / Dry Run Bidwell | 2 | 2 | 0 | 0% | 23-Apr-19 | 24-Apr-19 | | | | | 108 |
| SR-A5380 | P9 - Place Microsilica Overlay | 1 | 1 | 0 | 0% | 25-Apr-19 | 25-Apr-19 | | | | | 109 |
| SR-A5390 | P9 - Cure and Protect Overlay | 1 | 1 | 0 | 0% | 26-Apr-19 | 26-Apr-19 | | | | | 109 |
| SR-A5410 | P10 - Set Up / Dry Run Bidwell | 2 | 2 | 0 | 0% | 25-Apr-19 | 26-Apr-19 | | | | | 108 |
| SR-A5420 | P10 - Place Microsilica Overlay | 1 | 1 | 0 | 0% | 29-Apr-19 | 29-Apr-19 | | | | | 108 |
| SR-A5430 | P10 - Cure and Protect Overlay | 1 | 1 | 0 | 0% | 30-Apr-19 | 30-Apr-19 | | | | | 108 |
| SR-A5450 | Edge Overlay / Surface Remove | 3 | 3 | 0 | 0% | 01-May-19 | 03-May-19 | | | | | 108 |

| | | | Print Date/Time: 13-Dec-18 15:48 | Data Date: 01-Dec-18 | | | Cline Avenue Bridge - Contract Schedule - December 1, 2018 Data Date | | | | | 15 of 15 |

| Activity ID | Activity Name | Original Duration | Remaining Duration | Actual Duration | Activity % Complete | Start | Finish | BL1 Start | BL1 Finish | Actual Start | Actual Finish | Total Float |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SR-A5460 | Clean / Prep HMWM | 8 | 8 | 0 | 0% | 06-May-19 | 15-May-19 | | | | | 108 |
| SR-A5470 | Place HMWM | 5 | 5 | 0 | 0% | 16-May-19 | 22-May-19 | | | | | 108 |
| SR-A5480 | Surface Seal | 1 | 1 | 0 | 0% | 23-May-19 | 23-May-19 | | | | | 108 |
| **Non-EPC Work Items** | | | | | | | | | | | | |
| **West Approach Roadway Modifications** | | | | | | | | | | | | |
| WA1000 | Prep/Submit/Review Work Plans + Mobilize for WestAppr | 30 | 30 | 0 | 0% | 02-Apr-19 | 01-May-19 | 02-Apr-19 | 01-May-19 | | | 133 |
| WA1020 | Set Up MOT for Riley Road On Ramp | 1 | 1 | 0 | 0% | 02-May-19 | 02-May-19 | 02-May-19 | 02-May-19 | | | 86 |
| WA1030 | Mill Existing Asphalt 1.5" Depth (9,507 SYS) | 2 | 2 | 0 | 0% | 03-May-19 | 06-May-19 | 03-May-19 | 06-May-19 | | | 86 |
| WA1040 | Remove Existing Median Barrier (Approx 715 LF) | 4 | 4 | 0 | 0% | 07-May-19 | 13-May-19 | 07-May-19 | 13-May-19 | | | 86 |
| WA1060 | Drainage Modifications | 3 | 3 | 0 | 0% | 14-May-19 | 16-May-19 | 14-May-19 | 16-May-19 | | | 86 |
| WA1080 | Prep/Place Full-Depth Concrete Patch 18.5" (1,233 SYS) | 10 | 10 | 0 | 0% | 17-May-19 | 03-Jun-19 | 17-May-19 | 03-Jun-19 | | | 86 |
| WA1100 | F/P Concrete Barrier (319 LF) | 5 | 5 | 0 | 0% | 04-Jun-19 | 10-Jun-19 | 04-Jun-19 | 10-Jun-19 | | | 86 |
| WA1140 | Place New Asphalt Overlay (1,022 TONS) | 3 | 3 | 0 | 0% | 11-Jun-19 | 14-Jun-19 | 11-Jun-19 | 14-Jun-19 | | | 86 |
| WA1160 | Install Impact Attenuators (2 EA) | 5 | 5 | 0 | 0% | 17-Jun-19 | 21-Jun-19 | 17-Jun-19 | 21-Jun-19 | | | 86 |
| **East Approach Roadway Modifications** | | | | | | | | | | | | |
| EA1000 | Prep/Submit/Review Work Plans + Mobilize for EastAppr | 30 | 30 | 0 | 0% | 10-May-19 | 08-Jun-19 | 10-May-19 | 08-Jun-19 | | | 135 |
| EA1020 | Mill Existing Asphalt (2,155 SYS) | 2 | 2 | 0 | 0% | 10-Jun-19 | 11-Jun-19 | 10-Jun-19 | 11-Jun-19 | | | 88 |
| EA1040 | Place New Asphalt Overlay (112 TONS) | 2 | 2 | 0 | 0% | 12-Jun-19 | 13-Jun-19 | 13-Jun-19 | 14-Jun-19 | | | 88 |
| EA1060 | Prep/Place Full-Depth Concrete Patch 13" (96 SYS) | 3 | 3 | 0 | 0% | 17-Jun-19 | 19-Jun-19 | 17-Jun-19 | 19-Jun-19 | | | 88 |
| **Electronic Toll Collection System** | | | | | | | | | | | | |
| T1000 | Develop ETC | 120 | 46 | 184 | 61.67% | 31-May-18/ | 15-Jan-19 | 01-Apr-18 | 29-Jul-18 | 31-May-18 | | 11 |
| T1100 | Manufacture ETC Equipment | 185 | 185 | 0 | 0% | 16-Jan-19 | 19-Jul-19 | 30-Jul-18 | 25-May-19 | | | 11 |
| T1200 | Install Toll System | 100 | 100 | 0 | 0% | 20-Jul-19 | 27-Oct-19 | 26-May-19 | 02-Sep-19 | | | 11 |
| T1205 | Test Toll System | 31 | 31 | 0 | 0% | 08-Nov-19 | 08-Dec-19 | 09-Nov-19 | 09-Dec-19 | | | 0 |
| **Access Ramps for Cline Ave @ Ind Blvd** | | | | | | | | | | | | |
| AR1000 | Prep/Submit/Review Work Plans for Access Ramps | 61 | 61 | 0 | 0% | 01-Jan-19 | 02-Mar-19 | 26-Oct-18 | 25-Dec-18 | | | 10 |
| X3 | Mobilize + Construct Access Ramps (Place Holder) | 180 | 180 | 0 | 0% | 02-May-19 | 28-Oct-19 | 26-Dec-18 | 23-Jun-19 | | | 10 |

<u>EXHIBIT D</u>

<u>SCHEDULE OF VALUES</u>

[See Attached]

**CLINE AVENUE BRIDGE**
**MCLEAN CONTRACTING - SEGMENT ERECTION SCHEDULE OF VALUES**

| Item | Unit | Quantity | Unit Price | Amount |
|---|---|---|---|---|
| Payment and Performance Bond | LS | 1 | $ 96,500.00 | $ 96,500.00 |
| Mobilization Payment (Month 1) | LS | 1 | $ 360,000.00 | $ 360,000.00 |
| Mobilization Payment (Month 2) | LS | 1 | $ 360,000.00 | $ 360,000.00 |
| Mobilization Payment (Month 3) | LS | 1 | $ 480,000.00 | $ 480,000.00 |
| Erection Supervision | MO | 10 | $ 260,000.00 | $ 2,600,000.00 |
| Start-Up and Single Heading Erection | MO | 1 | $ 713,000.00 | $ 713,000.00 |
| Additional Mobilization, Two Heading Erection, Demobilization | MO | 8 | $ 1,190,000.00 | $ 9,520,000.00 |
| Final Payment Mobilization Adjustment/Credit | LS | 1 | $ (1,200,000.00) | $ (1,200,000.00) |
| **Total** | | | | **$ 12,929,500.00** |

NOTES:  1) Invoice for partial months will be prorated using the above schedule of values and the number
of days services were provided versus the number of days in that month.

2) Change Orders will be issued as needed per Exhibit A.

D - 2

<u>EXHIBIT E</u>

<u>INSURANCE</u>

I.      **Subcontractor Insurance**

The insurance set forth below shall be obtained and in effect as of commencement of the Subcontract Work.  The Contractor and its affiliates as well as the Owner and its affiliates will be named as additional insureds.

- COMMERCIAL GENERAL LIABILITY INSURANCE - Subcontractor shall provide Commercial General Liability insurance using the 2001 ISO Occurrence Form (CG 00 01 10/01), or an equivalent form. The Commercial General Liability insurance must include coverage for premises-operations, Independent contractors, products-completed operations, personal injury and contractual liability. The contractual liability must include the tort liability of another assumed in a business contract. Subcontractor or its agent/broker shall verify that there is no endorsement or modification of the CGL limiting the scope of coverage for liability arising from explosion, collapse, or underground property damage. Furthermore, Subcontractor's policy shall be endorsed to delete any restrictions for work performed within 50 feet of a railroad right-of-way. The Commercial General Liability insurance shall be maintained throughout the duration of the Project and for a minimum of five (5) years after completion of the work. The minimum limits shall be as follows;

  Each Occurrence limit

  Bodily Injury/Property Damage Liability              $1,000,000

  Personal Injury liability                           $1,000,000

  General Aggregate Limit                             $2,000,000

  Products/Completed Operations Aggregate Limit       $2,000,000

  The General Aggregate limit is to be written on a "per project" basis using Subcontractor's per project endorsement Amendment-Aggregate Limits of Insurance (CG 25 03) or equivalent language. The Products/Completed Operations Aggregate Limit must be at least $2,000,000 or written confirmation provided that the Commercial Umbrella coverage Includes liability coverage for damage to the Insured's completed work equivalent to that provided under the CG 00 01 10/01 coverage form.

  The Owner and Contractor are to be named as additional insureds in Subcontractor's policy with respect to this project using the ISO Additional Insured-Owners, Contractors endorsement (CG 20 10) for premises/operations and CG 20 37 for completed operations, or a substitute providing equivalent coverage. Verification of additional insured status shall be furnished to Owner and Contractor

by mailing a copy of the endorsement along with the Certificate of Insurance In accordance with the General Conditions paragraph below.

This Insurance shall apply as primary and non-contributory Insurance with respect to any other insurance or self-Insurance the Owner or Contractor may have or elect to carry with respect to this project or contract.

The policy shall provide for a waiver of subrogation in favor of the Owner and Contractor.

- COMPREHENSIVE AUTOMOBILE LIABILITY INSURANCE - Subcontractor must provide and maintain business auto liability Insurance for all owned, non-owned and hired vehicles on ISO form CA 00 01 12/90 or equivalent coverage form with the following limits;

Combined Single Limit                    $1,000,000 per accident

If necessary, the policy shall be endorsed to provide contractual liability coverage equivalent to that provided in the 1990 and later editions of the ISO CA 00 01 form.

Subcontractor's auto policy should also be endorsed to Include Pollution Liability-Broadened Coverage for Covered Auto (CA 99 48) or equivalent coverage if the required Contractors Pollution Liability excludes the pollution liability arising out of the transportation, loading, or unloading by a covered auto.

- WORKERS COMPENSATION - Subcontractor shall provide and maintain workers compensation and employers liability insurance providing coverage in the state (or states) in which the project is performed. Limits and coverage shall be as follows:

Workers Compensation Insurance          Statutory Benefits-Indiana

Employers liability Insurance            $1,000,000 each accident

                                         $1,000,000 policy limit

                                         $1,000,000 each employee

Because this Project involves work which may be subject to the U.S. Longshore and Harborworkers Act (USL&HW), or which may involve watercraft, if Subcontractor performs work on the Indiana Harbor Canal, Subcontractor shall attach the respective endorsements to provide this coverage as required by the Owner. The respective endorsement forms are: USL&HW (WC 00 01 O6 A) and Maritime Coverage (WC 00 02 01 A) or equivalent coverage. Subcontractor may maintain or cause to be maintained equivalent Maritime Coverage using Protection and Indemnity Insurance (P&I) for any vessel owned and/or chartered by Subcontractor and used in connection with the construction operation. Subcontractor's Workers Compensation policy shall be specifically endorsed to Waive Subrogation against Owner and Contractor using WC 00 03 13 or equivalent endorsement.

Exhibit E - 2

- UMBRELLA EXCESS LIABILITY - Subcontractor shall provide umbrella excess liability Insurance on an "occurrence" basis providing "following form" coverage for the underlying coverages outlined above.  This insurance can be structured as any combination of primary plus supplementary layers and umbrella liability and/or excess liability, or primary plus umbrella liability and/or excess liability.  The overall minimum insurance limits shall be:

  Each Occurrence Limit                         $10,000,000

  Aggregate Limit                               $10,000,000

  Subcontractor or its agent/broker shall confirm that Owner and Contractor are additional Insureds on Umbrella Excess in a form equal or equivalent to the Additional Insured and Per Project endorsements referenced in the underlying CGL. This Insurance shall be maintained throughout the duration of the Project and for a minimum of five (5) years after completion of the work.

- CONTRACTORS POLLUTION LIABILITY - Subcontractor shall provide Contractors Pollution Liability (CPL) insurance with limits of at least $5,000,000 per incident. The Contractors Pollution Liability policy shall provide coverage for third-party bodily injury, property damage, clean-up costs and defense costs which arise from the construction operations performed by or behalf of Subcontractor.

  Owner and Contractor shall be named as Additional insureds on the CPL policy. Subcontractor or Subcontractor's Agent/broker should confirm that the CPL policy contains a separation of insureds provision ('severability)" and that claims between insureds is permitted under the CPL coverage form.

  The Contractors Pollution liability coverage may be written on either an occurrence or Claims-made form. If coverage is provided on a claims-made form, the retroactive date of such coverage shall not be later than The Effective Date and Subcontractor agrees to provide uninterrupted coverage from the retro date throughout the duration of this project and for at least five (5) years after Substantial Completion of the project. Alternatively, Subcontractor may purchase an extended reporting period which shall remain in effect for at least five (5) years after Substantial Completion of the work.

- MARINE GENERAL LIABILITY – If Subcontractor performs work on the Indiana Harbor Canal, Subcontractor shall provide liability coverage for bodily injury and property damage claims arising out of the operation and use of watercraft during the course of construction with limits of at least $5,000,000 per occurrence/aggregate. The Aggregate Limit on the MGL is to be written on a "per project" basis using Subcontractor's per project endorsement similar or equivalent to the CG 25 03 used with the Commercial General Liability insurance.

  Owner and Contractor shall be named as Additional insureds on the MGL policy in a form similar to the Additional Insured requirements as described in the Commercial General Liability insurance.

- AVIATION LIABILITY - Should aircraft of any kind be used by Subcontractor or any tier of subcontractor, Subcontractor shall maintain or cause the operator of the aircraft to maintain aircraft liability Insurance. Such aircraft liability Insurance shall provide coverage for bodily Injury and properly damage caused by the operation, maintenance or use of such aircraft with minimum limits of $10,000,000 Combined Single Limit. Subcontractor shall name or require that Owner and Contractor be named as Additional Insureds on the aircraft liability policy.

## II.    Property Insurance

The Contractor shall purchase and shall maintain, a Builder's Risk Policy upon the entire Project for the full cost of replacement at the time of loss. This Insurance shall also name the Owner, Contractor, Subcontractor, other subcontractors, Sub-subcontractors, Material Suppliers and Engineer as insureds. This insurance shall be written as a Builder's Risk Policy or equivalent form to cover all risks of physical loss, and shall insure at least against the perils of fire, lightning, explosion, windstorm, hail, smoke, aircraft and vehicles, riot and civil commotion, theft, vandalism, malicious mischief, debris removal, flood, earthquake, earth movement, water damage, wind damage, testing, and collapse. The Owner and the Subcontractor shall be jointly responsible for any deductible amounts relating to the Subcontract Work. This policy shall provide for a waiver of subrogation in favor of the Owner, Subcontractor, other subcontractors, Sub-subcontractors, Material Suppliers and Engineer.

## III.    General Conditions

All insurance required by this Agreement shall be purchased and maintained with a company or companies lawfully authorized to do business in the State of Indiana.  Such insurance shall be for limits of liability as specified for the Project or legally required, whichever is greater.  All required insurance policies shall be endorsed to provide thirty (30) Days prior written notice by certified mail, of any material change, cancellation, or non-renewal to Contractor and Owner.  Owner and Contractor and where applicable, Subcontractor or Subcontractors, shall each be named as additional party insured on the policies required to be obtained hereunder.  Proof of the required insurance and endorsements shall be made by submission of certificates of insurance to Owner and Contractor prior to commencement of a Project.  All insurance policies shall contain a waiver of subrogation provision pursuant to which the insurer is prohibited from obtaining subrogation or transfer rights in respect of any claim under such policies against Contractor, Owner or where applicable, Subcontractor or Subcontractors and their employees, directors or officers.

Where applicable, Contractor and Owner shall be named as additional insured or loss payee on the policies required to be obtained hereunder.  The Certificates should be issued to Contractor and Owner at the addresses set forth in this Agreement.

<u>EXHIBIT F</u>

<u>BOND PROVISIONS</u>

[See Attached]

# ▲AIA® Document A312™ – 2010

## *Performance Bond*

**CONTRACTOR:**
*(Name, legal status and address)*

**SURETY:**
*(Name, legal status and principal place of business)*

**OWNER:**
*(Name, legal status and address)*

This document has important legal consequences. Consultation with an attorney is encouraged with respect to its completion or modification.

Any singular reference to Contractor, Surety, Owner or other party shall be considered plural where applicable.

**CONSTRUCTION CONTRACT**
Date:

Amount:

Description:
*(Name and location)*

AIA Document A312–2010 combines two separate bonds, a Performance Bond and a Payment Bond, into one form. This is not a single combined Performance and Payment Bond.

**BOND**
Date:
*(Not earlier than Construction Contract Date)*

Amount:

Modifications to this Bond:     ☐ None     ☐ See Section 16

**CONTRACTOR AS PRINCIPAL**
Company:                    *(Corporate Seal)*

**SURETY**
Company:                    *(Corporate Seal)*

Signature: _____
Name              Nam
and Title:

Signature: _____
e
and Title:

*(Any additional signatures appear on the last page of this Performance Bond.)*

*(FOR INFORMATION ONLY — Name, address and telephone)*
**AGENT or BROKER:**

**OWNER'S REPRESENTATIVE:**
*(Architect, Engineer or other party:)*

Exhibit F - 2

**§ 1** The Contractor and Surety, jointly and severally, bind themselves, their heirs, executors, administrators, successors and assigns to the Owner for the performance of the Construction Contract, which is incorporated herein by reference.

**§ 2** If the Contractor performs the Construction Contract, the Surety and the Contractor shall have no obligation under this Bond, except when applicable to participate in a conference as provided in Section 3.

**§ 3** If there is no Owner Default under the Construction Contract, the Surety's obligation under this Bond shall arise after

.1  the Owner first provides notice to the Contractor and the Surety that the Owner is considering declaring a Contractor Default. Such notice shall indicate whether the Owner is requesting a conference among the Owner, Contractor and Surety to discuss the Contractor's performance. If the Owner does not request a conference, the Surety may, within five (5) business days after receipt of the Owner's notice, request such a conference. If the Surety timely requests a conference, the Owner shall attend. Unless the Owner agrees otherwise, any conference requested under this Section 3.1 shall be held within ten (10) business days of the Surety's receipt of the Owner's notice. If the Owner, the Contractor and the Surety agree, the Contractor shall be allowed a reasonable time to perform the Construction Contract, but such an agreement shall not waive the Owner's right, if any, subsequently to declare a Contractor Default;

.2  the Owner declares a Contractor Default, terminates the Construction Contract and notifies the Surety; and

.3  the Owner has agreed to pay the Balance of the Contract Price in accordance with the terms of the Construction Contract to the Surety or to a contractor selected to perform the Construction Contract.

**§ 4** Failure on the part of the Owner to comply with the notice requirement in Section 3.1 shall not constitute a failure to comply with a condition precedent to the Surety's obligations, or release the Surety from its obligations, except to the extent the Surety demonstrates actual prejudice.

**§ 5** When the Owner has satisfied the conditions of Section 3, the Surety shall promptly and at the Surety's expense take one of the following actions:

**§ 5.1** Arrange for the Contractor, with the consent of the Owner, to perform and complete the Construction Contract;

**§ 5.2** Undertake to perform and complete the Construction Contract itself, through its agents or independent contractors;

**§ 5.3** Obtain bids or negotiated proposals from qualified contractors acceptable to the Owner for a contract for performance and completion of the Construction Contract, arrange for a contract to be prepared for execution by the Owner and a contractor selected with the Owner's concurrence, to be secured with performance and payment bonds executed by a qualified surety equivalent to the bonds issued on the Construction Contract, and pay to the Owner the amount of damages as described in Section 7 in excess of the Balance of the Contract Price incurred by the Owner as a result of the Contractor Default; or

**§ 5.4** Waive its right to perform and complete, arrange for completion, or obtain a new contractor and with reasonable promptness under the circumstances:

.1  After investigation, determine the amount for which it may be liable to the Owner and, as soon as practicable after the amount is determined, make payment to the Owner; or

.2  Deny liability in whole or in part and notify the Owner, citing the reasons for denial.

**§ 6** If the Surety does not proceed as provided in Section 5 with reasonable promptness, the Surety shall be deemed to be in default on this Bond seven days after receipt of an additional written notice from the Owner to the Surety demanding that the Surety perform its obligations under this Bond, and the Owner shall be entitled to enforce any remedy available to the Owner. If the Surety proceeds as provided in Section 5.4, and the Owner refuses the payment or the Surety has denied liability, in whole or in part, without further notice the Owner shall be entitled to enforce any remedy available to the Owner.

**§ 7** If the Surety elects to act under Section 5.1, 5.2 or 5.3, then the responsibilities of the Surety to the Owner shall not be greater than those of the Contractor under the Construction Contract, and the responsibilities of the Owner to the Surety shall not be greater than those of the Owner under the Construction Contract. Subject to the commitment by the Owner to pay the Balance of the Contract Price, the Surety is obligated, without duplication, for

    **.1**    the responsibilities of the Contractor for correction of defective work and completion of the Construction Contract;

    **.2**    additional legal, design professional and delay costs resulting from the Contractor's Default, and resulting from the actions or failure to act of the Surety under Section 5; and

    **.3**    liquidated damages, or if no liquidated damages are specified in the Construction Contract, actual damages caused by delayed performance or non-performance of the Contractor.

**§ 8** If the Surety elects to act under Section 5.1, 5.3 or 5.4, the Surety's liability is limited to the amount of this Bond.

**§ 9** The Surety shall not be liable to the Owner or others for obligations of the Contractor that are unrelated to the Construction Contract, and the Balance of the Contract Price shall not be reduced or set off on account of any such unrelated obligations. No right of action shall accrue on this Bond to any person or entity other than the Owner or its heirs, executors, administrators, successors and assigns.

**§ 10** The Surety hereby waives notice of any change, including changes of time, to the Construction Contract or to related subcontracts, purchase orders and other obligations.

**§ 11** Any proceeding, legal or equitable, under this Bond may be instituted in any court of competent jurisdiction in the location in which the work or part of the work is located and shall be instituted within two years after a declaration of Contractor Default or within two years after the Contractor ceased working or within two years after the Surety refuses or fails to perform its obligations under this Bond, whichever occurs first. If the provisions of this Paragraph are void or prohibited by law, the minimum period of limitation available to sureties as a defense in the jurisdiction of the suit shall be applicable.

**§ 12** Notice to the Surety, the Owner or the Contractor shall be mailed or delivered to the address shown on the page on which their signature appears.

**§ 13** When this Bond has been furnished to comply with a statutory or other legal requirement in the location where the construction was to be performed, any provision in this Bond conflicting with said statutory or legal requirement shall be deemed deleted herefrom and provisions conforming to such statutory or other legal requirement shall be deemed incorporated herein. When so furnished, the intent is that this Bond shall be construed as a statutory bond and not as a common law bond.

**§ 14 Definitions**
**§ 14.1 Balance of the Contract Price.** The total amount payable by the Owner to the Contractor under the Construction Contract after all proper adjustments have been made, including allowance to the Contractor of any amounts received or to be received by the Owner in settlement of insurance or other claims for damages to which the Contractor is entitled, reduced by all valid and proper payments made to or on behalf of the Contractor under the Construction Contract.

**§ 14.2 Construction Contract.** The agreement between the Owner and Contractor identified on the cover page, including all Contract Documents and changes made to the agreement and the Contract Documents.

**§ 14.3 Contractor Default.** Failure of the Contractor, which has not been remedied or waived, to perform or otherwise to comply with a material term of the Construction Contract.

**§ 14.4 Owner Default.** Failure of the Owner, which has not been remedied or waived, to pay the Contractor as required under the Construction Contract or to perform and complete or comply with the other material terms of the Construction Contract.

**§ 14.5 Contract Documents.** All the documents that comprise the agreement between the Owner and Contractor.

**§ 15** If this Bond is issued for an agreement between a Contractor and subcontractor, the term Contractor in this Bond shall be deemed to be Subcontractor and the term Owner shall be deemed to be Contractor.

AIA Document A312™ – 2010. The American Institute of Architects.

**§ 16** Modifications to this bond are as follows:



*(Space is provided below for additional signatures of added parties, other than those appearing on the cover page.)*

| **CONTRACTOR AS PRINCIPAL** | | **SURETY** | |
| Company: | *(Corporate Seal)* | Company: | *(Corporate Seal)* |
| Signature: _____ | | Signature: _____ | |
| Name and Title: | | Name and Title: | |
| Address: | | Address: | |

CAUTION: You should sign an original AIA Contract Document, on which this text appears in RED. An original assures that changes will not be obscured.

AIA Document A312™ – 2010. The American Institute of Architects.

Init.

/

**4**

# ▲IA® Document A312™ – 2010

## *Payment Bond*

**CONTRACTOR:**
*(Name, legal status and address)*

**SURETY:**
*(Name, legal status and principal place of business)*

**OWNER:**
*(Name, legal status and address)*

This document has important legal consequences. Consultation with an attorney is encouraged with respect to its completion or modification.

Any singular reference to Contractor, Surety, Owner or other party shall be considered plural where applicable.

**CONSTRUCTION CONTRACT**
Date:

Amount:

Description:
*(Name and location)*

AIA Document A312–2010 combines two separate bonds, a Performance Bond and a Payment Bond, into one form. This is not a single combined Performance and Payment Bond.

**BOND**
Date:
*(Not earlier than Construction Contract Date)*

Amount:

Modifications to this Bond:  ☐ None  ☐ See Section 18

**CONTRACTOR AS PRINCIPAL**
Company:                    *(Corporate Seal)*

**SURETY**
Company:                    *(Corporate Seal)*

Signature: _____
Name          Nam
and Title:

Signature: _____
                e
and Title:

*(Any additional signatures appear on the last page of this Payment Bond.)*

*(FOR INFORMATION ONLY — Name, address and telephone)*
**AGENT or BROKER:**

**OWNER'S REPRESENTATIVE:**
*(Architect, Engineer or other party:)*

**§ 1** The Contractor and Surety, jointly and severally, bind themselves, their heirs, executors, administrators, successors and assigns to the Owner to pay for labor, materials and equipment furnished for use in the performance of the Construction Contract, which is incorporated herein by reference, subject to the following terms.

**§ 2** If the Contractor promptly makes payment of all sums due to Claimants, and defends, indemnifies and holds harmless the Owner from claims, demands, liens or suits by any person or entity seeking payment for labor, materials or equipment furnished for use in the performance of the Construction Contract, then the Surety and the Contractor shall have no obligation under this Bond.

**§ 3** If there is no Owner Default under the Construction Contract, the Surety's obligation to the Owner under this Bond shall arise after the Owner has promptly notified the Contractor and the Surety (at the address described in Section 13) of claims, demands, liens or suits against the Owner or the Owner's property by any person or entity seeking payment for labor, materials or equipment furnished for use in the performance of the Construction Contract and tendered defense of such claims, demands, liens or suits to the Contractor and the Surety.

**§ 4** When the Owner has satisfied the conditions in Section 3, the Surety shall promptly and at the Surety's expense defend, indemnify and hold harmless the Owner against a duly tendered claim, demand, lien or suit.

**§ 5** The Surety's obligations to a Claimant under this Bond shall arise after the following:

**§ 5.1** Claimants, who do not have a direct contract with the Contractor,
> .1   have furnished a written notice of non-payment to the Contractor, stating with substantial accuracy the amount claimed and the name of the party to whom the materials were, or equipment was, furnished or supplied or for whom the labor was done or performed, within ninety (90) days after having last performed labor or last furnished materials or equipment included in the Claim; and
> .2   have sent a Claim to the Surety (at the address described in Section 13).

**§ 5.2** Claimants, who are employed by or have a direct contract with the Contractor, have sent a Claim to the Surety (at the address described in Section 13).

**§ 6** If a notice of non-payment required by Section 5.1.1 is given by the Owner to the Contractor, that is sufficient to satisfy a Claimant's obligation to furnish a written notice of non-payment under Section 5.1.1.

**§ 7** When a Claimant has satisfied the conditions of Sections 5.1 or 5.2, whichever is applicable, the Surety shall promptly and at the Surety's expense take the following actions:

**§ 7.1** Send an answer to the Claimant, with a copy to the Owner, within sixty (60) days after receipt of the Claim, stating the amounts that are undisputed and the basis for challenging any amounts that are disputed; and

**§ 7.2** Pay or arrange for payment of any undisputed amounts.

**§ 7.3** The Surety's failure to discharge its obligations under Section 7.1 or Section 7.2 shall not be deemed to constitute a waiver of defenses the Surety or Contractor may have or acquire as to a Claim, except as to undisputed amounts for which the Surety and Claimant have reached agreement. If, however, the Surety fails to discharge its obligations under Section 7.1 or Section 7.2, the Surety shall indemnify the Claimant for the reasonable attorney's fees the Claimant incurs thereafter to recover any sums found to be due and owing to the Claimant.

**§ 8** The Surety's total obligation shall not exceed the amount of this Bond, plus the amount of reasonable attorney's fees provided under Section 7.3, and the amount of this Bond shall be credited for any payments made in good faith by the Surety.

**§ 9** Amounts owed by the Owner to the Contractor under the Construction Contract shall be used for the performance of the Construction Contract and to satisfy claims, if any, under any construction performance bond. By the Contractor furnishing and the Owner accepting this Bond, they agree that all funds earned by the Contractor in the performance of the Construction Contract are dedicated to satisfy obligations of the Contractor and Surety under this Bond, subject to the Owner's priority to use the funds for the completion of the work.

---

Init.

/

**AIA Document A312™ – 2010.** The American Institute of Architects.

6

**§ 10** The Surety shall not be liable to the Owner, Claimants or others for obligations of the Contractor that are unrelated to the Construction Contract. The Owner shall not be liable for the payment of any costs or expenses of any Claimant under this Bond, and shall have under this Bond no obligation to make payments to, or give notice on behalf of, Claimants or otherwise have any obligations to Claimants under this Bond.

**§ 11** The Surety hereby waives notice of any change, including changes of time, to the Construction Contract or to related subcontracts, purchase orders and other obligations.

**§ 12** No suit or action shall be commenced by a Claimant under this Bond other than in a court of competent jurisdiction in the state in which the project that is the subject of the Construction Contract is located or after the expiration of one year from the date (1) on which the Claimant sent a Claim to the Surety pursuant to Section 5.1.2 or 5.2, or (2) on which the last labor or service was performed by anyone or the last materials or equipment were furnished by anyone under the Construction Contract, whichever of (1) or (2) first occurs. If the provisions of this Paragraph are void or prohibited by law, the minimum period of limitation available to sureties as a defense in the jurisdiction of the suit shall be applicable.

**§ 13** Notice and Claims to the Surety, the Owner or the Contractor shall be mailed or delivered to the address shown on the page on which their signature appears. Actual receipt of notice or Claims, however accomplished, shall be sufficient compliance as of the date received.

**§ 14** When this Bond has been furnished to comply with a statutory or other legal requirement in the location where the construction was to be performed, any provision in this Bond conflicting with said statutory or legal requirement shall be deemed deleted herefrom and provisions conforming to such statutory or other legal requirement shall be deemed incorporated herein. When so furnished, the intent is that this Bond shall be construed as a statutory bond and not as a common law bond.

**§ 15** Upon request by any person or entity appearing to be a potential beneficiary of this Bond, the Contractor and Owner shall promptly furnish a copy of this Bond or shall permit a copy to be made.

### § 16 Definitions
**§ 16.1 Claim.** A written statement by the Claimant including at a minimum:
- .1   the name of the Claimant;
- .2   the name of the person for whom the labor was done, or materials or equipment furnished;
- .3   a copy of the agreement or purchase order pursuant to which labor, materials or equipment was furnished for use in the performance of the Construction Contract;
- .4   a brief description of the labor, materials or equipment furnished;
- .5   the date on which the Claimant last performed labor or last furnished materials or equipment for use in the performance of the Construction Contract;
- .6   the total amount earned by the Claimant for labor, materials or equipment furnished as of the date of the Claim;
- .7   the total amount of previous payments received by the Claimant; and
- .8   the total amount due and unpaid to the Claimant for labor, materials or equipment furnished as of the date of the Claim.

**§ 16.2 Claimant.** An individual or entity having a direct contract with the Contractor or with a subcontractor of the Contractor to furnish labor, materials or equipment for use in the performance of the Construction Contract. The term Claimant also includes any individual or entity that has rightfully asserted a claim under an applicable mechanic's lien or similar statute against the real property upon which the Project is located. The intent of this Bond shall be to include without limitation in the terms "labor, materials or equipment" that part of water, gas, power, light, heat, oil, gasoline, telephone service or rental equipment used in the Construction Contract, architectural and engineering services required for performance of the work of the Contractor and the Contractor's subcontractors, and all other items for which a mechanic's lien may be asserted in the jurisdiction where the labor, materials or equipment were furnished.

**§ 16.3 Construction Contract.** The agreement between the Owner and Contractor identified on the cover page, including all Contract Documents and all changes made to the agreement and the Contract Documents.

---

**AIA Document A312™ – 2010.** The American Institute of Architects.

**§ 16.4 Owner Default.** Failure of the Owner, which has not been remedied or waived, to pay the Contractor as required under the Construction Contract or to perform and complete or comply with the other material terms of the Construction Contract.

**§ 16.5 Contract Documents.** All the documents that comprise the agreement between the Owner and Contractor.

**§ 17** If this Bond is issued for an agreement between a Contractor and subcontractor, the term Contractor in this Bond shall be deemed to be Subcontractor and the term Owner shall be deemed to be Contractor.

**§ 18** Modifications to this bond are as follows:



*(Space is provided below for additional signatures of added parties, other than those appearing on the cover page.)*

| CONTRACTOR AS PRINCIPAL | | SURETY | |
|---|---|---|---|
| Company: | *(Corporate Seal)* | Company: | *(Corporate Seal)* |
| Signature: | | Signature: | |
| Name and Title: | | Name and Title: | |
| Address | | Address | |

CAUTION: You should sign an original AIA Contract Document, on which this text appears in RED. An original assures that changes will not be obscured.

<u>EXHIBIT G</u>

<u>PRIME AGREEMENT</u>

[See Attached]

EXECUTION COPY

**ENGINEERING, PROCUREMENT**

**AND**

**CONSTRUCTION AGREEMENT**

for

**CLINE AVENUE BRIDGE**

**BY AND BETWEEN**

**CLINE AVENUE BRIDGE, LLC**, a Delaware limited liability company

(Owner)

and

**FIGG BRIDGE BUILDERS, LLC**, a Florida limited liability company

(EPC Contractor)

**June 8, 2017**

## TABLE OF CONTENTS

ARTICLE 1    DEFINITIONS ................................................................................1

   1.1    Definitions. .............................................................................1

ARTICLE 2    REPRESENTATIONS, WARRANTIES AND COVENANTS...................1

   2.1    Representations, Warranties and Covenants by EPC Contractor.....................1

   2.2    Representations by Owner......................................................4

ARTICLE 3    THE WORK .........................................................................5

   3.1    Scope of Work..................................................................5

   3.2    Development Agreement and Exchange Agreement. ...................................6

ARTICLE 4    EPC CONTRACTOR'S RIGHTS AND RESPONSIBILITIES .................6

   4.1    Engineering, Procurement and Construction of the Facility; Performance of the Work...........................................................6

   4.2    Retention of Qualified Subcontractors and Suppliers ...............................7

   4.3    Taxes. .......................................................................9

   4.4    Intentionally deleted. ..........................................................9

   4.5    Hazardous Substances; Erosion..................................................9

   4.6    Compliance with Governing Documents. ..........................................10

   4.7    Traffic Control Plan............................................................10

   4.8    Safety Plan.....................................................................10

   4.9    Security Plan...................................................................10

   4.10    Construction and Storage Confined to Site. .....................................11

   4.11    Construction Office; Records; Audits. ..........................................11

   4.12    No Liens. ....................................................................11

   4.13    Patents. .....................................................................12

   4.14    Inspections; Defective Work. ..................................................12

   4.15    Transfer of Work. .............................................................12

   4.16    Authorizations and Approvals....................................................12

   4.17    Insurance. ...................................................................13

   4.18    Tangible Net Worth Criteria....................................................13

   4.19    Payment and Performance Security. .............................................13

   4.20    Toll Collection System.........................................................14

ARTICLE 5    OWNER'S RIGHTS AND RESPONSIBILITIES...................................14

   5.1    Intentionally Omitted. .........................................................14

   5.2    Transfer of Control Responsibility to Owner......................................14

|  |  |  |
|---|---|---|
| 5.3 | Owner's Responsibilities During the Construction of the Project. | 14 |
| **ARTICLE 6** | **INTENTIONALLY OMITTED.** | **15** |
| **ARTICLE 7** | **OWNERSHIP OF ASSETS** | **15** |
| 7.1 | Ownership of the Cline Avenue Bridge; Risk of Loss. | 15 |
| **ARTICLE 8** | **COST OF THE WORK** | **16** |
| 8.1 | Cost of the Work. | 16 |
| 8.2 | Exclusions from Cost of the Work. | 16 |
| **ARTICLE 9** | **CHANGE ORDERS** | **17** |
| 9.1 | General. | 17 |
| 9.2 | Owner Initiated Change Orders. | 17 |
| 9.3 | Change Directives. | 17 |
| 9.4 | Notification Process for EPC Contractor-Initiated Change Orders. | 18 |
| 9.5 | Entitlement to EPC Contractor-Initiated Change Orders. | 19 |
| 9.6 | Change Order Pricing. | 21 |
| **ARTICLE 10** | **PAYMENT FOR WORK; REPORTING** | **22** |
| 10.1 | Payment Schedule. | 22 |
| 10.2 | Final Payment. | 26 |
| **ARTICLE 11** | **COMMENCEMENT AND PERFORMANCE OF WORK** | **27** |
| 11.1 | Commencement; Schedule. | 27 |
| 11.2 | Substantial Completion. | 27 |
| 11.3 | Final Completion. | 28 |
| 11.4 | Extension. | 29 |
| 11.5 | Recovery Schedule. | 29 |
| **ARTICLE 12** | **WARRANTIES AND LIQUIDATED DAMAGES** | **30** |
| 12.1 | EPC Contractor's Warranties. | 30 |
| 12.2 | Repair and Replacement of Defective Work. | 31 |
| 12.3 | Liquidated Damages and Early Completion Bonus | 32 |
| 12.4 | Rights and Remedies Available Under Law | 33 |
| **ARTICLE 13** | **DISPUTE MITIGATION AND RESOLUTION** | **33** |
| 13.1 | Payment of Undisputed Amounts. | 33 |
| 13.2 | Arbitration Procedure. | 33 |
| 13.3 | Qualified to Act. | 34 |
| 13.4 | Confidentiality. | 34 |
| 13.5 | Provisional Remedies | 34 |

| | | |
|---|---|---|
| 13.6 | Continuing Performance. | 35 |
| 13.7 | Participation in Other Proceedings. | 35 |
| 13.8 | Claims Following Termination. | 35 |
| 13.9 | Waiver of Lien Rights. | 35 |
| **ARTICLE 14** | **DEFAULTS; REMEDIES; TERM; TERMINATION** | **35** |
| 14.1 | EPC Contractor Default. | 35 |
| 14.2 | Owner's Default Remedies Against EPC Contractor. | 37 |
| 14.3 | Owner Event of Default. | 40 |
| 14.4 | EPC Contractor Remedies for Owner Event of Default. | 41 |
| 14.5 | Force Majeure. | 42 |
| 14.6 | Right to Termination. | 44 |
| 14.7 | Effect of Termination Under Section 14.2 or Section 14.4 or Section 14.5.2.3. | 44 |
| 14.8 | Completion; Survival. | 45 |
| 14.9 | Indemnity. | 45 |
| **ARTICLE 15** | **NONDISCRIMINATION/AFFIRMATIVE ACTION** | **50** |
| 15.1 | In General. | 50 |
| 15.2 | Posting of Notices. | 51 |
| **ARTICLE 16** | **INTENTIONALLY OMITTED.** | **51** |
| **ARTICLE 17** | **MISCELLANEOUS.** | **51** |
| 17.1 | Governing Law and Venue. | 51 |
| 17.2 | Interpretation. | 51 |
| 17.3 | Drafting Ambiguities. | 53 |
| 17.4 | Third Party Beneficiaries. | 53 |
| 17.5 | Good Faith and Fair Dealing. | 53 |
| 17.6 | Severability. | 53 |
| 17.7 | Intentionally Omitted. | 53 |
| 17.8 | Technical or Trade Usage. | 53 |
| 17.9 | Amendments and Waivers. | 54 |
| 17.10 | Notices. | 54 |
| 17.11 | Change of Address. | 55 |
| 17.12 | Successors; Assignment. | 55 |
| 17.13 | Counterparts. | 56 |
| 17.14 | Further Assurances. | 56 |
| 17.15 | Interest. | 56 |

EXECUTION COPY

17.16     No Partnership. ...............................................................................56

17.17     Further Assurances; Cooperating with Financing Activities of Owner...........56

**EXHIBITS AND SCHEDULES TO THE AGREEMENT**

Exhibit A               Description of the Site

Exhibit B               Authorizations and Approvals

Exhibit C               List of Due Diligence Documents

Exhibit D               Forms of Lien Waiver

Exhibit E               Environmental Report

Exhibit F               Form of Certificate of Substantial Completion

Exhibit G               Excluded Costs

Schedule I              Definitions

Schedule II             Insurance

Schedule III            Payment Schedule

Schedule IV             The Work

Schedule V              Key Personnel, Engineers, and Major Subcontractors

Schedule VI             Project Schedule

Schedule VII            Initial Payment

Schedule VIII           Form of Payment and Performance Bond

Schedule IX             Payment and Performance Bond Reduction Terms

Schedule X              Milestone Schedule

## ENGINEERING, PROCUREMENT AND CONSTRUCTION AGREEMENT

This **ENGINEERING, PROCUREMENT AND CONSTRUCTION AGREEMENT** (this "Agreement") is made and dated as of the 8th day of June, 2017, by and among **FIGG BRIDGE BUILDERS, LLC**, a Florida limited liability company ("EPC Contractor") and **CLINE AVENUE BRIDGE, LLC**, a Delaware limited liability company ("Owner").

## RECITALS

A.      Owner has acquired all rights, title and interest in the right of way and/or real property ("Site") required in connection with the construction and operation of the Cline Avenue Bridge which will cross over the Indiana Harbor and Ship Canal in East Chicago, Indiana ("Cline Avenue Bridge" or "Facility"). The Site is more particularly described on **Exhibit A** attached hereto and by this reference made a part hereof.

B.      Owner, its subsidiaries and agents have obtained the Authorizations and Approvals in connection with the Work described on **Exhibit B** attached hereto and by this reference made a part hereof.

C.      EPC Contractor has extensive experience in designing, engineering and constructing bridges and has agreed to perform the design, engineering and construction of the Cline Avenue Bridge upon the terms and conditions set forth in this Agreement.

D.      Operation and maintenance of the Cline Avenue Bridge will be performed pursuant to a separate agreement that may be entered into with an affiliate of EPC Contractor.

**NOW, THEREFORE**, for and in consideration of the promises and the mutual covenants and agreements hereinafter set forth, the Parties agree as follows:

## ARTICLE 1   DEFINITIONS

*1.1   Definitions.*

Capitalized terms used herein shall have the meanings set forth in **Schedule I**.

## ARTICLE 2   REPRESENTATIONS, WARRANTIES AND COVENANTS

*2.1   Representations, Warranties and Covenants by EPC Contractor.*

EPC Contractor represents and warrants to and covenants with Owner (which representations, warranties and covenants shall survive the expiration or termination of this Agreement) that:

2.1.1      <u>Organization and qualification</u>. It is a limited liability company duly organized and validly existing under the laws of the State of Florida and is qualified to conduct business, and is in good standing in the State of Indiana, and will remain duly qualified and in good standing throughout the Term and for as long thereafter as any obligations remain outstanding under this Agreement. It has all necessary power and authority to carry on its business as

1

presently conducted, to own or hold its properties, and to enter into and perform its obligations under this Agreement.

2.1.2 <u>Authorization, approval, no defaults</u>. The execution, delivery and performance of this Agreement by EPC Contractor (1) has been duly authorized by all requisite company action; (2) has not resulted and will not result in a violation of any of EPC Contractor's governing instruments; (3) to its knowledge, will not conflict with any provisions of applicable Law; and (4) will not conflict with, result in the breach of, constitute a default under, or accelerate performance required by, any covenant, agreement, understanding, decree or order to which it is a party or by which it or any of its properties or assets is bound or affected.

2.1.3 <u>Enforceability</u>. This Agreement constitutes the legal, valid and binding obligation of EPC Contractor enforceable in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, or similar laws affecting creditors' rights generally.

2.1.4 <u>Legal proceedings</u>. There is no action, suit or proceeding, at law or in equity, or official investigation by or before any Governmental Authority, tribunal or any other body pending or, to the knowledge of EPC Contractor, threatened against or affecting EPC Contractor or any of its properties, rights or assets, which could reasonably be expected to result in a material adverse effect on EPC Contractor's ability to perform its obligations under this Agreement or on the validity or enforceability of this Agreement.

2.1.5 <u>Site Inspection and Conditions</u>. EPC Contractor and EPC Contractor's agents and representatives have visited, inspected and are familiar with the Site, its physical condition (including all reported and reasonably discoverable soil and groundwater conditions), roads, waterways, access rights, utilities, topographical conditions and air quality conditions, and have performed all reasonable investigations necessary to determine that the Site is suitable for the construction and installation of the Cline Avenue Bridge, and are familiar with every reported and reasonably discoverable condition which may be material to EPC Contractor's performance of its obligations under this Agreement (including, but not limited to, design requirements, transportation, seasons and climates, access, the handling and storage of materials and availability and quality of labor and materials).

2.1.6 <u>Necessary Rights</u>. EPC Contractor owns or will obtain the legal right to use all patents, rights to patents, trademarks, copyrights and licenses necessary for the performance by EPC Contractor of this Agreement and the transactions contemplated hereby, without any material conflict with the rights of others.

2.1.7 <u>Approvals/Requirements</u>. Prior to entering into this Agreement, EPC Contractor has familiarized itself with the requirements of (i) any and all applicable Laws; (ii) the data and requirements related to the Facility and the

Work as set forth in **Exhibit C**, (iii) the Development Agreement, (iv) the Exchange Agreement and (v) the conditions of any required Authorizations and Approvals. EPC Contractor represents and warrants that all Authorizations and Approvals that have been obtained remain in full force and effect, that EPC Contractor and the Work remain in full compliance with such Authorizations and Approvals, and that its design and construction means and methods are and will be consistent and meet the requirements of all Authorizations and Approvals. EPC Contractor shall be responsible for complying with the foregoing at its sole cost and without any additional compensation or time extension on account of such compliance, regardless of whether such compliance would require additional time for performance or additional labor, equipment and/or materials not expressly provided for in the Governing Documents. As of the Effective Date, EPC Contractor has no reason to believe that any Authorization and Approval required to be obtained by EPC Contractor that has not yet been obtained as of the Effective Date will not be granted in due course and thereafter remain in effect so as to enable the Work to proceed in accordance with the Governing Documents.

2.1.8    Qualification.

(a)    Professional Qualification and Authority.

(i)    EPC Contractor (including where applicable, through Subcontractors and Affiliates) possesses the necessary experience, expertise, resources, and skill to design, engineer and construct the Cline Avenue Bridge and to fulfill EPC Contractor's obligations under this Agreement.

(ii)    All Work furnished by EPC Contractor will be performed by or under the supervision of Persons who hold all necessary, valid licenses to practice in the State of Indiana, by personnel who are skilled, experienced and competent in their respective trades or professions, who are professionally qualified to perform the Work in accordance with the Governing Documents and who shall assume professional responsibility for the accuracy and completeness within the standard of care described herein of any and all documents prepared or checked by them.

(iii)    During all periods necessary for the performance of the Work, EPC Contractor (including where applicable, its Subcontractors and Affiliates) will maintain all required authority, license status, professional ability, skills and capacity to perform the Work in accordance with the requirements contained in the Governing Documents.

(b)    Timing. As of the Effective Date, EPC Contractor has evaluated the feasibility of performing the Work in accordance with the Project Schedule and for the Cost of the Work, accounting for constraints affecting the Facility and the Site and has reasonable grounds for believing and does believe that such performance (including achievement of Substantial Completion and Final Completion by the

applicable completion deadline for the Cost of the Work) is feasible and practicable.

(c)     <u>Means and Methods; Hazardous Substance Handling</u>. EPC Contractor acknowledges and agrees that EPC Contractor, and not Owner, has chosen the design and construction means and methods of the Work and that EPC Contractor, and not Owner, shall be solely responsible for implementing the design and construction means and methods and managing, handling and transporting any Hazardous Substances or other materials that arise from, relate to or emanate from the Site in connection with the Work.

2.2 *Representations by Owner.*

Owner represents and warrants (which representations and warranties shall survive the expiration or termination of this Agreement) to EPC Contractor that:

2.2.1     <u>Organization and qualification</u>. It is a limited liability company duly organized and validly existing under the laws of the State of Delaware. It has all necessary power and authority to carry on its business as presently conducted, to own or hold its properties, and to enter into and perform its obligations under this Agreement.

2.2.2     <u>Authorization, approvals, no defaults</u>. The execution, delivery and performance of this Agreement by Owner (1) has been duly authorized by all requisite company action; (2) to its knowledge, will not conflict with any provisions of applicable Law; and (3) will not conflict with, result in the breach of, constitute a default under, or accelerate performance required by, any covenant, agreement, understanding, decree or order to which it is a party or by which it or any of its properties or assets is bound or affected.

2.2.3     <u>Enforceability</u>. This Agreement constitutes the legal, valid and binding obligation of Owner enforceable in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, or similar laws affecting creditors' rights generally.

2.2.4     <u>Legal proceedings</u>. There is no action, suit or proceeding, at law or in equity, or official investigation by or before any Governmental Authority, tribunal or any other body pending or, to the knowledge of Owner, threatened against or affecting Owner or any of its properties, rights or assets, which could reasonably be expected to result in a material adverse effect on Owner's ability to perform its obligations under this Agreement or on the validity or enforceability of this Agreement.

2.2.5     <u>Site, Authorizations and Approvals</u>. Owner has all right, title and interest in and to the Site, and, together with its subsidiaries and agents, as applicable, has obtained the Authorizations and Approvals listed on **<u>Exhibit B</u>** attached hereto for the construction of the Cline Avenue Bridge.

4

2.2.6    <u>Financing</u>. Owner has obtained valid, binding, and enforceable commitments to fund the full amount necessary to satisfy all of Owner's obligations under this Agreement (the "Financing Agreements"). Prior to the Construction Commencement Date, Owner shall deliver to EPC Contractor and its surety a comfort letter, in a form satisfactory to EPC Contractor and its surety, describing the funding mechanism for the full amount necessary to satisfy all of Owner's obligations under this Agreement.

## ARTICLE 3   THE WORK

3.1    *Scope of Work.*

EPC Contractor shall perform the Work as described on **Schedule IV**, in accordance with the terms of the Governing Documents. Without limiting the foregoing, the Work shall include conducting, performing, providing or procuring the following when and as necessary to progress the Work in accordance with the Project Schedule as described on **Schedule VI**:

3.1.1    all design and engineering activities and services necessary to perform the Work and complete the Facility in accordance with this Agreement;

3.1.2    all design and engineering activities and services necessary to obtain the necessary Authorizations and Approvals for the design and construction of the Facility;

3.1.3    all construction activities and services necessary to perform the Work and complete the Facility in accordance with the Governing Documents, including, without limitation, utility connection or relocation, and lighting;

3.1.4    all materials and equipment necessary to perform the Work and complete the Facility in accordance with the Governing Documents;

3.1.5    all work forces necessary to perform the Work and complete the Facility in accordance with the Governing Documents (including all skilled and unskilled labor, supervisory, quality assurance and support service personnel); and

3.1.6    all other activities, services and items, whether or not specifically described above, or elsewhere in the Governing Documents, if such performance, provision or procurement is necessary for a complete and operable Facility in accordance with the Governing Documents; provided, that EPC Contractor shall not be responsible for performing, providing or procuring those activities, services and items for which Owner bears express responsibility pursuant to **Article 5**.

5

3.2    *Development Agreement and Exchange Agreement.*

EPC Contractor acknowledges that Owner has provided to EPC Contractor a copy of each of the Development Agreement and the Exchange Agreement. EPC Contractor warrants that it has read and understood each of the Development Agreement and the Exchange Agreement and is fully aware of the obligations, risks and liabilities assumed by Owner thereunder in each case to the extent applicable to the Work and the performance by EPC Contractor of its obligations under this Agreement and the other Governing Documents.

Subject to and in accordance with this Agreement, EPC Contractor shall, in its performance of its obligations under this Agreement, on a back to back basis, comply with all of Owner's obligations and liabilities set forth in each of the Development Agreement and the Exchange Agreement related to the Work, the terms of each of which are incorporated herein and made a part of this Agreement for all purposes as if recited *verbatim* herein. EPC Contractor shall perform its obligations and exercise its rights under this Agreement and the other Governing Documents in such manner and at such times so that:

   3.2.1    no act, omission or Default by EPC Contractor and no EPC Contractor Event of Default shall cause any breach by Owner of any of its obligations under the Development Agreement, or the Exchange Agreement; and

   3.2.2    the rights or benefits of Owner under the Development Agreement and the Exchange Agreement are not altered, reduced or affected in any material way.

EPC Contractor shall provide such information and prepare such notices, reports and documents (insofar as these relate to the Work) within such time frames as Owner reasonably requires in order to satisfy its obligations under the Development Agreement and the Exchange Agreement, as the case may be.

## ARTICLE 4   EPC CONTRACTOR'S RIGHTS AND RESPONSIBILITIES

4.1    *Engineering, Procurement and Construction of the Facility; Performance of the Work.*

EPC Contractor, in fulfilling its obligations under this Agreement, shall be solely responsible for the engineering, procurement, construction and construction management of the Work, including, without limitation, the overall oversight and coordination of construction of the Facility in accordance with the Governing Documents.

Without the prior written consent of Owner, in its sole discretion, EPC Contractor may not amend, modify or waive any right, remedy or obligation in the Toll System Installation Agreement, except to the extent that such amendment, modification or waiver will not (i) increase costs to Owner under such agreement or otherwise, including the Cost of the Work, the life cycle costs or the operations and maintenance costs, or (ii) adversely impact the Project Schedule or the safety, quality, revenues, insurance, bonding, warranty, repair, capacity, or performance of the Facility; provided that the foregoing will not prejudice EPC Contractor's right to seek an EPC Contractor-Initiated Change Order in accordance with the provisions of this Agreement.

Notwithstanding that the Toll Work will be performed by the Toll System Installer and Integrator under the Toll System Installation Agreement and other aspects of the Work will be performed by other Subcontractors, EPC Contractor shall be solely responsible for the performance of the Work in accordance with the Governing Documents. The appointment of the Toll System Installer and Integrator and such other Subcontractors will not relieve EPC Contractor of any responsibility, liability or obligation under this Agreement and the other Governing Documents. References in this Agreement and the other Governing Documents to any act, omission, default, breach, negligence or neglect of EPC Contractor shall include such act, omission, default, breach, negligence or neglect of such other Toll System Installer and Integrator and other Subcontractors relating to or arising out the Work or the other obligations of such parties under this Agreement and the Governing Documents.

4.2     *Retention of Qualified Subcontractors and Suppliers*

    4.2.1    <u>Subcontractors; Key Personnel</u>. In addition to the Toll System Installer and Integrator, Major Equipment Suppliers, and Major Subcontractors, each determined in accordance with Section 4.2.4 and 4.2.5, EPC Contractor may contract other portions of the Work to one or more Subcontractors. Owner shall have the right to present to EPC Contractor any objections or concerns Owner has regarding such proposed Subcontractors, which objections and concerns shall be duly considered by EPC Contractor; provided, however, that the final decision and responsibility as to whether to contract with any particular Subcontractor (other than the Toll System Installer and Integrator, Major Equipment Suppliers, and Major Subcontractors) shall reside with EPC Contractor.  Owner and EPC Contractor will agree on a list of key positions and personnel from EPC Contractor, the Engineers, and Major Subcontractors listed on **Schedule V** ("Key Personnel").  Key Personnel will be dedicated to the Project for the duration of the portion of the Work for which they are responsible and will not be replaced without the reasonable prior approval of the Owner.

    4.2.2    <u>Engineers</u>. EPC Contractor shall retain or assume the contracts by which Owner has previously retained the companies ("Engineers") listed on **<u>Schedule V</u>** to provide engineering services for the Project (collectively "Engineers Contracts"). Engineers Contracts shall include, among other terms and conditions: (a) the requirement that the Engineers dedicate a competent team of professionals to perform the services required under the Engineers Contracts; and (b) commercially reasonable levels of professional liability insurance protecting against errors and omissions of Engineers' employees and agents. Engineers shall have the primary design responsibilities with respect to the Facility. The Engineers' roles and responsibilities shall be more particularly set forth in the Engineers Contracts.

    4.2.3    <u>Project Manager/Construction Manager</u>. EPC Contractor shall provide the project manager/construction manager for the Project ("PM/CM"). At a minimum, the PM/CM will (a) monitor and oversee compliance with the Project Schedule; (b) monitor and oversee the performance of all

Subcontractors and Suppliers to keep the Work moving towards completion in accordance with the Project Schedule; (c) review and recommend whether to pay all invoices submitted by Suppliers and Subcontractors and review the Work related thereto and confirm that the Work for which payment is requested has been performed; (d) inspect the Work as completed to confirm that it was constructed in accordance with the Specifications and performed to the required standard of care; and (e) comply with the Safety Plan.

4.2.4    Major Equipment Suppliers. EPC Contractor's major equipment supplier for the toll collection system (the "Toll System Installer and Integrator") will be determined and approved by Owner, in its sole discretion, no later than nine (9) months after the Effective Date.  The Toll System Installer and Integrator will also be responsible for the installation of the toll collection system pursuant to the Toll System Installation Agreement. Contracts with other major equipment suppliers ("Major Equipment Suppliers") executed after the Effective Date shall be consistent with the requirements of **Article 14**. Without the prior written consent of Owner, in its sole discretion, EPC Contractor shall not amend, modify or waive any right, remedy or obligation of any contracts with Major Equipment Suppliers, except to the extent that such amendment, modification or waiver will not (i) increase costs to Owner under such agreement or otherwise, including the Cost of the Work, the life cycle costs or the operations and maintenance costs, or (ii) adversely impact the schedule of performance under such agreement or the safety, quality, revenues, insurance, bonding, warranty, repair, capacity, or performance of the Facility; provided that the foregoing will not prejudice EPC Contractor's right to seek an EPC Contractor-Initiated Change Order in accordance with the provisions of this Agreement.

4.2.5    Major Subcontractors. EPC Contractor shall retain, in addition to the toll system installer and integrator approved by Owner in accordance with Section 4.2.3, the persons listed on **Schedule V** as the major subcontractors ("Major Subcontractors") for the Project. If applicable, EPC Contractor will select additional Major Subcontractors by an evaluation process that evaluates potential candidates based upon relevant criteria, including experience, reputation and demonstrated success in comparable construction projects, such additional Major Subcontractors to be subject to Owner's approval, not to be unreasonably withheld or delayed. The contracts between EPC Contractor and the Major Subcontractors (the "Major Subcontractor Contracts") shall provide for payment to the Major Subcontractors on a fixed lump sum price basis. To the extent applicable, the Major Subcontractor Contracts shall be consistent with the requirements of **Article 14** of this Agreement. Without the prior written consent of Owner, in its sole discretion, EPC Contractor shall not amend, modify or waive any right, remedy or obligation of any Major Subcontractor Contract, except to the extent that such amendment, modification or waiver will not (i) increase costs to Owner under such agreement or otherwise, including the Cost of the Work, the life cycle costs or the operations and maintenance costs, or (ii) adversely impact the

8

Project Schedule, or the safety, quality, revenues, insurance, bonding, warranty, repair, capacity, or performance of the Facility; provided that the foregoing will not prejudice EPC Contractor's right to seek a EPC Contractor-Initiated Change Order in accordance with the provisions of this Agreement.

4.2.6    Quality Control/Quality Assurance. EPC Contractor shall retain or cause to be retained a qualified Person or Persons to be responsible for quality control and quality assurance for the completion of the Work. The quality control and the quality assurance person(s) are herein collectively referred to as the "QA/QC Director." Details of the quality management program of the Project are set forth in Section 5 – Construction Monitoring of **Schedule IV** of this Agreement. The QA/QC Director shall report to EPC Contractor and Owner on a regular basis as requested by either of them.

4.2.7    Safety Director. EPC Contractor will retain one safety director to serve as the safety director for the Project (the "Safety Director"). The Safety Director shall be responsible to observe and enforce safe practices at the Site and related support facilities and shall report to the PM/CM on a regular basis as requested by the PM/CM.

The appointment of any Subcontractor will not relieve EPC Contractor of any responsibility, liability or obligation under this Agreement and the other Governing Documents. References in this Agreement and the other Governing Documents to any act, omission, default, breach, negligence or neglect of EPC Contractor shall include such act, omission, default, breach, negligence or neglect of a Subcontractor.

4.3    Taxes.

EPC Contractor shall pay as part of the Cost of the Work, all withholding, sales, income, excise, consumer, use, gross receipts, and other similar taxes, special assessments, imposts, duties, charges, dues and other fees in accordance with applicable Law, including all direct and indirect costs and expenses to discharge the same and any and all penalties and fines pertaining to any of the above (whether levied on or payable by EPC Contractor or any of its Subcontractors). Owner shall be responsible and liable for all real property taxes and assessments imposed on the Facility and the Site.

4.4    Intentionally deleted.

4.5    Hazardous Substances; Erosion.

4.5.1    Notwithstanding EPC Contractor's retention of any Subcontractor, EPC Contractor shall be responsible for taking all actions necessary (including, as applicable, investigation, handling, storage, management, containment, characterization, treatment, remediation, clean-up transport, and disposal) with respect to all Hazardous Substances at, in, on or under the Site (including pre-existing Hazardous Substances migrating or transported to or from the Site) in connection with the Work, the Project and EPC Contractor's performance of its other obligations under this Agreement.  EPC Contractor

9

shall investigate, handle, store, manage, contain, characterize, treat, remediate, transport, use and dispose of such Hazardous Substances in accordance with the requirements of the Governing Documents. EPC Contractor acknowledges that Owner shall not bear any responsibility for undertaking the foregoing activities; provided, however, that, EPC Contractor shall be eligible for additional time, compensation and other relief to the extent provided for in **Article 8**, **Article 9**, or elsewhere in this Agreement.

4.5.2    EPC Contractor shall be responsible for all waste generated in the performance of the Work under this Agreement and shall ensure that all such waste is transported to or from, moved, used or stored upon the Site in accordance with the requirements of the Governing Documents.

4.5.3    EPC Contractor shall conduct all sedimentation, erosion control, and siltation within or adjacent to the Site in accordance with the requirements of the Governing Documents.

4.5.4    EPC Contractor is solely responsible for the selection of the construction means and methods and the handling, transport and disposal of Hazardous Substances and day to day management and control of such Hazardous Substances at the Site.

4.6    *Compliance with Governing Documents.*

In carrying out its duties hereunder, EPC Contractor shall comply with all requirements of the Governing Documents, including, without limitation, all Laws relating to health, safety or the protection of the environment.

4.7    *Traffic Control Plan.*

EPC Contractor shall develop a comprehensive traffic control plan for the Project ("Traffic Control Plan"), to assure all Persons supplying the Work prompt and safe access to the Site.

4.8    *Safety Plan.*

EPC Contractor shall prepare a safety plan (the "Safety Plan") that shall establish and maintain appropriate safety rules and procedures in connection with the performance of the Work. EPC Contractor shall observe such Safety Plan, and shall cause any and all Subcontractors to observe such Safety Plan or to establish, maintain, observe and enforce their own safety plan which is comparable to or exceeds the Safety Plan.

4.9    *Security Plan.*

EPC Contractor shall establish appropriate security measures to maintain the security of the Site and to protect the Work in progress (the "Security Plan"), which plan will cover the areas of the Site to the extent EPC Contractor has control over such areas, and shall be effective on and after the Construction Commencement Date.

*4.10  Construction and Storage Confined to Site.*

EPC Contractor shall, and shall cause any and all Subcontractors and Suppliers to, confine construction activities and storage primarily to the Site.  Any offsite storage of materials dedicated to the Project require the prior approval of EPC Contractor; provided that such materials are clearly marked for the Project and shall be owned by the Owner upon payment for such materials, regardless of their location.

*4.11  Construction Office; Records; Audits.*

4.11.1 <u>Construction Office</u>. EPC Contractor shall maintain a temporary construction office at the Site during the construction of the Facility. EPC Contractor shall maintain at such office a copy of the Specifications, together with construction-related drawings that are developed during the course of the Project. EPC Contractor agrees to remove any temporary construction offices from the Site within two (2) years after the Substantial Completion Date.

4.11.2 <u>Maintenance of Books and Records</u>. EPC Contractor shall keep and maintain books, records and accounts with respect to the Work hereunder in accordance with GAAP and all applicable laws and regulations.

4.11.3 <u>Filing System</u>. EPC Contractor shall index, file and maintain Work files in accordance with a filing system maintaining an inventory of in-progress Work product and completed Work product and delivery of completed Work product in accordance with EPC Contractor's usual and customary business practices.

4.11.4 <u>Work Product</u>. EPC Contractor shall make available to Owner and the Independent Engineer for inspection, audit or reproduction designated in-progress Work product in its possession within forty-eight (48) hours after a written request from Owner for a copy thereof and as soon as reasonably possible after written request for in-progress Work product not in its possession.

4.11.5 <u>Audit</u>. EPC Contractor agrees that Owner and, if Owner designates the Independent Engineer and/or a third party financial advisor to be its representative for review of books and records, shall have the right, upon forty-eight (48) hours' prior written notice, to examine, copy, and audit EPC Contractor's books and records relating to the Work, the Site and/or the Project to determine compliance with the Governing Documents, verification of invoicing, payment and Change Order pricing, or as is necessary to verify progress of the Work.

*4.12  No Liens.*

No equipment or materials incorporated into the Work that are purchased by EPC Contractor or by any Subcontractor, shall be subject to any chattel mortgage, conditional sales contract or security agreement under which an interest or lien is retained. EPC Contractor shall, and shall

cause each applicable Subcontractor to, deliver to Owner, as a condition precedent to any payment from Owner, duly executed Lien Waivers in the applicable form set forth on **Exhibit D** for payments made during the preceding Payment Period (except with respect to any disputed portion of the Work which was not included in such request for payment) and, as to the Final Payment, deliver to Owner Final Lien Waivers duly executed by EPC Contractor and each applicable Subcontractor before Final Payment is required to be made by Owner.

### 4.13  Patents.

EPC Contractor shall pay, or shall cause any and all Subcontractors and Suppliers to pay, all royalties, license fees or other costs incident to their use in the performance of the Work of any invention, design, process, product, or device that is the subject of patent rights or copyrights held by others. Payments by EPC Contractor to or by the Toll System Installer and Integrator is expressly included in this obligation.

### 4.14  Inspections; Defective Work.

EPC Contractor shall communicate regularly with the Owner and the Independent Engineer concerning the completed portions of the Work for conformity with the Specifications, for freedom from defects and to provide required tests, inspections and other reports dealing with environmental matters, Hazardous Substances and other existing conditions. In the event the Owner notifies EPC Contractor of defective work that: (a) has the potential to have a material impact on the Cost of the Work or the Project Schedule; or (b) indicates a systemic problem (i.e., a persistent, widespread and/or material problem for the Project) with any piece of equipment, any portion of the Work, or the performance of any Major Equipment Supplier or Subcontractor, EPC Contractor shall within ten (10) Business Days provide relevant information to Owner and the Independent Engineer. Such information shall include the nature and extent of the problem, the cost and delay associated with the defective Work (if known), and the steps that EPC Contractor is taking to remedy the defective performance, including any remedies that they are pursuing under the applicable contract.

### 4.15  Transfer of Work.

EPC Contractor shall be responsible for coordinating the prompt transfer of all of the Work to Owner upon Owner's making the Final Payment.

### 4.16  Authorizations and Approvals.

EPC Contractor shall obtain, renew and maintain and shall ensure that its Subcontractors obtain, renew and maintain, where applicable, all Authorizations and Approvals (e.g., without limitation, electrical permits, erosion control permits) required for the performance of the Work in accordance with the Governing Documents. EPC Contractor shall comply with the terms of all Authorizations and Approvals that apply to the Work.

**EXECUTION COPY**

*4.17  Insurance.*

EPC Contractor, at its sole cost and expense, shall, or shall cause its Subcontractors to (i) obtain and maintain at all times insurance as set forth in **Schedule II** and (ii) ensure that Owner is listed as loss payee and/or additional insured with respect to all such insurance at all times and deliver insurance certificates and endorsements, as applicable, to that effect.

*4.18  Tangible Net Worth Criteria.*

On the Effective Date, EPC Contractor shall be in compliance with the Tangible Net Worth Criteria, as defined in **Schedule I**.

*4.19  Payment and Performance Security.*

4.19.1    On or before the Construction Commencement Date, EPC Contractor, as part of the Cost of the Work, shall deliver a payment and performance bond in the form attached hereto as **Schedule VIII** or otherwise in form and substance satisfactory to Owner and having the Required Rating, in a total amount equal to one-hundred percent (100%) of the Cost of the Work (the "Payment and Performance Bond").

4.19.2    Subject to any permitted adjustments pursuant to this **Section 4.19**, EPC Contractor shall ensure that the Payment and Performance Bond remains valid and enforceable until the expiration of the EPC Contractor's Warranty Period; provided that the amount of the Payment and Performance Bond shall reduce as provided in **Schedule IX**.  Upon the expiration of the EPC Contractor's Warranty Period, Owner will release its rights as to the Payment and Performance Bond.

4.19.3    After an EPC Contractor Event of Default which is not cured within any applicable cure period, Owner shall be entitled to exercise its rights under the terms and conditions of the Payment and Performance Bond.

4.19.4    The terms and conditions of the Bond shall apply to the obligations of Owner, EPC Contractor and EPC Contractor's surety in the event of an EPC Contractor Event of Default.

4.19.5    If at any time prior to the expiration of the EPC Contractor's Warranty Period, the rating of the issuer of the Payment and Performance Bond is downgraded below the Required Rating, then upon demand by Owner, EPC Contractor shall, within ten (10) Business Days, replace such Payment and Performance Bond with a Payment and Performance Bond issued by a surety company having the Required Rating and substantially in the form shown on **Schedule VIII**.

13

*4.20  Toll Collection System.*

EPC Contractor shall fully perform and be responsible and liable for the work and obligations to be performed by the Toll System Installer and Integrator under the Toll System Installation Agreement in the same manner in which the Toll System Installer and Integrator has obligated itself to EPC Contractor under the Toll System Installation Agreement. Each of such obligations is expressly incorporated herein by reference and shall be direct obligations of EPC Contractor (in addition to EPC Contractor's obligations to perform as the "EPC Contractor" under the Toll System Installation Agreement); provided, however, that in no event shall EPC Contractor have any greater rights and remedies against Owner with respect to such work or obligations of the Toll System Installer and Integrator than EPC Contractor has with respect to the other Work under this Agreement notwithstanding that the Toll System Installer and Integrator may have such greater rights and remedies against EPC Contractor under the Toll System Installation Agreement.

## ARTICLE 5  OWNER'S RIGHTS AND RESPONSIBILITIES

*5.1   Intentionally Omitted.*

*5.2   Transfer of Control Responsibility to Owner.*

   5.2.1      On the Substantial Completion Date, Owner through Operator shall assume sole responsibility for the dispatch and control of the Cline Avenue Bridge except that EPC Contractor shall be obligated to (a) provide technical guidance as to which EPC Contractor possesses actual knowledge, (b) provide the Toll Systems Operation Manual, the operations manual and all other manuals set forth in this Agreement and the Toll System Installation Agreement; (c) complete any remaining Punch List items on a schedule that is mutually agreeable to the Parties; and (d) otherwise perform its remaining obligations under this Agreement.

*5.3   Owner's Responsibilities During the Construction of the Project.*

Owner shall:

   5.3.1      take all actions necessary to obtain the financing needed to enable Owner to satisfy its payment obligations under this Agreement and shall make payments for the Cost of the Work in accordance with **Article 10**;

   5.3.2      require employees and agents of Owner to abide by all rules applicable to the Site and the Facility, including but not limited to rules pertaining to safety and security procedures or requirements and applicable Law;

   5.3.3      reasonably cooperate with EPC Contractor and provide any other assistance reasonably necessary to enable EPC Contractor to perform the Work as required by this Agreement; provided, however, that such reasonable cooperation and assistance is not intended to include, without limitation, the expenditure of a material amount of funds (and any unbudgeted funds shall be

14

considered material), assumption of additional liabilities or obligations, waivers of rights and remedies under this Agreement, granting of approvals or consents that are identified as being within the discretion (including the sole discretion) of Owner or modification of the Work;

5.3.4    at all times promptly respond, including making appropriate representatives available with decision-making authority, to any reasonable requests by EPC Contractor for meetings, for review and comments regarding relevant documents provided to Owner for review and comment;

5.3.5    at all times, use commercially reasonable efforts to proceed in a manner that supports the Project Schedule; and

5.3.6    promptly take all actions reasonably requested by EPC Contractor to assist EPC Contractor in obtaining any Authorizations or Approvals for the Facility, including executing applications for Authorizations or Approvals to the extent such actions can only be taken by Owner, in its capacity as owner of the Facility and the Site.

## ARTICLE 6   INTENTIONALLY OMITTED.

## ARTICLE 7   OWNERSHIP OF ASSETS

7.1    *Ownership of the Cline Avenue Bridge; Risk of Loss.*

7.1.1    Ownership of the Work, the Toll Collection System and other Facility items incorporated therein, including all associated Subcontractor and Supplier warranties, the Toll Systems Operation Manual and all other manuals set forth in this Agreement and the Toll System Installation Agreement, shall pass from EPC Contractor to Owner, free and clear from liens or other encumbrances, upon the earlier to occur of (a) incorporation of such items and equipment into the Facility and (b) payment therefor in full by Owner pursuant to **Article 10**.

7.1.2    Notwithstanding the transfer of ownership in accordance with **Section 7.1.1**, the care, custody and control of the Facility and all items of equipment incorporated therein, shall rest with EPC Contractor and EPC Contractor shall bear the risk of loss of the Facility until the Substantial Completion Date. As of the Substantial Completion Date, the care, custody and control of the Facility shall pass to Owner (subject to EPC Contractor's remaining rights and obligations under this Agreement, including, without limitation, **Article 12**) and on the Substantial Completion Date and thereafter, Owner shall bear the risk of loss with respect thereto.

**EXECUTION COPY**

## ARTICLE 8  COST OF THE WORK

   *8.1  Cost of the Work.*

Subject to the terms and conditions of this Agreement, Owner shall pay EPC Contractor for completion of the Work the fixed sum of $_____ (as such sum may be adjusted from time to time in accordance with **Article 9**, "Cost of the Work"). The Cost of the Work includes, without limitation, and shall be the entire compensation payable to EPC Contractor in respect of (a) all amounts to be paid to all other Subcontractors and Suppliers; (b) all other equipment, labor, materials, transportation, disposal, storage, services, and intellectual property rights to be provided hereunder in connection with the Work or any other obligations under this Agreement;(c) all taxes, special assessments or other fees for which EPC Contractor is responsible pursuant to **Section 4.3**; (d) any increased cost in connection with the Work or any other obligations under this Agreement due to inflation; (e) all costs incurred for obtaining and/or maintaining authorizations and approvals from third parties other than Owner (except that costs of Owner that are required to be paid or reimbursed by EPC Contractor under this Agreement are included in this **clause (e)**); (f) any legal, technical, financial or other advisor costs and fees involved in obtaining agreements with third parties in connection with the Work or any other obligations under this Agreement; (g) any Claim for additional costs or time extensions from any Subcontractor or Supplier not covered by **Section 8.2** below; and (h) any changes to means and methods required by Law or Governmental Authorities which do not constitute Change Orders hereunder. For the avoidance of doubt, EPC Contractor has previously completed certain pre-work items as described in the Agreement for Early Work Items dated June 6, 2016, Agreement for Early Work Items No. 3 dated February 8, 2017, and Agreement for Early Work Items No. 4 dated May 19, 2017 (collectively, the "Pre-Work"). All amounts paid to EPC Contractor under such agreements for Pre-Work prior to the Construction Commencement Date is included in the Cost of the Work and reduces the lump sum Cost of the Work payable for the Work. The payment for the Work shall be made by Owner in the form of monthly progress payments based on the progress of the Work actually completed in accordance with the provisions of **Article 10**.

   *8.2  Exclusions from Cost of the Work.*

The following costs (the "Excluded Costs") are not covered by the Cost of the Work. Any increase in the Cost of the Work for the Excluded Costs shall be payable as set forth in **Article 9**:

    8.2.1     Costs resulting from Change Orders and Change Directives described in **Article 9**;

    8.2.2     Costs resulting from any breach by Owner of any of its obligations under this Agreement;

    8.2.3     Cost of the toll collection system and all amounts payable under the Toll System Installation Agreement; and

    8.2.4     Cost of the Work described on **Exhibit G**.

16

## ARTICLE 9   CHANGE ORDERS

*9.1   General.*

The Cost of the Work, the scope of Work and the Project Schedule (including the Target Substantial Completion Date and the Delay Default Date) may only be adjusted by Change Orders or Change Directives as described more fully in this **Article 9**. Change Orders shall only be effective upon execution in writing by both EPC Contractor and Owner.

*9.2   Owner Initiated Change Orders.*

9.2.1      Notice of Proposed Change.

Owner may at any time and from time to time authorize and require, pursuant to a Change Order, changes to the Work or the Project Schedule (including the Target Substantial Completion Date and the Delay Default Date, as applicable). If Owner desires to initiate a Change Order or to evaluate whether to initiate a Change Order, Owner shall deliver to EPC Contractor a written notice of the proposed change (a "Change Proposal").

9.2.2      Evaluation of a Change Proposal.

Within thirty (30) days after receipt of a Change Proposal from Owner (or such longer or shorter period as the Parties may mutually agree depending upon the complexity of the proposed change in such Change Proposal) EPC Contractor shall deliver to Owner: (i) any applicable plans and specifications for the requested change, (ii) a description of the impacts, if any, to the Project Schedule as a result of such proposed change and if there is an impact, a revised Project Schedule and (iii)  a statement and detailed breakdown of the estimated adjustment to the Cost of the Work as a result of such proposed change, if any, together with all other information reasonably necessary for Owner to evaluate the proposed change.

9.2.3      Owner Determination.

Within thirty (30) days after receipt of EPC Contractor's evaluation as described in **Section 9.2.2**, Owner shall provide written notice to EPC Contractor of Owner's intent to proceed or not to proceed with the Change Proposal. If Owner elects to proceed with the Change Proposal and accepts the adjustments to the Cost of Work and/or the Project Schedule (including the Target Substantial Completion Date and the Delay Default Date, as applicable), Owner shall prepare a Change Order for execution. If Owner elects to proceed with the Change Proposal but does not accept the proposed adjustments to the Cost of Work and/or the Project Schedule, Owner and EPC Contractor shall negotiate a mutually acceptable Change Order or Owner shall issue a Change Directive.

*9.3   Change Directives.*

Owner may issue a Change Directive, including a reductive Change Directive, in the event of a dispute (A) in negotiating a mutually acceptable Change Order in accordance with **Section 9.2.3,** (B) regarding the scope of Work, or (C) as to whether EPC Contractor has performed the Work in accordance with the requirements of the Governing Documents. The Change Directive will

17

describe the Work in question and will state the basis for determining compensation, if any. Subject to **Section 9.6.1.3**, EPC Contractor shall proceed immediately as directed in the Change Directive, and the Parties shall negotiate a Change Order based on such Change Directive in accordance with **Section 9.6.1.3**. If the Parties are unable to reach agreement upon the Change Order, such dispute shall be resolved in accordance with **Article 13**.

9.4    *Notification Process for EPC Contractor-Initiated Change Orders.*

      9.4.1    <u>Notice of Change Order</u>.

EPC Contractor shall within five (5) Business Days after the date on which EPC Contractor knows of a Change Event (as defined below), provide written notice to Owner of such Change Event and EPC Contractor's intention to submit an EPC Contractor-Initiated Change Order (as defined below) in relation thereto ("Notice of Change Event"). Within 30 days after submitting a Notice of Change Event, EPC Contractor shall submit a detailed description and request for Change Order ("Notice of Change Order") EPC Contractor's Notice of Change Order shall provide the following information: (i) a description of the underlying event, act or inaction constituting the Change Event; (ii) the contractual basis for entitlement to the EPC Contractor-Initiated Change Order; (iii) the estimated delay and impact to the Project Schedule and/or Work on the critical path (if applicable); (iv) the estimated cost impact of the Change Event (if applicable) and (v) EPC Contractor's proposed plan for mitigating the impacts of such Change Event and the estimated costs of such mitigation.  If the Notice of Change Order is not received by Owner within 30 days after receiving the Notice of Change Event, Owner will give EPC Contractor a written notice allowing an additional fifteen (15) Business Days in which to submit the Notice of Change Order and notifying EPC Contractor that failure to submit the detailed Notice of Change Order within such time period will result in a waiver of its rights to claim a Change Order for the event, condition or act which was the subject of the Notice of Change Event.

      9.4.2    <u>Owner Response to Notice of Change Order</u>.

Owner shall have fifteen (15) Business Days after receipt of EPC Contractor's Notice of Change Order under **Section 9.4.1** to either confirm or refute in writing the basis for such EPC Contractor-Initiated Change Order. If Owner fails to respond within fifteen (15) Business Days, EPC Contractor shall notify Owner in writing that EPC Contractor has not received a response and if Owner fails to respond within five (5) Business Days after such additional notice, Owner's failure to respond shall be deemed a denial of EPC Contractor's entitlement to the EPC Contractor-Initiated Change Order. If the Parties dispute EPC Contractor's entitlement to an EPC Contractor-Initiated Change Order, such dispute shall be resolved in accordance with **Article 13**.

      9.4.3    <u>Proposal for a Change Order</u>.

Within fifteen (15) Business Days after the end, resolution or completion, as applicable, of the Change Event upon which a Notice of Change Order is based and once the actual delay to the Project Schedule and/or the actual cost impact on the Cost of Work directly arising from such Change Event can be definitively quantified, EPC Contractor shall promptly submit to Owner a written proposal for a Change Order setting forth the requested adjustment to the Cost of Work

and/or the Project Schedule, as applicable. The proposal for a Change Order shall include: (i) a detailed description of the Change Event; (ii) a statement of the actual delay and impact to the Project Schedule and/or Work on the critical path (if applicable) and (iii) a detailed breakdown of the actual cost impact of the Change Event, including the costs of any mitigation (if applicable) consistent with the pricing requirements set forth in **Section 9.6**. If the Change Event giving rise to the Notice of Change Order is ongoing and not reasonably expected to be resolved within a reasonable period of time prior to Final Completion, EPC Contractor shall deliver a written proposal for a Change Order with a good faith estimate of the time and cost impact directly arising out of such Change Event. Such estimate shall indicate EPC Contractor's agreement to accept the time and/or price adjustments proposed in such proposal for a Change Order as full compensation for such Change Event, waiving any right to make additional claims with respect thereto, but including any reservations from such waiver proposed by EPC Contractor.

9.4.4    <u>Owner's Response to Proposal for a Change Order</u>.

Owner shall have thirty (30) days after receipt of EPC Contractor's proposal for a Change Order pursuant to **Section 9.4.3** to accept such proposal as submitted or to commence negotiation of the adjustment to the Cost of Work and/or the Project Schedule, if and as applicable. If the Parties are unable to reach agreement on such adjustments, such dispute shall be resolved in accordance with **Article 13**. Pending final determination, Owner and EPC Contractor shall enter into a Change Order covering any change and any corresponding amounts that are not in dispute and Owner shall pay EPC Contractor such amounts.

9.5    *Entitlement to EPC Contractor-Initiated Change Orders.*

9.5.1    <u>Entitlement</u>.

Subject to the terms of **Section 9.5** and upon compliance with the notification process set forth in **Section 9.4**, EPC Contractor shall be entitled to a Change Order (an "EPC Contractor-Initiated Change Order") adjusting (i) the Project Schedule (including the Target Substantial Completion Date and the Delay Default Date, as applicable), based on critical path analysis for delays to items of Work on the critical path in the Project Schedule to the extent of the actual delay caused by a Change Event (if applicable) and/or (ii) the Cost of Work to the extent of changes to the Cost of Work caused by a Change Event and as provided in **Section 9.6** (if applicable). Upon the occurrence of a Change Event, EPC Contractor shall use reasonable efforts to mitigate the cost and schedule impacts of such Change Event.

9.5.2    <u>Change Events</u>.

Each of the following events, conditions or acts shall constitute a "Change Event," to the extent such Change Event (i) is beyond the reasonable control of EPC Contractor and is not due to a breach, fault, negligence or violation of the Governing Documents by any EPC Contractor Party; (ii) delays and/or increases the cost of EPC Contractor's performance of the Work; and (iii) (or the effects thereof) could not have been avoided or prevented by due diligence and use of

19

**EXECUTION COPY**

reasonable efforts by an EPC Contractor Party, in each case, that could have been conducted without incurring unreasonable costs or expenses:

    (a)    Changes to the scope of the Work requested by Owner, including material revisions to the design or construction of the Facility that are not based on statutory and regulatory non-discretionary standards relating to public health, safety and welfare;

    (b)    Force Majeure events as defined in **Section 14.5** (in which case, EPC Contractor shall only be entitled to an adjustment to the Project Schedule due to delay, in accordance with the provisions of **Section 14.5**);

    (c)    Change Directives, except Change Directives resulting from or issued to correct the fault, negligence, failure to perform or breach of obligations by an EPC Contractor Party;

    (d)    To the extent not covered by insurance required to be maintained pursuant to **Schedule II** of this Agreement, the presence, release or discharge at the Site of Hazardous Substances that were not identified in the Phase I report attached hereto as **Exhibit E**, provided that such presence, release or discharge is not caused and does not arise out of or relate to the Work or the performance by any EPC Contractor Party of any other obligations of EPC Contractor under this Agreement;

    (e)    To the extent not covered by insurance required to be maintained pursuant to **Schedule II** of this Agreement, the presence at the Site of Hazardous Substances which exist as of the Effective Date that were not known by EPC Contractor as identified in the Phase 1 report attached hereto as **Exhibit E** or reasonably expected by EPC Contractor, or the release or discharge at the Site of Hazardous Substances (known or unknown as of the Effective Date) which exist as of the Effective Date, provided that in each case such presence, release or discharge as described is not caused and does not arise out of or relate to the Work or the performance by any EPC Contractor Party of any other obligations of EPC Contractor under this Agreement;

    (f)    A Change of Law or change in Governmental Authorization from that in effect on the Effective Date, which (1) requires a material modification of the Facility design, (2) requires EPC Contractor to obtain a new major Governmental Authorization not previously required for the Project, or (3) results in an increase in EPC Contractor's costs directly attributable to such change of at least $50,000;

    (g)    Concealed or subterranean conditions at the Site that were not known by EPC Contractor as indicated on the reports attached hereto as **Exhibit E** or reasonably expected by EPC Contractor; or

(h)     Delays resulting from suspension or delay of Work at Owner's direction, or a breach by Owner of any of its obligations under this Agreement, and not due to the negligence, breach, failure to perform or fault by an EPC Contractor Party.

9.6     *Change Order Pricing.*

9.6.1          Pricing for Changes in Scope of Work.

In the event of an additive Change Order, the amount of increase in the Cost of Work to be allowed will be the estimated increase in the Cost of the Work occasioned by such change, including profit and overhead. In the event of a deductive Change Order, the amount of decrease in the Cost of the Work to be allowed will be the estimated reduction in the Cost of the Work occasioned by such change including profit and overhead. When both additions and reductions are involved in any one Change Order, the adjustment in the Cost of the Work shall be determined on the basis of net increase or decrease. Increases or decreases in the Cost of the Work resulting from Change Orders changing the scope of Work shall be determined in the order of preference set forth below.

9.6.1.1   For all Change Orders, the Parties shall first attempt to negotiate a mutually acceptable lump sum increase or decrease to the Cost of the Work properly itemized and supported by sufficient substantiating data to permit evaluation;

9.6.1.2   If there is no agreement on a lump sum, but the Parties mutually agree that the increase or decrease to the Cost of the Work is determinable by unit prices used to develop the Cost of the Work or new unit prices mutually agreeable to the Parties can be established, then an adjustment to the Cost of the Work shall be negotiated using the unit prices agreed upon; and

9.6.1.3   If the Parties cannot reach agreement using the methods in **Sections 9.6.1.1 and 9.6.1.2** and Owner issues a Change Directive to EPC Contractor to perform the changed Work, as the case may be, EPC Contractor shall promptly proceed with the changed Work, and the increase or reduction in the Cost of the Work, as applicable, shall be determined on the basis of the reasonable cost reimbursable expenditures or savings for the Work attributed to such Change Directive plus profit, markup and overhead where applicable. Costs for expenditures and savings shall be calculated in accordance with the provisions of this **Section 9.6.1.3**. In such case, EPC Contractor shall keep and present, in such form as Owner may reasonably require, an itemized accounting together with appropriate supporting data. Any such increase in the Cost of Work directly arising from such Change Directive shall be invoiced and paid for, without duplication of sums, based upon the sum of the following actual, reasonable costs incurred by EPC Contractor as a result of such changed Work (including subcontract expense, material expense, design, travel, relocation, and equipment rental expense) and additional profit and overhead at the rates set forth below:

(a)     For Labor. Owner shall reimburse EPC Contractor for labor and for supervision by foremen dedicated solely to the particular item of Work. The construction labor payment shall be calculated on the basis of the actual wages and benefits

21

applicable to such labor in effect at the time of the changed Work, plus fifteen percent (15%) to cover profit and overhead; provided that the engineering costs shall have an overhead factor based on the Federal Acquisition Regulations and a profit of ten percent (10%).

(b)     <u>For Equipment and Materials</u>. Owner shall reimburse the actual, reasonable invoice cost for equipment and materials supplied by EPC Contractor and installed or purchased for spares or inventory, plus fifteen percent (15%) to cover profit and overhead. EPC Contractor shall provide Owner with valid copies of Supplier invoices.

(c)     <u>For Tools and Construction Equipment</u>. Owner shall reimburse the actual, reasonable invoice cost for tools and construction equipment, plus fifteen percent (15%) to cover profit and overhead. Approval by Owner is required with respect to the selection of machine-powered tools or construction equipment.

(d)     <u>Subcontractors</u>. Subcontractors shall be allowed their actual, reasonable and documented costs for insurance, business and occupation tax, and bonding.

(e)     <u>Contractor Markup on Subcontractors:</u> EPC Contractor shall be allowed an additional markup equal to five percent (5%) of the total eligible costs computed for Subcontractors under subsections (a), (b), and (c) above to cover administrative costs.

(f)     <u>Insurance</u>. EPC Contractor shall be paid its actual, reasonable insurance costs.

9.6.1.4   Except for Owner initiated changes under **Section 9.2** and Change Directives under **Section 9.3** (in either case, excluding Change Directives resulting from or issued to correct the fault, negligence, failure to perform or breach of obligations by an EPC Contractor Party or resulting from an inability to agree on the schedule impact or cost of a Change Order pending resolution thereof) or changes that arise out of the gross negligence or willful misconduct of Owner, delay and disruption costs and damages, other than direct cost damages are not compensable by Owner in connection with any Change Order or otherwise.

9.6.1.5   Agreement on any Change Order shall constitute a final settlement of all Claims and matters relating to the change in the Work which is the subject of such Change Order, including all direct and indirect costs associated with such change and any and all adjustments to the Cost of the Work and/or the Project Schedule (including the Target Substantial Completion Date and the Delay Default Date, as applicable) pursuant to such Change Order.

## ARTICLE 10 PAYMENT FOR WORK; REPORTING

*10.1 Payment Schedule.*

    10.1.1     <u>Initial Payment</u>.

Subject to **Section 10.1.8**, on the Construction Commencement Date, Owner shall make an initial payment in the amount of $_____ ("Initial Payment") to EPC Contractor, which Initial Payment shall fully (1) reimburse EPC Contractor (and all Affiliates of EPC Contractor) for all amounts incurred prior to and on the Construction Commencement Date by EPC Contractor (and all such Affiliates) in connection with the Project; (2) permit EPC Contractor to pay amounts due and payable as of the Construction Commencement Date on all contracts executed by or on behalf of Owner in connection with the Project; (3) provide for the payment to EPC Contractor of all mobilization costs and expenses; (4) payment for the work described in the Agreement for Early Work Items No. 4, dated May 19, 2017; and (5) reimburse or provide funds for certain miscellaneous costs, such as insurance, incurred by EPC Contractor prior to and on the Construction Commencement Date. The details of the Initial Payment, including a breakdown of the amounts and costs referred to in the immediately preceding sentence are set forth on **Schedule VII**. The Initial Payment shall be credited against the Cost of Work.

10.1.2      Progress Report, Invoices and Other Monthly Deliverables.

Without prejudice to any reporting, invoicing, notice or other obligations of EPC Contractor under this Agreement, on or about the tenth (10th) day of each calendar month, EPC Contractor shall prepare and submit to Owner each of the following items (collectively, the "Monthly Deliverables"):

10.1.2.1 A written progress report (a "Progress Report") in form and substance acceptable to Owner containing a reasonably detailed account of each of the following items during the immediately preceding calendar month (the "Payment Period"):

(i)      a description of the Work performed during the Payment Period (in accordance with the schedule of values set forth in **Schedule III**);

(ii)      the status of performance as against the Project Schedule for the Payment Period and a forecast plan (including Milestone Dates) for the subsequent calendar month;

(iii)      a summary health and safety report itemizing any accidents;

(iv)      information with respect to any Force Majeure event or Change Event encountered during the Payment Period that has impacted the Work;

(v)      the status of any Claims by or against EPC Contractor in relation to the Work performed during the Payment Period;

(vi)      A discussion of any problems encountered during the Payment Period and the remedies effected or planned;

(vii)      A Gantt chart reflecting progress of the Work against the Project Schedule;

(viii)      information with respect to (including a discussion of the contractual basis for entitlement to) any Excluded Costs which EPC Contractor is

23

claiming in the Monthly Invoice being submitted with the respective Progress Report; and

(ix)    Any other information reasonably requested in writing by Owner.

10.1.2.2 an invoice (a "Monthly Invoice"), in a form acceptable to Owner, containing each of the following items with respect to the Payment Period:

(i)    a statement of the total amount due to EPC Contractor for Work performed during the Payment Period, *less* five percent (5%) thereof to be retained as Retention Money pursuant to **Section 10.1.7**;

(ii)    a statement of all sums paid to EPC Contractor in connection with the Work prior to the date of such Monthly Invoice; and

(iii)    a financial accounting of the Cost of Work undertaken to date against the amount of the Monthly Invoice and amounts previously paid with respect the Work.

10.1.2.3  A certification from each of the PM/CM and the QA/QC Director that the Work performed during the Payment Period complies in all material respects with the terms and conditions of the Governing Documents;

10.1.2.4  Lien Waivers in the applicable form set forth in **Exhibit D**, duly executed by EPC Contractor and each applicable Subcontractor covering all the Work performed by each through the prior Payment Period; and

10.1.2.5  A certificate from EPC Contractor confirming that all payrolls, invoices for material and equipment, and other amounts payable for the Work performed during the Payment Period and included in the Monthly Invoice have been paid or will be paid upon EPC Contractor's receipt of payment from Owner, and certifying that such officer does not have knowledge of the existence as of the date of such certificate, of any condition or event that constitutes a Default or an Event of Default or, if any such condition exists, specifying the nature and period of existence thereof.

10.1.3    Financial Reporting. EPC Contractor shall deliver to Owner commencing on the Effective Date and continuing until the end of the EPC Contractor's Warranty Period:

10.1.3.1  Annual Financial Statements: as soon as available and in any event within one hundred twenty (120) days after the end of each fiscal year, (a) complete audited financial statements of EPC Contractor, including the balance sheet of EPC Contractor as of the end of such fiscal year and income statements and statement of cash flows of the EPC Contractor for such fiscal year, in each case prepared in reasonable detail and in accordance with GAAP consistently applied, certified by the chief financial officer or chief accounting officer of EPC Contractor that they fairly present the financial condition of EPC Contractor as of the last day of such fiscal year and the results of its operations and cash flows for such fiscal year and (b) a report thereon of Warren Averett, LLC (or if EPC Contractor changes its accounting firm, a

24

report thereon of such new accounting firm subject to the reasonable approval of Owner), which report shall state that such financial statements fairly present the financial position of EPC Contractor as of the last day of such fiscal year and the results of its operations and its cash flows for such fiscal year in accordance with GAAP consistently applied and that the examination by such accountants in connection with such financial statements has been made in accordance with generally accepted auditing standards;

10.1.3.2 Quarterly Financials: with respect to any fiscal quarter following the Effective Date, within forty-five (45) days after the end of the identified fiscal quarter of EPC Contractor, unaudited financial statements of EPC Contractor, including a balance sheet of EPC Contractor as of the end of such fiscal quarter and income statements and statements of cash flows of EPC Contractor for such fiscal quarter and for the elapsed portion of the fiscal year, in each case prepared in reasonable detail and in accordance with GAAP consistently applied, certified by the chief financial officer or chief accounting officer of EPC Contractor that they fairly present the financial condition of EPC Contractor as of the last day of the fiscal quarter covered thereby and the results of its operations and cash flows for the periods covered thereby in accordance with GAAP consistently applied (subject to changes resulting from audit and normal year-end adjustments); and

10.1.3.3 Officer's Certificates: together with each delivery of financial statements delivered pursuant to **Sections 10.1.3.1 and 10.1.3.2**, a certificate of the chief financial officer or chief accounting officer of EPC Contractor stating the Tangible Net Worth Criteria calculation for the accounting period covered by such financial statements, together with supporting calculations in reasonable detail as to EPC Contractor and each Major Subcontractor included in the calculation of the Tangible Net Worth Criteria.

10.1.4    Invoicing. Invoices will be prepared following the Payment Schedule as set forth on **Schedule III**. EPC Contractor shall submit no more than one (1) invoice in each month, unless the Owner agrees otherwise. Payments to EPC Contractor shall only be made on the basis of progress actually achieved, verified by the Owner, and in amounts no greater than those set forth in the applicable schedule of values for the Work in **Schedule III** and in Change Orders and Change Directives. The schedule of values and the payment schedule in **Schedule III** is a limit on the amount that may be paid with respect to the Work or a component thereof other than amounts relating to Change Orders or Change Directives, and is not intended to limit the timing of payment (*e.g.*, for completion of Work ahead of schedule), subject to progress actually achieved and verified by the Owner.

10.1.5    Payment. Owner shall pay the undisputed portion of an outstanding invoice no later than fifteen (15) days after receipt by Owner of the invoice and each Monthly Deliverable related thereto (the "Payment Due Date").

10.1.6    Owner's Failure to Make Payment. If Owner shall fail to make payment of any undisputed amount in excess of $10,000 within fifteen (15) days after the applicable Payment Due Date (as such date may be extended by any grace period expressly stated herein), then if EPC Contractor intends to stop Work,

EPC Contractor shall give Owner written notice of such non-payment and stating EPC Contractor's intention to stop performing the Work under this **Section 10.1.6**.  If Owner fails to make payment of any undisputed amounts within ten (10) additional Business Days after Owner receives such written notice, EPC Contractor shall have the right to stop performing the Work, and may instruct all Subcontractors to stop performing any such Work until payment of such undisputed amount is made. Except as set out in this **Section 10.1.6**, EPC Contractor shall not suspend its performance of the Work for any reason unless suspended or terminated by Owner pursuant to rights specifically allowed by the terms of this Agreement or pursuant to a Force Majeure event.

10.1.7    Retention.

10.1.7.1  Retention Money. Owner shall be entitled to retain an amount equal to five percent (5%) of each invoice amount paid by Owner ("Retention Money"). Such Retention Money shall be held by Owner in a separate interest bearing account and may be applied by Owner from time to time to remedy any breach by EPC Contractor of its obligations under this Agreement. Within 5 Business Days after the Substantial Completion Date, Owner shall return ninety-five percent (95%) of the Retention Money (including all accrued interest) except for (i) the amount of the Punch List Money, if any, retained in accordance with **Section 10.1.7.2**, (ii) the amount of any Liquidated Damages payable to Owner, if any, and (iii) the amount of any unresolved dispute pursuant to **Section 13.2**, if any, which if EPC Contractor loses, would result in damages or amounts owed to Owner by EPC Contractor. The balance of the Retention Money will be returned to EPC Contractor within 5 Business Days after Final Completion. Owner may, in its sole discretion, but subject to the written consent of EPC Contractor's surety, elect to release up to fifty percent (50%) of the Retention Money prior to Substantial Completion, taking into account factors such as satisfactory performance of the Work, no claims or disputes, and meeting or exceeding the Project Schedule.

10.1.7.2  Punch List Money.  On the Substantial Completion Date, Owner shall be entitled to retain out of the balance of the Retention Money (i) an amount equal to two hundred percent (200%) of the Punch List items ("Punch List Money") evaluated in accordance with **Section 11.2.1**, which Punch List Money shall be returned to EPC Contractor within five (5) Business Days after all such Punch List items are completed by EPC Contractor in accordance with this Agreement.

10.1.8    Payment and Performance Security. Notwithstanding any provision to the contrary, Owner shall not be obligated to make any payment under this Agreement, unless and until EPC Contractor has delivered the Payment and Performance Bond in accordance with **Section 4.19**, and the Payment and Performance Bond remains in full force and effect.

*10.2  Final Payment.*

Upon (i) the occurrence of Final Completion and the acceptance of the Work by Owner in accordance with **Section 11.3**, (ii) the submission to Owner by EPC Contractor of the invoice for Final Payment, (iii) the delivery to Owner by EPC Contractor of a certificate certifying to Owner

26

that all insurance required by the Governing Documents to be maintained on and after the Final Completion Date remains in full force and effect as of the Final Completion Date and covenants that EPC Contractor will maintain all such insurance for the duration of the periods of time set forth in the Governing Documents, and (iv) the receipt by Owner of all duly executed and notarized Final Lien Waivers from EPC Contractor, all Subcontractors and all Suppliers, Owner shall pay to EPC Contractor the remainder of the Cost of the Work, including any Retention Money, *less* any amounts authorized under this Agreement to be withheld or offset therefrom (the "Final Payment"). Acceptance of the Final Payment by EPC Contractor shall constitute a waiver of all Claims by EPC Contractor except those previously made in writing and identified by EPC Contractor as unsettled at the time of submission of the invoice for the Final Payment.

## ARTICLE 11  COMMENCEMENT AND PERFORMANCE OF WORK

*11.1 Commencement; Schedule.*

Owner shall issue a notice to proceed to EPC Contractor to commence performance of the Work on the thirtieth (30th) day following the Effective Date (the "Construction Commencement Date").

*11.2 Substantial Completion.*

"Substantial Completion" shall mean the occurrence of all of the following: (a) all materials and equipment for the Facility have been installed in accordance with the Specifications; (b) all systems required to be installed by EPC Contractor, the Toll System Installer and Integrator and all other Subcontractors have been installed and all required testing described in the Work on **Schedule IV** with respect thereto has been successfully completed consistent with **Schedule IV**; (c) the Facility is ready to commence operations, including, without limitation, tolling and revenue operations; (d) the Punch List (including the value attributable to each Punch List item) has been established by EPC Contractor and approved by Owner, such approval not to be unreasonably withheld or delayed; (e) all Work, other than the Punch List items and other minor items of the Work that would not affect the safe performance or operation of the Facility, has been completed in accordance with the Governing Documents; (f) the Facility is capable of Commercial Operation in accordance with the Governing Documents; (g)  EPC Contractor has performed its obligations under all other provisions of, and delivered all items required by, this Agreement as are then expressly required or contemplated by this Agreement to be performed or delivered by, in connection with or as of Substantial Completion; (h) EPC Contractor is not in Default and no EPC Contractor Event of Default has occurred and is continuing; (i) Owner has received all certificates of occupancy required from each applicable Governmental Authority, (j) Owner has received Lien Waivers in the applicable form set forth in **Exhibit D**, duly executed by EPC Contractor, all Subcontractors and all Suppliers, with respect to all Work performed up to Substantial Completion by each such Person and all amounts paid prior to or payable upon the achievement of Substantial Completion; and (k) EPC Contractor has removed all of its construction materials, waste material and garbage from the Site, except for (A) construction materials required for Work, if any, to be used by EPC Contractor in connection with the Punch List items, and (B) all tools and equipment

27

reasonably required by Owner and/or Operator for the operation and maintenance of the Facility, and in each case, as certified by EPC Contractor to Owner and reviewed and approved by Owner, acting reasonably.

11.2.2   EPC Contractor shall notify Owner and the Independent Engineer at least ten (10) Business Days in advance of when EPC Contractor believes the Substantial Completion Date will occur. EPC Contractor shall provide ten (10) Business Days' prior written notice to Owner of any commissioning activities or performance testing that will be conducted relating to Substantial Completion and Owner or if identified to be its representative for testing, the Independent Engineer, may, but will not be obligated to, witness any such commissioning activities or performance testing. On the Substantial Completion Date, EPC Contractor and Owner shall execute and deliver a Certificate of Substantial Completion in the form of **Exhibit F**.

11.2.3   All Liquidated Damages and other undisputed amounts owing by EPC Contractor hereunder, if any, shall be paid in full or satisfied within ten (10) Business Days after the Substantial Completion Date.

11.2.4   Owner shall pay to EPC Contractor the Early Completion Bonus, if any, within ten (10) Business Days after the Substantial Completion Date.

11.3   *Final Completion.*

11.3.1   "Final Completion" shall mean the occurrence of all of the following: (i) all Liquidated Damages and other amounts owing by EPC Contractor hereunder, if any, have been paid in full, (ii) EPC Contractor has performed its obligations under all other provisions of, and delivered all items required or contemplated by, this Agreement to be performed or delivered by, in connection with or as of Final Completion, (iii) each item on the Punch List has been completed, verified by the Independent Engineer and approved by Owner, such approval, in each case, not be unreasonably withheld or delayed, and (iv) EPC Contractor is not in Default hereunder and no EPC Contractor Event of Default has occurred and is continuing, and in each case, as certified by EPC Contractor to Owner and reviewed and approved by Owner, acting reasonably.

11.3.2   EPC Contractor will notify Owner and the Independent Engineer at least ten (10) Business Days in advance of when EPC Contractor believes the Final Completion Date will occur. EPC Contractor shall provide ten (10) Business Days prior written notice to Owner and the Independent Engineer of any commissioning activities or performance testing that will be conducted relating to Final Completion and Owner, or if identified to be its representative for testing, the Independent Engineer, may, but will not be obligated to, witness any such commissioning activities and performance testing.

28

Notwithstanding any other provisions herein, on and after the Final Completion Date, EPC Contractor shall only remain responsible and liable to Owner for (i) any breach of a representation or covenant set forth in this Agreement occurring on or before the Final Completion Date, except for any representation or covenant that, under the express terms of this Agreement, extends beyond or is to be performed after the Final Completion Date, (ii) indemnification under **Section 14.9** and elsewhere under this Agreement, (iii) any other Default by EPC Contractor or EPC Contractor Event of Default that has occurred on or before the Final Completion Date and is continuing; (iv) the Warranties as specifically provided in this Agreement until the expiration of the EPC Contractor's Warranty Period applicable thereto; and (v) such other obligations, liabilities and responsibilities of a contractor under Law (as it exists as of the Final Completion Date), it being the express intent of the Parties that this paragraph shall not waive or limit any right of Owner in Law or in equity.

*11.4 Extension.*

With respect to delay in performance by EPC Contractor of the Work, the occurrence of the events described in **Section 8.2.1, Section 8.2.2** or **Section 9.5.2** shall (subject in all events to the conditions set forth in **Section 9.5.1**) excuse such delay in performance for such period as is set forth in **Section 9.5.1.**

*11.5 Recovery Schedule.*

11.5.1    If at any time, (i) a Milestone is not achieved by the date set forth in **Schedule X** or (ii) the Work is delayed for a period which exceeds the greater of either 30 days in the aggregate or that number of days in the aggregate equal to 5% of the days remaining until the Target Substantial Completion Date, then EPC Contractor shall, within 10 Business Days of the date on which either or clause (i) or clause (ii) above occurs, submit to Owner for its review and approval, a Recovery Schedule demonstrating EPC Contractor's proposed plan to regain lost schedule progress and to achieve Milestones in accordance with this Agreement, including Substantial Completion by the Target Substantial Completion Date.

11.5.2    Owner shall notify EPC Contractor within 14 days after receipt of each such Recovery Schedule whether the Recovery Schedule is accepted (which acceptance shall not be unreasonably withheld or delayed) or rejected. Within 7 days after any rejection by Owner of the Recovery Schedule, EPC Contractor will resubmit a revised Recovery Schedule incorporating Owner's comments. When Owner accepts EPC Contractor's Recovery Schedule, EPC Contractor shall, within 5 days after Owner's acceptance, incorporate and fully include such schedule into the Project Schedule, deliver the same to Owner and proceed in accordance with the approved Recovery Schedule.

11.5.3    All costs incurred by EPC Contractor in preparing, implementing and achieving the Recovery Schedule shall be borne by EPC Contractor and shall

29

EXECUTION COPY

not result in a change to the Cost of Work except as otherwise provided in **Section 8.2**.

11.5.4   If EPC Contractor fails to provide an acceptable Recovery Schedule as required herein and in addition to any other rights and remedies in favor of Owner arising out of such failure, EPC Contractor shall have no right to receive progress payments until such time as EPC Contractor has prepared and Owner has approved such Recovery Schedule. Any failure or delay in the submittal or approval of a Recovery Schedule shall not result in any time extension under the Agreement.

## ARTICLE 12   WARRANTIES AND LIQUIDATED DAMAGES

*12.1 EPC Contractor's Warranties.*

EPC Contractor warrants to and covenants with Owner as follows (collectively, the "Warranties"):

12.1.1   EPC Contractor shall perform the design and engineering services hereunder in conformance with all professional engineering principles generally accepted as standards of the industry in the state or province where the Project is located for projects of similar size, type and complexity, and shall, subject to that standard, be sufficient for construction of the Project and conform to all standards relating to design contained in the Governing Documents.

12.1.2   EPC Contractor shall perform its construction and construction management services and procurement of all materials hereunder in accordance with good business practices associated with constructing facilities similar to the Facility. EPC Contractor shall have no obligation for breach of warranty under this **Section 12.1** to the extent any deficiencies are the result of Force Majeure which results after the Substantial Completion Date, normal wear and tear, misuse or negligence by Owner or Operator or any other Person acting on Owner's behalf, including the Independent Engineer.

12.1.3   All materials and equipment procured or furnished by EPC Contractor hereunder shall be new (unless otherwise agreed by Owner in writing), of good quality and in accordance with the Governing Documents.

12.1.4   The Work shall be free from construction defects and from design defects within the applicable standard of care.

12.1.5   The Work shall be fit for use for the intended function.

12.1.6   The Work shall meet the requirements of the Governing Documents.

30

**EXECUTION COPY**

12.1.7    *EPC Contractor's Warranty Period*.

      12.1.7.1 EPC Contractor's Warranties under this Agreement shall, subject to all limitations set forth in this Agreement and any re-warranty or extension as set forth in this **Section 12.1.7**, be valid for a period of two (2) years after the Final Completion Date ("EPC Contractor's Warranty Period"), provided, that, in the event that any Defective Work is discovered, repaired, replaced, reperformed or otherwise remedied during the EPC Contractor's Warranty Period (a "Remedied Item"), such Remedied Item shall be re-warranted (on the basis of the same Warranties in **Section 12.1**) for an additional two (2) years from the date of completion of such repair, replacement, reperformance and/or remedy and the EPC Contractor's Warranty Period shall be extended accordingly (but only in respect of such Remedied Item), and this **Section 12.1.7** shall continue to apply in full in respect of such Remedied Item.

      12.1.7.2 Should the Facility or any part thereof be shut down following the Substantial Completion Date as a result of a Defect, the EPC Contractor's Warranty Period shall be extended for a time equal to the duration of such shut-down, except in the event of Force Majeure.

12.1.8     EPC Contractor's Warranties do not include remedies for Defects or damages caused by Force Majeure which occurs after the Substantial Completion Date, normal wear and tear during normal usage, improper or insufficient maintenance, modifications performed by Owner or other parties (other than any EPC Contractor Party) or from abuse.

12.1.9     The Warranties and Subcontractor warranties are in addition to all rights and remedies available under the Governing Documents or applicable Law or in equity, and shall not limit EPC Contractor's liability or responsibility imposed by the Governing Documents or applicable Law or in equity with respect to the Work, including, if applicable, liability for design defects, latent construction defects, strict liability, breach, negligence, intentional misconduct or fraud.

*12.2  Repair and Replacement of Defective Work*.

If any breach arises under EPC Contractor's Warranties in **Section 12.1**, EPC Contractor shall, at its sole cost and expense, promptly correct, replace or repair any Defect in design, engineering, materials, workmanship or operability in the Facility or the Work discovered during the EPC Contractor's Warranty Period. EPC Contractor's correction, replacement, or repair shall be made with due regard to Owner's operational requirements. If EPC Contractor fails to remedy or commence and continue to pursue remedying any Defect as required under this **Section 12.2** during the EPC Contractor's Warranty Period within the period agreed by the Parties or, within ten (10) Business Days from Owner's written instruction to remedy such Defect, if the Parties fail to agree on such period, or within two (2) Business Days in the event of an emergency repair which impacts public safety, Owner may, but shall not be obligated to, remedy that Defect through a third party, at EPC Contractor's cost and expense; provided, further, that EPC

31

Contractor shall be liable in connection with any such remedial work by such third party as though EPC Contractor had carried out such remedial work, so long as such remedial work was carried out with reasonable care and skill and pursuant to a written contract. Owner shall use commercially reasonable efforts to obtain a warranty from such third party for the remedial work. Owner shall assign to EPC Contractor such written contract, including all warranties it receives from the third party engaged to remedy a Defect in accordance with this **Section 12.2**.

Subcontractor Warranties.

EPC Contractor shall in its negotiations with all Subcontractors for the Work, require that such Subcontractors provide the remedies, including warranties, performance guarantees, and, where appropriate, liquidated damages, bonds, and insurance coverages required by this Agreement for the portion of the Work to be performed by such Subcontractors; provided that EPC Contractor may, in its reasonable discretion, waive such requirements for Subcontractors (other than Major Subcontractors) whose scope of work may not necessitate such requirements. EPC Contractor shall enforce contractual remedies and enforce any other remedies against the Subcontractors, including, without limitation, those arising from Subcontractors' negligent acts or omissions. EPC Contractor agrees to assign to Owner on and as of the Final Completion Date any warranties, performance guarantees and related liquidated damages provisions contained in any contracts between EPC Contractor and Subcontractors with respect to the Work.

### 12.3  Liquidated Damages and Early Completion Bonus

12.3.1    If Substantial Completion is not achieved by EPC Contractor by the Target Substantial Completion Date, EPC Contractor shall pay to Owner, promptly upon (but in no event later than ten (10) Business Days after) Owner's demand as liquidated damages ("Liquidated Damages") and not as a penalty, an amount equal to $18,575 per day for each day after the Target Substantial Completion Date up to the Substantial Completion Date.

Such Liquidated Damages shall constitute Owner's sole right to damages for such delay, provided that: (a) such delay does not delay Substantial Completion beyond the Delay Default Date and (b) EPC Contractor continues to diligently perform the Work. If Substantial Completion does not occur by the Delay Default Date, Owner shall have the right to: (a) terminate this Agreement; (b) continue to assess Liquidated Damages; and/or (c) exercise any other right or remedy under this Agreement, at Law or in equity.

12.3.2    EPC Contractor acknowledges that such Liquidated Damages are reasonable in order to compensate Owner for damages it will incur as a result of late Substantial Completion. Such damages include loss of potential revenue for Owner due to late Substantial Completion, loss of use, enjoyment and benefit of the Facility by the general public, injury to Owner's credibility and reputation with the general public who depend on and expect availability of service by the Target Substantial Completion Date, which injury to credibility and reputation may directly result in loss of ridership on the Facility and further loss of Owner's toll revenues, and additional costs of administering this Agreement (including engineering, legal, accounting, overhead and other

32

administrative costs). EPC Contractor further acknowledges that these damages are incapable of accurate measurement because of, among other things, the unique nature of the Facility and the unavailability of a substitute for it. EPC Contractor hereby waives any and all defenses it might have that liquidated damages constitute a penalty or that they do not bear a reasonable relation to the actual damages.

12.3.3    If Substantial Completion is achieved by EPC Contractor prior to the Target Substantial Completion Date, Owner shall pay to EPC Contractor 10 Business Days after the Substantial Completion Date an amount equal to $_____ for each day between the day that Substantial Completion is achieved and the Target Substantial Completion Date.


*12.4  Rights and Remedies Available Under Law*

Owner shall have the benefit of all rights and remedies available under Law or in equity, including, without limitation, the remedies provided under Indiana's statutes of repose with respect to construction work.


## ARTICLE 13 DISPUTE MITIGATION AND RESOLUTION

*13.1  Payment of Undisputed Amounts.*

Subject to the express provisions of this Agreement, where there is any dispute as to the amount of monies owing by any party to any other Party hereunder, the portion of the amount owing that is not in dispute or otherwise contested or challenged, if any, shall be paid within the time required herein or if the required time has elapsed, shall be paid immediately, without deduction or abatement, but without prejudice to the rights of the Parties to contest, challenge or otherwise dispute the appropriate disposition of the remaining portion of the monies claimed hereunder.

*13.2  Arbitration Procedure.*

Any dispute, claim or controversy arising out of or in connection with this Agreement, including any dispute regarding the existence, validity or termination of this Agreement (the "Dispute"), shall be resolved in accordance with the following procedures:

(a)    Direct Negotiations. The Parties shall consult in good faith in an attempt to reach an amicable settlement in relation to the Dispute. The Party alleging the existence of a Dispute shall give to the other Party written notice setting out the particulars of the Dispute (the "Notice of Dispute"). If the Dispute is not settled amicably between the Parties within thirty (30) calendar days from the receipt of the Notice of Dispute (or within such longer period of time as the Parties may mutually agree in writing), such Dispute shall be finally settled by arbitration as set out in **Section 13.2(b)**.

33

(b)  Arbitration. (i) Any Dispute that is not amicably settled under **Section 13.2(a)** shall be finally resolved through arbitration under the Construction Industry Arbitration Rules of the American Arbitration Association (the "AAA") then in effect, including the Procedures for Large, Complex Construction Disputes, as applicable, except for Rule L-5(d), which shall have no application (the "Arbitration Rules").

(ii)  The Dispute shall be resolved by three (3) arbitrators (the "Arbitral Tribunal") selected in accordance with the Arbitration Rules.

(iii)  The Arbitral Tribunal shall resolve the Dispute in accordance with the laws of the State of Indiana.

(iv)  The place or seat of arbitration shall be Indianapolis, Indiana. The Parties may agree to hold hearings in another location. The arbitration shall be conducted in the English language.

(v)  The award issued by the Arbitral Tribunal (the "Award") shall be final and binding upon the Parties and shall not be subject to appeal.

(vi)  The Parties irrevocably submit to the jurisdiction of any court with jurisdiction over the Parties or their assets for purposes of recognizing and enforcing the Award.

(vii)  The Parties shall have the right to seek the consolidation of arbitration proceedings and the joinder of parties to an arbitration proceeding

*13.3  Qualified to Act.*

The arbitrators selected as the Arbitral Tribunal shall have at least fifteen (15) years' experience in complex construction, engineering or toll facility disputes.

*13.4  Confidentiality.*

Save and except as may be necessary in the course of the enforcement of arbitration awards, the Arbitral Tribunal and all Persons participating therein shall be responsible for ensuring the confidentiality of each Party's proprietary and confidential information.

*13.5  Provisional Remedies*

No Party shall be precluded from initiating a proceeding in a court of competent jurisdiction for the purpose of obtaining any emergency, equitable or provisional remedy to protect its rights which may be necessary and which is not otherwise available under this Agreement, including temporary and preliminary injunctive relief and restraining orders. Venue for any provisional remedies action arising out of the Governing Documents shall lie in U.S. District Court for the Northern District of Indiana or the United States Court of Appeals for the Seventh Circuit.

*13.6  Continuing Performance.*

At all times during the Term, notwithstanding the existence of any Dispute, EPC Contractor and Owner shall continue to perform their respective obligations in a diligent manner and without delay in accordance with the provisions of this Agreement without prejudice to the right to contest, dispute and challenge the relevant matter in accordance with the provisions of this Agreement.

*13.7  Participation in Other Proceedings.*

EPC Contractor agrees that at Owner's request, EPC Contractor will allow itself to be joined as a participant in any arbitration or other proceeding that involves Owner, any of its officers, directors, employees or agents and any other participant in the Work. This provision is for the benefit of Owner and its officers, directors, employees and agents and not for the benefit of any other Party. Agreements between EPC Contractor and the other EPC Contractor Parties shall ensure that such other EPC Contractor Parties shall be bound by any binding arbitration hereunder.

*13.8  Claims Following Termination.*

Notwithstanding anything contained in this Agreement, the dispute resolution procedure set forth in this **Article 13** shall no longer apply to disputes between the Parties after the expiration of the EPC Contractor's Warranty Period or other termination of this Agreement which have not been resolved on a final and binding basis pursuant to **Section 13.2** prior to such expiration or other termination and save as aforesaid, the Parties shall be entitled after the expiration of the EPC Contractor's Warranty Period or other termination of this Agreement to commence legal proceedings seeking any recourse available to it or them at law or in equity.

*13.9  Waiver of Lien Rights.*

So long as Owner is not in default under the terms of this Agreement, except to the extent prohibited  by Law, EPC Contractor hereby waives and relinquishes the right and ability to impose, file, attach or enact a lien against the Site, the Project or the Work.

**ARTICLE 14 DEFAULTS; REMEDIES; TERM; TERMINATION**

*14.1  EPC Contractor Default.*

The occurrence of any of the events set forth below shall constitute an EPC Contractor Default under this Agreement:

> 14.1.1    Bankruptcy. EPC Contractor becomes insolvent, or become the subject of any bankruptcy, insolvency or similar proceeding, which, in the case of any such proceeding that a third party brings against EPC Contractor, has not been terminated, stayed, or dismissed within sixty (60) days after it was commenced, unless EPC Contractor provides evidence satisfactory to Owner, in its sole discretion, of EPC Contractor's ability to perform all of its obligations under this Agreement despite such proceeding;

14.1.2   <u>Representation False</u>. Any representation made by EPC Contractor herein shall have been false or misleading in any material respect when made;

14.1.3   <u>Failure to Provide and Maintain Insurance or Payment and Performance Security</u>. EPC Contractor fails to provide and maintain the insurance coverages or Payment and Performance Bond as and when required under this Agreement, or fails to comply with any requirement of this Agreement pertaining to the amount, terms or coverage of the same;

14.1.4   <u>Failure to Perform</u>. EPC Contractor (i) fails to perform the Work in accordance with the Governing Documents, including conforming to applicable standards set forth therein in design and construction of the Project, or refuses to correct remove and replace rejected materials or Non-conforming Work; or (ii) materially fails to timely observe or perform or cause to be observed or performed any other material covenant, agreement, obligation, term or condition required to be observed or performed by EPC Contractor under the Governing Documents (other than as referred to in this **Section 14.1**, in which case such specific reference shall apply to such failure to perform or breach);

14.1.5   <u>Failure to Achieve Substantial Completion</u>. Substantial Completion is not achieved by the Delay Default Date;

14.1.6   <u>Improper Assignment</u>. EPC Contractor makes or attempts to make (which attempt is not terminated before becoming an assignment or transfer or having any legal effect) or suffers a voluntary or involuntary assignment or transfer of all or any portion of this Agreement except as allowed under **Section 17.12**;

14.1.7   <u>Failure to Commence Construction</u>. EPC Contractor fails to commence construction on the Construction Commencement Date;

14.1.8   <u>Suspension of Work</u>. EPC Contractor suspends, ceases, stops or abandons the Work or fails to continuously and diligently prosecute the Work (exclusive of work stoppage due to (i) termination of this Agreement or a portion thereof by Owner, (ii) Force Majeure, (iii) suspension of the Work by Owner, or (iv) nonpayment of undisputed amounts by Owner to the extent permitted under **Section 10.1.6**);

14.1.9   <u>Failure to Resume Performance</u>. EPC Contractor fails to resume performance of Work which has been suspended or stopped, within a reasonable time after receipt of notice to do so from Owner (which time shall not exceed two (2) Business Days for suspensions or stoppages equal to or shorter than five (5) Business Days and five (5) Business Days for suspensions or stoppages that exceed five (5) Business Days) or (if applicable) after cessation of the event preventing performance;

14.1.10  <u>Failure to Pay</u>. EPC Contractor fails, absent a good faith dispute, to make payment when due for labor, equipment or materials in accordance with

36

applicable Law and its agreements with Subcontractors and Suppliers, subject to the terms of **Section 10.1.6**; provided, however, that EPC Contractor shall not be considered to be in default under this **Section 14.1.10** if  (i) (x) Owner has failed to pay undisputed amounts owing to EPC Contractor with respect to the Work and (y) as a result of Owner's failure to pay, EPC Contractor does not have sufficient available funds to make such payment for labor, equipment or materials (funds other than those that are restricted and not permitted to be used for such payments under binding contract shall be considered "available" for purposes of this clause (y);  or (ii) in the event of a dispute as to payment of labor, equipment or material, EPC Contractor has provided a bond or other form of security reasonably acceptable to Owner in the amount of one hundred fifty percent (150%) of such amount in dispute;

14.1.11    Failure to Replace Payment and Performance Bond. EPC Contractor fails to replace the Payment and Performance Bond as required by **Section 4.19.5**;

14.1.12    Reports, Invoices or Certifications. EPC Contractor makes a misrepresentation or omission of material information in any written report, financial statement, invoice or certification submitted to Owner.

With respect to the EPC Contractor Default set forth in **Sections 14.1.2**, **14.4.3**, **14.1.4**, **14.1.7** through **14.1.10** (inclusive of both) and **Section 14.1.12**, EPC Contractor shall have seven  (7) days following delivery to EPC Contractor of a notice from Owner to cure such EPC Contractor Default, or if a cure can be commenced but cannot be completed within such seven (7) day period, such period shall extend for a reasonable period of time, but not to exceed a total of thirty (30) days, so long as EPC Contractor is proceeding diligently to cure such default throughout such period. Notwithstanding the foregoing, if Owner believes a condition affecting the Project or the Work poses an immediate and imminent danger to public health or safety, Owner may (but shall not be obligated to), without notice and without awaiting lapse of any cure period, rectify the condition at EPC Contractor's sole cost and expense, and so long as Owner undertakes such action in good faith, such action shall not expose Owner to liability to EPC Contractor and shall not entitle EPC Contractor to any other remedy, it being acknowledged that Owner has a paramount public interest in providing and maintaining safe public use of and access to the Project. Owner shall be deemed to have acted in good faith regarding the existence of such danger in the absence of clear and convincing evidence that the danger did not exist.  A Default set forth in **Section 14.1.5** through **Section 14.1.7** (inclusive of both), or **Section 14.1.11**, or a Default set forth in other parts of this **Section 14.1** shall constitute an "EPC Contractor Event of Default" if the Default is continuing after the expiration of all applicable cure periods.

14.2  *Owner's Default Remedies Against EPC Contractor.*

14.2.1    Owner's Remedies and EPC Contractor's Obligations for an EPC Contractor Event of Default

If an EPC Contractor Event of Default shall have occurred and be continuing, in addition to all other rights and remedies provided by Law or in equity or available under this Agreement or

otherwise, including the rights to recover Liquidated Damages and to seek recourse against the Payment and Performance Bond. Owner shall have the following rights and remedies, without further notice, and without prejudice to any of its other rights or remedies and without waiving or releasing EPC Contractor from any obligations, and EPC Contractor shall have the following obligations (as applicable):

(a) Owner may order EPC Contractor to suspend or discontinue the Work or any portion thereof;

(b) Owner may terminate this Agreement or the portion thereof relating to the Work, in which case, the provisions of **Section 14.7** shall apply;

(c) If and as directed by Owner, EPC Contractor shall withdraw from the Site and shall remove such materials, equipment, tools and instruments used by, and any debris or waste materials generated by, EPC Contractor or any Subcontractor in the performance of the Work;

(d) If and as directed by Owner, EPC Contractor shall deliver to Owner possession of any or all facilities of EPC Contractor located on the Site, as well as any or all designs, drawings, and all other documents that Owner deems necessary for completion of the Work, including partially completed drawings, plans, elevations, sections, details and diagrams, specifications, records, information, schedules, samples, and shop drawings;

(e) If and as directed by Owner, EPC Contractor shall assign to Owner (without future recourse to EPC Contractor relating to the period from and after the assignment) such contracts of Subcontractors and Suppliers as Owner may request and shall confirm the assignment to Owner of such contracts requested by Owner and shall terminate, at its sole cost and expense, all other contracts with Subcontractors and Suppliers;

(f) Owner may deduct from any amounts payable by Owner to EPC Contractor such amounts payable by EPC Contractor to Owner, including reimbursements owing, Liquidated Damages, amounts reasonably necessary to cover any existing or threatened claims, liens and stop notices of Subcontractors, laborers or other Persons, amounts of any losses that have accrued, the cost to complete or remediate uncompleted Work, Defective Work or Nonconforming Work or other damages or amounts that Owner has determined are or may be payable to Owner under the Governing Documents;

(g) Owner, without incurring any liability to EPC Contractor, and subject to the rights and remedies of the EPC Contractor's surety under the Payment and Performance Bond, shall have the rights (i) to take the performance of all or a portion of the Work from EPC Contractor (either with or without the use of EPC Contractor's materials, equipment, tools and instruments) and enter into an agreement with another Person for the completion of such Work; or (ii) to use such other

38

methods, as in the opinion of Owner, will be required for the completion of the Project;

(h)     To the extent any specific items of the Work is partially complete at the time of termination, Owner shall pay EPC Contractor for any Work completed by EPC Contractor less any damages, losses, costs, charges, expenses, fines, penalties, and other amounts payable by EPC Contractor under this Agreement. Owner may, at its sole option, complete any partially completed Work, or may require EPC Contractor to complete such Work. If EPC Contractor completes any partially completed Work, Owner shall pay EPC Contractor for the completion of the Work, *less* any damages, losses, costs, charges, expenses, fines, penalties, Liquidated Damages and other amounts payable by EPC Contractor to Owner under this Agreement; and/or

(i)     Owner shall have the right, but not the obligation, to perform any obligations of EPC Contractor, including: (i) perform or attempt to perform, or cause to be performed, all or a portion of the Work, (ii) spend such sums as Owner deems necessary and reasonable to employ and pay such architects, engineers, consultants and contractors and obtain materials and equipment as may be required for the purpose of completing the Work, (iii) execute all applications, certificates and other documents as may be required for completing the Work, (iv) modify or terminate any contractual arrangements, (v) take any and all other actions which it may in its sole discretion consider necessary to complete the Work; and (vi) prosecute and defend any action or proceeding incident to the Work.

14.2.2     Liability of EPC Contractor for Completion of Work

If an Event of Default has occurred, EPC Contractor shall be liable to Owner (in addition to any other damages, losses, costs, charges, expenses, fines, and penalties under this Agreement other than those costs intended to be covered by Liquidated Damages payable hereunder) for all costs reasonably incurred by Owner or any party acting on its behalf in completing the Work or having the Work completed by another Person. Such costs of completing the Work may include, without limitation, the costs of procuring and negotiating new contracts and subcontracts, any throwaway costs for unused portions of the completed Work, increased financing costs, and actual costs for administering any subcontract and for legal fees associated with the foregoing. Such costs and fees for which EPC Contractor is liable may be deducted by Owner in such order as Owner may determine, in its sole discretion, out of monies due, or that may at any time thereafter become due, to EPC Contractor pursuant to the terms of this Agreement (up to the remaining portion of the Cost of the Work including any Excluded Costs to which EPC Contractor may be entitled), from any Retention Money held by Owner or from the Payment and Performance Bond. If such costs to complete the Work exceed such remaining portion of the Cost of the Work, then EPC Contractor shall be liable for, and shall promptly, but in any event not more than thirty (30) days after notice from Owner, pay to Owner, the amount of such excess, excluding changes in the Work approved by Owner following such EPC Contractor Event of Default (other than changes in the Work caused by or relating to the EPC Contractor Event of Default).

14.2.3     Notwithstanding the availability and/or exercise of the foregoing remedies, no single or partial exercise of any right or remedy under this Agreement by Owner shall preclude any other or further exercise of that right or remedy or the exercise of any other right or remedy by Owner under this Agreement and, other than Liquidated Damages which shall be the only remedy for failure to achieve Substantial Completion by the Target Substantial Completion Date, the rights and remedies of Owner under this Agreement shall be cumulative and not exclusive of any rights, remedies, powers and privileges provided by or available under Law or in equity, including the right to specific performance, injunctive relief and/or direct monetary damages.

14.2.4     In exercising any remedies, Owner shall use reasonable efforts to mitigate its damages.

14.2.5     <u>Limitation on Remedies</u>. EPC Contractor shall not be liable for punitive damages or any indirect, incidental or consequential damages, whether arising out of breach of this Agreement, tort (including negligence) or any other theory of liability, and Owner hereby releases EPC Contractor from any such liability. The foregoing limitation on EPC Contractor's liability shall not apply to or limit any right of recovery Owner may have with respect to the (a) Liquidated Damages; (b) losses arising out of fraud, criminal conduct, intentional misconduct (which does not include any intentional EPC Contractor Event of Default), recklessness, bad faith or gross negligence on the part of any EPC Contractor Party, (c) EPC Contractor's indemnities under **Section 14.9** , and (d) any amounts EPC Contractor may owe or be obligated to reimburse under the express provisions of this Agreement, including interest.

14.2.6      <u>Cap on Liability</u>.  Notwithstanding any other provision of this Agreement, in no event will EPC Contractor's liability relating to the Cline Avenue Bridge and the Work exceed the Cost of the Work; provided however, such limitation shall not apply to losses arising out of fraud or criminal conduct of EPC Contractor.

*14.3  Owner Event of Default.*

Each of the following shall constitute an "Owner Event of Default":

14.3.1     <u>Failure to Make a Payment to EPC Contractor When Due</u>. Owner fails to make payment to EPC Contractor of any outstanding and undisputed amount on the Payment Due Date, which failure is not remedied within applicable cure periods set forth in **Section 10.1.6**;

14.3.2     <u>Bankruptcy</u>. Owner becomes insolvent, or becomes the subject of any bankruptcy, insolvency or similar proceeding, which, in the case of any such proceeding that a third party brings against Owner has not been terminated, stayed, or dismissed within sixty (60) days after it was commenced, unless

Owner provides evidence satisfactory to EPC Contractor, in its reasonable discretion, of Owner's ability to perform all of its obligations under this Agreement despite such proceeding;

14.3.3     <u>Representation False</u>. Any representation made by Owner herein was false or misleading in any material respect when made and such representation has a material adverse effect on Owner's ability to perform its financial obligations under this Agreement, which representation is not cured within sixty (60) days, provided, that, such period shall extend for up to a total of one hundred twenty (120) days so long as Owner is proceeding diligently to cure such breach throughout such period; or

14.3.4     <u>Failure to Perform</u>. Owner's failure to perform any of its material non-payment obligations under this Agreement, and such failure is not cured within thirty (30) days after receipt of written notice thereof from EPC Contractor, provided, that, if a cure cannot be effected within such thirty (30) day period, such period shall extend for up to a total of one hundred twenty (120) days, so long as Owner is proceeding diligently to cure such default throughout such period.

*14.4  EPC Contractor Remedies for Owner Event of Default.*

14.4.1     <u>Termination.</u> Upon the occurrence of an Owner Event of Default set forth in **Section 14.3.1 or 14.3.2** (and the expiration of all cure periods applicable thereto), EPC Contractor shall have the right to terminate this Agreement, to order all Subcontractors to stop Work and remove all their tools and equipment from the Site, and/or pursue all such remedies as may be allowed under this Agreement, at Law or in equity. In addition, and without limiting the foregoing remedies, Owner shall pay to EPC Contractor the amounts payable upon termination under **Section 14.7**.

14.4.2     <u>Damages</u>. Upon the occurrence of an Owner Event of Default set forth in **Section 14.3.3** or **14.3.4** (and the expiration of all cure periods applicable thereto), EPC Contractor shall be entitled to recover any and all damages available at Law, including all attorneys' fees and costs (subject to the obligation to mitigate damages) directly arising out of such Owner Event of Default. In no event shall EPC Contractor be entitled to terminate this Agreement upon the occurrence of an Owner Event of Default set forth in **Section 14.3.3** or **14.3.4**.

14.4.3     <u>Limitation on Remedies.</u> Owner shall not be liable for punitive damages or any indirect, incidental or consequential damages, whether arising out of breach of this Agreement, tort (including negligence) or any other theory of liability, and EPC Contractor hereby releases Owner from any such liability. The foregoing limitation on Owner's liability shall not apply to or limit any right of recovery EPC Contractor may have respecting the (a) losses arising out of fraud, criminal conduct, intentional misconduct (which does not include

41

any intentional Owner Event of Default), recklessness, bad faith or gross negligence on the part of Owner or the Independent Engineer, (b) Owner's Indemnity under **Section 14.9.4**, and (c) any amounts Owner may owe or be obligated to reimburse under the express provisions of this Agreement, including interest.

*14.5 Force Majeure.*

14.5.1     Notice of Occurrence and Impact.

14.5.1.1 Any Party claiming that it is delayed in performing its obligations under this Agreement due to the occurrence of a Force Majeure event (as defined in **Section 14.5.3**) shall promptly after such affected Party becomes aware of such event, use commercially reasonable efforts to notify the other Party of the same by expedient means, such as by telephone or email.  If the affected Party is EPC Contractor, within five (5) Business Days of the Force Majeure event, EPC Contractor shall provide written notice of the Force Majeure event, and within thirty (30) days of the Force Majeure event, EPC Contractor shall also provide the following information to Owner: (i) the nature of such Force Majeure event, (ii) an estimate of the extent such event will delay Substantial Completion or Final Completion, and (iii) the date and time the Force Majeure event commenced and how long EPC Contractor estimates the impact of the event will continue.

14.5.1.2 The Party receiving the notice of Force Majeure pursuant to **Section 14.5.1.1** shall have the right to object to the declaration of a Force Majeure event. If the existence of a Force Majeure event is disputed, either Party may initiate dispute resolution proceedings pursuant to **Article 13**.

14.5.1.3 Each affected Party shall (i) act diligently to overcome, remove and/or mitigate the effects of a Force Majeure event, (ii) notify the other Party on a continuing basis of its efforts to overcome, remove and/or mitigate the effects of the Force Majeure event, (iii) notify the other Party promptly after becoming aware that such Force Majeure event has ceased, and (iv) resume performance of its obligations affected by such Force Majeure event as soon as reasonably practicable.

14.5.2     Effect of Force Majeure.

14.5.2.1 Any delays in or failure of performance by a Party, other than the obligation to pay monies hereunder, shall not constitute a default hereunder if and to the extent such delays or failures of performance are caused by Force Majeure events (subject to the limitations set forth in this Agreement).

14.5.2.2  The occurrence of a Force Majeure event shall excuse the affected Party's delay in performing its obligations under this Agreement on a day-for-day basis for a period of time equal to the duration of the Force Majeure event *plus* the time needed to remedy its effects, and in each case, only to the extent (i) affected Party's performance is delayed thereby and (ii) a corresponding extension has been granted under the Development Agreement and the Exchange Agreement in respect of such Force Majeure event, if the granting of an extension is necessary under such agreements. No such delay in performance caused by a Force Majeure

42

event shall constitute a Default, Owner Event of Default or EPC Contractor Event of Default, as applicable.

14.5.2.3 <u>Termination for Force Majeure</u>. In the event that a Force Majeure event continues for more than 180 days after notice of the event of Force Majeure is given under **Section 14.5.2**, then either party may terminate this Agreement, in its sole discretion, within sixty (60) days after the expiration of such 180-day period, by giving at least twenty (20) Business Days' prior written notice to the other party.

14.5.3    <u>Definition of Force Majeure</u>.

(a) The term "Force Majeure" shall mean the occurrence of any of the following events that materially and adversely affects performance of EPC Contractor's or Owner's obligations, provided that such events (or the effects of such events) could not have been avoided by the exercise of caution, due diligence, or reasonable efforts by any EPC Contractor Party or Owner, as the case may be, and do not result from or arise out of the acts, omissions, negligence, fault, willful misconduct, breach or violation of any Governing Document by any EPC Contractor Party or by Owner:

 i.  war (including civil war and revolution), invasion, armed conflict, violent act of foreign enemy, military or armed blockade, or military or armed takeover of the Facility, in each case occurring within the State of Indiana;

 ii.  any act of terrorism or sabotage that causes direct physical damage to the Facility or the Project or that constitutes a specific and material threat to the Facility or the Project, as determined by applicable Governmental Authorities;

 iii.  nuclear explosion or contamination, in each case occurring within one hundred fifty (150) miles of the Facility or in the State of Indiana;

 iv.  riot and civil commotion on or in the immediate vicinity of the Facility;

 v.  any kind of local or national emergency declared by an applicable Governmental Authority;

 vi.  fire, flood, hurricane, storm, earthquake, tornado, or other natural disaster that causes direct and material physical damage to the Facility or the Project, or that results in the issuance of a hurricane or evacuation warning by an applicable Governmental Authority, provided that relief shall only be provided for floods and storms that meet or exceed the criteria set out in the builder's risk policy of insurance identified on Schedule II to this Agreement;

 vii.  epidemic in the vicinity of the Facility;

 viii.  explosion (other than explosions of ordinances on or at the Site), sabotage, act of God, to the extent such occurrence causes direct physical damage to the Facility or the Project,

43

ix. failure of the Subcontractors or Suppliers to perform or deliver on a timely basis, to the extent such failure is due to a force majeure condition affecting the Subcontractor or Supplier (where such force majeure condition is one of those enumerated in this Section and not limited below),

x.  condemnation or confiscation of the Facility or the Site;

xi. any national or regional strike, labor dispute, work slowdown, work stoppage, secondary boycott, walkout or other similar occurrence; and

xii. issuance of a temporary restraining order or other form of injunction by a court that prohibits prosecution of a material portion of the Work or material work stoppage or delay directly resulting from action of a Governmental Authority;

provided however, that no event or circumstance shall constitute Force Majeure under this Agreement if (and to the same extent) such event is limited by **Section 14.5**. The term "**Force Majeure Event**" shall be limited to the matters listed above and specifically excludes from its definition the following matters which might otherwise be considered a force majeure event:

(i)     any fire or other physical destruction or damage, or delays to the Project which occur by action of the elements, including lightning, explosion, drought, rain, flood, snow, storm, except as specified in clause (vi) or clause viii) above;

(ii)    malicious or other acts intended to cause loss or damage or other similar occurrence, including vandalism or theft, to the Facility;

(iii)   any strike, labor dispute, work slowdown, work stoppage, secondary boycott, walkout or other similar occurrence that targets the Project or any EPC Contractor Party or relates to or arises from the acts or omissions of any EPC Contractor Party.

*14.6  Right to Termination.*

No Party shall have the right to terminate this Agreement for cause or otherwise except as described in **Section 14.2, Section 14.4 or Section 14.5.2.3.**

*14.7  Effect of Termination Under Section 14.2 or Section 14.4 or Section 14.5.2.3.*

In the event that this Agreement is terminated by either EPC Contractor or Owner pursuant to **Sections 14.2, 14.4 or 14.5.2.3**, Owner shall pay to EPC Contractor an amount equal to the sum of (1) the Cost of the Work incurred by EPC Contractor, Subcontractors and Suppliers as of the date of termination, *plus* (2) to the extent not already reflected in **clause (1)**, any termination charges imposed by Subcontractors or Suppliers as a result of the termination and any other costs reasonably incurred by EPC Contractor solely as a result of the termination. To the extent that a default triggers coverage and reimbursement pursuant to insurance policies maintained by EPC Contractor pursuant to **Schedule II,** the defaulting party shall be responsible for the payment of the deductible amounts under any said insurance policies and in the event the termination is pursuant to **Section 14.5.2.3** the Owner shall be responsible for the payment of one-half of the

44

deductible amounts under said insurance policies. In the case of termination under **Section 14.2**, Owner shall not be obligated to pay any termination charges imposed by Subcontractors or Suppliers or any termination costs incurred by EPC Contractor as a result of the termination, and may deduct from any amounts payable by Owner to EPC Contractor such amounts payable by EPC Contractor to Owner, if any, including Liquidated Damages, amounts reasonably necessary to cover any existing or threatened Claims, liens and stop notices of Subcontractors, Suppliers, laborers or other Persons, the cost to complete or remediate uncompleted Work, Defective Work or Nonconforming Work or other damages or amounts payable to Owner under the Governing Documents. Upon payment by Owner to EPC Contractor in accordance with this **Section 14.7**, Owner shall have exclusive ownership of the Facility and the Work and EPC Contractor shall have no further obligations with respect thereto.

Notwithstanding the termination of this Agreement pursuant to **Sections 14.2**, **14.4**, or **14.4.2.3** EPC Contractor shall remain liable to Owner for any breach or EPC Contractor Event of Default hereunder on, as a result of, or prior to such termination and Owner shall remain liable to EPC Contractor for any breach or Owner Event of Default hereunder on, as a result of, or prior to such termination.

   14.8  *Completion; Survival.*

Unless earlier terminated pursuant to the terms of this **Article 14**, this Agreement shall be deemed to be completed when both of the following events have occurred: (a) the Final Completion Date has occurred and (b) Owner has paid the Cost of the Work in full pursuant to **Article 10** and any other provision. Notwithstanding the foregoing, EPC Contractor's obligations under **Article 12** shall continue until the expiration of the EPC Contractor's Warranty Period as set forth in **Article 12**. Notwithstanding anything in this Agreement to the contrary, all indemnity provisions, the provisions of **Section 12.3** and **Article 13** and any other provision that expressly states that it shall survive the completion or termination of this Agreement shall survive the completion or termination of this Agreement and the termination of this Agreement shall not limit or otherwise affect the respective rights and obligations of the Parties which accrued prior to the date of termination.

   14.9  *Indemnity.*

   14.9.1   **SUBJECT TO <u>SECTION 14.9.3,</u> EPC CONTRACTOR SHALL INDEMNIFY, DEFEND AND HOLD HARMLESS EACH OF THE OWNER INDEMNITEES AND THEIR RESPECTIVE SUCCESSORS AND ASSIGNS FROM AND AGAINST ANY AND ALL SUITS, ACTIONS, LIENS, CLAIMS, INJURIES, DAMAGESAND LOSSES, INCLUDING WITHOUT LIMITATION, PERSONAL OR BODILY INJURY OR DEATH,  BROUGHT ON ACCOUNT OF OR RECEIVED OR SUSTAINED BY ANY THIRD PARTIES (INCLUDING MEMBERS OF THE PUBLIC) OR ASSESSED BY GOVERNMENTAL AUTHORITIES, AND ARISING OUT OF, RELATING TO OR RESULTING FROM:**

45

(a) THE BREACH OR ALLEGED BREACH OF ANY OBLIGATIONS UNDER, OR FAILURE TO PERFORM THE WORK PURSUANT TO, THE TERMS OF THE GOVERNING DOCUMENTS BY ANY EPC CONTRACTOR PARTY;

(b) THE FAILURE OR ALLEGED FAILURE BY ANY EPC CONTRACTOR PARTY TO COMPLY WITH GOVERNING LAWS (INCLUDING LAWS REGARDING HAZARDOUS SUBSTANCES MANAGEMENT); PROVIDED, THAT TO THE EXTENT FAILURE TO COMPY IS DUE TO AN ERROR IN DESIGN, THIS INDEMNITY WILL APPLY ONLY IF SUCH DESIGN ERROR DOES NOT COMPLY WITH THE APPLICABLE STANDARD OF CARE;

(c) ANY ALLEGED PATENT OR COPYRIGHT INFRINGEMENT OR OTHER ALLEGEDLY IMPROPER APPROPRIATION OR USE OF TRADE SECRETS, PATENTS, PROPRIETARY INFORMATION, KNOW-HOW, COPYRIGHT RIGHTS TRADEMARKED OR SERVICE MARKED MATERIALS, EQUIPMENT, DEVICES OR PROCESSES (INCLUDING INTELLECTUAL PROPERTY) OR INVENTIONS IN PERFORMANCE OF THE WORK, OR ARISING OUT OF ANY USE IN CONNECTION WITH THE PROJECT OF METHODS, PROCESSES, DESIGNS, INFORMATION, OR OTHER ITEMS FURNISHED OR COMMUNICATED TO OWNER PURSUANT TO THIS AGREEMENT; OR USE OF WORK PRODUCT FOR ANY PURPOSE OTHER THAN THE WO RK; PROVIDED THAT THIS INDEMNITY SHALL NOT APPLY TO ANY INFRINGEMENT OR ALLEGED INFRINGEMENT RESULTING FROM AN ADDITION TO OR CHANGE IN SUCH MATERIALS, EQUIPMENT, DEVICES OR PROCESSES MADE INDEPENDENTLY BY OWNER WITHOUT THE PRIOR WRITTEN CONSENT OF EPC CONTRACTOR;

(d) THE ACTUAL OR ALLEGED CULPABLE ACT, ERROR, OR OMISSION, NEGLIGENCE, BREACH OR MISCONDUCT OF ANY EPC CONTRACTOR PARTY IN OR ASSOCIATED WITH PERFORMANCE OF THE WORK AND/OR THE SITE THAT DOES NOT COMPLY WITH THE APPLICABLE STANDARD OF CARE; OR

(e) THE ACTUAL OR THREATENED RELEASE, SPILL OR DISCHARGE OF HAZARDOUS SUBSTANCES BY ANY EPC CONTRACTOR PARTY.

OWNER SHALL BE ENTITLED TO ALL REASONABLE COSTS, EXPENSES, EXPERT FEES AND ATTORNEYS' FEES INCURRED OR PAID BY OWNER IN CONNECTION WITH ANY CLAIM FOR WHICH EPC CONTRACTOR IS OBLIGATED TO PROVIDE INDEMNIFICATION PURSUANT TO THIS SECTION 14.9.1.

46

All terms used in this **Section 14.9** that are defined in **Schedule I** shall have the meanings set forth in **Schedule I**.

14.9.2    Indemnification in Other Agreements

EPC Contractor shall use reasonable efforts to include the Owner Indemnitees in any indemnities EPC Contractor obtains from its Major Subcontractors.

14.9.3    **LIMITATIONS ON INDEMNITY BY EPC CONTRACTOR**

**NOTWITHSTANDING SECTION 14.9.1 OR ANY OTHER PROVISION OF THIS AGREEMENT TO THE CONTRARY, BUT IN NO WAY LIMITING THE INSURANCE COVERAGE REQUIRED TO BE OBTAINED AND MAINTAINED BY EPC CONTRACTOR UNDER SECTION 4.17, EPC CONTRACTOR SHALL HAVE NO OBLIGATION TO PROVIDE INDEMNIFICATION IN RESPECT OF CLAIMS AND LOSSES TO THE EXTENT THE SAME RELATE TO A BREACH OF THIS AGREEMENT BY OWNER, THE INDEPENDENT ENGINEER OR THEIR RESPECTIVE REPRESENTATIVES OR THE NEGLIGENCE OR WILLFUL ACT OR OMISSION OF OWNER, THE INDEPENDENT ENGINEER OR THEIR RESPECTIVE REPRESENTATIVES.**

14.9.4    **OWNER'S INDEMNITY**

**SUBJECT TO SECTION 14.9.5, OWNER SHALL INDEMNIFY, DEFEND AND HOLD HARMLESS EPC CONTRACTOR, AND ITS DIRECTORS, EMPLOYEES, OFFICERS, MANAGERS, MEMBERS, SHAREHOLDERS, AGENTS, CONTRACTORS AND AFFILIATES, FROM AND AGAINST ANY AND ALL SUITS, ACTIONS, LIENS, CLAIMS, INJURIES, DAMAGES AND LOSSES,   INCLUDING WITHOUT LIMITATION, PERSONAL OR BODILY INJURY OR DEATH,   BROUGHT ON ACCOUNT OF OR RECEIVED OR SUSTAINED BY ANY THIRD PARTIES (INCLUDING MEMBERS OF THE PUBLIC) OR ASSESSED BY GOVERNMENTAL AUTHORITIES, AND ARISING OUT OF, RESULTING FROM OR RELATING TO:**

(a)    **ANY ACTUAL OR ALLEGED BREACH, VIOLATION OR NON-PERFORMANCE BY OWNER OF ANY COVENANT, OBLIGATION OR AGREEMENT OF OWNER CONTAINED IN OR REQUIRED TO BE PERFORMED PURSUANT TO THIS AGREEMENT OR ANY GOVERNING DOCUMENTS;**

(b)    **THE FAILURE OR ALLEGED FAILURE BY OWNER TO COMPLY WITH GOVERNING LAWS;**

(c)    **THE ACTUAL OR ALLEGED CULPABLE ACT, ERROR OR OMISSION, NEGLIGENCE, RECKLESS OR INTENTIONAL MISCONDUCT, BAD FAITH OR FRAUD BY OR ON BEHALF OF OWNER; AND**

(d)      **ANY MATERIAL INACCURACY IN OR BREACH OF ANY OF THE REPRESENTATIONS OR WARRANTIES OF OWNER CONTAINED IN THIS AGREEMENT WHEN SUCH REPRESENTATION HAS A MATERIAL ADVERSE EFFECT ON OWNER'S ABILITY TO PERFORM ITS FINANCIAL OBLIGATIONS UNDER THIS AGREEMENT.**

(e)      **THE ACTUAL OR THREATENED RELEASE, SPILL OR DISCHARGE OF HAZARDOUS SUBSTANCES BY THE OWNER.**

**EPC CONTRACTOR SHALL BE ENTITLED TO ALL REASONABLE COSTS, EXPENSES, EXPERT FEES AND ATTORNEYS' FEES INCURRED OR PAID BY EPC CONTRACTOR IN CONNECTION WITH ANY CLAIM FOR WHICH OWNER IS OBLIGATED TO PROVIDE INDEMNIFICATION PURSUANT TO THIS <u>SECTION 14.9.4</u>.**

14.9.5     **<u>Intentionally Omitted.</u>**

14.9.6     **<u>LIMITATIONS ON INDEMNITY OF OWNER</u>**

**NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS AGREEMENT, BUT SUBJECT TO SECTION 14.9.3, EPC CONTRACTOR SHALL BE LIABLE FOR AND OWNER SHALL HAVE NO OBLIGATION TO INDEMNIFY EPC CONTRACTOR IN RESPECT OF CLAIMS AND LOSSES TO THE EXTENT THE SAME ARISE AS A RESULT OF A BREACH OF THIS AGREEMENT BY OR ON BEHALF OF ANY EPC CONTRACTOR PARTY (AND WHICH IS NOT CAUSED BY THE GROSSLY NEGLIGENT OR WILLFUL ACT OR OMISSION OF OWNER) OR THE NEGLIGENCE OR WILLFUL ACT OR OMISSION OF ANY EPC CONTRACTOR PARTY.**

14.9.7     Notice of Claim; Tender of Claim to Insurers.

If either Party receives notice of a Claim or otherwise becomes aware of a Claim, it shall by writing as soon as practicable tender the Claim to the insurers under all potentially applicable insurance policies. If such Party seeks indemnification under this **<u>Section 14.9.7</u>** or under any other indemnity provision of this Agreement respecting such Claim, it also shall by writing as soon as practicable (and in no event more than ten (10) Business Days after becoming aware of such Claim): (i) inform the indemnifying Party of such Claim, (ii) specify whether the Claim arises as a result of a Claim by a Person against the indemnified Party, (iii) specify with reasonable particularity (to the extent that the information is available) the factual basis for the Claim and the amount of the Claim, if known, and (iv) send to the indemnifying Party a copy of all written materials it has received asserting such Claim and (A) notify the indemnifying Party that should no insurer accept defense of the Claim either (1) the defense of such Claim is being tendered to the indemnifying Party or (2) the indemnified Party has elected to conduct its own defense.

48

### 14.9.7.2 Acceptance of Claim

If the insurer under any applicable insurance policy accepts the tender of defense, EPC Contractor and Owner shall cooperate in the defense as required by the insurance policy. If no defense is provided by insurers under potentially applicable insurance policies, then **Section 14.9.7.3** shall apply.

### 14.9.7.3 Insurer Rejects Tender of Defense

(a)   If the defense is tendered to the indemnifying Party, it shall, within thirty (30) days of tender, deliver to the Party tendering the Claim a written notice stating that the indemnifying Party (i) accepts the tender and confirms that the Claim is subject to full indemnification hereunder without any "reservation of rights" to deny or disclaim full indemnification thereafter, (ii) accepts the tender but with a "reservation of rights" in whole or in part or (iii) rejects the tender if it determines it is not required to indemnify against the Claim under this **Section 14.9.7**. If notice is not delivered within such thirty (30) days, the tender of defense shall be deemed rejected.

(b)   If the indemnifying Party gives notice under <u>clause (i)</u> of Subsection (a), the indemnifying Party shall have the right to select legal counsel for the indemnified Party, subject to reasonable approval of the indemnified Party, and the indemnifying Party shall otherwise control the defense of such Claim, excluding settlement which shall require the indemnified Party's approval (not to be unreasonably withheld or delayed), and bear the fees and costs of defending and settling such Claim. During such defense: (i) the indemnifying Party shall fully and regularly inform the indemnified Party of the progress of the defense and of any settlement discussions; and (ii) the indemnified Party shall cooperate in said defense, provide to the indemnifying Party all materials and access to personnel it requests which or who are under the control of or reasonably available to the indemnified Party, as reasonably necessary for defense, preparation, settlement and trial, and maintain the confidentiality of all communications between it and the indemnifying Party concerning such defense.

(c)   The indemnified Party shall be entitled to select its own legal counsel and otherwise control the defense of such Claim if: (i) the defense is tendered to the indemnifying Party and it refuses the tender, or fails to accept such tender within thirty (30) days, or reserves any right to deny or disclaim such full indemnification thereafter; or (ii) the indemnified Party, at the time it gives notice of the Claim or at any time thereafter, reasonably determines that (A) a conflict exists between it and the indemnifying Party which prevents or potentially prevents the indemnifying Party from presenting a full and effective defense, (B) the indemnifying Party is otherwise not providing an effective defense in connection with the Claim or (C) the indemnifying Party lacks the financial capacity to satisfy potential liability or to provide an effective defense. An indemnified Party may assume its own defense by delivering to the indemnifying Party written notice of such election and the reasons therefor. A refusal of, or

49

failure to accept, a tender of defense, as well as any dispute over whether an indemnified Party which has assumed control of defense is entitled to do so under this **Section 14.9.7**, may be treated by either Party as a Claim, subject to resolution pursuant to the provisions of **Article 13**.

(d)     If the indemnified Party is entitled and elects to conduct its own defense pursuant hereto, all reasonable costs and expenses it incurs in investigating and defending a Claim for which it is entitled to indemnification hereunder shall be reimbursed by the indemnifying Party on a current basis to the extent not so reimbursed by insurance, except during the pendency of any good faith dispute concerning the indemnified Party's election to conduct its own defense under Subsection (c). In the event the indemnified Party is entitled to and elects to conduct its own defense, then it shall have the right to settle or compromise the Claim with the indemnifying Party's prior written consent, which shall not be unreasonably withheld or delayed, or with approval of the court or arbitrator, and with the full benefit of the indemnifying Party's indemnity.

14.9.7.4  Cooperation.

The indemnified Party and the indemnifying Party shall cooperate fully with each other with respect to Claims, and shall keep each other fully advised with respect thereto (including supplying copies of all relevant documentation promptly as it becomes available and notifying promptly of any and all relevant benefits, recoveries and deductions).

14.9.7.5  Survival of Indemnities

The provisions of **Section 14.9** and any other indemnity provision under this Agreement shall survive the expiration or earlier termination of this Agreement for any reason as to Claims arising with respect to events occurring or circumstances existing prior to any such expiration or termination.

14.9.7.6  Not a Reimbursable Cost

Notwithstanding any provision of this Agreement to the contrary, any cost or expense incurred by EPC Contractor pursuant to its indemnity obligations under this **Section 14.9** or under any other indemnity provision under this Agreement shall be for EPC Contractor's own account and shall not constitute a reimbursable cost or other reimbursable amount under this Agreement.

## ARTICLE 15 NONDISCRIMINATION/AFFIRMATIVE ACTION

*15.1  In General.*

In connection with the performance of the Work under this Agreement, EPC Contractor agrees not to discriminate against any employee or applicant for employment because of age, race, religion, color, handicap, sex, physical condition, sexual orientation, national origin, or any other basis prohibited by Law.

50

*15.2  Posting of Notices.*

EPC Contractor agrees to post in conspicuous places, available for employees and applicants for employment, a notice of its non-discrimination policy.

## ARTICLE 16   INTENTIONALLY OMITTED.

## ARTICLE 17    MISCELLANEOUS.

*17.1  Governing Law and Venue.*

This Agreement shall be construed in accordance with the laws of the State of Indiana without regard to its conflict of Law principles.

*17.2  Interpretation.*

17.2.1    Exhibits and Schedules are Part of Agreement. This Agreement includes the following attached Exhibits and Schedules:

| | |
|---|---|
| Exhibit A | Description of Site |
| Exhibit B | Authorizations and Approvals |
| Exhibit C | Due Diligence Documents |
| Exhibit D | Forms of Lien Waiver |
| Exhibit F | Form of Certificate of Substantial Completion |
| Exhibit G | Excluded Cost |
| Schedule I | Definitions |
| Schedule II | Insurance |
| Schedule III | Payment Schedule |
| Schedule IV | The Work |
| Schedule V | Key Personnel, Engineers, and Major Subcontractors |
| Schedule VI | Project Schedule |
| Schedule VII | Initial Payment |
| Schedule VIII | Form of Payment and Performance Bond |
| Schedule IX | Payment and Performance Bond Reduction Terms |

51

Schedule X          Milestone Schedule

17.2.2   <u>Entire Agreement</u>. This Agreement, together with the Exhibits and Schedules attached hereto, constitutes the entire agreement and complete understanding between EPC Contractor and Owner with respect to the subject matter described herein and supersedes all other understandings and agreements between the Parties with respect to such subject matter.

17.2.3   <u>Order of Interpretation</u>. In the event of any inconsistencies between the terms and conditions of the body of this Agreement and the Exhibits and Schedules, the provision of the body of this Agreement shall prevail over the terms of any Exhibit or Schedule, with the exception of the Payment and Performance Bond at **Schedule VIII**, which terms and conditions thereof shall take precedence over this Agreement in the event of any inconsistency.

17.2.4   <u>Captions</u>. Captions or headings to Articles, Sections or paragraphs of this Agreement are inserted for convenience of reference only and shall not affect the interpretation or construction hereof.

17.2.5   <u>Singular and Plural</u>. Words denoting the singular include the plural and vice versa and words denoting any gender include all genders.

17.2.6   <u>Including</u>. The word "including" shall mean "including without limitation".

17.2.7   <u>Statutory References</u>. Any reference to a statute shall mean the statute in force as at the date hereof, together with all regulations promulgated thereunder, as the same may be amended, re-enacted, restated, consolidated and/or replaced, from time to time, and any successor statute thereto, unless otherwise expressly provided.

17.2.8   <u>Day</u>. The words "day" shall mean a calendar day.

17.2.9   <u>Calculation of Days</u>. When calculating the period of time within which or following which any act is to be done or step taken, the date which is the reference day in calculating such period shall be excluded. If the last day of such period is not a Business Day, the period shall end on the next Business Day.

17.2.10  <u>Dollar Amounts</u>. All dollar amounts are expressed in U.S. Dollars.

17.2.11  <u>Word Meanings</u>. Save and except as otherwise expressly defined in this Agreement, words or abbreviations which have well known or trade meanings are used herein and in the Governing Documents in accordance with their recognized meanings.

**EXECUTION COPY**

17.2.12 <u>GAAP</u>. All calculations of dollar amounts, financial reporting and financial statements shall be made or prepared in accordance with GAAP.

17.2.13 <u>Sum/Aggregate</u>. The phrase "the aggregate of", "the total of", "the sum of" or a phrase of similar meaning means "the aggregate (or total or sum), without duplication of".

### 17.3  Drafting Ambiguities.

Each Party to this Agreement and its counsel has reviewed this Agreement. The rule of construction that any ambiguities are to be resolved against the drafting parties shall not be employed in the interpretation of this Agreement, or any amendment thereto.

### 17.4  Third Party Beneficiaries.

Except with respect to the provisions of this Agreement pertaining to assignment, this Agreement is not intended to and shall not create rights of any character whatsoever in favor of any person other than the Parties to this Agreement, and the obligation assumed herein are solely for the use and benefit of the Parties.

### 17.5  Good Faith and Fair Dealing.

Whenever this Agreement grants to any Party the right to take action, exercise discretion, or determine whether to approve a proposal of any other Party, the Party possessing the right shall act in good faith and shall deal fairly with the other Party. In the event of a Dispute, the Parties shall be obligated to make a reasonable and diligent effort to resolve the Dispute at the appropriate level before invoking the dispute resolution procedures in **Article 13**. Each of the Parties further expressly agrees that at all times it will exercise its good faith in the administration of this Agreement, and all actions of the Parties shall be designed to facilitate the successful completion of the Work by EPC Contractor and to promote the effective and efficient administration of this Agreement.

### 17.6  Severability.

Every part, term or provision of this Agreement is severable from others. Notwithstanding any possible future finding by a duly constituted authority that a particular part, term or provision is invalid, void or unenforceable, this Agreement has been made with the clear intention that the validity and enforceability of the remaining parts, terms and provisions shall not be affected thereby.

### 17.7  Intentionally Omitted.

### 17.8  Technical or Trade Usage.

When words that have a well-known technical or trade meaning are used to describe materials, equipment or services, such words will be interpreted in accordance with such meaning. Reference to such standard specifications, manuals, or codes of any technical society, organization or association, or to the code of any Governmental Authority, whether such

**EXECUTION COPY**

references be specific or by implication, shall mean the latest standard specification, manual or code.

*17.9  Amendments and Waivers.*

This Agreement may be amended only by a written instrument signed by a duly authorized representative of each Party. The failure of any Party to insist on one or more occasions upon strict performance of the obligations owed it by the other parties shall not waive or release such party's right to insist on strict performance of such obligation or any other obligation in the future.

*17.10       Notices.*

Except as otherwise expressly provided in this Agreement, all notices given to any of the Parties pursuant to or in connection with this Agreement shall be in writing, and shall be delivered by hand, by certified or registered mail, return receipt requested, or by Federal Express, Express Mail, or other nationally recognized overnight carrier, or via e-mail as provided below. Notices are effective when hand-delivered or via e-mail, on the date shown on the return receipt when sent by certified or registered mail, or one Business Day after deposit with Federal Express, Express Mail, or other nationally recognized overnight carrier.   Notice addresses are as follows:

If to EPC Contractor:

        Figg Bridge Builders, LLC
        Attention: Linda Figg, Manager, President/CEO
        424 North Calhoun Street
        Tallahassee, FL 32301
        Phone Number: (850) 224-7400

With copy to:   Figg Bridge Builders, LLC
        Attention: Nancy Duessel, General Counsel
        10000 North Central Expressway, Suite 1300
        Dallas, Texas  75231
        Phone Number: (214) 363-3444

If to Owner:   United Bridge Operating, LLC
        Attention: Edward O. Diffendal
        7800 E. Union Ave., Suite 525
        Denver, CO  80237
        Phone Number: (720) 893-7502
        E-mail: ediffendal@unitedbridgepartners.com

With a copy to:

        United Bridge Partners
        7800 E. Union Ave., Suite 525

Denver, CO  80237
Attention: G. Melody Pickett
Phone Number: (303) 324-5361
E-mail: mpickett@unitedbridgepartners.com

And

Vinson & Elkins, LLP
666 Fifth Avenue, 26th Floor
New York, NY  10103-0040
Attention: Carolyn Blitzer, Esq.
Phone Number: (212) 237-0000

If notice is required to be provided to Owner and the Independent Engineer, delivery of notice to Owner at the address shown above and ie@unitedbridgepartners.com shall constitute satisfaction of EPC Contractor's obligation hereunder and any failure to provide notice to the Independent Engineer shall not constitute a Default.

17.11    *Change of Address.*

Any Party may, by written notice to the other Parties given in accordance with the foregoing, change its address for notices.

17.12    *Successors; Assignment.*

This Agreement shall be binding upon the parties and their respective successors and permitted assigns. With the exception of any assignment to EPC Contractor's surety required in consideration for the Payment and Performance Bonds required under this Agreement, EPC Contractor shall not make any sale, assignment, mortgage, pledge or other transfer of all or any portion of its rights or obligations under this Agreement, whether voluntarily or involuntarily, by operation of law or otherwise, without the prior written consent of Owner, in its sole discretion. EPC Contractor shall also not cause or suffer a change in management control of EPC Contractor until after the expiration of all Warranties under this Agreement, without the prior written consent of Owner, in its sole discretion. Except in the case where Owner conveys or sells its interest in and to the Cline Avenue Bridge, Owner shall not make any sale, assignment, mortgage, pledge or other transfer of all or any portion of its rights or obligations under this Agreement, whether voluntarily or involuntarily, by operation of law or otherwise, without the prior written consent of EPC Contractor in its reasonable discretion; provided, however, that the foregoing limitation shall not apply to (i)  any assignment, sale or transfer in connection with the sale of Owner's rights in the Facility or (ii) any sale, transfer or assignment of any equitable interest in and to Owner. Any successor to EPC Contractor's or Owner's respective interests under this Agreement shall assume in writing all responsibilities of EPC Contractor or Owner, as the case may be, under this Agreement.

*17.13     Counterparts.*

This Agreement may be signed in counterparts, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute the same instrument.

*17.14     Further Assurances.*

Each Party agrees to execute and deliver any such instruments and to perform any such acts as may be necessary or reasonably requested by any other Party in order to give full effect to the terms of this Agreement.

*17.15     Interest.*

Past due payments hereunder that are not being contested in good faith shall bear interest from the due date until paid at the Late Payment Rate.

*17.16     No Partnership.*

The Parties hereby expressly disclaim any intention to create a joint venture or partnership relation between any of the Parties.

*17.17     Further Assurances; Cooperating with Financing Activities of Owner.*

Each Party shall promptly execute and deliver such further documents and assurances for, and take such further actions reasonably required by, the other Party, as may be reasonably necessary to carry out the intent and purpose of this Agreement. EPC Contractor acknowledges that Owner may obtain equity or debt financing to finance the development, construction and operation of the Facility and the Project, EPC Contractor agrees to reasonably cooperate with Owner, by executing and delivering to Owner documents and taking such other actions as are reasonably necessary to accommodate such financing of the Facility or the Project; provided that such documents and actions are consistent with the terms of this Agreement and do not increase the EPC Contractor's obligations hereunder and that the EPC Contractor receives its costs and expenses associated with such assistance.

**[SIGNATURES ON NEXT PAGE]**

**IN WITNESS WHEREOF,** the Parties have caused this Agreement to be executed and delivered by their duly authorized officers as of the date first set forth above.

**"OWNER"**

**CLINE AVENUE BRIDGE, LLC,**
a Delaware limited liability company

By: United Bridge Operating, LLC
Its:  Sole Member

By: _____
Name: Edward O. Attendal
Title: CEO

**"EPC CONTRACTOR"**

**FIGG BRIDGE BUILDERS, LLC,**
a Florida limited liability company

By: _____
Name: Linda Figg
Title:   Manager, President/CEO

Engineering, Procurement and Construction Agreement
Cline Avenue Bridge
Signature Page

**EXHIBIT A**

**DESCRIPTION OF THE SITE**

The attached description of the site corresponds to the property owned by Cline Avenue Bridge, LLC. The area that the Work is performed on will differ from this depending on construction activities and schedule. The Security Plan per EPC Agreement Section 4.9 will provide for measures to be implemented on certain portions of The Site where construction activities are underway.

## PROPERTIES

**CAB Property**

A Part of the Southeast quarter of Section 11 and a part of the Southwest quarter of Section 12, Township 5 North, Range 4 East, Jackson County, Indiana and intended to be a more accurate and corrective surveyed description of that land described in Instrument #200704028 in the records of the Jackson County Recorder's Office, described as follows:

Commencing at an Iron Pipe at the Southwest corner of said Section 12; thence North 00 degrees 29 minutes 28 seconds East with the West line of the Southwest quarter of said Section 12, 1285.71 feet to a 5/8" rebar set with orange cap inscribed "Daniel S. Blann, PLS #20300053" on the Northerly Right of Way of Highway 50 and the Point of Beginning; thence with said Northerly right of way line along a curve to the right having a radius of 1954.86 feet an arc length of 66.26 feet and bearing a chord of North 49 degrees 35 minutes 06 seconds East, 66.25 feet to a right of way marker; thence North 49 degrees 18 minutes 23 seconds East with said Right of Way line, 156.45 feet to a 5/8" rebar with "J. Isaacs" cap: thence North 33 degrees 18 minutes 03 seconds West, 318.87 feet to a 5/8" rebar with "J. Isaacs" cap; thence South 73 degrees 28 minutes 25 seconds West, 158.66 feet to a found iron pin. in the Brownstown Honeytown Rood; thence South 13 degrees 00 minutes 39 seconds West along said rood, 185.22 feet to a mag nail set with washer with said inscription; thence South 04 degrees 18 minutes 21 seconds West along said rood, 62.32 feet to a mag nail set with said washer; thence South 35 degrees 52 minutes 16 seconds East (passing through a 5/8" rebar set at 25.00 feet), 231.25 feet to a 5/8" Rebar set with said cap on the Northerly Right of Way of Highway 50; thence with said Right of Way line along a curve to the right having a radius of 1954.86 feet an arc length of 93.89 feet and bearing chord of North 47 degrees 14 minutes 17 seconds East, 93.88 feet to the Point of Beginning, containing 2.43 Acres, more or less, and subject to all rights of way, and easements of record.

## PARCEL SUMMARY COMPRISING TIF AREA

### Parcel 2 (see Parcel 17)
Parcel 2 is a duplicate of Parcel 17 and was acquired as Parcel 3 under Proj MM-850(22)

### Parcel 3
Right-of-way conveyed to the State of Indiana by Fothas Buildings Corporation, via Warranty Deed (with no Reversionary Rights) dated June 9, 1978.

| | |
|---|---|
| Parcel 3: 0.587 ac | Sta 87+00 |

### Parcel 4
Right-of-way conveyed to the State of Indiana by Inland Steel Company, via Warranty Deed (with no Reversionary Rights) dated July 15, 1980.

| | |
|---|---|
| Parcel 4: 0.063 ac | Sta 100+50 |
| Parcel 4A: 2.173 ac | Sta 120+00 |
| Parcel 4B: 16.906 ac | Sta 150+00 |

### Parcel 5
Right-of-way conveyed to the State of Indiana by Amsted Industries Incorporated, via Warranty Deed (with no Reversionary Rights) dated August 1, 1978.

| | |
|---|---|
| Parcel 6: 4.978 ac | Sta 130+00 |

### Parcel 6
Right-of-way conveyed to the State of Indiana by Youngstown Sheet and Tube Company, via Warranty Deed (with no Reversionary Rights) dated May 28, 1980.

| | |
|---|---|
| Parcel 6: 3.959 ac | Sta 160+00 |

### Parcel 7
Right-of-way conveyed to the State of Indiana by Inland Steel Company, by Warranty Deed (with no Reversionary Rights) dated July 3, 1984.

| | |
|---|---|
| Parcel 7: 0.114 ac | Sta 42+00 (Line S-1-E/Riley Road) |
| Parcel 7A: 0.020 ac | Sta 40+00 (Line S-1-E/Riley Road) |
| Parcel 7B: 3.843 ac | Sta 175+00 |

### Parcel 14
Easement for Road conveyed to the State of Indiana by the Department of the Army (Indiana Harbor Canal) via Easement for Road or Street dated March 10, 1978

| | |
|---|---|
| Parcel 14: 1.214 ac | Sta 139+50 |

### Parcel 15
Right-of-way conveyed to the State of Indiana by Amoco Oil Company, by Warranty Deed (with no Reversionary Rights) dated April 20, 1981.

| | |
|---|---|
| Parcel 15B: 0.578 ac | Sta 174+00 |

**Parcel 16**

Right-of-way conveyed to the State of Indiana by Indiana Harbor Belt Railroad, via Agreed Finding and Judgment filed November 5, 1982.

| | |
|---|---|
| Parcel 16: 1.532 ac | Sta 159+00 |
| Parcel 16 Excess land: 0.637 ac | Sta 56+00 (Line S-1-E/Riley Road) |
| Parcel 16A: 1.350 ac | Sta 166+00 |
| Parcel 16B: 1.156 ac | Sta 165+00 |
| Parcel 16C: 0.124 ac | Sta 42+00 (Line S-1-E/Riley Road) |
| Parcel 16D: 0.352 ac | Sta 171+00 |
| Parcel 16E: 0.056 ac | Sta 169+00 |
| Parcel 16F: 0.074 ac | Sta 170+00 |

**Parcel 17**

Right-of-way conveyed to the State of Indiana by Consolidated Rail Corporation, via Agreed Finding and Judgment filed January 4, 1982 (Cause C82-5345)

| | |
|---|---|
| Parcel 17: 1.894 ac | Sta 160+00 |
| Parcel 17 Excess Land: 0.247 ac | Sta 56+00 (Line S-1-E/Riley Road) |
| Parcel 17A: 0.057 ac | Sta 63+00 (Line S-1-E/Riley Road) |
| Parcel 17B: 0.546 ac | Sta 165+00 |
| Parcel 17C: 0.248 ac | Sta 172+00 |
| Parcel 17D: 0.073 ac | Sta 60+00 (Line S-1-E/Riley Road) |
| Parcel 17E: 0.012 ac | Sta 171+00 |

**Parcel 19**

Right-of-way conveyed to the State of Indiana by Penn Central Corporation, via Agreed Finding and Judgment filed January 22, 1983 (Cause CP-82-366)

| | |
|---|---|
| Parcel 19: 2.050 ac | Sta 95+00 |
| Parcel 19A: 0.038 ac | Sta 100+00 |
| Parcel 19B: 0.866 ac | Sta 107+00 |
| Parcel 19B Excess Land: 1.017 ac | Sta 118+00 |

2 easements described for as Railroad R/W purpose

The Parties acknowledge that Parcel 7B contains real property that is not necessary to construct the New Bridge and should be retained by INDOT as public right of way. The Parties agree to use good faith efforts to mutually determine which portion of Parcel 7B will be retained by INDOT as public right of way on or before the Closing Date.



# RIGHT-OF-WAY EXHIBIT

AMERICAN
**STRUCTUREPOINT**
INC.

7260 SHADELAND STATION
INDIANAPOLIS, IN 46256-3957
TEL 317.547.5580   FAX 317.543.0270
www.structurepoint.com

DATE: 06.04.2012

DRAWN BY: NDH

JOB NO.   2011.01681

SHEET NO.
1
of
1

DESC. FILE: .

**Steel Structure as an Improvement to the INDOT Property**

A portion of the INDOT Property consisting of the Steel Structure to which INDOT has assigned the number 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.

**EXHIBIT B**

**AUTHORIZATIONS AND APPROVALS**

The Authorizations and Approvals listed below constitute all of the authorizations and approvals provided or obtained in advance of this Agreement, unless otherwise indicated (in which case, EPC Contractor shall secure them in a manner consistent with the Project Schedule).  Any other authorization and approvals to be granted during the construction process are the sole responsibility of the EPC Contractor.

1.  City of East Chicago, Indiana, Development Agreement, May 15, 2012;

2.  Indiana Department of Transportation, Letter of Intent, Proposed Exchange of Property for New Cline Avenue Bridge, May 15, 2012;

3.  Indiana Department of Transportation, Amended and Restated Exchange Agreement, December 31, 2012;

4.  United States Department of Homeland Security, United States Coast Guard (Lead Federal Agency) Bridge Permit, January 27, 2015;

5.  Section 106 Coordination (State Historic Preservation Officer), September 23, 2014;

6.  United States Army Corp of Engineers, December 11, 2014;

7.  Indiana Department of Environmental Management Section 401 Water Quality Certification, October 9, 2014 (renewal in process);

8.  Indiana Department of Natural Resources Construction in a Floodway, February 21, 2017;

9.  Coastal Zone Management Federal Consistency Determination, October 17, 2014;

10.  Indiana Department of Transportation Right of Way Permit, Submitted February 28, 2017;

11.  Indiana Department of Homeland Security, Division of Fire & Building Safety, Plan Review Division, Construction Design Releases, January 7, May 25, August 10, and December 22, 2016 (for Facility Office Building);

12.  Indiana Department of Environmental Management, Notice of Sufficiency, June 24, 2016 (Facility Office Building construction);

13.  City of East Chicago Building Permits for Facility Office Building, Building (July 21, 2016), Electrical (February 9, 2017), Plumbing (April 10, 2017) and HVAC (April 17, 2017);

14.  Various routine approvals and authorizations that will be obtained during the course of construction (to be applied for)

**EXHIBIT C**

**LIST OF DUE DILIGENCE DOCUMENTS**


Certain aspects of the Cline Avenue Bridge project have evolved during project development. The description of The Work in Schedule IV provides the scope intended under this EPC Agreement. In the event of any conflict between the documents listed below and Schedule IV, Schedule IV will govern.


1.   City of East Chicago, Indiana, Development Agreement, May 15, 2012;

2.   Indiana Department of Transportation, Letter of Intent, Proposed Exchange of Property for New Cline Avenue Bridge, May 15, 2012;

3.   Indiana Department of Transportation, Amended and Restated Exchange Agreement, December 31, 2012;

4.   Purchase Agreement between Skip Spenst, Sandra Spenst, John Zaiger and Virginia Zaiger and Cline Avenue Bridge, LLC, dated February 28, 2013;

5.   City of East Chicago, Indiana, Redevelopment Commission Resolution No. 2014-RED-1476, May 7, 2014;

6.   Environmental Report identified on Exhibit E;

7.   Attached Bridge Renderings (Note: Ramp A is Excluded from The Work);

8.   Cline Avenue Bridge Financial Model, prepared by United Bridge Partners, August 22, 2014;

9.   Cline Avenue Traffic and Revenue Study Presentation, prepared by Steer Davies Gleave, August 4, 2014;

10.  Cline Avenue Bridge Traffic and Revenue Study – Draft Report, prepared by Steer Davies Gleave, August 2014;

11.  Preliminary Bridge Plans prepared by Figg Bridge Engineers, Inc., September 26, 2016 (Note: Ramp A is Excluded from The Work);

12.  General Assembly of the State of Indiana, House Enrolled Act No. 1397, effective July 1, 2015;

13.  Draft Geotechnical Exploration Report, Cline Avenue Bridge, prepared by Professional Service Industries, Inc., March 14, 2017.





**EXHIBIT D**

**FORMS OF LIEN WAIVER**

Two forms of Lien Waiver are included in this Exhibit on the following pages:

1. Partial Release of Lien (to be used for monthly invoicing or other interim invoices)
2. Final Release of Lien (to be used for final payment at Final Completion)

## **PARTIAL RELEASE OF LIEN**

(This release is null and void if Cline Avenue Bridge, LLC does not pay the funds referenced below.)

  The undersigned ("Contractor"), in consideration of **$_____**, does hereby, upon receipt of such amount, release and waive any and all liens, claim of liens, bond rights, suits, accounts, debts, demands, claims, torts, charges, and causes of actions against Cline Avenue Bridge, LLC ("Owner"), any sureties of Owner, and their respective officers, directors, employees, agents, servants, attorneys, parent, and subsidiary companies, the Project and all real and personal property associated with the Project arising out of labor, services, work, materials or equipment performed, furnished or utilized on the Cline Avenue Bridge ("Project") by, for or on behalf of the undersigned or otherwise in connection with or arising out of the Project through Contractor's Requisition #_____, except as follows: (invoice #'s, amounts, etc.) **(_____)**

  The undersigned hereby warrants and represents that all labor, services, work, materials and equipment performed, furnished or utilized in connection with the Project through all prior Contractor's Requisitions have been paid or upon receipt of the amount set forth above will pay in full including all applicable duties and taxes, including sales, use and payroll taxes, if any, applicable to the labor, services, work, materials, equipment performed, furnished or utilized by or for undersigned, except as follows: (subcontractor/materialmen/supplier invoice #'s, amounts, etc.)

**(_____)**

_____

  The undersigned further represents and warrants that Contractor has good title to all materials and equipment furnished or utilized in connection with the Project through the above referenced Contractor's Requisition #_____, and that there are no liens, encumbrances or security interest against such materials or equipment.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this ____day of _____, 201__.

        Contractor:  Figg Bridge Builders, LLC

        By:_____

         Linda Figg
         Title: Manager

State of _____
City/County of _____
  Before me this day came _____ who is either known by me or produced _____ as identification and acknowledged that he/she executed this release and acknowledged he/she fully understood its contents and freely executed the same for the sole consideration therein expressed.
  Subscribed and sworn to before me this _____ day of _____, 20___.

        _____
        NOTARY PUBLIC

My Commission Expires _____

**FINAL RELEASE OF LIEN**

(This release is null and void if Cline Avenue Bridge, LLC does not pay the funds referenced below.)

The undersigned ("Contractor"), in consideration of **$**_____, does hereby, upon receipt of such amount, release and waive any and all liens, claim of liens, bond rights, suits, accounts, debts, demands, claims, torts, charges, and causes of actions against Cline Avenue Bridge, LLC ("Owner"), any sureties of Owner, and their respective officers, directors, employees, agents, servants, attorneys, parent, and subsidiary companies, the Project and all real and personal property associated with the Project arising out of labor, services, work, materials or equipment performed, furnished or utilized on the Cline Avenue Bridge ("Project") by, for or on behalf of the undersigned or otherwise in connection with or arising out of the Project through Contractor's Final Requisition **#**_____, except as follows: (invoice #'s, amounts, etc.) **(**_____**)**

The undersigned hereby warrants and represents that all labor, services, work, materials and equipment performed, furnished or utilized in connection with the Project through all prior Contractor's Requisitions have been paid or upon receipt of the amount set forth above will pay in full including all applicable duties and taxes, including sales, use and payroll taxes, if any, applicable to the labor, services, work, materials, equipment performed, furnished or utilized by or for undersigned, except as follows: (subcontractor/materialmen/supplier invoice #'s, amounts, etc.)

**(**_____**)**

_____

The undersigned further represents and warrants that Contractor has good title to all materials and equipment furnished or utilized in connection with the Project through the above referenced Contractor's Final Requisition #_____, and that there are no liens, encumbrances or security interest against such materials or equipment.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this ____ day of _____, 20___.

Contractor:    Figg Bridge Builders, LLC

By:_____
Linda Figg
Title: Manager

State of _____
City/County of _____
Before me this day came _____ who is either known by me or produced _____ as identification and acknowledged that he/she executed this release and acknowledged he/she fully understood its contents and freely executed the same for the sole consideration therein expressed.
Subscribed and sworn to before me this _____ day of _____, 20___.

_____
NOTARY PUBLIC
My Commission Expires _____

Exhibit G - 75

**Exhibit E – Environmental Report**

This Exhibit includes the key portions of the Categorical Exclusion Document (490 pages) dated January 19, 2011, which was produced by the Office of Environmental Services of the Indiana Department of Transportation. This document was created to evaluate the environmental effects related to demolition of the previous Cline Avenue Bridge carrying SR 912 and subsequent rerouting of traffic over Riley Road and Dickey Road. The excerpts include discussion of the potential for hazardous materials near the project site, the environmental commitments for the project, wetland inventory and the Red Flag and Environmental Site Assessment performed. The full Categorical Exclusion Document is included by reference in this Exhibit E.

The Safety Plan referenced in EPC Agreement Section 4.8 will incorporate recommendations included in the Phase II Hazardous Materials Environmental Site Assessment report as applicable to the Work as described in Schedule IV.

# Categorical Exclusion Document



# Designation Number 0501116 et. al.

## SR 912 Re-Connectivity Project

## Lake County, Indiana

**INDOT-Central Office**

**Office of Environmental Services**

**January 19, 2011**



**Relocation of People, Businesses or Farms:**

| | Yes | No |
|---|---|---|
| Will the proposed action result in the relocation people, businesses or farms? | | X |
| Is a business needs survey required? | | X |

Number of relocations:   Residences: ___0___   Businesses: ___0___   Farms: ___0___   Other: _____

*If a business information survey or Conceptual Stage Report is required, discuss the results in the Remarks section.*

Remarks:

> No relocations of people, businesses, or farms will take place as a result of this project.

---

## SECTION H – HAZARDOUS MATERIALS & REGULATED SUBSTANCES

| | Documentation | |
|---|---|---|
| | Yes | No |
| Red Flag Investigation | X | |
| Hazardous Materials Site Assessment Form | | X |
| Phase I Initial Site Assessment (ISA) | X | |
| Phase II Preliminary Site Investigation(PSI) | X | |
| Design/Specifications for Remediation required? | | X |

| | No | Yes/ Date |
|---|---|---|
| **OES Review of Investigations** | | Yes / January 4, 2011 |

Include a summary of findings for each investigation.

Remarks:

> A red flag survey was completed on September 7, 2008 by Loni Hrynk – INDOT, Office of Environmental Services. At the time, the project was a bridge rehabilitation project. Since that time the project has been redesigned and a larger footprint has emerged.  Upon consultation with Ken McMullen, INDOT, OES, Hazardous Materials Section on June 28, 2010, a new red flag was not warranted.  However due to several potentially hazardous sites located in the project vicinity, a Phase 1 was recommended by INDOT-OES, Hazardous Materials Section.
>
> The Phase 1: Environmental Site Assessment Report was completed July 21, 2010 by Ken Gill and Ken McMullen, INDOT-OES, Hazardous Materials Section.  The phase 1 was conducted to provide an assessment of the environmental condition of the project area.  The assessment included a site reconnaissance and desktop research.  INDOT-OES, Hazardous Materials section stated "In our professional opinion it is recommended that a Phase II Environmental Assessment be performed on the subject property to evaluate the subsurface conditions.  This investigation should include the collection and analysis of soil and groundwater samples.  Investigation is to be prepared by contractor prior to excavation."
>
> A Phase II, Hazardous Materials Environmental Site Assessment was conducted in the fall of 2010 by ATC Associates Inc. (ATC).  A report was prepared by ATC and sent to INDOT- OES, Hazardous Materials Section on January 4, 2011.  The report conclusions

and recommendations are as follows:

Adsorbed Contaminants of Concern (COC) were detected at concentrations above the IDEM Risk Integrated System of Closure (RISC) Residual Default Closure Levels (RDCLs) and/or Industrial Default Closure Levels (IDCLs) from the soil samples collected from SB-6 and SB-8 which were advanced at Site A, Arcelor Mittal. However, the concentrations were reported below the IDEM Construction Worker Exposure values. Dissolved COCs were detected at concentrations above the IDEM RISC RDCLs and/or IDCLs in the groundwater sample collected from soil boring SB-1, SB-3, SB-4, SB-6, SB-7, SB-11, SB-15, SB-16, SB-19 and SB-20. It should be noted that groundwater was encountered at depths ranging from 3 to 7 ft-bgs. Based on the analytical results, COC concentrations above the IDEM RISC RDCLs were present in the subsurface and a release appears to have occurred at Site A. ATC recommends that the INDOT report the findings to IDEM. However, for construction worker safety purposes, the concentrations did not exceed the IDEM established Construction Worker Exposure Levels.  The exposure pathways associated with construction activities are through direct skin contact, ingestion, and inhalation of soil vapors or particles. Based on the results of this investigation, ATC recommends that a Site Specific Health and Safety Plan be written and implemented prior to construction activities. Additionally, standard Personal Protective Equipment (PPE) suitable for construction activities be donned for the completion of the improvement project. Direct contact with soil should be kept to a minimum with proper PPE being utilized if soil contact cannot be avoided as the soil does contain detectable concentrations of COCs. If excessive dust is observed, control measures should be implemented with air monitoring for COCs which may warrant the use of a respirator or dust mask.  Based on the depth of groundwater encountered during this investigation (3 to 7ft-bgs), groundwater is likely to be encountered during the intersection improvement activities. If groundwater is encountered direct contact should be kept to a minimum, be handled as contaminated, and provisions for proper disposal should be arranged.  No mitigation site is anticipated to be needed for this project.

Additional hazardous material information:  The U.S. Army Corps of Engineers is in the process of dredging contaminated sediments from the Indiana Harbor Canal to allow its continued use as a navigable waterway.  Some of these sediments are contaminated by polycyclic aromatic hydrocarbons (PAHs), polychlorinated biphenyls (PCBs), and heavy metals.  The main source of the sediment contamination is due to combined sewer overflows, industrial discharge, and urban runoff.  The sediments will be dredged into a confined disposal facility.  The U.S. Army Corps of Engineers will need to be contacted if any work is to take place in the Indiana Harbor Canal and all appropriate permits will need to be secured before construction activities occur.

Further investigation for hazardous materials is not required at this time.

| SECTION I – PERMITS CHECKLIST |
|---|

| | Required | Not Required |
|---|---|---|
| **Army Corps of Engineers (404/Section10 Permit)** | | |
| Individual Permit (IP) | | X |
| Nationwide Permit (NWP) | X | |
| Regional General Permit (RGP) | | X |
| Pre-Construction Notification (PCN) | X | |
| Other: Section 10 | X | |
| Wetland Mitigation required | | X |
| **IDEM** | | |
| Section 401 WQC | X | |
| Isolated Wetlands determination | | X |
| Rule 5 | X | |
| Other | | X |
| Wetland Mitigation required | | X |
| Stream Mitigation  required | | X |
| **IDNR** | | |
| Construction in a Floodway | X | |
| Navigable Waterway Permit | X | |
| Lake Preservation Permit | | X |
| Other | | X |
| Mitigation Required | | X |
| **US Coast Guard Section 9 Bridge Permit** | | X |
| **Others  (Please discuss in the Remarks section below)** | | X |

Remarks:

Permits may be required for this project.  It will be the responsibility of the designer to submit plans to OES to process permits.  If more than 1 acre of ground disturbance occurs an IDEM Rule 5 permit will be needed.  If the project will construct, excavate, or fill in or on the floodway of the Indiana Harbor Canal, formal approval of IDNR pursuant to the Flood Control Act (IC 14-28-1).  Detailed plans would need to be sent to the IDNR, Division of Water, Technical Services Section for a determination if a permit will be required.  Please contact, INDOT-OES, Ecology and Permits Section for any questions related to permits.  The Army Corps of Engineers (ACOE) – Chicago District has jurisdiction over the Indiana Harbor Canal.  The demolition of the SR 912 (Cline Avenue) Bridge along with the modifications to the Dickey Road drawbridge may warrant ACOE, IDNR and IDEM permits if the waterway will be impacted by construction activities.  The U.S. Coast Guard will also need to be contacted to determine what permits may be required for impacts to the SR 912 (Cline Avenue) Bridge and the Dickey Road drawbridge.

**SECTION J- ENVIRONMENTAL COMMITMENTS**

*Information below must be included on Commitments Summary Form.* List all commitments, indicating which are firm and which are optional.

Remarks:

Appropriately designed measures for controlling erosion and sediment must be implemented to prevent sediment from entering the stream or leaving the construction site; maintain these measures until construction is complete and all disturber areas are stabilized. (IDNR) **for further consideration**

Do not deposit or allow demolition materials or debris to fall or otherwise enter the waterway. (IDNR) **firm**

All excavated material must be properly spread or completely removed from the project site such that erosion and off-site sedimentation of the material is prevented. (IDNR) **firm**

Do not construct any temporary runarounds or causeways. (IDNR) **for further consideration**

Use minimum average 6 inch graded riprap stone extended below the normal water level to provide habitat for aquatic organisms in the voids. (IDNR) **for further consideration**

Do not cut any trees suitable for Indiana bat roosting (greater than 3 inches dbh, living or dead, with loose hanging bark) from April 1 through September 30. (IDNR) **for further consideration**

Do not excavate in the low flow area except for the placement of piers, foundations, and riprap, or removal of the old structure. (IDNR) **firm**

Do not work in the waterway from April 1 through June 30 without the prior written approval of the Division of Fish and Wildlife. (IDNR) **firm**

Minimize and contain within the project limits inchannel disturbance and the clearing of trees and brush. (IDNR) **firm**

Revegetate all bare and disturbed areas with a mixture of grasses (excluding all varieties of tall fescue), legumes, and native shrub and hardwood species as soon as possible upon completion. (IDNR) **for further consideration**

If permanent or temporary right-of-way amounts change, the appropriate INDOT Environmental Office (District or Central Office) will be contacted immediately. **firm**

Any work in a wetland area within INDOT's right-of-way or in borrow/waste areas is prohibited unless specifically allowed in the US Army Corps of Engineers in IDEM permit. **firm**

If any archaeological artifacts or human remains are uncovered during construction, federal law and regulations (16 USC 470, et seq.; 36 CFR 800.11, et al.) and State Law (IC 14-21-1) require that work must stop immediately and that the discovery must be reported to the Division of Historic Preservation and Archaeology in the Indiana Department of Natural Resources within 2 business days. **firm**

If any potentially hazardous materials are discovered during construction the IDEM Spill Line should be notified with details of the discovery within 24 hours.  INDOT Office of Environmental Services, Hazardous Materials Unit should then be contacted to organize the proper handling of the material to be in accordance with the IDEM guidelines.  **firm**

All solid wastes generated by the project, or removed from the project site, need to be taken to a properly permitted solid waste processing or disposal facility.  **firm**

If Polychlorinated Biphenyls (PCBs) are found at this site, please contact the Industrial Waste Section of OLQ at 317-308-3103.  **firm**

All facilities slated for renovation or demolition must be inspected by an Indiana-licensed asbestos inspector prior to renovation or demolition activities.  If regulated asbestos-containing material (RACM) that may become airborne is found, demolition, renovation, or asbestos removal activities must be performed in accordance with notification and emission control requirements.  **firm**

In all cases where demolition activity will occur (even if no asbestos is found), the owner or operator must notify IDEM 10 working days prior to demolition.  **firm**

For projects involving construction activity (which includes clearing, grading, excavation, and other land disturbing activities) that result in the disturbance of one (1), or more , acres of total land area, contact the Office of Water Quality – Watershed Planning Branch (317-233-1864) regarding the need for a Rule 5 Storm Water Runoff Permit.  **firm**

The Office of Environmental Services – Ecology Unit will check to ensure that no Peregrine falcons are present at site(s) under the SR 912 (Cline Avenue) Bridge  **for further consideration**

All demolition work to the SR 912 bridge will not take place during the Peregrine falcon nesting season (March 1 through July 15), without permission from the Office of Environmental Services. **firm**

The Gary/Chicago Regional Airport is a public use airport that is located approximately 11,307 feet south east of the proposed project site.  If any permanent structures or equipment utilized for this project penetrate a 100:1 slope from the airport FAA form 7460 (Notice of proposed construction or alteration) must be filed.  For assistance contact Marcus Dial, INDOT Office of Aviation, 317-232-1494. **firm**

The project will need to avoid two potential wetlands directly under the SR 912 (Cline Avenue) bridge within the Indiana Harbor Canal during the demolition and removal of the bridge.  **firm**

Historical Commitment: Period lighting style of an antique clover leaf pole with a globe light will be used on the sides of Riley and Dickey Roads directly adjacent to Marktown. They will be spaced 60 feet apart.  Per INDOT safety standards, taller light poles with arm-extensions and down-lighting will be installed on those sides of Riley (south) and Dickey (east) roads not directly adjacent to Marktown. **firm**

# *Appendices*

**A.  Graphics**

| | |
|---|---|
| A1 | Location Map |
| A2 | Topographic Map |
| A3 | Aerial Map |
| A4 | Project Area Map |
| A5 | National Bridge Inventory Map |
| A6 | National Wetland Inventory Map |
| A7 | Wetlands within Indiana Harbor Canal |
| A8-A9 | Floodplain Maps |
| A10-A12 | Project Pictures |
| A13-A38 | Preliminary Design Plans |

**B.  General Project Information**

| | |
|---|---|
| B1-B2 | Northwest Indiana 2009-2013 Transportation Improvement Program |
| B3-B4 | INSTIP FY 2010-2013 |
| B5-B6 | INDOT-FHWA Correspondence - PM 2.5 Hot Spot Analysis |
| B7-B9 | EPA response to PM 2.5 Hot Spot Analysis |
| B10-B12 | Environmental Justice Analysis |
| B13-B14 | Utilities Contact List |

**C.  Early Coordination**

| | |
|---|---|
| C1-C4 | Early Coordination Letter |
| C5-C6 | List of Early Coordination Recipients |
| C7-C19 | Alternative List and Illustrations |
| C20-C21 | US Department of Agriculture, NRCS Response |
| C22 | IDEM – Wellhead Protection Determination |
| C23-C26 | US Fish & Wildlife Service Responses |
| C27 | Indiana Geological Survey Response |
| C28 | U.S. Coast Guard, Ninth District |
| C29 | Army Corps of Engineers-Detroit District Response |
| C30 | U.S. Coast Guard, Eighth District |
| C31-C33 | Lake County Commissioners – Frances DuPey Response |
| C34-C50 | Indiana Dept. of Natural Resources Response |
| C51-C55 | Indiana Dept. of Environmental Management Electronic Response |
| C56 | Office of Aviation Response |
| C57-C59 | USFWS, DNR and INDOT correspondence for Peregrine falcons |
| C60 | DNR- Division of Outdoor Recreation Response |

# *Appendices Continued….*

**D. Historical and Archaeological Studies**

| | |
|---|---|
| D1-D11 | FHWA "No Adverse Affect" Documentation |
| D12-D13 | FHWA Area of Potential Effect Eligibility Determinations |
| D14 | Section 106 Consulting Parties |
| D15-D18 | Project Location Maps and Areas of Potential Effect |
| D19-D42 | Photographs of Historical Properties & Project Area |
| D43-D44 | Early Coordination Letter – July 27, 2010 |
| D45-D47 | SHPO Response, August 24, 2010 |
| D48-D49 | Indiana Landmarks Response, August 26, 2010 |
| D50-D51 | Marktown Preservation Society Response Email, September 14, 2010 |
| D52-D53 | Consulting Parties Meeting Announcement and Agenda |
| D54-D59 | Consulting Parties Meeting Summary |
| D60-D69 | Marktown Preservation Society remarks – Paul Myers |
| D70-D101 | Slideshow Presentation presented by INDOT to Consulting Parties 10/7/2010 |
| D102-D103 | Paul Myers Handout presented at Consulting Parties Meeting |
| D104-D105 | SHPO Response, November 10, 2010 |
| D106-D130 | INDOT Response to Consulting Parties (Additional Attachments) |
| D131-D132 | SHPO Response, December 3, 2010 |
| D133 | Archaeological Short Report – Recommendation |
| D134-D135 | Historic Properties Short Report – Conclusions |
| D136-D139 | Final Design Street Lighting |

**E. Red Flag and Environmental Site Assessment**

| | |
|---|---|
| E1-E8 | Red Flag Survey |
| E9-E17 | Environmental Site Assessment- Phase 1 |
| E18-E20 | Environmental Site Assessment- Phase 2 |

**F. Public Involvement**

| | |
|---|---|
| F1 | INDOT Press Release Nov. 13, 2009 |
| F2-F3 | INDOT Press Release Dec. 28, 2009 |
| F4-F14 | Public Hearing held by NW Indiana Legislators Jan. 9, 2010 |
| F15-F26 | Public comments received concerning SR 912 closure |
| F27-F31 | INDOT Press Releases Feb. 8/9, 2010 |
| F32-F54 | Public Information Meeting Feb. 9, 2010 |
| F55-F60 | Public Information Sign-In Sheets for Feb. 9, 2010 |
| F61-F62 | Public comments received for Public Information meeting |
| F63-F94 | April 15, 2010 Presentation to media and legislators |
| F95-F97 | Notice of Survey Letter and Distribution list |
| F98-F104 | Public Information Meeting Notices |
| F105-F112 | Public Information Sign-In Sheets for Aug.10, 2010 |
| F113 | Written Comment: Sacred Heart Church |
| F114-F118 | Public Information Meeting Packet |

**G. Noise Analysis**

| | |
|---|---|
| G1-G44 | Noise Analysis Study |
| G45 | Noise Study Approval 01/21/2011 |

# Site Location
# SR 912, Lake County, Indiana



This map is intended to serve as an aid in graphic representation only. This information is not warranted for accuracy or other purposes.

**Sources: Non Orthophotography**
**Data** - Obtained from the State of Indiana Geographical Information Office Library
**Orthophotography** - Obtained from Indiana Map Framework Data (www.indianamap.org)
**Map Projection:** UTM Zone 16 N   **Map Datum:** NAD83

Scale 1:17,575

Miles
0.3   0.15   0   0.3

| Section Town and Range | Interstate |
| County Boundary | State Route |
| Local Road | US Route |

Exhibit G - 86

A-4



# Cline Ave. /912
# Lake County, Indiana
## 0501116, Wetlands



Cline Ave

Ur

Approximate location of wetland

Wetland No. 1

Lake County

912

W

Wetland No. 2

Approximate location of wetland

Ur

Cline Ave

N

Miles

0.04    0.02    0    0.04

Scale 1:1,796

**Sources: Non Orthophotography**
**Data** - Obtained from the State of Indiana Geographical
Information Office Library
**Orthophotography** - Obtained from Indiana Map Framework Data
(www.indianamap.org)
**Map Projection:** UTM Zone 16 N    **Map Datum:** NAD83

This map is intended to serve as an aid in graphic
representation only. This information is not warranted
for accuracy or other purposes.

| | NWI - Points | | Soil Types |
| | NWI- Lines | | Interstate |
| | NWI Wetlands | | State Route |
| | Section Town and Range | | US Route |
| | County Boundary | | Local Road |

Exhibit G - 88
A-7

## **Appendix E:  Red Flag and Environmental Site Assessment**

E1-E8           Red Flag Survey
E9-E17          Environmental Site Assessment- Phase 1
E18-E20         Environmental Site Assessment- Phase 2



# INDIANA DEPARTMENT OF TRANSPORTATION

**Driving Indiana's Economic Growth**

100 North Senate Avenue
Room N642
Indianapolis, Indiana 46204-2216  (317) 232-5348  FAX: (317) 233-4929

**Mitchell E. Daniels, Jr., Governor**
**Karl B. Browning, Commissioner**

September 23, 2008

To:     Loni Hrynk
        Environmental Services
        Central Office

From: Ken McMullen
        Supervisor
        Hazardous Materials Unit
        Office of Environmental Services

RE:     Red Flag Investigation
        Des # 0501114, 1115, 1116, 1117, 1119, 1120
        SR 912 Bridge Ramp Projects
        Lake County

There were waterways identified in the area of this project during this investigation, including impaired streams, wetlands and Wetland Points. Please contact the Waterways Permitting Unit for further instructions concerning these issues.

There were areas of hazardous materials found during this investigation, including Registered Underground Storage Tanks, Leaking Underground Storage Tanks, a listed Brownfield, Schools, Industrial Waste Site, Corrective Acton Sites, Voluntary Remediation Program, Religious Facilities, and Railroads. It is recommended that a phase I investigation be started for this project to minimize the possibility of encountering contamination in conjunction with this project. Additional information should be gathered in the field visit. Please contact the Hazardous Materials Unit if the field inspection reveals more information.

No Historical information was provided in the Red Flag Investigation therefore no comments can be made on the historical impact on this project at this time.

The potential to encounter an endangered vertebrate animal in close proximity to this project was discovered during this investigation. Please contact the Ecology Unit for details.

If you have any other questions regarding the investigation or location, please contact me at 317-232-5113 or kmcmullen@indot.in.gov.
Thank you.

# INDIANA DEPARTMENT OF TRANSPORTATION
Indianapolis, Indiana 46204
## INTER-DEPARTMENT COMMUNICATION

MEMORANDUM:

TO:      Ben Lawrence, PE, Administrator
Environmental Policy Section
Office of Environmental Services

Ken McMullen
Hazardous Materials Unit Supervisor
Environmental Policy Section
Office of Environmental Services

FROM:    Saundra Venerable GIS/Graphic Design Specialist
Environmental Policy Section
Office of Environmental Services

DATE:    September 19, 2008
SR 912 Bridge Ramp
Bridge Deck Reconstruction projects
Lake County Des# 0501114, 0501115, 0501116, 0501117, 0501119, 0501120

Attached are copies of the Indiana Geological Survey's (GIS) topographic and aerial photos identifying environmental areas of concern regarding the above project including the SPMS schedule.

The following Red Flags were identified:

- Railroads
- School
- Religious Facilities
- Underground Storage Tanks
- Industrial Waste Site
- Leaking Underground Storage Tanks
- Wetlands
- Wetland Points
- Brownfields
- Corrective Action Sites
- Voluntary Remediation Program
- Impaired Streams
- Vertebrate Animal

E-2

## BRIDGE SITE



## Venerable, Saundra

**From:** Hrynk, Loni
**Sent:** Friday, September 12, 2008 10:41 AM
**To:** Venerable, Saundra
**Cc:** Mcmullen, Kenneth B.
**Subject:** Red Flag Request: SR 912 Bridge, Lake Co, Des. #s 0501114, 0501115, 0501116, 0501117, 0501119, 0501120
**Attachments:** Bridge Site Map for SR-912 .pdf; Bridge Layout for SR-912 .pdf; SR 912 Bridge Pictures East to West.doc; Project Area.doc

Saundra,

I would like to request a Red Flag Investigation for the above referenced project.  It is a bridge rehabilitation project for the SR 912 bridge in East Chicago involving reconstruction of the SR 912 bridge over the Indiana Harbor Canal, railroads, and other intersecting streets.  The work will also include four ramp structures that connect into the mainline and steel approach spans.  No new permanent right-of-way will be required.  The project will begin approximately 0.3 mile west of the Michigan Ave. overpass and will end approximately 0.1 mile west of Riley Road.

The project is going to be done in phases.  The letting dates for the respective phases are as follows:

Des. No. 0501114 – 7/19/2012

Des. No. 0501115 – 5/18/2011

Des. No. 0501116 – 7/15/2009

Des. No. 0501117 – 7/14/2010

Des. No. 0501119 – 7/15/2009

Des. No. 0501120 – 4/17/2013

I have attached close-up aerial photographs of the entire project area running from the east end of the project (beginning) to the west (end) as well as a map showing the project area.  The Bridge Site Map shows the termini for the project.  Please let me know if you have any questions.

Thanks,

*Historical INfo ?*

*Loni Hrynk*

*Indiana Department of Transportation*

*Office of Environmental Services*

*100 N. Senate Ave. Rm N642*

*Indianapolis, IN 46204-2216*

Exhibit G - 93

E-4



SR 912 Projects Des#
0501114,
0501115,0501116,05011117,
05011119, 5051120

Legend

● Wetland Points

Roads (TeleAtlas- labeled)

⬚ Wetlands

Scale 1:23000

0    2000    4000 ft

Indiana Geological Survey

This map was prepared by the Indiana Geological Survey, using data believed to be accurate; however, a margin of error is inherent in all maps. This product is distributed "AS-IS" without warranties of any kind, either expressed or implied, including but not limited to warranties of suitability of a particular purpose or use. There is no attempt to indicate design or production of this map to define the limits or jurisdiction of any federal, state or local government. A detailed on-the-ground survey and historical analysis of a single site may differ from this map.

Projects Area

Map Output

Exhibit G - 94

E-5

http://129.79.145.7/servlet/com.esri.esrimap.Esrimap?ServiceName=statewideIndex&ClientVersion=3.1.&Form=True&Encode=False

SR 912 Projects Des#
0501114,
0501115,0501116,05011117,
05011119, 5051120

**Legend**

Streams - Impaired (IDEM)

Roads (TeleAtlas- labeled)

Scale 1:23000

Indiana Geological Survey

This map was prepared by the Indiana Geological Survey, using data believed to be accurate; however, a margin of error is inherent in all maps. This product is distributed "AS-IS" without warranties of any kind, either expressed or implied, including but not limited to warranties of suitability of a particular purpose or use. There is no attempt in either design or production of this map to define the limits or jurisdiction of any federal, state or local government. A detailed on-the-ground survey and historical analysis of a single site may differ from this map.

Projects Area

Exhibit G - 95

Map Output

Page 1 of 1

Map Output



Exhibit G - 96

Map Output



### SR 912 Project
### Des#0501114,0501115,0501116,0501117,050

### Legend

Religious Facilities

Schools (HAZUS)

Railroads (1:100,000)

Roads (TeleAtlas- labeled)

Scale 1:23000

Indiana Geological Survey

This map was prepared by the Indiana Geological Survey, using data believed to be accurate; however, a degree of error is inherent in all maps. This product is distributed "AS-IS" without warranties of any kind, either expressed or implied, including but not limited to warranties of suitability of a particular purpose or use. There is no responsibility or liability assumed on the part of this map to define the limits or jurisdiction of any federal, state or local government. A detailed historical analysis of a single site may differ from this map.

Project Area

4000 ft

2000

0

# PHASE I

# ENVIRONMENTAL SITE ASSESSMENT

Re-Routing of SR 912(Dickey Rd. & Riley Rd),
East Chicago, Lake County, IN

**Prepared for**

Laporte District

**Prepared by**

**Hazardous Materials Unit**
**Office of Environmental Services**
**Indiana Department of Transportation**

21July10
0501116



21July10
Ref. No. 0501116
Laporte District

**Attention:**   INDOT Staff

**Re:**   **Phase I Environmental Site Assessment Report**
     Re-Routing of SR 912(Dickey Rd. & Riley Rd),

INDOT's Hazardous Materials Unit is pleased to submit our report describing the findings of the Phase I Environmental Site Assessment of Re-Routing of SR 912(Dickey Rd. & Riley Rd.This assessment was prepared in general accordance with the American Society of Testing and Materials (ASTM) Standard Practices for Environmental Site Assessments: Phase I ESA Process (ASTM Designation: E1527-2000).

The purpose of the Phase I ESA was to gather sufficient information to render an independent professional opinion about the environmental condition of the property. This assessment included a site reconnaissance as well as research.

**In our professional opinion it is recommended that a Phase II Environmental Site Assessment be performed on the subject property to evaluate the subsurface conditions. This investigation should include the collection and analysis of soil and groundwater samples.    Investigation is to be prepared by contractor prior to excavation.**

If you have any questions or require further clarification of the report findings, please contact the undersigned at your convenience. Thank you for the opportunity to be of service to Laporte District.

Yours very truly,

Kenneth B. McMullen, CHMM 14768
Hazardous Materials Unit Supervisor

Kenneth Gill, LPG
Project Geologist

# EXECUTIVE SUMMARY

Laporte District engaged INDOT's Hazardous Materials Unit to conduct a Phase I Environmental Site Assessment (ESA) of the project Re-Routing of SR 912(Dickey Rd. & Riley Rd), is subsequently referred to in this report as "the subject properties". This assessment was prepared in general accordance with the American Society of Testing and Materials (ASTM) Standard Practices for Environmental Site Assessments: Phase I ESA Process (ASTM Designation: E1527-2000).

The purpose of the Phase I ESA was to identify any potential sources of environmental risk or liability on the subject property. This assessment included a site reconnaissance as well as research.

The subject property consists of existing apparent right of way along Dickey Rd., Riley Rd., and a section of SR 912 (Cline Ave.) as well as some proposed Right of Way at the intersection of Riley and Dickey and Dickey and SR 912. Zoning of the subject property is industrial. The subject property is currently used for:

Highway Right of Way, Local Roadways, and Industrial facilities

No buildings or structures were present on the subject property. (Determination made without exact ROW takes) There is what appears to be a foundation in the proposed ROW.

Based on the information gathered and on observations made during this investigation, the Phase I Environmental Site Assessment has revealed the following on-site environmental conditions associated with the subject property:

***It was not possible to definitively determine either the presence or absence of environmental concerns under the roadway or in the apparent ROW. Due in large part to the significant number of environmental concerns and the high permeability and high rate of subsurface flow associated with the subsurface conditions of the surrounding area.***

Based on the information gathered and on observations made during this investigation, the Phase I Environmental Site Assessment has revealed the following off-site environmental conditions associated with the subject property:

| FID | Business Name | LOCATION | REC # |
|---|---|---|---|
| | Former Inland Steel | Intersection of Dickey Rd and railroad adjacent to SR 912 (location of proposed off ramp) | 1 |
| 45-28 | LTV Steel RWS 1 | 3001 Dickey Rd | 2 |
| 200401097 | ISG – Indiana Harbor, Inc. | 3001 Dickey Rd | 2 |
| IND005462( | ISG Indiana Harbor Inc | 3001 Dickey Rd | 2 |
| IND984972' | Heckett Multiserv PLT 11 A Harsco CO | 3001 Dickey Rd | 2 |
| 4474 | Harsco Corp. | 3001 Dickey Rd | 2 |
| 49 | BP Amoco Oil Company Whiting Refinery | Intersection of Dickey Rd and draw bridge | 3 |
| | Unregistered UST | Intersection of Dickey Rd and Riley | 4 |

Exhibit G - 100

A Phase I Environmental Site Assessment in conformance with the scope of work and ASTM Practice E 1527-2000 was performed on the subject property. This assessment revealed evidence of recognized environmental conditions associated with the subject property:

| FID | Business Name | LOCATION | REC # |
|-----|---------------|----------|-------|
| | | Intersection of Dickey Rd and railroad adjacent to SR 912 | |
| | Former Inland Steel | (location of proposed off ramp) | 1 |
| | Unregistered UST | INT of Dickey and Riley | 4 |

Based on the results of the Phase I Environmental Site Assessment of the subject property, the following further investigation is recommended at this time:

**In our professional opinion it is recommended that a Phase II Environmental Site Assessment be performed on the subject property to evaluate the subsurface conditions. This investigation should include the collection and analysis of soil and groundwater samples.   Emphasis should be placed on the two above indicated properties as well as all ROW from Industrial facilities.**

# Phase I Investigation - Water Resources Map
## SR 912 from Cline Ave E on Riley Rd S across canal to Cline Ave

## 0501116 , Restoration of connectivity of SR 912 to NW Indiana
## Lake County, Indiana



| Legend | | |
|---|---|---|
| Wetland Points | Impaired Rivers and Streams | Half Mile Buffer · Interstate |
| Drinking Water Wells | Indiana Natural and Scenic Rivers | Mile Buffer · State Route |
| Located Water Wells | Lake - Impaired | Project Area · US Route |
| Wetland Lines | Wetland Areas | · Local Road |

**Sources: Non Orthophotography**
**Data** - Obtained from the State of Indiana Geographical
Information Office Library
**Orthophotography** - Obtained from Indiana Map Framework Data
(www.indianamap.org)
**Map Projection:** UTM Zone 16 N   **Map Datum:** NAD83

Miles
0.5   0.25   0   0.5

Exhibit G-102

This map is intended to serve as an aid in graphic
representation only. This information is not warranted
for accuracy or other purposes.

E-13

# Phase I Investigation - Surficial and Bedrock Geology Map
## SR 912 from Cline Ave E on Riley Rd S across canal to Cline Ave, 0501116 , Restoration of connectivity of SR 912 to NW Indiana Lake County, Indiana

USDC N/IND case 2:20-cv-00459-PPS-JEM document 41-1 filed 11/02/20 page 172 of 243



| Surficial Geology | Half Mile Buffer | State Route |
| Bedrock Geology | Mile Buffer | US Route |
| Project Area | Interstate | Local Road |

Sources: Non Orthophotography
Data - Obtained from the State of Indiana Geographical Information Office Library
Orthophotography - Obtained from Indiana Map Framework Data (www.indianamap.org)
Map Projection: UTM Zone 16 N    Map Datum: NAD83

Miles
0.5    0.25    0    0.5

Exhibit G-103

This map is intended to serve as an aid in graphic representation only. This information is not warranted for accuracy or other purposes.

E-14

# Phase I Investigation - Physiography and Soil Associations Map
## SR 912 from Cline Ave E on Riley Rd S across canal to Cline Ave.
## 0501116 , Restoration of connectivity of SR 912 to NW Indiana
## Lake County, Indiana

USDC NIND case 2:20-cv-00435-JVB-JEM  document 41  filed 12/02/20  page 173 of 243



| NRCS Soil Associations | Half Mile Buffer | State Route |
| Physiographic Regions | Mile Buffer | US Route |
| Project Area | Interstate | Local Road |

Sources: Non Orthophotography
Data - Obtained from the State of Indiana Geographical
Information Office Library
Orthophotography - Obtained from Indiana Map Framework Data
(www.indianamap.org)
Map Projection: UTM Zone 16 N   Map Datum: NAD83

Miles
0.5  0.25  0  0.5

Exhibit G-104

This map is intended to serve as an aid in graphic representation only. This information is not warranted for accuracy or other purposes.

E-15

# Phase I Investigation - Mining and Mineral Exploration Map
## SR 912, from Cline Ave E on Riley Rd, S across canal to Cline Ave.
### 0501116 , Restoration of connectivity of SR 912 to NW Indiana
### Lake County, Indiana



| | | | |
|---|---|---|---|
| ☀ Gas Well | ⊤ Petroleum Field | ▭ Half Mile Buffer | ⋀ Interstate |
| ◎ Oil Well | ⌂ Mine - Underground | ▭ Mile Buffer | ⋀ State Route |
| ∿ Pipeline | ▭ Mine - Surface | ▭ Project Area | ⋀ US Route |
| | | | ⋀ Local Road |

**Sources:** Non Orthophotography
**Data** - Obtained from the State of Indiana Geographical
Information Office Library
**Orthophotography** - Obtained from Indiana Map Framework Data
(www.indianamap.org)
**Map Projection:** UTM Zone 16 N   **Map Datum:** NAD83

Miles

0.5   0.25   0   0.5

This map is intended to serve as an aid in graphic
representation only. This information is not warranted
for accuracy or other purposes.

Exhibit G 105

E-16

# Phase I Investigation - Hazardous Materials Concerns Map

## SR 912, from Cline Ave E on Riley Rd. S across canal to Cline Ave. 0501116 , Restoration of connectivity of SR 912 to NW Indiana Lake County, Indiana



| Symbol | | Symbol | | Symbol | | Symbol | |
|---|---|---|---|---|---|---|---|
| | Community Right To Know Sites | Ⓢ | Restricted Waste Site | ✴ | Brownfield | | Project Area |
| | Underground Storage Tank | | Open Dump Waste Site | ★ | Superfund | | Interstate |
| | Leaking Underground Storage Tank | | Corrective Action Sites | | Hazardous Spill | | State Route |
| | Voluntary Remediation Program | ▲ | State Cleanup Site | | Half Mile Buffer | | US Route |
| | | | Solid Waste Landfill | | Mile Buffer | | Local Road |

Sources: Non Orthophotography
Data - Obtained from the State of Indiana Geographical
Information Office Library
Orthophotography - Obtained from Indiana Map Framework Data
(www.indianamap.org)
Map Projection: UTM Zone 16 N    Map Datum: NAD83

Miles
0.5   0.25   0   0.5

Exhibit G-106

This map is intended to serve as an aid in graphic representation only. This information is not warranted for accuracy or other purposes.

E-17



**PHASE II – PRELIMINARY SITE INVESTIGATION
RE-ROUTING OF SR 912
INDOT DESIGNATION NO. 0501116**

SR 912 (DICKEY RD & RILEY RD)
EAST CHICAGO, LAKE COUNTY, INDIANA

ATC PROJECT NO. 86.30801.0184

JANUARY 4, 2011

PREPARED FOR:

INDIANA DEPARTMENT OF TRANSPORTATION
HAZARDOUS MATERIALS UNIT
100 NORTH SENATE AVENUE, ROOM N642
INDIANAPOLIS, INDIANA 46204-2216

ATTN: MR. KENNETH MCMULLEN

**PHASE II – PRELIMINARY SITE INVESTIGATION REPORT**
RE-ROUTING OF STATE ROAD 912
INDOT DESIGNATION NO. 0501116

STATE ROAD 912 (DICKEY RD & RILEY RD)
EAST CHICAGO, LAKE COUNTY, INDIANA
ATC PROJECT NO. 86.30801.0184

## EXECUTIVE SUMMARY

ATC Associates Inc. (ATC) is pleased to provide the Indiana Department of Transportation (INDOT) with this *Phase II – Preliminary Site Investigation Report* documenting the subsurface investigation conducted along the intersection right-of-way (ROW) along Dickey Road, Riley Road and near State Road 912 at Dickey Road in East Chicago, Indiana (site). A total of three "properties" were identified for the investigation. Soil borings were advanced on Site A – Arcelor Mittal near Dickey Road and SR 912 overpass, Site B – Dickey Road and Riley Road Intersection and Riley Road, Site C – SR 912/Riley Road Intersection. The investigation was performed per INDOT's request to assess the soil and groundwater conditions beneath the surface of the ROW of a planned re-routing of State Road 912. The scope of this project was based on a Request for Estimate from the INDOT dated August 26, 2010.

ATC advanced a total of 22 soil borings as part of subsurface investigation activities conducted at site A (SB-1 through SB-9), site B (SB-10 through SB-18), and site C (SB-19 through SB-22). Soil borings (SB-10 through SB-22) were advanced on October 21-22, 2010 and soil borings SB-1 through SB-9 were advanced on December 1-2, 2010 to assess the soil and groundwater conditions in the ROW of the planned re-routing of SR 912 roadway project. A soil sample was obtained from each boring and submitted for laboratory analysis. Additionally, representative groundwater samples were collected from each site and submitted for laboratory analysis. According to the analytical results, adsorbed and dissolved contaminants of concern (COC) were present in the subsurface of the ROW. The results and findings from the subsurface activities are summarized in the following sections of this report.

### 4.0 CONCLUSIONS AND RECOMMENDATIONS

Adsorbed COCs were detected at concentrations above the IDEM RISC RDCLs and/or IDCLs from the soil samples collected from SB-6 and SB-8 which were advanced at Site A, Arcelor Mittal. However, the concentrations were reported below the IDEM Construction Worker Exposure values.

Dissolved COCs were detected at concentrations above the IDEM RISC RDCLs and/or IDCLs in the groundwater sample collected from soil boring SB-1, SB-3, SB-4, SB-6, SB-7, SB-11, SB-15, SB-16, SB-19 and SB-20. It should be noted that groundwater was encountered at depths ranging from 3 to 7 ft-bgs.

Based on the analytical results, COC concentrations above the IDEM RISC RDCLs were present in the subsurface and a release appears to have occurred at Site A. ATC recommends that the INDOT report the findings to IDEM. However, for construction worker safety purposes, the concentrations did not exceed the IDEM established Construction Worker Exposure Levels.

The exposure pathways associated with construction activities are through direct skin contact, ingestion, and inhalation of soil vapors or particles. Based on the results of this investigation, ATC recommends that a Site Specific Health and Safety Plan be written implemented prior to the construction activities. Additionally, standard PPE suitable for construction activities be donned for the completion of the improvement project. Direct contact with soil should be kept to a minimum with proper PPE being utilized if soil contact can not be avoided as the soil does contain detectable concentrations of COCs. If excessive dust is observed, control measures should be implemented with air monitoring for COCs which may warrant the use of a respirator or dust mask.

Based on the depth of groundwater encountered during this investigation (3 to 7 ft-bgs), groundwater is likely to be encountered during the intersection improvement activities. If groundwater is encountered direct contact should be kept to a minimum, be handled as contaminated, and provisions for proper disposal should be arranged.

**EXHIBIT F**

**FORM OF CERTIFICATE OF SUBSTANTIAL COMPLETION**

Date: _____

1. Figg Bridge Builders, LLC ("Contractor") delivers this Substantial Completion Certificate of the Cline Avenue Bridge Project (the "Substantial Completion Certificate") to Cline Avenue Bridge, LLC ("Owner") pursuant to Section 11.2.2 of the Engineering, Procurement, and Construction Agreement for Cline Avenue Bridge, dated May ___, 2017, by and between Contractor and Owner (the "Contract").  Capitalized terms used herein that are not defined herein have the meaning set forth in the Contract.

2. Contractor certifies and represents as of the date set forth above:

   (i)      Contractor has performed all of the Work, other than the Punch List items listed on Exhibit A (attached hereto and incorporated herein) and other minor items of Work that would not affect the safe performance or operation of the Facility, required by the Governing Documents; and

   (ii)     The Facility is capable of Commercial Operation in accordance with the Governing Documents.

3. This Certificate of Substantial Completion will establish as of the date set forth above:

   (i)      Owner has represented that it has received all certificates of occupancy required from each applicable Governmental Authority;

   (ii)     The care, custody and control of the Facility passed to Owner and Owner shall bear the risk of loss with respect thereto, including without limitation all responsibilities for items such as security, maintenance, utilities, insurance, and damages to the Cline Avenue Project;

   (iii)    Warranties required by the Contract commenced; and

   (iv)     Owner shall be obligated to pay to Contractor any remaining amounts for all Work described in the Certificate of Substantial Completion, plus the Early Completion Bonus, if any, pursuant to Section 11.2.1, plus, the Retention Money pursuant to Section 10.1.7.1, less amounts as detailed in Section 10.1.7.2 of the Contract for the Punch List items.

4. The person signing below is duly authorized to submit this Certificate of Substantial Completion.

[SIGNATURE PAGE FOLLOWS]

FIGG BRIDGE BUILDERS, LLC


By: _____

Name: _____

Title: _____

Date: _____


Owner agrees that Substantial Completion of the Project has been achieved in accordance with the Contract.


CLINE AVENUE BRIDGE, LLC


By: _____

Name: _____

Title: _____

Date: _____

Exhibit A

Punch List

**EXHIBIT G**

**EXCLUDED COSTS**

This EPC Agreement specifically excludes the following work items, which will be added to the Project by a written supplement to this Agreement. A description and estimated budget is included below.

1. **Rehabilitation of the existing 2,397 foot long steel viaduct** on the east end of the project carrying Cline Avenue. This includes modifications to transition from the two lanes of the new bridge to six lanes with ramp at the existing east abutment, deck rehabilitation, resurfacing, concrete repair, and other upgrades. A preliminary estimate of the rehabilitation cost for the existing steel viaduct is $___ million.

2. **Approach roadway modifications on SR 912 for approximately 1,000 feet on the west end** of the project to transition from the two lanes of the new bridge with existing westbound on-ramp at the east abutment to six lanes typical section. This includes modifications to the barrier rails, pavement rehabilitation, drainage system updates and modifications to signing and striping. A preliminary estimate of these costs is $___ million.

3. **Approach roadway improvements on SR 912 on the east end** as needed to satisfy the "Repaving Obligation" of the Amended and Restated Exchange Agreement between INDOT and CAB dated December 31, 2012. This obligation is for $3.0 million in rehabilitation costs, and references plans provided by INDOT for Road Rehabilitation dated July 1, 2014.

4. **An Electronic Toll Collection (ETC) system**, including overhead gantries, gantry foundations, transponder sensors and related cameras (gantry, pavement or any other locations), related power supply, conduits and cabling, any toll equipment shelter other than the area provided in the facility office building, backup generator and fuel storage facility, facility signage (wayfinding, facility identification, rate schedule, variable message signs, etc.), and toll collection electronic equipment/software. This includes any enhancements to existing Ramp D (Riley Road to westbound Cline Avenue). A preliminary estimate of the cost of an ETC system is $___ million.

5. **Access ramps for Cline Avenue at Indianapolis Boulevard (US 20)**, including engineering, right-of-way, and any construction or modification of existing SR 912 west of Cline Avenue Bridge. Also excluded is construction of an access road for the BP Refinery underneath the Cline Avenue Bridge near the west abutment. A preliminary estimate of the cost of an exit ramp from westbound Cline Avenue to US 20 and an on-ramp from US 20 to Cline Avenue eastbound is $___ million

6. **Any work not included in the Scope of Work as given in Schedule IV** of this Agreement, including but not limited to items such as removal of existing remnants of Ramp A (previous ramp from westbound Cline Avenue to Riley Road), construction of a new Ramp A, variable message signs and supporting structures, investigation and mitigation of any unforeseen hazardous materials as defined in Section 9.5.2 (d) and (e) of the EPC Agreement, etc.

**Schedule I**

**Definitions**

"**Affiliate**" shall mean (i) any Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with a Party, and (ii) any Person that, directly or indirectly, is the beneficial owner of fifty percent (50%) or more of any class of equity securities of, or other Ownership interests in, a Party or of which the Party is directly or indirectly the owner of fifty percent (50%) or more of any class of equity securities or other Ownership interests.

"**Agreement**" shall have the meaning assigned to it in the first paragraph of this Agreement.

"**Authorization,**" "**Approval**" or "**Authorizations and Approvals**" shall mean any license, permit, approval, filing, consent, registration, notarization, waiver, exemption, variance, clearance, entitlement, allowance, franchise, special lease, or other requirement or authorization, whether from any Governmental Authority, corporate or otherwise, including Governmental Authorizations and the authorizations and approvals set forth in **Exhibit B**.

"**Business Day(s)**" shall mean any day other than a Saturday, Sunday or a day on which either the state or national banks in the State of Indiana are not open for the conduct of normal banking business.

"**Change Directive**" shall mean a written direction signed by Owner directing a change in the Work that complies with the requirements of **Section 9.3**.

"**Change Event**" shall have the meaning assigned to it in **Section 9.5.2**.

"**Change of Law**" shall mean the adoption, promulgation or repeal of any promulgated applicable Law, any reinterpretation of applicable Law, or any change in the application of any Applicable Law by any Government Authority that occurs after the Effective Date.

"**Change Order**" shall mean a written order signed by Owner and EPC Contractor identified as a "Change Order" and authorizing a change in the Work, the Project Schedule (including the Target Substantial Completion Date and the Delay Default Date, as applicable) or an adjustment in any portion of the Cost of the Work as described in **Article 9**.

"**Change Proposal**" shall have the meaning assigned to it in **Section 9.2.1**.

"**City**" shall mean the City of East Chicago, Indiana, a municipal corporation.

"**Claim**" shall mean any claim, demand, suit, proceeding, liability, damage, loss, action or cause of action, assessment, reassessment, proposed assessment or proposed reassessment, judgment, investigation, legal or administrative proceeding, and liability of any kind and all costs and expenses relating thereto arising out of this Agreement or the performance of the Work.

"**Commercial Operation**" shall mean the opening of the Cline Avenue Bridge to the public for vehicular traffic and includes the commencement of full tolling operations.

"**Construction Commencement Date**" shall have the meaning assigned to it in **Section 11.1**.

 "**Cost of the Work**" shall have the meaning assigned to it in **Section 8.1**.

"**Default**" shall mean a condition or event which, after notice or lapse of time or both, would constitute an EPC Contractor Event of Default or Owner Event of Default, as the case may be.

"**Defect**" shall mean any non-compliance of the Work or the Facility (or any portion thereof) with any of the Warranties set forth in **Section 12.1**, and "**Defective**" shall be construed accordingly.

 "**Delay Default Date**" shall mean the date falling 6 calendar months after the Target Substantial Completion Date, as may be amended in accordance with this Agreement.

"**Development Agreement**" shall mean the Development Agreement entered into between the City and Owner dated as of May 15, 2012 (as amended from time to time) pursuant to which Owner has acquired the Access and Support Rights (as defined in the Development Agreement) in order to facilitate the construction of the Facility.

 "**Dispute**" shall have the meaning assigned to it in **Section 13.2**.

"**Due Diligence Documents**" shall mean the documents identified in **Exhibit C**.

"**Effective Date**" shall mean the date on which this Agreement is signed by each of EPC Contractor and Owner and delivered to the other Party.

 "**Engineers**" shall have the meaning assigned to it in **Section 4.2.2**.

"**Engineers' Contracts**" shall have the meaning assigned to it in **Section 4.2.2**.

"**Environmental Laws**" mean: any Laws and Regulations applicable to the Facility, the Project or the Work regulating or imposing liability or standards of conduct that pertains to the environment, Hazardous Substances, contamination of any type whatsoever, or environmental health and safety matters, and any lawful requirements and standards that pertain to the environment, Hazardous Substances, contamination of any type whatsoever, or environmental health and safety matters, set forth in any permits, licenses, approvals, plans, rules, regulations or ordinances adopted, or other criteria and guidelines promulgated, pursuant to Laws and Regulations applicable to the Facility, the Project or the Work, as such have been or are amended, modified, or supplemented from time to time (including any present and future amendments thereto and reauthorizations thereof) including those relating to (a) the manufacture, processing, use, distribution, existence, treatment, storage, disposal, generation, and transportation of Hazardous Substances; (b) air, soil, surface and subsurface strata, stream sediments, surface water, and groundwater; (c) releases of Hazardous Substances; (d) protection of wildlife, threatened or endangered species, sensitive species, wetlands, water courses and water bodies, historical, archeological, and paleontological resources, and natural resources;

(e) the operation and closure of underground storage tanks; (f) and safety of employees and other persons; and (g) notification, documentation, and record keeping requirements relating to the foregoing. Without limiting the above, the term "Environmental Laws" shall also include the following:

(i)      The National Environmental Policy Act (42 U.S.C. §§ 4321 *et seq*.), as amended;

(ii)     The Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. §§ 9601 *et seq*.), as amended;

(iii)    The Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act (42 U.S.C. §§ 6901 *et seq*.);

(iv)     The Emergency Planning and Community Right to Know Act of 1986 (42 U.S.C. §§ 11001 *et seq*.), as amended;

(v)      The Clean Air Act (42 U.S.C. §§ 7401 *et seq*.), as amended;

(vi)     The Federal Water Pollution Control Act, as amended by the Clean Water Act (33 U.S.C. §§ 1251 *et seq*.);

(vii)    The Resource Conservation and Recovery Act (42 U.S.C. §§ 6901, *et seq*.), as amended;

(viii)   The Toxic Substances Control Act (15 U.S.C. §§ 2601 *et seq*.), as amended;

(ix)     The Hazardous Materials Transportation Act (49 U.S.C. §§ 1801 *et seq*.), as amended;

(x)      The Oil Pollution Act (33 U.S.C. §§ 2701, *et seq*.), as amended;

(xi)     The Federal Insecticide, Fungicide and Rodenticide Act (7 U.S.C. §§ 136 *et seq*.), as amended;

(xii)    The Federal Safe Drinking Water Act (42 U.S.C. §§ 300 *et seq*.), as amended;

(xiii)   The Federal Radon and Indoor Air Quality Research Act (42 U.S.C. §§ 7401 *et seq*.), as amended;

(xiv)    The Occupational Safety and Health Act (29 U.S.C. §§ 651 *et seq*.);

(xv)     The Endangered Species Act (16 U.S.C. §§ 1531 *et seq*.), as amended;

(xvi)    The Fish and Wildlife Coordination Act (16 U.S.C. §§ 661 *et seq*.), as amended;

(xvii)   The National Historic Preservation Act (16 U.S.C. §§ 470 *et seq*.), as amended;

(xviii)  The Coastal Zone Management Act (33 U.S.C. §§ 1451 *et seq*.), as amended;

> (xix)    all directives or requirements issued by any Governmental Authority in connection therewith, including any EPA Order; and
>
> (xx)    any other Laws relating to environmental matters.

"**EPA**" shall mean the United States Environmental Protection Agency.

"**EPC Contractor**" shall mean Figg Bridge Builders, LLC, a Florida limited liability company, qualified to conduct business in the State of Indiana.

"**EPC Contractor Event of Default**" shall have the meaning assigned to it in **Section 14.1**.

"**EPC Contractor-Initiated Change Order**" shall have the meaning assigned to it in **Section 9.5.1**.

"**EPC Contractor Party**" shall mean: (a) EPC Contractor, (b) Subcontractors (including Suppliers), (c) any other Persons performing any of the Work, (d) any other Persons for whom EPC Contractor may be legally or contractually responsible arising out of or in connection with any portion of the Work, the Project or any other obligations under this Agreement, and (e) the joint venture members and/or members, partners, employees, agents, officers, directors, shareholders, representatives, consultants, successors and assigns of any of the foregoing.

"**EPC Contractor's Warranty Period**" shall have the meaning assigned to it in **Section 12.1.7**.

"**Exchange Agreement**" shall mean the Amended and Restated Exchange Agreement entered into between Owner and the Indiana Department of Transportation, duly created and existing under and by virtue of Indiana Code 8-23, as amended, as an administrative department of the State of Indiana, pursuant to which Owner acquired certain real property constituting the Site.

"**Facility**" shall mean the Cline Avenue Bridge.

"**Final Completion**" shall have the meaning assigned to it in **Section 11.3**.

"**Final Completion Date**" shall mean the date Final Completion occurs.

"**Final Lien Waiver**" shall mean (a) with respect to EPC Contractor, a lien waiver in the form set forth in **Exhibit D**, titled "EPC Contractor's Final Lien and Claim Waiver" and (b) with respect to Subcontractors, a lien waiver in the form set forth in **Exhibit D**, titled "Subcontractor's Final Lien and Claim Waiver".

"**Final Payment**" shall have the meaning assigned to it in **Section 10.2**.

"**Force Majeure**" shall have the meaning assigned to it in **Section 14.5.3**.

"**GAAP**" shall mean United States generally accepted accounting principles as in effect from time to time.

"**Governing Documents**"[1] shall mean: (a) this Agreement; (b) the Specifications; (c) the Project Schedule; (d) all Change Orders and Change Directives authorized in accordance with **Article 8** or **Article 9** of this Agreement, as applicable; (e) the Authorizations and Approvals; (f) the Traffic Control Plan, the Safety Plan and the Security Plan; (g) the Development Agreement and (h) the Exchange Agreement.

"**Governmental Authority**" shall mean the federal government of the United States, and any state, county or local government or regulatory department, body, political subdivision, commission, agency, instrumentality, ministry, court, judicial or administrative body, taxing authority, or other authority thereof (including any corporation or other entity owned or controlled by any of the foregoing) having jurisdiction over either Party, the Facility or the Site, whether acting under actual or assumed authority.

"**Governmental Authorizations**" shall mean the Authorizations and Approvals issued by the applicable Governmental Authority as of the Effective Date and all additional Authorizations and Approvals issued after said date, which authorize or pertain to the Facility or the Work.

"**Hazardous Substances**" shall mean any solid, liquid, gas, odor, heat, sound, vibration, radiation or other substance or emission which is a contaminant, pollutant, dangerous substance, liquid waste, industrial waste, hazardous material or hazardous substance which is or becomes regulated by Environmental Laws or which is classified as hazardous or toxic under Environmental Laws.

"**Independent Engineer**" shall mean such engineer as Owner may engage to perform the duties and have the rights of the Independent Engineer under this Agreement. Owner shall contract with and pay the cost of the Independent Engineer, and such cost shall not be included in the Cost of the Work.  Selection of the Independent Engineer shall be subject to EPC Contractor's prior written approval which shall not be unreasonably withheld. For avoidance of doubt, the Independent Engineer shall not be deemed a Subcontractor.

"**Initial Payment**" shall have the meaning assigned to it in **Section 10.1.1**.

 "**Key Personnel**" shall have the meaning assigned to it in **Section 4.2** and evidenced by **Schedule V**, as amended from time to time by agreement of the parties.

"**Late Payment Rate**" shall mean, for any period, the lesser of (i) twelve percent (12%) per annum simple interest, non-compounded, and (ii) the maximum rate permitted by applicable Law.

"**Law**" shall mean (i) any law, legislation, statute, act, rule, ordinance, decree, treaty, regulation, order, judgment, or other similar legal requirement, (ii) Environmental Laws, and (iii) any legally binding announcement, directive or published practice or interpretation thereof, enacted, issued or promulgated by any Governmental Authority.

"**Lien Waivers**" shall mean, collectively, the Interim Lien Waivers and the Final Lien Waivers.

"**Liquidated Damages**" shall have the meaning assigning to it in **Section 12.3.1**.

"**Major Equipment Suppliers**" shall have the meaning assigned to it in **Section 4.2.4**.

"**Major Subcontractor**" shall have the meaning assigned to it in **Section 4.2.5**.

"**Major Subcontractor Contracts**" shall have the meaning assigned to it in **Section 4.2.5**.

"**Milestone**" shall mean each of the major key tasks and associated timing of the Work as set forth in **Schedule X**.

"**Milestone Date**" shall mean the date by which EPC Contractor shall achieve a Milestone in accordance with this Agreement and the Project Schedule, in each case as verified and confirmed by the Independent Engineer.

"**Monthly Deliverables**" shall have the meaning assigned to it in **Section 10.1.2**.

"**Nonconforming Work**" shall mean Work that does not conform to the requirements of the Governing Documents.

"**Notice of Change Order**" shall have the meaning assigned to it in **Section 9.4.1**.

"**Operator**" shall mean the entity selected by Owner to operate and maintain the Cline Avenue Bridge commencing on Substantial Completion.

"**Owner**" shall mean Cline Avenue Bridge, LLC, a Delaware limited liability company, qualified to conduct business in the State of Indiana.

"**Owner Event of Default**" shall have the meaning assigned to it in **Section 14.3**.

"**Owner Indemnitees**" shall mean, collectively, Owner and any of its the board members, shareholders, managers, partners, members, officers, employees, agents and representatives.

"**Parties**" shall mean EPC Contractor and Owner, when referred to collectively and "**Party**" shall mean either of the Parties referred to singly.

"**Payment Due Date**" shall have the meaning assigned to it in **Section 10.1.5**.

"**Payment Period**" shall have the meaning assigned to it in **Section 10.1.2.1**.

"**Payment and Performance Bond**" shall have the meaning assigned to it in **Section 4.19.1**.

"**Person**" shall mean any individual, firm, company, association, general partnership, limited partnership, limited liability company, trust, business trust, corporation, public body, or other legal entity.

"**PM/CM**" shall have the meaning assigned to it in **Section 4.2.3**.

"**Progress Report**" shall have the meaning assigned to it in **Section 10.1.2.1**.

Exhibit G - 119

"**Project**" shall mean the development of the Cline Avenue Bridge at the Site, and shall include the Work.

"**Project Schedule**" shall mean the schedule of activities during the construction of the Project set forth in **Schedule VI** that coordinates all aspects of the Project, including without limitation, permitting, engineering, procurement of equipment and materials, construction, Substantial Completion and completion of the Punch List (including all amendments or supplements thereto following the Effective Date).

"**Punch List**" shall mean the list of items of the Work that remain to be completed by EPC Contractor, to be established by EPC Contractor subject to the approval of Owner, not to be unreasonably withheld or delayed, in accordance with **Section 11.2**.

"**QA/QC Director**" shall have the meaning assigned to it in **Section 4.2.6**.

"**Recovery Schedule**" shall mean the schedule EPC Contractor is required to submit under **Section 11.5** of the Agreement.

"**Required Rating**" shall mean that the Payment and Performance Bond has been issued by a surety company having a minimum credit rating of "A" from A.M. Best Company, Inc.

"**Safety Director**" shall have the meaning assigned to it in **Section 4.2.7**.

"**Safety Plan**" shall have the meaning assigned to it in **Section 4.8**.

"**Security Plan**" shall have the meaning assigned to it in **Section 4.9**.

"**Site**" shall have the meaning assigned to it in **Recital A** of this Agreement.

"**Specifications**" shall mean the specifications and standards as set forth in **Schedule IV**, which are incorporated into this Agreement by this reference, and any supplements or amendments thereto that may be agreed to by the Parties after the Effective Date. The Specifications shall further include any Change Orders, Change Directives and other changes to the Work authorized in accordance with **Article 8** or **Article 9** of this Agreement.

"**Substantial Completion**" shall have the meaning set forth in **Section 11.2**.

"**Substantial Completion Date**" shall mean the date Owner confirms in writing that Substantial Completion of the Facility has occurred.

"**Subcontractor**" shall mean every Person (other than employees of EPC Contractor) employed or engaged by EPC Contractor or any Person (other than Owner) directly or indirectly in privity with EPC Contractor (including every sub-subcontractor of whatever tier) to perform any portion of the Work, whether the furnishing of labor, materials, equipment, services or otherwise, and shall include, without limitation, the Engineers, the PM/CM, the Major Equipment Suppliers, the QA/QC Director and the Safety Director.

"**Suppliers**" shall mean a manufacturer, fabricator, supplier, distributor, materialman or vendor having a direct contract with EPC Contractor or with any Subcontractor to furnish materials or equipment to be incorporated in the Work by EPC Contractor or any Subcontractor.

"**Tangible Net Worth Criteria**" shall mean that the total net worth of EPC Contractor and its Subcontractors, collectively, is equal to or greater than fifty percent (50%) of the amount that is the Cost of Work; provided, that this percentage may be reduced by EPC Contractor as necessary to involve specialized local Subcontractors with prior approval by Owner whose expertise will allow for an overall lower construction price or benefit the Project Schedule, as long as such Subcontractor obtains a payment and performance bond for the portion of the Work they will perform.

"**Target Substantial Completion Date**" shall mean the date falling thirty (30) calendar months after the Construction Commencement Date, as may be extended in accordance with this Agreement.

"**Term**" shall mean the duration of this Agreement, from the Effective Date until the expiration of the latest applicable EPC Contractor's Warranty Period.

"**Toll System Installation Agreement**" shall mean the Toll System Installation Agreement to be made and entered into by and between EPC Contractor and the Toll System Installer and Integrator.

"**Toll System Installer and Integrator**" shall mean EPC Contractor's major equipment supplier for the toll collection system selected as provided in **Section 4.2.4**.

"**Toll Systems Operation Manual**" shall mean the manual or manuals provided by EPC Contractor to Owner pursuant to **Section 7.1.1**, including operation requirements, guidelines and manuals established by the manufacturers of the toll collection system for the Cline Avenue Bridge.

"**Toll Work**" shall mean the work to be performed under the Toll System Installation Agreement, as defined therein.

"**Traffic Control Plan**" shall have the meaning set forth in **Section 4.7**.

"**Warranties**" shall have the meaning set forth in **Section 12.1**.

"**Work**" shall mean the Work described on **Schedule IV**, including all design, engineering, procurement, construction, erection, installation and systems testing and commissioning to achieve a complete and fully operable Facility in accordance with the terms of this Agreement.

**Schedule II**

**Insurance**

The insurance set forth below shall be obtained and in effect as of the Construction Commencement Date.  The Parties acknowledge that such insurance shall also act as insurance for all of EPC Contractor's obligations under the Agreement and shall run to the benefit of Owner.

## I.    Construction Insurance for Major Subcontractors

EPC Contractor shall cause Major Subcontractors responsible for construction work to maintain the insurance for the term and with limits provided below. The EPC Contractor and its affiliates as well as the Owner and its affiliates will be named as additional insureds.

- COMMERCIAL GENERAL LIABILITY INSURANCE - Major Subcontractors shall provide Commercial General Liability insurance using the 2001 ISO Occurrence Form (CG 00 01 10/01), or an equivalent form. The Commercial General Liability insurance must include coverage for premises-operations, Independent contractors, products-completed operations, personal injury and contractual liability. The contractual liability must include the tort liability of another assumed in a business contract. Subcontractor or its agent/broker shall verify that there is no endorsement or modification of the CGL limiting the scope of coverage for liability arising from explosion, collapse, or underground property damage. Furthermore, Subcontractor's policy shall be endorsed to delete any restrictions for work performed within 50 feet of a railroad right-of-way. The Commercial General Liability insurance shall be maintained throughout the duration of the Project and for a minimum of five (5) years after completion of the work. The minimum limits shall be as follows;

Each Occurrence limit

| | |
|---|---|
| Bodily Injury/Property Damage Liability | $1,000,000 |
| Personal Injury liability | $1,000,000 |
| General Aggregate Limit | $2,000,000 |
| Products/Completed Operations Aggregate Limit | $2,000,000 |

The General Aggregate limit is to be written on a "per project" basis using Subcontractor's per project endorsement Amendment-Aggregate Limits of Insurance (CG 25 03) or equivalent language. The Products/Completed Operations Aggregate Limit must be at least $2,000,000 or written confirmation provided that the Commercial Umbrella coverage Includes liability coverage for damage to the Insured's completed work equivalent to that provided under the CG 00 01 10/01 coverage form.

The Owner and EPC Contractor are to be named as an additional insureds in Subcontractor's policy with respect to this project using the ISO Additional Insured-Owners, Contractors endorsement (CG 20 10) for premises/operations and CG 20 37 for completed operations, or a substitute providing equivalent coverage. Verification of additional insured status shall be furnished to Owner and EPC Contractor by mailing a copy of the endorsement along with the Certificate of Insurance In accordance with Article III of this Schedule.

This Insurance shall apply as primary and non-contributory Insurance with respect to any other insurance or self-Insurance the Owner or EPC Contractor may have or elect to carry with respect to this project or contract.

The policy shall provide for a waiver of subrogation in favor of the Owner and EPC Contractor.

- COMPREHENSIVE AUTOMOBILE LIABILITY INSURANCE - Major Subcontractors must provide and maintain business auto liability Insurance for all owned, non-owned and hired vehicles on ISO form CA 00 01 12/90 or equivalent coverage form with the following limits;

Combined Single Limit                    $1,000,000 per accident

If necessary, the policy shall be endorsed to provide contractual liability coverage equivalent to that provided in the 1990 and later editions of the ISO CA 00 01 form.

Subcontractor's auto policy should also be endorsed to Include Pollution Liability-Broadened Coverage for Covered Auto (CA 99 48) or equivalent coverage if the required Contractors Pollution Liability excludes the pollution liability arising out of the transportation, loading, or unloading by a covered auto.

- WORKERS COMPENSATION - Major Subcontractors shall provide and maintain workers compensation and employers liability insurance providing coverage in the state (or states) in which the project is performed. Limits and coverage shall be as follows:

Workers Compensation Insurance          Statutory Benefits-Indiana

Employers liability Insurance            $1,000,000 each accident

                                         $1,000,000 policy limit

                                         $1,000,000 each employee

Because this Project involves work which may be subject to the U.S. Longshore and Harborworkers Act (USL&HW), or which may involve watercraft, Major Subcontractors whose scope includes work on the Indiana Harbor Canal will attach the respective endorsements to provide this coverage as required by the Owner. The respective endorsement forms are: USL&HW (WC 00 01 O6 A) and Maritime Coverage (WC 00 02 01 A) or equivalent coverage. Subcontractors may maintain or cause to be maintained equivalent Maritime Coverage using Protection and

Indemnity Insurance (P&I) for any vessel owned and/or chartered by Subcontractor and used in connection with the construction operation. Subcontractor's Workers Compensation policy shall be specifically endorsed to Waive Subrogation against Owner and EPC Contractor using WC 00 03 13 or equivalent endorsement.

- UMBRELLA EXCESS LIABILITY - Major Subcontractors shall provide umbrella excess liability Insurance on an "occurrence" basis providing "following form" coverage for the underlying coverages outlined above.  This insurance can be structured as any combination of primary plus supplementary layers and umbrella liability and/or excess liability, or primary plus umbrella liability and/or excess liability.  The overall minimum insurance limits shall be:

Each Occurrence Limit                           $10,000,000

Aggregate Limit                                 $10,000,000

Subcontractor or its agent/broker shall confirm that Owner and EPC Contractor are additional Insureds on Umbrella Excess in a form equal or equivalent to the Additional Insured and Per Project endorsements referenced in the underlying CGL. This Insurance shall be maintained throughout the duration of the Project and for a minimum of five (5) years after completion of the work.

- CONTRACTORS POLLUTION LIABILITY - Major Subcontractors shall provide Contractors Pollution Liability (CPL) insurance with limits of at least $5,000,000 per incident. The Contractors Pollution Liability policy shall provide coverage for third-party bodily injury, property damage, clean-up costs and defense costs which arise from the construction operations performed by or behalf of Subcontractor.

Owner and EPC Contractor shall be named as Additional insureds on the CPL policy. Subcontractor or Subcontractor's Agent/broker should confirm that the CPL policy contains a separation of insureds provision ('severability)" and that claims between insureds is permitted under the CPL coverage form.

The Contractors Pollution liability coverage may be written on either an occurrence or Claims-made form. If coverage is provided on a claims-made form, the retroactive date of such coverage shall not be later than The Effective Date and Subcontractor agrees to provide uninterrupted coverage from the retro date throughout the duration of this project and for at least five (5) years after Substantial Completion of the project. Alternatively, Subcontractors may purchase an extended reporting period which shall remain In effect for at least five (5) years after Substantial Completion of the work.

- MARINE GENERAL LIABILITY - Major Subcontractors whose scope includes work on the Indiana Harbor Canal shall provide liability coverage for bodily injury and property damage claims arising out of the operation and use of watercraft during the course of construction with limits of at least $5,000,000 per occurrence/aggregate. The Aggregate Limit on the MGL is to be written on a "per project" basis using Subcontractor's per project endorsement similar or equivalent to the CG 25 03 used with the Commercial General Liability insurance.

Owner and EPC Contractor shall be named as Additional insureds on the MGL policy in a form similar to the Additional Insured requirements as described in the Commercial General Liability insurance.

- AVIATION LIABILITY - Should aircraft of any kind be used by Major Subcontractors or any tier of subcontractor, Subcontractor shall maintain or cause the operator of the aircraft to maintain aircraft liability Insurance. Such aircraft liability Insurance shall provide coverage for bodily Injury and properly damage caused by the operation, maintenance or use of such aircraft with minimum limits of $10,000,000 Combined Single Limit. Major Subcontractors shall name or require that Owner and EPC Contractor be named as Additional Insureds on the aircraft liability policy.

## II.   EPC Contractor shall maintain insurance during construction as follows:

EPC Contractor shall purchase and maintain the following types and amounts of insurance. The Owner and its affiliates shall be named as additional insureds.

- COMMERCIAL GENERAL LIABILITY INSURANCE – EPC Contractor shall provide Commercial General Liability insurance using the 2001 ISO Occurrence Form (CG 00 01 10/01), or an equivalent form.  The Commercial General Liability insurance must include coverage for premises-operations, Independent contractors, products-completed operations, personal injury and contractual liability. The contractual liability must include the tort liability of another assumed in a business contract. EPC Contractor or his agent/broker shall verify that there is no endorsement or modification of the CGL limiting the scope of coverage for liability arising from explosion, collapse, or underground property damage. Furthermore, EPC Contractor's policy shall be endorsed to delete any restrictions for work performed within 50 feet of a railroad right-of-way. The Commercial General Liability insurance shall be maintained throughout the duration of the Project and for a minimum of five (5) years after completion of the work. The minimum limits shall be as follows;

Each Occurrence limit

| | |
|---|---|
| Bodily Injury/Property Damage Liability | $2,000,000 |
| Personal Injury liability | $2,000,000 |
| General Aggregate Limit | $2,000,000 |
| Products/Completed Operations Aggregate Limit | $2,000,000 |

The General Aggregate limit is to be written on a "per project" basis using Contractor's per project endorsement Amendment-Aggregate Limits of Insurance (CG 25 03) or equivalent language.  The Products/Completed Operations Aggregate Limit must be at least $2,000,000 or written confirmation provided that the Commercial Umbrella coverage Includes liability coverage for damage to the Insured's completed work equivalent to that provided under the CG 00 01 10/01 coverage form.

The Owner is to be named as an additional insured in the EPC Contractor's policy with respect to this project using the ISO Additional Insured-Owners, EPC Contractor's endorsement (CG 20 10) for premises/operations and CG 20 37 for completed operations, or a substitute providing equivalent coverage. Verification of additional insured status shall be furnished to Owner by mailing a copy of the endorsement along with the Certificate of Insurance In accordance with Article III of this Schedule.

This Insurance shall apply as primary and non-contributory Insurance with respect to any other insurance or self-Insurance the Owner may have or elect to carry with respect to this project or contract.

The policy shall provide for a waiver of subrogation in favor of the Owner.

- COMPREHENSIVE AUTOMOBILE LIABILITY INSURANCE – EPC Contractor must provide and maintain business auto liability Insurance for all owned, non-owned and hired vehicles on ISO form CA 00 01 12/90 or equivalent coverage form with the following limits;

Combined Single Limit                    $1,000,000 per accident

If necessary, the policy shall be endorsed to provide contractual liability coverage equivalent to that provided in the 1990 and later editions of the ISO CA 00 01 form.

- WORKERS COMPENSATION – EPC Contractor shall provide and maintain workers compensation and employers liability insurance providing coverage in the state (or states) in which the project is performed. Limits and coverage shall be as follows:

Workers Compensation Insurance          Statutory Benefits-Indiana

Employers liability Insurance            $1,000,000 each accident

                                         $1,000,000 policy limit

                                         $1,000,000 each employee

EPC Contractor's Workers Compensation policy shall be specifically endorsed to Waive Subrogation against Owner using WC 00 03 13 or equivalent endorsement.

- UMBRELLA or EXCESS LIABILITY – umbrella or excess liability Insurance on an "occurrence" basis providing "following form" coverage for the underlying Commercial General Liability insurance coverage outlined above.  This insurance can be structured as any combination of primary plus supplementary layers and umbrella liability and/or excess liability, or primary plus umbrella liability and/or excess liability.  The overall minimum insurance limits shall be:

Each Occurrence Limit                    $10,000,000

Aggregate Limit                          $10,000,000

Exhibit G - 126

EPC Contractor or his agent/broker shall confirm that Owner is an additional Insured on Umbrella or Excess in a form equal or equivalent to the Additional Insured and Per Project endorsements referenced in the underlying CGL. This Insurance shall be maintained throughout the duration of the Project and for a minimum of five (5) years after completion of the Work.

- PROPERTY INSURANCE - The EPC Contractor shall purchase and shall maintain, a Builder's Risk Policy upon the entire Project for the full cost of replacement at the time of loss. This Insurance shall also name the Owner, EPC Contractor, Major Subcontractors, Subcontractors, Sub-subcontractors, Material Suppliers and Engineer as insureds. This insurance shall be written as a Builder's Risk Policy or equivalent form to cover all risks of physical loss, and shall insure at least against the perils of fire, lightning, explosion, windstorm, hail, smoke, aircraft and vehicles, riot and civil commotion, theft, vandalism, malicious mischief, debris removal, flood, earthquake, earth movement, water damage, wind damage, testing, and collapse. The Owner and the Major Subcontractors shall be jointly responsible for any deductible amounts. This policy shall provide for a waiver of subrogation in favor of the Owner, Major Subcontractors, Subcontractors, Sub-subcontractors, Material Suppliers and Engineer. Partial occupancy or use of the Work shall not commence until the EPC Contractor has secured the consent of the Insurance Company or companies providing the coverage required in this Section.

- PROFESSIONAL LIABILITY INSURANCE - EPC Contractor shall purchase and maintain a project specific professional liability insurance policy providing coverage for claims arising out of errors and omissions during the performance of professional design engineering services. The limit of such project specific professional liability coverage shall be $5,000,000 per claim/aggregate and shall maintain a 5-year extended reporting period. All subconsultants to EPC Contractor shall be named as additional insureds on the policy.

## III.    General Conditions

All insurance required by this Agreement shall be purchased and maintained with a company or companies lawfully authorized to do business in the State of Indiana.  Such insurance shall be for limits of liability as specified for the Project or legally required, whichever is greater.  All required insurance policies shall be endorsed to provide thirty (30) Days prior written notice by certified mail, of any material change, cancellation, or non-renewal to EPC Contractor and Owner.  Owner and EPC Contractor and where applicable, Major Subcontractors or Subcontractors, shall each be named as additional party insured on the policies required to be obtained hereunder.  Proof of the required insurance and endorsements shall be made by submission of certificates of insurance to Owner and EPC Contractor prior to commencement of a Project.  All insurance policies shall contain a waiver of subrogation provision pursuant to which the insurer is prohibited from obtaining subrogation or transfer rights in respect of any claim under such policies against EPC Contractor, Owner or where applicable, Major Subcontractors or Subcontractors and their employees, directors or officers.

Where applicable, EPC Contractor and Owner shall be named as additional insured or loss payee on the policies required to be obtained hereunder.  The Certificates should be issued to EPC Contractor and Owner at the addresses set forth in this Agreement.

**Schedule IV- The Work**

**GENERAL STATEMENT OF SCOPE**

Figg Bridge Builders, LLC (EPC Contractor) will design and build a new two-lane, fixed span, precast concrete segmental toll bridge In East Chicago, Indiana (Figure 1). The new facility, the Cline Avenue Bridge (CAB), will carry State Road 912 (SR 912) over Riley Road, the Indiana Harbor Canal, several railroad tracks and Dickey Road along the same alignment as the previous structure, which was demolished in 2012.



**Figure 1 – Location Map**

Figure 2 illustrates the overall project limits which extend from the existing west abutment of the previous bridge (approximately 1,440 feet east of the Cline Avenue / Indianapolis Boulevard intersection) to the east abutment of the existing steel viaduct (near the intersection of Watling Street and Guthrie Street). Some roadway work will be required beyond the abutments to tie the new two-lane facility into the existing six-lane approaches and to satisfy the obligations for approach roadway improvements under the land swap agreement with the Indiana Department of Transportation (INDOT). This scope of work provides for construction of the new segmental bridge and the facility office building.  The major elements of the project scope are:

   A. New two-lane precast concrete segmental bridge 6,236 feet long (engineering and construction)
   B. Rehabilitation of the existing 2,397 foot long steel viaduct on the east end of the project (engineering only)
   C. Approach roadway modifications on SR 912 for approximately 1,000 feet on the west end (engineering only)
   D. A facility office building located adjacent to Cline Avenue south and east of Riley Road (design and construction)



**Figure 2 – Bridge Project Limits**

Other elements of the project that are currently excluded but are anticipated to be added as a supplement to the Scope are:

1. Rehabilitation of the existing 2,397 foot long steel viaduct on the east end of the project (construction)
2. Approach roadway modifications on SR 912 for approximately 1,000 feet on the west end (construction)
3. Approach roadway improvements on SR 912 for up to 1.6 miles on the east end as needed to satisfy the obligations to INDOT
4. Electronic Toll Collection (ETC) system
5. Access ramps for Cline Avenue at Indianapolis Boulevard (US 20).

EPC Contractor will furnish design and construction services, quality control / quality assurance, materials, equipment, labor, transportation and incidentals required to complete the work in accordance with the requirements of the Engineer, Procure and Construct (EPC) Agreement. This includes work required for:

a. Design and construction of  the new concrete segmental bridge as noted above, including bridge foundation work, substructure work, earthwork and support of excavation
b. Design for rehabilitation of the existing steel viaduct
c. Design for adjustments and improvements to the west end approach roadway on Cline Avenue
d. Partial removal of existing structures
e. Obtaining and complying with required permits
f. Maintenance of traffic, including traffic control devices and measures
g. Surveying
h. Limited landscaping

      i.   Quality assurance and quality control for design and construction
      j.   Overall project management

The design and construction will be in accordance with the American Association of State Highway and Transportation Officials (AASHTO) standards, INDOT standards, the project special provisions and the project permits. The construction quality will be verified, documented, and assured through the use of a Quality Management Plan for the project.

## SECTION 1 - PROGRAM SCOPE COMPONENTS

A.   New two-lane precast concrete segmental bridge 6,236 feet long

The new bridge will consist of two 12 foot wide traffic lanes and two 9 foot wide shoulders built on the north side of the Cline Avenue alignment as shown in Figures 3 and 4. Span lengths vary from 103 feet to 316 feet, with clearances over the Indiana Harbor Canal of 230 foot horizontal and 100 foot vertical. The existing west abutment will be modified for use with the new bridge, and the existing piles from the previous bridge will be incorporated into the new bridge. The existing concrete footings under the alignment of the new bridge will be removed, additional piling installed as needed for capacity, and new footings, piers and pier caps constructed. A transition pier will be constructed at the east end of the new bridge where it ties into the existing steel bridge. The bridge surface will be lit with LED lighting fixtures on light poles mounted to the edges of the bridge deck. The main span over the canal will include a required navigation lighting system.

The bridge will be designed and constructed to allow future construction of a two-lane parallel bridge immediately south to create a four-lane facility.

Reconstruction of the exit ramp from westbound Cline Avenue to Riley Road (Ramp A) is not included with this scope. The existing ramp fill, abutment and pier foundations will remain in place.



**Figure 3 – New Bridge Typical Section**



**Figure 4 – New Bridge Key Plan and Elevation**

B.  Design for rehabilitation of the existing 2,397 foot long steel viaduct on the east end of the project

The existing steel bridge carrying Cline Avenue on the east end of the project will be designed for modification and rehabilitation to transition from the two lanes of the new bridge at the transition pier to six lanes with ramp at the existing east abutment. Design elements will include the following:

- Remove and reconstruct portions of the barrier rails as needed for the new lane configuration and alignment
- Remove surface overlay and replace with new overlay within the limits of the new lane configuration only
- Rehabilitate any unsound areas of the bridge deck within the limits of the new lane configuration
- Remove areas of unsound concrete and repair columns and pier caps supporting the portions of the steel bridge that will be carrying traffic
- Replace any elastomeric bearings that are no longer functioning as intended
- Replace expansion joints in the portions of the deck that will accommodate traffic
- Modify the deck drainage system to accommodate the new lane and traffic barrier configuration
- Paint the outside surface of the exterior girders along both edges of the steel bridge
- Update the signing and striping for the revised traffic configuration

C.  Design of approach roadway modifications on SR 912 for approximately 1,000 feet on the west end

The existing approach roadway carrying Cline Avenue on the west end of the project will be designed for modification and rehabilitation to transition from the two lanes of the new bridge with existing westbound on-ramp at the east abutment to six lanes typical section approximately 1,000 feet west of the Cline Avenue Bridge west abutment. Design elements will include the following:

- Remove and reconstruct portions of the barrier rails as needed for the new lane configuration and alignment
- Rehabilitate any unsound areas of the pavement within the limits of the new lane configuration
- Modify the drainage system to accommodate the new lane and traffic barrier configuration
- Update the signing and striping for the revised traffic configuration

D.   A facility office building located adjacent to Cline Avenue south and east of Riley Road

A facility office building will be designed and built turn-key by EPC Contractor to house operations personnel. The building will be located adjacent to the Cline Avenue Bridge as shown in Figure 5. Plan area of the facility will be approximately 90 feet by 40 feet, encompassing 2,840 square feet of finished office and 1,560 square feet of storage space. Included in the building will be a lobby, conference room, restrooms, breakroom and offices for reception, marketing, collections, general manager, facility manager and visitor. The storage area will provide space for a facility management vehicle and toll collection equipment.



**<u>Figure 5 – Facility Office Building Key Plan</u>**

The facility office building will be constructed as a pre-fabricated metal building on a concrete slab with masonry and steel exterior. The roof will be standing seam metal. Plumbing, mechanical and electrical, as well as interior finishes and furnishings will be included. EPC Contractor will utilize the building during construction for office space and turn it over to CAB for operations at the end of construction. Figure 6 is a rendering of the completed facility office building.



**Figure 6 – Rendering of Facility Office Building**

<u>Exclusions</u>

This scope specifically excludes the following work items, which may be added to this scope by supplemental agreement:

- Rehabilitation of the existing 2,397 foot long steel viaduct on the east end of the project carrying Cline Avenue. This includes modifications to transition from the two lanes of the new bridge to six lanes with ramp at the existing east abutment, deck rehabilitation, resurfacing, concrete repair, and other upgrades.

- Approach roadway modifications on SR 912 for approximately 1,000 feet on the west end of the project to transition from the two lanes of the new bridge with existing westbound on-ramp at the east abutment to six lanes typical section. This includes modifications to the barrier rails, pavement rehabilitation, drainage system updates and modifications to signing and striping.

- Approach roadway improvements on SR 912 on the east end as needed to satisfy the "Repaving Obligation" of the Amended and Restated Exchange Agreement between INDOT and CAB dated December 31, 2012. This obligation is for $3.0 million in rehabilitation costs, and references plans provided by INDOT for Road Rehabilitation dated July 1, 2014.

- An Electronic Toll Collection (ETC) system, including overhead gantries, gantry foundations, transponder sensors and related cameras (gantry, pavement or any other locations), related power supply, conduits and cabling, any toll equipment shelter other than the area provided in the facility office building, backup generator and fuel storage facility, facility signage (wayfinding, facility identification, rate schedule, variable message signs, etc.), and toll collection electronic equipment/software. This includes any enhancements to existing Ramp D (Riley Road to westbound Cline Avenue).

- Access ramps for Cline Avenue at Indianapolis Boulevard (US 20), including engineering, right-of-way, and any construction or modification of existing SR 912 west

of Cline Avenue Bridge other than as noted in (C) above. Also excluded is construction of an access road for the BP Refinery underneath the Cline Avenue Bridge near the west abutment.

- Investigation and mitigation of any unforeseen hazardous materials as defined in Section 9.5.2 (d) and (e) of the EPC Agreement as present at that specific location.

<u>Key Personnel</u>

EPC Contractor will provide a Project Manager on-site that will be the final authority on design and construction issues. All subcontractors will have a lead point of contact that will report to the Project Manager.  Each subcontractor will have the responsibility of managing its staff and related subcontractors. EPC Contractor's Design Project Manager will have the responsibility of managing all the design consultants.  EPC Contractor will also provide a Design and Construction Quality Manager that will report to the Project Manager and manage the quality control and quality assurance (QA) team that performs the checks in accordance with the Quality Management Plan.

## SECTION 2 - DESIGN REQUIREMENTS

The plans and specifications will be signed and sealed by a professional engineer registered in the State of Indiana. The following design engineering tasks will be performed by the EPC Contractor:

- Permitting
- Bridge Design for the new concrete segmental structure
- Bridge Rehabilitation Design for the existing steel approach bridge
- Geotechnical Design
- Roadway and Civil Design
- Architectural design of the facility office building
- Lighting and Electrical Design

## 1.    Design Management and Coordination

The Design Manager will be responsible for the coordination of all design tasks, as well as coordination with the Project Manager.  This will include coordination of subconsultant designs and coordination between the designers and the construction subcontractors during construction. He will schedule weekly design coordination meetings while design work is ongoing to review progress and coordinate design with construction activities. EPC Contractor will prepare monthly progress reports that outline the status of completed design and construction coordination activities for submittal to Owner along with the monthly invoices.

## 2.    Quality Management

EPC Contractor will create and implement the Quality Management Plan (QMP) for the project. For design activities, the QMP program will utilize individuals that are independent of the original design team to perform a Quality Control review of the design, plans and special provisions to ensure they meet the design criteria and standards.  These individuals will report directly to the QA/QC Manager.

The QA Engineer will audit the project files to verify that the design documents have been properly reviewed and coordinated, with findings documented in accordance with the QMP. After the QA Engineer certifies the QA/QC process is complete, the drawings will be stamped "Released for Construction" and provided to the Project Manager for distribution.

## 3.    Permitting

EPC Contractor will coordinate with Federal and Local agencies to obtain the following permits:

- United States Coast Guard (Lead Federal agency)
- Section 106 Coordination (State Historic Preservation Officer)
- United States Army Corp of Engineers
- IDEM Section 401 Water Quality Certification
- IN-DNR Construction in a Floodway
- Coastal Zone Management Federal Consistency Determination
- INDOT Right of Way Permit
- IDEM Rule 5 (Stormwater Runoff During Construction)
- FAA Form 7460-1 Notice of Proposed Construction of Alternation and Notification to Gary Airport

Note that the United States Coast Guard (USCG), as lead agency, determined that no NEPA analysis document is needed for this project. The USCG permit was issued under a Categorical Exclusion.

EPC Contractor will provide a bulleted list of key permit compliance requirements to subcontractors prior to construction beginning and submit pre-construction notifications as required by permits. EPC Contractor will also provide on-call assistance to the contractor for questions or issues with permit compliance and provide compliance reviews throughout construction for items related to environmental permits. All necessary environmental permits are obtained through this scope of services to build the bridge.

## 4.    Bridge Design

EPC Contractor will design the bridge in accordance with the AASHTO LRFD Bridge Design Specifications, project specific design criteria, and applicable INDOT design standards. The design will include the following items:

New concrete segmental bridge

- Steel piling design
- Footing design
- Abutment design
- Pier design, including special piers (straddle, transition) and railroad protection walls
- Precast segmental superstructure design including diaphragms
- Bearing design
- Expansion joint design
- Miscellaneous bridge element design (drainage, barriers, access hatches, etc.)
- Fender rehabilitation as needed
- Development of special provisions for bridge elements

- As-built plans
- Owner's Manual

The contract drawings will be completed as construction drawings. The drawings will include the typical details required to precast the segments and will include the dimensions for all embedded items. These drawings will include embedded PT pipes, drains and electrical openings. The drawings will also include bar bend details, including variable rebar lengths for pie-shaped segments, barrier lengths and PT pipe bend information.

A casting manual will be provided that includes the procedures and geometry required for casting the precast segments and an erection manual that includes the engineering information for erecting and stressing the segments.

The Owner's Manual will include procedures for performing future inspections and maintenance of all permanent structures, roadways and tolling equipment. The manual will outline a schedule for periodic inspections on the facility, outline the key elements to be inspected and have maintenance procedures.

<u>Bridge rehabilitation design</u>

- Field review of existing structure
- Integrate roadway alignment and lane distribution requirements with rehabilitation
- Analyze capacity of superstructure to confirm adequacy
- Pier rehabilitation design, including columns, caps and railroad protection walls
- Deck rehabilitation design for the areas of the deck that will carry traffic
- Miscellaneous bridge element rehabilitation design (drainage, barriers, bearings, joints, lighting, etc.)
- As-built plans

**5.    Roadway and Civil Design**

The roadways will be designed in accordance with AASHTO's Policy on Geometric Design of Highways and Streets and applicable portions of the INDOT design manual.  Any design exceptions required will be documented. The roadway and civil design will include the following items:

- Control and Route Surveying - establish horizontal and vertical control points
- ALTA (American Land Title Association) land title survey - establish the existing right of way line as it abuts the parcels along the project route
- Topographic survey
- Project Baseline - establish the geometry and stationing of a project baseline.
- Determine the location of existing utilities
- Prepare base mapping
- Photogrammetry - perform a Photogrammetric Survey of the project limits to provide additional data beyond the field run survey area
- Roadway Design – Determine typical roadway sections. Develop horizontal alignments and vertical profiles, including transitions from 6-lane roadways to 2-lane roadways.
- Pavement design
- Construction phase traffic and access management
- Storm drainage design for surface roadways and runoff from bridge drains/scuppers

- Erosion and sediment control design, including Stormwater Pollution Prevention Plan (SWPPP)
- Signage and pavement marking

## 6. Lighting and Electrical Design

EPC Contractor will provide electrical design, plans and construction specifications for the following items:

- Roadway lighting design and plans based on INDOT lighting level standards. For the new bridge, LED lighting fixtures will be utilized and pole mounted on the barriers. Lighting on the existing steel viaduct will utilize the existing lighting system.
- Aesthetic lighting design and plans for select piers of the new bridge.
- Provide design and plans for power and controls for navigational lighting for the USCG navigable channel in accordance with the USCG regulations. These lights will be LED lights.
- Provide design and plans for power, communications and controls for ITS Camera system.
- Provide design and plans for power for overhead toll equipment gantries located on the existing steel viaduct at the east end of the project, and at the entrance to Ramp B on the west end of the project.
- Provide design and plans for bonding for metal toll gantry.
- Provide research and recommendations for all needed electrical equipment, and interface with equipment vendors for necessary electrical design.
- Provide construction specifications for all electrical, data, communication and conduit construction packages.

## 7. Geotechnical Design

EPC Contractor will provide the geotechnical design for the new bridge including the following items:

- Perform the subsurface boring exploration and soil testing program
- Perform a load test of the existing piling to determine capacity of existing piles to be incorporated into the new bridge as well as the capacity of new piles to be installed.
- Develop the Geotechnical Foundation Design
- Prepare the Geotechnical Report, including boring logs
- Prepare Specifications for construction

The geotechnical exploration, testing and design recommendations will be reviewed by an independent geotechnical firm that did not produce the original geotechnical design. The review will consist of reviewing and commenting on the exploratory borings, engineering and design recommendations from the geotechnical report, foundation plans and specifications, foundation installation plans and methodology, field load testing data, pile installation operations and QA/QC procedures.

## 8. Facility Office Building

Design for the new office building will be provided by EPC Contractor. This includes site layout, grading, drainage, access, parking, sidewalks, landscaping, utilities, building foundation, structure, interior and exterior finishes, plumbing, electrical and HVAC. The building will comply with applicable building codes.

## SECTION 3 -  CONSTRUCTION COMPONENTS

EPC Contractor will construct the items included in the project scope of work as described herein. The construction will be performed in accordance with the project documents including plans, specifications, project special provisions, the Construction Quality Control Plan, and applicable portions of the INDOT Standard Construction Specifications. This includes overall management and coordination of the project, material procurement and management of subcontractors. The construction of the project will be performed by construction subcontractors, who may have second tier subcontractors for some portions of the work.

A Construction Quality Control Plan will be prepared that outlines the required QC/QA procedures for construction.  EPC Contractor will monitor construction quality control for the project (see Section 4 below). Prior to starting work, a job-specific Health and Safety Manual will be in place, which will contain a list of safety procedures and a Hazard Analysis Plan detailing existing hazards and accident prevention measures. A Safety Manager will be assigned to the project and will be responsible for implementation of the Health and Safety Manual.

EPC Contractor with construction subcontractors will be responsible for the following items:

- Safety on the project construction site in accordance with the Site Access Control Plan
- Maintenance of traffic for streets crossing under the Cline Avenue Bridge
- Equipment required for the construction of the project
- Construction of the Facility Office Building, including furnishings. The building and furnishing will be utilized by the EPC Contractor during construction as a project office.
- Precasting of the superstructure segments
- Removal of existing pile caps at locations where new footings will be built for the new segmental bridge
- Installation of additional piles as needed to support the new concrete bridge
- Installation of new pier footings for the segmental bridge
- Reconstruction of the west abutment
- Construction of  piers and pier caps for the new segmental bridge
- Erection of the precast segments for the new segmental superstructure including stressing and grouting of post-tensioning
- Installation of bridge railing on the new segmental bridge
- Grinding and grooving of the segmental bridge deck
- Installation of all electrical and lighting work on the new segmental bridge
- Environmental compliance during construction
- Traffic Management
- Quality control and materials testing
- Landscaping at the facility entrances
- Relocation of utilities as required

## SECTION 4 -  CONSTRUCTION MONITORING

The construction quality control and quality assurance (QC/QA) during construction of the project will be performed by EPC Contractor. EPC Contractor will provide an on-site Construction Quality Manager who will monitor the construction subcontractor's QC inspection team and assure that the work conforms to the contract documents and Construction Quality Control Plan (CQCP). The CQCP will detail the project requirements including testing frequency, nature of testing, and acceptance criteria of testing, and will be based on INDOT standards.

The construction QC team, led by the Quality Control Manager, will have the primary responsibility for documenting the quality, including all work and products of subcontractors, fabricators, suppliers, and vendors both on-site and off-site. The QC program will verify that procurement, shipping, handling, fabrication, installation, cleaning, inspection, certification, construction, testing, storage, examination, repair, maintenance, and required modifications of all materials, equipment, and elements of the work comply with the requirements of the contract documents and that all materials and equipment incorporated in the work will perform satisfactorily for the purpose intended.

The construction QC inspectors will inspect the workmanship during construction as per the observations, measurements, and documentation specified in the CQCP.  Inspection observations, measurements, results, non-conformances, and corrective actions will be documented on forms as part of the CQCP.  Materials will be subject to inspection, sampling, and testing at any time before final acceptance of the work.  References in the CQCP to a test method or test designation will mean the latest revision of that test method or specification for that item in effect on the date of notice-to-proceed.

Materials will be sampled and tested by the construction QC inspection team. Copies of all test results will be furnished to the Project Manager and the Construction Quality Manager.  The construction QC inspection team will perform sampling and testing for process control and for acceptance of materials to be used on the project in accordance with the CQCP.  Reports of each test will be recorded on the form prescribed for that test.  Any tests that do not pass specified requirements will be handled in accordance with the CQCP for non-conformance resolution.

The minimum frequency of CQC sampling and testing will be consistent with the CQCP and project specifications. The Construction Quality Manager will utilize an electronic system to document and track material and field test results. Laboratory CQC testing will be conducted by different testing laboratories for QC and for QA under separate subcontracts that comply with the requirements for INDOT certification for applicable tests.  Laboratories will be accredited by the AASHTO Material Reference Laboratory (AMRL), the Concrete Cement Reference Laboratory (CCRL), the National Precast Concrete Association (NPCA) for precasters, or the Prestressed Concrete Institute (PCI), as appropriate, for the work to be constructed.  Field laboratories may be used where appropriate for the tests being conducted. The equipment in the field laboratories will be certified at the start of Work and annually thereafter. Certification will be issued by an independent party.

The Quality Control Manager will be responsible for compiling all required Quality Control inspection and testing documentation developed during construction, including testing results and inspector logs, and will have them available for review at all times during construction. The Quality Assurance (QA) team will be completely independent of the construction subcontractor QC team and will report directly to the Construction Quality Manager.  The

Construction Quality Manager will have the authority to stop work and to require changes if any defective work is found that does not meet the quality standards for the project. The Construction Quality Manager will periodically audit the CQC documentation throughout construction to verify it complies with the requirements of the CQCP.

## SECTION 5 -  PROJECT SCHEDULE

The project schedule (EPC Schedule VI) shows the tasks required to design and build the Facility, including durations and interrelationships, with Substantial Completion within 30 months after the Construction Commencement Date.

## SECTION 6 -  PROJECT COMPLETION

**Deliverables** - Deliverables to Owner at project completion will be as follows:

1.   New two-lane precast concrete segmental bridge approximately 6,236 feet long crossing the Indiana Harbor Canal, carrying two 12' lanes with 9' shoulders.
2.   Design plans for rehabilitation of the 2,397 foot long existing steel viaduct on the east end of the project
3.   Design plans for the approach roadway modifications on SR 912 for approximately 1,000 feet on the west end of the project to transition from the two lanes of the new bridge with existing westbound on-ramp at the east abutment to six lanes typical section.
4.   Main span navigation clearances of 100' (vertical) and 230' (horizontal)
5.   Functional vessel fender system in front of the two main piers
6.   LED roadway lighting system on the new bridge
7.   Navigation lighting system
8.   Landscaping at the project entrances
9.   Owner's manual for inspection and maintenance of the segmental bridge
10.   Completed Facility Office Building with furnishings
11.   As-built plans for the segmental bridge
12.   Documentation of the construction Quality Management program, including materials test results

**Substantial Completion** – The project will be deemed to be substantially complete upon the following conditions and in accordance with the contract requirements:

- Contractor has completed all work necessary to open the new segmental bridge to revenue traffic (note - the Toll System and Approach Roadways must be complete and functional for the facility to open to revenue traffic).  Completion of items such as punch list items, maintenance, final cleanup, turf establishment, and other items only included in the requirements for Final Completion are not necessary for Substantial Completion.

**Final Completion** – Final Completion of the project will occur upon the following conditions and in accordance with the contract requirements:

- Requirements for Substantial Completion have been satisfied.
- Cline Avenue Bridge, LLC has received all deliverables listed above.
- Contractor's and subcontractor's personnel, supplies, equipment, waste materials, and temporary facilities have been removed from the site.

- The punch list items have been completed.
- Any other Contractor's obligations under this Agreement (other than obligations by their nature are required to be performed after Final Acceptance) have been satisfied.

**Schedule V**

**Key Personnel, Engineers and Major Subcontractors**

## KEY PERSONNEL

**FIGG Bridge Builders, LLC:**

Project Manager – Ray Schmahl

Construction Manager – Tom Jenkins

QA/QC Director – Bill Shealy

Safety Director – Tom Jenkins

**Engineering Leads:**

Design Manager – John Dvorak (FIGG)

Roadway/Civil – Chris Murphy (American Structure Point, Inc.)

Geotechnical – Chris Carson (Professional Services Industries, Inc.)

Independent Geotechnical – Dan Brown (Dan Brown and Associates)

Electrical Design – Chris Bailey (Highground Services)

Lighting – Ron Kurtz (Randy Burkett Lighting Design, Inc.)

**Subcontractor Leads:**

Kenny Construction Company – Lead position will be identified prior to notice-to-proceed for Subcontractor and will be subject to Owner's prior written approval which shall not be unreasonably withheld

Structural Technologies, LLC (VSL) – Lead position will be identified prior to notice-to-proceed for Subcontractor and will be subject to Owner's prior written approval which shall not be unreasonably withheld

## ENGINEERS

Design and Design Office Support During Construction:

Figg Bridge Engineers, Inc – Design Management and New Segmental Bridge Design

American Structure Point, Inc. – Roadway, Civil, Surveying and Steel Bridge Rehabilitation

Professional Services Industries, Inc. (PSI) - Geotechnical Investigation and Analysis

Dan Brown and Associates - Independent Geotechnical Engineer

Highground Services - Electrical Design

Randy Burkett Lighting Design, Inc. – Lighting

Owners Quality Control / Quality Assurance:

Figg Bridge Inspection, Inc. - Bridge and Roadway Construction Engineering and Inspection

## MAJOR SUBCONTRACTORS

Kenny Construction Company –Substructure Construction

Structural Technologies, LLC (VSL) - Superstructure Erection and Post-Tensioning

Steel Bridge Rehabilitation – Subcontractor subject to Owner's prior written approval which shall not be unreasonably withheld

Approach Roadways and Ramps - Subcontractor subject to Owner's prior written approval which shall not be unreasonably withheld

Toll Collection System Installation - Toll system installer and integrator approved by Owner, in its sole discretion

## OTHER SUBCONTRACTORS

Cline Precast, LLC – Bridge Superstructure Precasting

The Ross Group – Facility Office Building (design/build)

**Schedule VI**

**Project Schedule**

**[See Attached]**

| Activity Name | Month |
|---|---|

**Columns**
- Construct Columns - Piers 2 thru 16

**Superstructure**
- Install Temp Stability Tower (Pier 2)
- Install End Bent Falsework - Span 1
- Erect Pier Segments Pier 2 (2 Ea)
- Erect Starter Segments Pier 2 (2 Ea)
- Erect Span 1 End Bent Segments from Falsework (3 Ea)
- Erect Remaining Segments Pier 2 (18 Ea)
- Pier 3 - Cantilever Span Complete - (18 Segments)
- Pier 4 - Cantilever Span Complete - (20 Segments)
- CIP Closures - Spans 2 thru 16
- Pier 5 - Cantilever Span Complete - (20 Segments)
- Pier 6 - Cantilever Span Complete - (20 Segments)
- Pier 7 - Cantilever Span Complete - (22 Segments)
- Pier 8 - Cantilever Span Complete - (20 Segments)
- Pier 9 - Cantilever Span Complete - (16 Segments)
- Pier 10 - Cantilever Span Complete - (21 Segments)
- Pier 11 - Cantilever Span Complete - (21 Segments)
- Pier 12 - Cantilever Span Complete - (22 Segments)
- Pier 13 - Cantilever Span Complete - (24 Segments)
- Pier 14 - Cantilever Span Complete - (22 Segments)
- Pier 15 - Cantilever Span Complete - (27 Segments)
- Pier 16 - Cantilever Span Complete - (33 Segments)

**Mainline Structure Over Canal**

**Columns**
- F/P/S Column - Pier 17 (86' - 3 Lifts)
- F/P/S Column - Pier 18 (85' - 3 Lifts)

**Superstructure**
- Pier 17 - Cantilever Span Complete - (34 Segments)
- Pier 18 - Cantilever Span Complete - (36 Segments)
- CIP Closure Segment - Span 16
- CIP Closure Segment - Span 17

**Mainline Structure East of Canal**

**Demolition / Excavation**
- Excavate Footings - Piers 19 thru 28
- Demolish Footings - Piers 19 thru 28

**Foundation / Footings**
- Install Pipe Piles - Piers 19 thru 28

**Columns**
- Construct Columns - Piers 19 thru 28

**Superstructure**
- Pier 19 - Cantilever Span Complete - (30 Segments)
- Pier 20 - Cantilever Span Complete - (34 Segments)
- CIP Closures - Spans 18 thru 28

| Activity Name | Month |
|---|---|
| | 1 2 3 4 5 6 7 8 9 10 11 12 13 14 15 16 17 18 19 20 21 22 23 24 25 26 27 28 29 30 31 32 33 34 35 36 37 38 39 40 41 42 |
| Pier 21 - Cantilever Span Complete - (32 Segments) | Pier 21 - Cantilever Span Complete - (32 Segments) |
| Pier 22 - Cantilever Span Complete - (32 Segments) | Pier 22 - Cantilever Span Complete - (32 Segments) |
| Pier 23 - Cantilever Span Complete - (26 Segments) | Pier 23 - Cantilever Span Complete - (26 Segments) |
| Pier 24 - Cantilever Span Complete - (31 Segments) | Pier 24 - Cantilever Span Complete - (31 Segments) |
| Pier 25 - Cantilever Span Complete - (29 Segments) | Pier 25 - Cantilever Span Complete - (29 Segments) |
| Pier 26 - Cantilever Span Complete - (30 Segments) | Pier 26 - Cantilever Span Complete - (30 Segments) |
| Pier 27 - Cantilever Span Complete - (16 Segments) | Pier 27 - Cantilever Span Complete - (16 Segments) |
| Install End Bent Falsework - Pier 29 | Install End Bent Falsework - Pier 29 |
| Install Temp Stability Tower - Pier 28 | Install Temp Stability Tower - Pier 28 |
| Erect Pier Segments - Pier 28 (2 Ea) | Erect Pier Segments - Pier 28 (2 Ea) |
| Erect Segments on Falsework - Span 28 (1 Ea) | Erect Segments on Falsework - Span 28 (1 Ea) |
| Erect Starter Segments - Pier 28 (2 Ea) | Erect Starter Segments - Pier 28 (2 Ea) |
| Erect Remaining Segments - Pier 28 (17 Ea) | Erect Remaining Segments - Pier 28 (17 Ea) |
| **Existing Steel Bridge** | |
| **Rehabilitation** | |
| Remove and Patch Barriers | Remove and Patch Barriers |
| Demolish Existing WB Deck (137,000 sf) | Demolish Existing WB Deck (137,000 sf) |
| Steel Beam Rehab and Painting | Steel Beam Rehab and Painting |
| Patch Substructure | Patch Substructure |
| Construct New Deck / Replace Expansion Joints | Construct New Deck / Replace Expansion Joints |

**Schedule VIII**

**Form of Payment and Performance Bond**

**[See Attached]**

# AIA® Document A312™ – 2010

## *Performance Bond*

**CONTRACTOR:**
*(Name, legal status and address)*

**SURETY:**
*(Name, legal status and principal place of business)*

**OWNER:**
*(Name, legal status and address)*

This document has important legal consequences. Consultation with an attorney is encouraged with respect to its completion or modification.

Any singular reference to Contractor, Surety, Owner or other party shall be considered plural where applicable.

AIA Document A312–2010 combines two separate bonds, a Performance Bond and a Payment Bond, into one form. This is not a single combined Performance and Payment Bond.

**CONSTRUCTION CONTRACT**
Date:

Amount:

Description:
*(Name and location)*

**BOND**
Date:
*(Not earlier than Construction Contract Date)*

Amount:

Modifications to this Bond:   ☐ None      ☐ See Section 16

**CONTRACTOR AS PRINCIPAL**
Company:            *(Corporate Seal)*

**SURETY**
Company:                  *(Corporate Seal)*

Signature: _____
Name          Nam
and Title:

Signature: _____
                    e
and Title:

*(Any additional signatures appear on the last page of this Performance Bond.)*

*(FOR INFORMATION ONLY — Name, address and telephone)*
**AGENT or BROKER:**

**OWNER'S REPRESENTATIVE:**
*(Architect, Engineer or other party:)*

**§ 1** The Contractor and Surety, jointly and severally, bind themselves, their heirs, executors, administrators, successors and assigns to the Owner for the performance of the Construction Contract, which is incorporated herein by reference.

**§ 2** If the Contractor performs the Construction Contract, the Surety and the Contractor shall have no obligation under this Bond, except when applicable to participate in a conference as provided in Section 3.

**§ 3** If there is no Owner Default under the Construction Contract, the Surety's obligation under this Bond shall arise after

.1 the Owner first provides notice to the Contractor and the Surety that the Owner is considering declaring a Contractor Default. Such notice shall indicate whether the Owner is requesting a conference among the Owner, Contractor and Surety to discuss the Contractor's performance. If the Owner does not request a conference, the Surety may, within five (5) business days after receipt of the Owner's notice, request such a conference. If the Surety timely requests a conference, the Owner shall attend. Unless the Owner agrees otherwise, any conference requested under this Section 3.1 shall be held within ten (10) business days of the Surety's receipt of the Owner's notice. If the Owner, the Contractor and the Surety agree, the Contractor shall be allowed a reasonable time to perform the Construction Contract, but such an agreement shall not waive the Owner's right, if any, subsequently to declare a Contractor Default;

.2 the Owner declares a Contractor Default, terminates the Construction Contract and notifies the Surety; and

.3 the Owner has agreed to pay the Balance of the Contract Price in accordance with the terms of the Construction Contract to the Surety or to a contractor selected to perform the Construction Contract.

**§ 4** Failure on the part of the Owner to comply with the notice requirement in Section 3.1 shall not constitute a failure to comply with a condition precedent to the Surety's obligations, or release the Surety from its obligations, except to the extent the Surety demonstrates actual prejudice.

**§ 5** When the Owner has satisfied the conditions of Section 3, the Surety shall promptly and at the Surety's expense take one of the following actions:

**§ 5.1** Arrange for the Contractor, with the consent of the Owner, to perform and complete the Construction Contract;

**§ 5.2** Undertake to perform and complete the Construction Contract itself, through its agents or independent contractors;

**§ 5.3** Obtain bids or negotiated proposals from qualified contractors acceptable to the Owner for a contract for performance and completion of the Construction Contract, arrange for a contract to be prepared for execution by the Owner and a contractor selected with the Owner's concurrence, to be secured with performance and payment bonds executed by a qualified surety equivalent to the bonds issued on the Construction Contract, and pay to the Owner the amount of damages as described in Section 7 in excess of the Balance of the Contract Price incurred by the Owner as a result of the Contractor Default; or

**§ 5.4** Waive its right to perform and complete, arrange for completion, or obtain a new contractor and with reasonable promptness under the circumstances:

.1 After investigation, determine the amount for which it may be liable to the Owner and, as soon as practicable after the amount is determined, make payment to the Owner; or

.2 Deny liability in whole or in part and notify the Owner, citing the reasons for denial.

**§ 6** If the Surety does not proceed as provided in Section 5 with reasonable promptness, the Surety shall be deemed to be in default on this Bond seven days after receipt of an additional written notice from the Owner to the Surety demanding that the Surety perform its obligations under this Bond, and the Owner shall be entitled to enforce any remedy available to the Owner. If the Surety proceeds as provided in Section 5.4, and the Owner refuses the payment or the Surety has denied liability, in whole or in part, without further notice the Owner shall be entitled to enforce any remedy available to the Owner.

---

**§ 7** If the Surety elects to act under Section 5.1, 5.2 or 5.3, then the responsibilities of the Surety to the Owner shall not be greater than those of the Contractor under the Construction Contract, and the responsibilities of the Owner to the Surety shall not be greater than those of the Owner under the Construction Contract. Subject to the commitment by the Owner to pay the Balance of the Contract Price, the Surety is obligated, without duplication, for

    **.1**    the responsibilities of the Contractor for correction of defective work and completion of the Construction Contract;

    **.2**    additional legal, design professional and delay costs resulting from the Contractor's Default, and resulting from the actions or failure to act of the Surety under Section 5; and

    **.3**    liquidated damages, or if no liquidated damages are specified in the Construction Contract, actual damages caused by delayed performance or non-performance of the Contractor.

**§ 8** If the Surety elects to act under Section 5.1, 5.3 or 5.4, the Surety's liability is limited to the amount of this Bond.

**§ 9** The Surety shall not be liable to the Owner or others for obligations of the Contractor that are unrelated to the Construction Contract, and the Balance of the Contract Price shall not be reduced or set off on account of any such unrelated obligations. No right of action shall accrue on this Bond to any person or entity other than the Owner or its heirs, executors, administrators, successors and assigns.

**§ 10** The Surety hereby waives notice of any change, including changes of time, to the Construction Contract or to related subcontracts, purchase orders and other obligations.

**§ 11** Any proceeding, legal or equitable, under this Bond may be instituted in any court of competent jurisdiction in the location in which the work or part of the work is located and shall be instituted within two years after a declaration of Contractor Default or within two years after the Contractor ceased working or within two years after the Surety refuses or fails to perform its obligations under this Bond, whichever occurs first. If the provisions of this Paragraph are void or prohibited by law, the minimum period of limitation available to sureties as a defense in the jurisdiction of the suit shall be applicable.

**§ 12** Notice to the Surety, the Owner or the Contractor shall be mailed or delivered to the address shown on the page on which their signature appears.

**§ 13** When this Bond has been furnished to comply with a statutory or other legal requirement in the location where the construction was to be performed, any provision in this Bond conflicting with said statutory or legal requirement shall be deemed deleted herefrom and provisions conforming to such statutory or other legal requirement shall be deemed incorporated herein. When so furnished, the intent is that this Bond shall be construed as a statutory bond and not as a common law bond.

### § 14 Definitions

**§ 14.1 Balance of the Contract Price.** The total amount payable by the Owner to the Contractor under the Construction Contract after all proper adjustments have been made, including allowance to the Contractor of any amounts received or to be received by the Owner in settlement of insurance or other claims for damages to which the Contractor is entitled, reduced by all valid and proper payments made to or on behalf of the Contractor under the Construction Contract.

**§ 14.2 Construction Contract.** The agreement between the Owner and Contractor identified on the cover page, including all Contract Documents and changes made to the agreement and the Contract Documents.

**§ 14.3 Contractor Default.** Failure of the Contractor, which has not been remedied or waived, to perform or otherwise to comply with a material term of the Construction Contract.

**§ 14.4 Owner Default.** Failure of the Owner, which has not been remedied or waived, to pay the Contractor as required under the Construction Contract or to perform and complete or comply with the other material terms of the Construction Contract.

**§ 14.5 Contract Documents.** All the documents that comprise the agreement between the Owner and Contractor.

**§ 15** If this Bond is issued for an agreement between a Contractor and subcontractor, the term Contractor in this Bond shall be deemed to be Subcontractor and the term Owner shall be deemed to be Contractor.

---

**Init.**

AIA Document A312™ – 2010. The American Institute of Architects.

**/**

3

**§ 16** Modifications to this bond are as follows:



*(Space is provided below for additional signatures of added parties, other than those appearing on the cover page.)*

**CONTRACTOR AS PRINCIPAL**                                 **SURETY**
Company:                         *(Corporate Seal)*         Company:                         *(Corporate Seal)*

Signature: _____                       Signature: _____
Name and Title:                                            Name and Title:
Address                                                     Address

CAUTION: You should sign an original AIA Contract Document, on which this text appears in RED. An original assures that changes will not be obscured.

**Init.**

AIA Document A312™ – 2010. The American Institute of Architects.

**4**

/

# ▲AIA® Document A312™ – 2010

## *Payment Bond*

**CONTRACTOR:**
*(Name, legal status and address)*

**SURETY:**
*(Name, legal status and principal place of business)*

**OWNER:**
*(Name, legal status and address)*

**CONSTRUCTION CONTRACT**
Date:

Amount:

Description:
*(Name and location)*

**BOND**
Date:
*(Not earlier than Construction Contract Date)*

Amount:

Modifications to this Bond:   ☐ None   ☐ See Section 18

**CONTRACTOR AS PRINCIPAL**
Company:                  *(Corporate Seal)*

**SURETY**
Company:                  *(Corporate Seal)*

Signature: _____
Name        Nam
and Title:

Signature: _____
e
and Title:

*(Any additional signatures appear on the last page of this Payment Bond.)*

*(FOR INFORMATION ONLY — Name, address and telephone)*
**AGENT or BROKER:**

**OWNER'S REPRESENTATIVE:**
*(Architect, Engineer or other party:)*

This document has important legal consequences. Consultation with an attorney is encouraged with respect to its completion or modification.

Any singular reference to Contractor, Surety, Owner or other party shall be considered plural where applicable.

AIA Document A312–2010 combines two separate bonds, a Performance Bond and a Payment Bond, into one form. This is not a single combined Performance and Payment Bond.

AIA Document A312™ – 2010. The American Institute of Architects.          061110

5

**§ 1** The Contractor and Surety, jointly and severally, bind themselves, their heirs, executors, administrators, successors and assigns to the Owner to pay for labor, materials and equipment furnished for use in the performance of the Construction Contract, which is incorporated herein by reference, subject to the following terms.

**§ 2** If the Contractor promptly makes payment of all sums due to Claimants, and defends, indemnifies and holds harmless the Owner from claims, demands, liens or suits by any person or entity seeking payment for labor, materials or equipment furnished for use in the performance of the Construction Contract, then the Surety and the Contractor shall have no obligation under this Bond.

**§ 3** If there is no Owner Default under the Construction Contract, the Surety's obligation to the Owner under this Bond shall arise after the Owner has promptly notified the Contractor and the Surety (at the address described in Section 13) of claims, demands, liens or suits against the Owner or the Owner's property by any person or entity seeking payment for labor, materials or equipment furnished for use in the performance of the Construction Contract and tendered defense of such claims, demands, liens or suits to the Contractor and the Surety.

**§ 4** When the Owner has satisfied the conditions in Section 3, the Surety shall promptly and at the Surety's expense defend, indemnify and hold harmless the Owner against a duly tendered claim, demand, lien or suit.

**§ 5** The Surety's obligations to a Claimant under this Bond shall arise after the following:

**§ 5.1** Claimants, who do not have a direct contract with the Contractor,

   **.1**   have furnished a written notice of non-payment to the Contractor, stating with substantial accuracy the amount claimed and the name of the party to whom the materials were, or equipment was, furnished or supplied or for whom the labor was done or performed, within ninety (90) days after having last performed labor or last furnished materials or equipment included in the Claim; and

   **.2**   have sent a Claim to the Surety (at the address described in Section 13).

**§ 5.2** Claimants, who are employed by or have a direct contract with the Contractor, have sent a Claim to the Surety (at the address described in Section 13).

**§ 6** If a notice of non-payment required by Section 5.1.1 is given by the Owner to the Contractor, that is sufficient to satisfy a Claimant's obligation to furnish a written notice of non-payment under Section 5.1.1.

**§ 7** When a Claimant has satisfied the conditions of Sections 5.1 or 5.2, whichever is applicable, the Surety shall promptly and at the Surety's expense take the following actions:

**§ 7.1** Send an answer to the Claimant, with a copy to the Owner, within sixty (60) days after receipt of the Claim, stating the amounts that are undisputed and the basis for challenging any amounts that are disputed; and

**§ 7.2** Pay or arrange for payment of any undisputed amounts.

**§ 7.3** The Surety's failure to discharge its obligations under Section 7.1 or Section 7.2 shall not be deemed to constitute a waiver of defenses the Surety or Contractor may have or acquire as to a Claim, except as to undisputed amounts for which the Surety and Claimant have reached agreement. If, however, the Surety fails to discharge its obligations under Section 7.1 or Section 7.2, the Surety shall indemnify the Claimant for the reasonable attorney's fees the Claimant incurs thereafter to recover any sums found to be due and owing to the Claimant.

**§ 8** The Surety's total obligation shall not exceed the amount of this Bond, plus the amount of reasonable attorney's fees provided under Section 7.3, and the amount of this Bond shall be credited for any payments made in good faith by the Surety.

**§ 9** Amounts owed by the Owner to the Contractor under the Construction Contract shall be used for the performance of the Construction Contract and to satisfy claims, if any, under any construction performance bond. By the Contractor furnishing and the Owner accepting this Bond, they agree that all funds earned by the Contractor in the performance of the Construction Contract are dedicated to satisfy obligations of the Contractor and Surety under this Bond, subject to the Owner's priority to use the funds for the completion of the work.

---

**AIA Document A312™ – 2010.** The American Institute of Architects.

**§ 10** The Surety shall not be liable to the Owner, Claimants or others for obligations of the Contractor that are unrelated to the Construction Contract. The Owner shall not be liable for the payment of any costs or expenses of any Claimant under this Bond, and shall have under this Bond no obligation to make payments to, or give notice on behalf of, Claimants or otherwise have any obligations to Claimants under this Bond.

**§ 11** The Surety hereby waives notice of any change, including changes of time, to the Construction Contract or to related subcontracts, purchase orders and other obligations.

**§ 12** No suit or action shall be commenced by a Claimant under this Bond other than in a court of competent jurisdiction in the state in which the project that is the subject of the Construction Contract is located or after the expiration of one year from the date (1) on which the Claimant sent a Claim to the Surety pursuant to Section 5.1.2 or 5.2, or (2) on which the last labor or service was performed by anyone or the last materials or equipment were furnished by anyone under the Construction Contract, whichever of (1) or (2) first occurs. If the provisions of this Paragraph are void or prohibited by law, the minimum period of limitation available to sureties as a defense in the jurisdiction of the suit shall be applicable.

**§ 13** Notice and Claims to the Surety, the Owner or the Contractor shall be mailed or delivered to the address shown on the page on which their signature appears. Actual receipt of notice or Claims, however accomplished, shall be sufficient compliance as of the date received.

**§ 14** When this Bond has been furnished to comply with a statutory or other legal requirement in the location where the construction was to be performed, any provision in this Bond conflicting with said statutory or legal requirement shall be deemed deleted herefrom and provisions conforming to such statutory or other legal requirement shall be deemed incorporated herein. When so furnished, the intent is that this Bond shall be construed as a statutory bond and not as a common law bond.

**§ 15** Upon request by any person or entity appearing to be a potential beneficiary of this Bond, the Contractor and Owner shall promptly furnish a copy of this Bond or shall permit a copy to be made.

**§ 16 Definitions**

**§ 16.1 Claim.** A written statement by the Claimant including at a minimum:
.1    the name of the Claimant;
.2    the name of the person for whom the labor was done, or materials or equipment furnished;
.3    a copy of the agreement or purchase order pursuant to which labor, materials or equipment was furnished for use in the performance of the Construction Contract;
.4    a brief description of the labor, materials or equipment furnished;
.5    the date on which the Claimant last performed labor or last furnished materials or equipment for use in the performance of the Construction Contract;
.6    the total amount earned by the Claimant for labor, materials or equipment furnished as of the date of the Claim;
.7    the total amount of previous payments received by the Claimant; and
.8    the total amount due and unpaid to the Claimant for labor, materials or equipment furnished as of the date of the Claim.

**§ 16.2 Claimant.** An individual or entity having a direct contract with the Contractor or with a subcontractor of the Contractor to furnish labor, materials or equipment for use in the performance of the Construction Contract. The term Claimant also includes any individual or entity that has rightfully asserted a claim under an applicable mechanic's lien or similar statute against the real property upon which the Project is located. The intent of this Bond shall be to include without limitation in the terms "labor, materials or equipment" that part of water, gas, power, light, heat, oil, gasoline, telephone service or rental equipment used in the Construction Contract, architectural and engineering services required for performance of the work of the Contractor and the Contractor's subcontractors, and all other items for which a mechanic's lien may be asserted in the jurisdiction where the labor, materials or equipment were furnished.

**§ 16.3 Construction Contract.** The agreement between the Owner and Contractor identified on the cover page, including all Contract Documents and all changes made to the agreement and the Contract Documents.

**§ 16.4 Owner Default.** Failure of the Owner, which has not been remedied or waived, to pay the Contractor as required under the Construction Contract or to perform and complete or comply with the other material terms of the Construction Contract.

**§ 16.5 Contract Documents.** All the documents that comprise the agreement between the Owner and Contractor.

**§ 17** If this Bond is issued for an agreement between a Contractor and subcontractor, the term Contractor in this Bond shall be deemed to be Subcontractor and the term Owner shall be deemed to be Contractor.

**§ 18** Modifications to this bond are as follows:



*(Space is provided below for additional signatures of added parties, other than those appearing on the cover page.)*

**CONTRACTOR AS PRINCIPAL**                                   **SURETY**
Company:                          *(Corporate Seal)*     Company:                          *(Corporate Seal)*

Signature: _____                      Signature: _____
Name and Title:                                          Name and Title:
Address                                                   Address

**CAUTION: You should sign an original AIA Contract Document, on which this text appears in RED. An original assures that changes will not be obscured.**

AIA Document A312™ – 2010. The American Institute of Architects.

Init.

/

**Schedule IX**

**Payment and Performance Bond Reduction Terms**

In accordance with the EPC Agreement Section 4.19, EPC Contractor will provide a payment and performance bond satisfactory to Owner in a total amount equal to one-hundred percent (100%) of the Cost of the Work (the "Payment and Performance Bond"). EPC Contractor shall ensure that the Payment and Performance Bond remains valid and enforceable until the expiration of the EPC Contractor's Warranty Period. The amount of the Payment and Performance Bond shall be as follows:

| Period | Amount |
|---|---|
| From Construction Commencement Date to one year following Final Completion | One-hundred percent (100%) of the Cost of the Work |
| From one year following Final Completion to two years following Final Completion | Twenty-five percent (25%) of the Cost of the Work |
| From two years following Final Completion to expiration of the EPC Contractor's Warranty Period (for any re-warranty) | Ten percent (10%) of the Cost of the Work |
| Upon expiration of the EPC Contractor's Warranty Period | Owner will release its rights as to the Payment and Performance Bond |

**Schedule X**

**Milestone Schedule**

| Milestone Number | Title / Definition | Proposed Date * |
|:---:|:---|:---:|
| 1 | Start pier construction / First lift of pier concrete poured | |
| 2 | Cast first precast superstructure segment | |
| 3 | Start superstructure erection / First pier segments set on top of pier column | |
| 4 | Complete casting 50% of pier columns | |
| 5 | Completion of foundations / All pier footings cast | |
| 6 | Complete precasting 50% of superstructure segments | |
| 7 | Begin new overlay on steel bridge deck / First overlay section placed | |
| 8 | Pier construction complete / All pier columns and caps cast | |
| 9 | Start approach roadway rehabilitation / First 10% of pavement removal complete | |
| 10 | Superstructure erection complete / All precast superstructure segments erected into the bridge, all closure pours made and all longitudinal post-tensioning stressed | |

\*   Proposed dates will be established within 30 days of Construction Commencement

<u>EXHIBIT H</u>

<u>PERMITS</u>

| <u>Permit</u> | <u>Status</u> |
|---|---|
| United States Coast Guard<br>(Lead Federal agency) | Approved 1/27/15. Expires 1/16/20; Subcontractor to provide information regarding any work done in navigable waterways. |
| Section 106 Coordination<br>(State Historic Preservation Office) | Approved 9/23/14 |
| United States Army Corp of Engineers | Approved 12/11/14 and Re-issued on 1/22/18. Expires 1/22/21. |
| IDEM Section 401 Water Quality Certification | Approved 10/9/14 and Extended on 2/23/18. Expires 1/22/21 (required before beginning work in the Indiana Harbor Canal). |
| IN-DNR Construction in a Floodway | Renewed 2/21/17. Expires 2/27/19 (New application in process). |
| Coastal Zone Management Federal Consistency Determination | Approved 10/17/14 |
| INDOT Right of Way Permit | Approved 6/29/17. Extension granted 5/2/18. Expires 6/29/19. |
| IDEM Rule 5 Notice of Sufficiency<br>(Stormwater Runoff During Construction) | Issued 7/28/17. Expires 7/21/22. |
| FAA Form 7460-1 Notice of Proposed Construction of Alternation and Notification to Gary Airport | Submittals and coordination continuing as necessary during construction. FAA Form 7460-1 is needed for EACH roadway lighting at the elevation above ground. |

| <u>Access/Right of Way Permits</u> | <u>Status</u> |
|---|---|
| Anunnaki Access Agreement | In place; provides access to the right-of-way on the east side. |
| ArcelorMittal Access Agreement | In place |
| Indiana Harbor Belt RR ROE | In place |

Any additional permits and approvals needed for Subcontractor's means and methods not covered by the above permits and access/right of way permits shall be obtained by Subcontractor.

**45D04-2011-PL-000758**
USDC IN/ND case 2:20-cv-00439-JVB-JEM document 1 filed 11/02/20 page 230 of 243

Filed: 11/2/2020 1:57 PM
Clerk
Lake Superior Court, Civil Division 4    FIGG Building Bridges as Landmarks™ Lake County, Indiana



April 7, 2020

**VIA EMAIL:**
jhoffmann@mcleancontracting.com

Mr. Joseph W. Hoffmann, P.E.
Vice President – Projects
McLean Contracting Company
6700 McLean Way
Glen Burnie, MD  21060
443.270.5907

REFERENCE:        Cline Avenue Bridge Work Suspension

Dear Joe:

As communicated to you verbally and via e-mail exchange today, because of action of the Owner, Cline Avenue Bridge, LLC, you and your subcontractors are not authorized to come to the site or take any further action until further written notice from Figg Bridge Builders, LLC.

Sincerely,

FIGG BRIDGE BUILDERS, LLC

William (Jay) J. Rohleder, Jr., P.E., S.E.
Project Manager

xc:    Ms. Linda Figg (FIGG)
       Mr. Alan R. Phipps, P.E., S.E. (FIGG)

424 North Calhoun Street, Tallahassee, Florida 32301-1298 ▪ 850.224.7402

**EXHIBIT C**

Filed: 11/2/2020 1:57 PM
Clerk
Lake County, Indiana

6700 McLean Way
Glen Burnie, MD 21060

P: 410.553.6700

April 8, 2020

Mr. William J. (Jay) Rohleder, Jr., P.E., S.E.
Figg Bridge Builders, LLC
219 Riley Road
East Chicago, IN  46312

RE:   Cline Avenue Bridge Project, East Chicago, Indiana

**Subj:  Notice of Impact – Cline Avenue Bridge Work Suspension**

Dear Mr. Rohleder;

McLean Contracting Company is in receipt of your letter dated April 7, 2020 advising that McLean and our subcontractors are not authorized to come to the site or take any further action until further written notice from Figg Bridge Builders, LLC.

This letter serves as our written notice of intent to file claim as may be required in Subcontract Articles 4.3, 9.3, 9.4, 9.6 or 9.8 and as our written notice of a change in Scope of Work as contemplated in Subcontract Article 1.1.6: Contractor-directed suspensions of work.

Be advised that McLean has the following outstanding payments due to us for work performed.  The payment expectation dates listed are as advised by FBB on April 2nd:

- Payment Requisition #13 for the period ending 1/31/2020 in the amount of $1,026,032.21, payment expected 4/8/2020.
- Payment Requisition #14 for the period ending 2/29/2020 in the amount of $1,050,010.51, payment expected 4/21/2020.
- Payment Requisition #15 for the period ending 3/31/2020 in the amount of $1,478,620.64, payment expected between 5/6/2020 and 5/21/2020.
- Retainage Held in the amount of $830,817.76.
- Offsetting credit for mobilization payments is ($1,200,000.00)

Additionally, McLean will prepare a payment requisition for work completed between Requisition #15 and the notice of suspension.

Additionally, McLean and our subcontractors have the following daily standby costs that will continue throughout the work suspension at your expense:

- McLean Supervision:  $8,700.00 / calendar day
- 600 Ton Crawler Crane:  $1,810.00 / calendar day
- 330 Ton Crawler Crane #1:  $1,410.00 / calendar day
- 330 Ton Crawler Crane #2:  $1,410.00 / calendar day
- Omega Beam Trestle Sections:  $355.00 / calendar day
- Triple Beam Falsework Sections:  $135.00 / calendar day
- Material Barge:  $495.00 / calendar day



*Bringing Peace of Mind to Those We Serve*

EXHIBIT D

**McLean**

Corporate Office
6700 McLean Way
Glen Burnie, MD 21060

P: 410.553.6700

If directed to demobilize, we anticipate up to four weeks of time required to disassemble and remove the Omega sections off the top of the trestle (piles would be left behind), disassemble and demobilize three cranes and return the barge. This work would be performed on a T&M basis including McLean Supervision, Ironworkers and Crane Operators/Oilers as required, plus the following known lumpsum demobilization costs:

- 600 Ton Crawler Crane: $50,000.00
- 330 Ton Crawler Crane #1: $46,000.00
- 330 Ton Crawler Crane #2: $46,000.00
- Material Barge: $2,000.00

Today, McLean has left the site as required. The site was secured as much as possible prior to leaving. McLean will not be responsible for issues that arise on site between the time of this work suspension and when we return to work, or return to demobilize.

As always, McLean strives to resolve this matter in a fair and equitable manner. We will work together with you to resolve the item and minimize costs and impacts to the project to the greatest extent possible.

Please call me should you have any questions on this matter. My phone number is 443-270-5907 and my email address is jhoffmann@mcleancontracting.com.

Best Regards,
McLean Contracting Company

Joseph W. Hoffmann, P.E.
Vice President - Projects


CC:   Great American Insurance Company
      301 East Fourth Street
      Cincinnati, OH  45202
      Ref:  Bond # 1517337

*Bringing Peace of Mind to Those We Serve*

**45D04-2011-PL-000758**
Filed: 11/2/2020 1:57 PM
Clerk
USDC IN/ND case 2:20-cv-00439-JVB-JEM document 1-1 filed 11/02/20 page 233 of 243 Lake County, Indiana
Lake Superior Court, Civil Division 1

■ ■ ■ Building Bridge Landmarks ™


**BRIDGE BUILDERS**

June 15, 2020

VIA EMAIL:
mfilipczak@mcleancontracting.com

Mr. Michael Filipczak
McLean Contracting Company
6700 McLean Way
Glen Burnie, Maryland 21060

REFERENCE: Cline Avenue Bridge Project
Construction Subcontract Services

Dear Mr. Filipczak:

This is a follow-up notice of ending the subcontract agreement dated January 4, 2019 between FIGG Bridge Builders, LLC (FIGG) and McLean Contracting Company, for the superstructure erection services at the Cline Avenue Bridge project site.

FIGG received a termination of the Cline Avenue Bridge project contract from the owner of the project, Cline Avenue Bridge, LLC, which FIGG has disputed and has filed a lawsuit against the owner for such wrongful termination. FIGG was directed to leave the site, without an opportunity to collect and return any equipment.

Due to actions of Cline Avenue Bridge, LLC, any invoices for work under the subcontract performed through April 7, 2020 can be sent to FIGG for processing. Any amounts related to the period after April 7, 2020 need to be processed through the owner, Cline Avenue Bridge, LLC. If you are not satisfied with payments received by the owner for any amounts after April 7, you may present a written claim to us for those charges and we will use our best efforts to pass your claim through as part of our litigation against the owner.

Please coordinate collecting any equipment or entering into a separate subcontract agreement with the owner, Cline Avenue Bridge, LLC, to the extent these are not yet complete. The suggested contact is Terry Velligan, General Manager at Cline Avenue Bridge, LLC (219.712.2515).

Sincerely,
FIGG BRIDGE BUILDERS, LLC

William (Jay) J. Rohleder, Jr., P.E., S.E.
Project Manager

Attachments
xc:     Ms. Linda Figg (FIGG)
        Mr. Alan R. Phipps, P.E., S.E. (FIGG)

**EXHIBIT E**

424 North Calhoun Street, Tallahassee, Florida 32301-1298 ▪ 850.224.7402

Filed: 11/2/2020 1:57 PM
Clerk
Lake County, Indiana

**McLean**

6700 McLean Way
Glen Burnie, MD 21060

P: 410.553.6700

April 28, 2020

BY CERTIFIED MAIL – RETURN RECEIPT

Great American Insurance Company
301 East Fourth St.
Cincinnati, OH 45202
Attn: Tim Martin, Divisional Vice President of Bond Claims

RE:     Cline Avenue Bridge Project, East Chicago, Indiana

**Subj:     CLAIM ON PAYMENT BOND NO. 1517337**

Gentlemen:

In accordance with the provisions of Payment Bond No. 1517337, McLean Contracting Company ("McLean") submits this Claim for payment to Great American Insurance Company.  McLean was a direct subcontractor to Great American's principal, Figg Bridge Builders, LLC ("Figg").  We submit the following information in accordance with section 16.1 of the Bond:

| | |
|---|---|
| Name of Claimant | McLean Contracting Company<br>6700 McLean Way, Glen Burnie, MD 21060 |
| Name of the Person to Whom Services Furnished: | Figg Bridge Builders, LLC<br>424 Calhoun St., Tallahassee, FL 32301 |
| Copy of the Subcontract: | See Attachment 1 |
| Brief description of McLean's Work: | Provide supervision, subcontract labor and equipment to erect precast bridge segments. |
| Date of Last Work: | April 7, 2020 |
| Total Amount Earned by Claimant as of Date of Claim: | $16,195,746.86 |
| Total Amount of Previous Payments received by Claimant: | $13,256,906.34 |
| Total Amount Due and Unpaid as of the Date of the Claim: | $2,938,840.52 |

EXHIBIT F

**McLean**

Corporate Office
6700 McLean Way
Glen Burnie, MD 21060

P: 410.553.6700

McLean is owed the following amounts by Figg Bridge Builders as of the date of this Claim:

| | |
|---|---|
| Retainage: | $752,995.62 |
| Unpaid Invoice No. 23852, dated Mar. 6, 2020 | $1,050,010.51 |
| Unpaid Invoice No. 23928, dated Apr. 7, 2020 | $1,556,442.78 |
| Projected Invoice No. 23958, dated Apr. 28, 2020 (portion for work completed April 1 – 7, 2020) | $403,766.34 |
| Projected Invoice No. 23958, dated Apr. 28, 2020 (for accrued standby costs  April 8 – 30, 2020) | $375,625.27 |
| Credit for mobilization payment | ($1,200,000.00) |
| TOTAL DUE | $2,938,840.52 |

The above is a statement of McLean's damages as of April 30th, but damages are continuing to accrue every day.  In attachment 2, Figg advised McLean that the Owner had "suspended" its work and that Figg was essentially on "standby" on the Project. However, we have been told verbally that the Owner has terminated Figg's EPC Contract for this Project and have requested clarification on this point. See Attachment 5.  There have been discussions with McLean about continuing work on the Project, but we do not know either the Owner's or Figg's intentions as to this point.  Meanwhile, we have accrued over $375,000 in standby damages since April 7, 2020, and these will continue to accrue at $14,315 per day or approximately $435,000 per month.

We will soon have to make a decision whether to incur an additional $630,000 in equipment and material demobilization costs to mitigate some of these continuing daily damages.  If McLean were to restart its work on this Project at a later date, then it will cost a similar amount to remobilize this equipment and material.  The passage of time without action or further direction by Figg or Great American is rapidly increasing McLean's damages accruing on this Project, and for which we will be sending a supplement to this Claim each month.

**McLean**

Corporate Office
6700 McLean Way
Glen Burnie, MD 21060

P: 410.553.6700

It is therefore imperative that the status of this project and McLean's participation in it be resolved as quickly as possible.  Please contact me at 410-982-4162, or by email at jhoffmann@mcleancontracting.com.


Best Regards,
McLean Contracting Company

Joseph W. Hoffmann, P.E.
Vice President - Projects


Cc:    William J. Rohleder, Jr. P.E., S.E. (by email to: jrohleder@figgbridge.com)
        Tim Martin, GAIC Bond Claims (by email to: tdmartin@gaic.com)


Attachments:

| | |
|---|---|
| 1. | Subcontract Agreement between Figg and McLean, via Electronic Download Link |
| 2. | Figg Bridge Builders letter of April 7, "Cline Avenue Bridge Work Suspension" |
| 3. | McLean letter of April 8, 2020, "Notice of Impact – Work Suspension" |
| 4. | McLean letter of April 20, 2020; "Request for Retainage Release" |
| 5. | McLean Letter of April 28, 2020; "Cline Avenue Bridge Termination" |

Corporate Office
6700 McLean Way
Glen Burnie, MD 21060

P: 410.553.6700

Attachment #1

Subcontract Agreement between
Figg Bridge Builders, LLC and McLean Contracting Company
dated January 4, 2019

Available for download:
https://mcleancontracting-
my.sharepoint.com/:b:/p/jhoffmann/ESc_Iu95nkdEn8FgSyccIhsB7yToUOUgc97XLIcX0
sJPZg?e=mC0A4W



April 7, 2020

VIA EMAIL:
jhoffmann@mcleancontracting.com

Mr. Joseph W. Hoffmann, P.E.
Vice President – Projects
McLean Contracting Company
6700 McLean Way
Glen Burnie, MD  21060
443.270.5907

REFERENCE:     Cline Avenue Bridge Work Suspension

Dear Joe:

As communicated to you verbally and via e-mail exchange today, because of action of the Owner, Cline Avenue Bridge, LLC, you and your subcontractors are not authorized to come to the site or take any further action until further written notice from Figg Bridge Builders, LLC.

Sincerely,

FIGG BRIDGE BUILDERS, LLC

William (Jay) J. Rohleder, Jr., P.E., S.E.
Project Manager


xc:     Ms. Linda Figg (FIGG)
        Mr. Alan R. Phipps, P.E., S.E. (FIGG)

April 8, 2020

Mr. William J. (Jay) Rohleder, Jr., P.E., S.E.
Figg Bridge Builders, LLC
219 Riley Road
East Chicago, IN  46312

RE:    Cline Avenue Bridge Project, East Chicago, Indiana

**Subj:  Notice of Impact – Cline Avenue Bridge Work Suspension**

Dear Mr. Rohleder;

McLean Contracting Company is in receipt of your letter dated April 7, 2020 advising that McLean and our subcontractors are not authorized to come to the site or take any further action until further written notice from Figg Bridge Builders, LLC.

This letter serves as our written notice of intent to file claim as may be required in Subcontract Articles 4.3, 9.3, 9.4, 9.6 or 9.8 and as our written notice of a change in Scope of Work as contemplated in Subcontract Article 1.1.6: Contractor-directed suspensions of work.

Be advised that McLean has the following outstanding payments due to us for work performed.  The payment expectation dates listed are as advised by FBB on April 2nd:
- Payment Requisition #13 for the period ending 1/31/2020 in the amount of $1,026,032.21, payment expected 4/8/2020.
- Payment Requisition #14 for the period ending 2/29/2020 in the amount of $1,050,010.51, payment expected 4/21/2020.
- Payment Requisition #15 for the period ending 3/31/2020 in the amount of $1,478,620.64, payment expected between 5/6/2020 and 5/21/2020.
- Retainage Held in the amount of $830,817.76.
- Offsetting credit for mobilization payments is ($1,200,000.00)

Additionally, McLean will prepare a payment requisition for work completed between Requisition #15 and the notice of suspension.

Additionally, McLean and our subcontractors have the following daily standby costs that will continue throughout the work suspension at your expense:
- McLean Supervision:  $8,700.00 / calendar day
- 600 Ton Crawler Crane:  $1,810.00 / calendar day
- 330 Ton Crawler Crane #1:  $1,410.00 / calendar day
- 330 Ton Crawler Crane #2:  $1,410.00 / calendar day
- Omega Beam Trestle Sections:  $355.00 / calendar day
- Triple Beam Falsework Sections:  $135.00 / calendar day
- Material Barge:  $495.00 / calendar day

Corporate Office
6700 McLean Way
Glen Burnie, MD 21060

P: 410.553.6700

If directed to demobilize, we anticipate up to four weeks of time required to disassemble and remove the Omega sections off the top of the trestle (piles would be left behind), disassemble and demobilize three cranes and return the barge.  This work would be performed on a T&M basis including McLean Supervision, Ironworkers and Crane Operators/Oilers as required, plus the following known lumpsum demobilization costs:

- 600 Ton Crawler Crane:  $50,000.00
- 330 Ton Crawler Crane #1:  $46,000.00
- 330 Ton Crawler Crane #2:  $46,000.00
- Material Barge:  $2,000.00

Today, McLean has left the site as required.  The site was secured as much as possible prior to leaving.  McLean will not be responsible for issues that arise on site between the time of this work suspension and when we return to work, or return to demobilize.

As always, McLean strives to resolve this matter in a fair and equitable manner.  We will work together with you to resolve the item and minimize costs and impacts to the project to the greatest extent possible.

Please call me should you have any questions on this matter. My phone number is 443-270-5907 and my email address is jhoffmann@mcleancontracting.com.

Best Regards,
McLean Contracting Company

Joseph W. Hoffmann, P.E.
Vice President - Projects


CC:   Great American Insurance Company
      301 East Fourth Street
      Cincinnati, OH  45202
      Ref:  Bond # 1517337

**McLean**

Corporate Office
6700 McLean Way
Glen Burnie, MD 21060

P: 410.553.6700

April 20, 2020

Mr. William J. (Jay) Rohleder, Jr., P.E., S.E.
Figg Bridge Builders, LLC
219 Riley Road
East Chicago, IN  46312

RE:    Cline Avenue Bridge Project, East Chicago, Indiana

**Subj:  Request for Retainage Release**

Dear Mr. Rohleder;

As you are aware, McLean has completed the full value and duration of our original contract work and completion of the superstructure, perhaps to be performed under a change order, is on hold due to a work suspension.

As of today, you have not paid us for work performed in January, February, March or April and, in addition, are holding approximately $752,995.62 in retention.

In accordance with Subcontract Section 7.2.2 we hereby request that you release all retainage currently held on McLean's billings.

Please call me should you have any questions on this matter. My phone number is 443-270-5907 and my email address is jhoffmann@mcleancontracting.com.

Best Regards,
McLean Contracting Company

Joseph W. Hoffmann, P.E.
Vice President - Projects


CC:    Great American Insurance Company
       301 East Fourth Street
       Cincinnati, OH  45202
       Ref:  Bond # 1517337

*Bringing Peace of Mind to Those We Serve*

Corporate Office
6700 McLean Way
Glen Burnie, MD 21060

P: 410.553.6700

**McLean**

April 28, 2020

Mr. William J. (Jay) Rohleder, Jr., P.E., S.E.
Figg Bridge Builders, LLC
219 Riley Road
East Chicago, IN  46312

RE:    Cline Avenue Bridge Project, East Chicago, Indiana

**Subj:  Cline Avenue Bridge Termination**

Dear Mr. Rohleder;

McLean Contracting Company is in receipt of your letter dated April 7, 2020, advising that McLean and our subcontractors are not authorized to come to the site or take any further action until further written notice from Figg Bridge Builders, LLC (FBB). This letter was entitled "Cline Avenue Bridge Work Suspension," and the letter noted it was "… because of action of the Owner …", both seeming to characterize this work-stoppage directive as a "Suspension By Owner for Convenience" under Sec. 9.3 of our Subcontract with FBB.  However, in a prior telephone conversation you had with me, and in a conversation Linda Figg had with Michael Filipczak, you and Ms. Figg both conceded that the Owner, Cline Avenue Bridge LLC (CAB) had in fact terminated Figg Bridge Builders, LLC as the EPC Contractor on this Project.

If that is the case, then this is not an Owner suspension of work, but rather a Termination by Owner covered under Sec. 9.4 of the Subcontract.  McLean's rights and remedies are different under Sections 9.3 and 9.4, and therefore this is not just a matter of semantics.  Furthermore, if the Owner has terminated FBB, FBB was obligated under Sec. 9.4 to provide McLean written notice of such termination within 3 business days. We have received no such notification.

We therefore request:

1.      A copy of any correspondence or directive from the Owner, either suspending FBB's work or terminating FBB's contract, as referenced in your April 7th letter.

2.      If this was a termination by the Owner, proper written notice of same as required under Sec. 9.4 of the Subcontract.

3.      The name and other contact information of the individual at your surety, Great American Insurance Company, to whom we should direct any correspondence concerning a payment bond claim for the amounts due to McLean.

It is imperative that the status of this project and McLean's participation in it be resolved as quickly as possible.  As detailed in our letter to you of April 8th, FBB owes McLean over $2.5 million in unpaid invoices for work done in February through March.

*Bringing Peace of Mind to Those We Serve*

Corporate Office
6700 McLean Way
Glen Burnie, MD 21060

P: 410.553.6700

Furthermore, we have accrued approximately $780,000 in billings and suspension of work damages in April, and the suspension of work damages continue to accrue at $14,315 per day.

We will soon have to make a decision to incur an additional $630,000 in demobilization costs to mitigate some of these continuing daily damages.  If McLean should restart its work on this Project at a later date, then it will cost a similar amount to remobilize this equipment and material.  The passage of time without action or further direction by FBB is rapidly increasing McLean's damages accruing on this Project, and for which we will be submitting a claim to FBB and its surety.

Please call me should you have any questions on this matter. My phone number is 443-270-5907 and my email address is jhoffmann@mcleancontracting.com.

Best Regards,
McLean Contracting Company

Joseph W. Hoffmann, P.E.
Vice President - Projects


CC:    Great American Insurance Company
       301 East Fourth Street
       Cincinnati, OH  45202
       Ref:  Bond # 1517337

*Bringing Peace of Mind to Those We Serve*