UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| MCLEAN CONTRACTING COMPANY,<br>      Plaintiff,<br><br>      v.<br><br>GREAT AMERICAN INSURANCE<br>COMPANY and FIGG BRIDGE BUILDERS,<br>LLC,<br>      Defendants.<br><br>FIGG BRIDGE BUILDERS, LLC,<br>      Counter Claimant,<br><br>      v.<br><br>MCLEAN CONTRACTING COMPANY,<br>      Counterclaim Defendant. | CAUSE NO.: 2:20-CV-439-JVB-JEM |

## OPINION AND ORDER

This matter is before the Court on Defendant Great American Insurance Company's Motion for Summary Judgment [DE 58] filed on January 12, 2023. For the reasons below, the Court denies the motion.

### PROCEDURAL BACKGROUND

On November 2, 2020, McLean Contracting Company ("McLean") filed a complaint against Figg Bridge Builders LLC ("Figg") and Great American Insurance Company ("Great American") in Lake County Superior Court. Great American removed the case to federal court on December 1, 2020, on the basis of diversity jurisdiction.

McLean brings claims against Great American for failure to honor payment bond obligations and for unjust enrichment. McLean also brings claims against Figg for breach of

contract and unjust enrichment. Figg, in turn, counterclaims against McLean for breach of contract and a demand for indemnity.

In broad terms, McLean was a subcontractor on a construction project for general contractor Figg, whose payment bond surety was Great American. The principal, Cline Avenue Bridge, LLC ("CAB"), terminated its contract with Figg, and McLean seeks, in this lawsuit, to recoup costs it incurred as a result of the cessation of work at the project site.

Great American's motion for summary judgment pertains only to McLean's claims against Great American. Great American argues that it has honored all of its payment bond obligations. The motion, supporting brief, statement of material facts, and designated evidence in support were filed on January 12, 2023. McLean filed its response brief, designated evidence, and response to the statement of material facts on March 1, 2023. Great American filed its reply on March 29, 2023, and its reply to the material facts on April 12, 2023. The motion for summary judgment is now ripe for ruling.

## SUMMARY JUDGMENT STANDARD

A motion for summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Rule 56(c) further requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party seeking summary judgment bears the initial responsibility of informing a court of the basis for its motion and identifying the evidence, if any, which it believes demonstrates the

lack of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If the moving party supports its motion for summary judgment with affidavits or other materials, the burden shifts to the non-moving party to showing that an issue of material fact exists. *Keri v. Bd. of Tr. of Purdue Univ.*, 458 F.3d 620, 628 (7th Cir. 2006). Rule 56(e) specifies that once a properly supported motion for summary judgment is made, "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts to establish that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences and resolve all doubts in favor of that party. *Keri*, 458 F.3d at 628. A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson v. Liberty Lobby*, 477 U.S. 242, 249-50 (1986).

## MATERIAL FACTS

Effective June 8, 2017, Figg and CAB entered into a contract for the design and construction of the Cline Avenue bridge over Indiana Harbor and Ship Canal in East Chicago, Indiana (the "Project"). (Compl. Ex. B. Subex. G at 7, 63, ECF No. 4-1).

At Figg's request, Great American issued[1] a payment bond (Bond No. 1517337) effective June 14, 2017, naming CAB as Owner. (Mot. Ex. B, ECF No. 61-2). The bond is modified by a "dual obligee rider" that has not been presented to the Court. *Id.* The bond names Figg as the principal, Great American as the surety, and CAB as the owner. *Id.*

---

[1] The parties do not dispute that the bond was issued, though the document before the Court is unsigned by Figg and Great American.

3

On January 4, 2019, Figg and McLean entered into a written subcontract for work on the Project. (Compl. Ex. B at 1, ECF No. 4-1). Section 9.6 of the subcontract addresses the procedures allowable if the contractor provides written instruction to the subcontractor to suspend work. (Resp. Ex. C § 9.6, ECF No. 67-3). Section 9.4 of the subcontract provides that if the prime contract is terminated, then the contractor will notify the subcontractor in writing within three business days of the termination and that the subcontract terminates upon the written notification. (Resp. Ex. C. § 9.4, ECF No. 67-3).

The parties agree that McLean commenced work under the subcontract on or about January 23, 2019. On April 7, 2020, CAB terminated the construction contract with Figg and instructed Figg to leave the Project site. (Mot. Ex. C at 4, ECF No. 61-3). A panel of arbitrators hearing the dispute between CAB and Figg found that CAB had insufficient grounds to terminate the agreement and breached its agreement with Figg by failing to give Figg notice with an opportunity to cure, which, in combination, constituted an Owner Event of Default. *Id.* at 29-30. McLean was not a party to the arbitration. *Id.*

Following CAB's termination of the construction contract with Figg, CAB entered into a prime contract with Granite Construction ("Granite") on April 13, 2020, to complete Figg's remaining work on the Project. (Mot. Ex. A at ¶ 8, ECF No. 61-1; Mot. Ex. D, ECF No. 61-4). Granite entered into a subcontract with McLean effective June 1, 2020, to perform work in completion of the Project. (Mot. Ex. A at ¶ 9, ECF No. 61-2; Mot. Ex. E, ECF No. 61-5 (contract proposal)).

The parties agree that McLean subsequently made a claim on the payment bond. Great American maintains that the disputed amount of McLean's payment bond claim is $802,040.15 and asserts that this amount represents rental charges for McLean's equipment (standby costs) on

site between April 7, 2020 and June 1, 2020. (Mot. Ex. G Nos. 3-4, ECF No. 61-7; Mot. Ex. F Subex. A, ECF No. 61-7 (line items "Stand[b]y thru 4/30" and "Standby thru 5/31")). McLean agrees it is owed for rental charges for the standby costs on site between April 7, 2020 and June 1, 2020. However, McLean disagrees with the claim amount, contending that the proper figure is $781,851.83, plus interest and costs. (Resp. Ex. A ¶ 27, ECF No. 67-1; Mot. Ex. F Subex. A, ECF No. 61-7 (current balance remaining)).

The payment bond provides:

> § 1 The Contractor and Surety, jointly and severally, bind themselves, their heirs, executors, administrators, successors and assigns to the Owner to pay for labor, materials and equipment furnished for use in the performance of the Construction Contract, which is incorporated herein by reference, subject to the following terms.

(Mot. Ex. B § 1, ECF No. 61-2). The "Construction Contract" is the prime contract between CAB and Figg. *Id.* § 16.3.

Great American, by declaration of its Vice President – Bond Division Timothy D. Martin, contends that McLean's equipment was not used and sat idle during the standby period between April 7, 2020, and June 1, 2020, as the construction contract ceased to exist beginning on April 7, 2020, upon the contract's termination by CAB. (Mot. Ex. A ¶ 10, ECF No. 61-1). Great American maintains that, during an April 7, 2020 conversation between Figg's Senior VP and Project Manager William (Jay) Rohleder, Jr., and McLean's Vice President of Projects Joseph Hoffmann, Rohleder told Hoffman that CAB had terminated Figg. (Rep. Ex. 1 ¶ 7, ECF No. 77-1). Rohleder asked Hoffmann to "consider keeping McLean's equipment on site for some period of time" in case Figg was able to reinstate its contract with CAB. *Id.*

McLean counters that it was provided no notice on April 7, 2020, that either McLean was being terminated or that CAB had terminated Figg. (Resp. Ex. A ¶ 14, ECF No. 67-1). Instead, McLean maintains that Rohleder directed Hoffmann to immediately suspend operations but keep

equipment and materials on site and keep supervisors available; McLean presents Hoffmann's affidavit in support. (Resp. Ex. A ¶¶ 10-11, ECF No. 67-1). Hoffmann memorialized the conversation with Rohleder in an email noting that cranes would remain "on rent on site" and supervisors would remain available. (Resp. Ex. D, ECF No. 67-4). A letter sent by Rohleder to Hoffmann on the same day confirms that "because of action of [CAB], you and your subcontractors are not authorized to come to the site or take any further action until further written notice from [Figg]." (Resp. Ex. E., ECF No. 67-5). The letter does not indicate that Figg's contract or McLean's subcontract had been terminated.

Hoffman avers that Figg, via the April 7 conversations, emails, and letter, induced and directed McLean to hold personnel, equipment, and materials on standby status. (Resp. Ex. A ¶ 15, ECF No. 67-1). As a result, McLean incurred additional costs including, but not limited to, leased cranes and barge, owned trestle sections and falsework beams, the contractually agreed upon McLean supervision rate, and insurance. *Id.* ¶ 16.

By letter dated April 8, 2020, McLean confirmed receipt of the April 7 letter and provided notice of its intent to file claims against Figg for nonpayment of certain outstanding amounts under the subcontract and for its standby costs. (Resp. Ex. F, ECF No. 67-6). Figg did not respond to the April 8 Letter. (Resp. Ex. A ¶ 18, ECF No. 67-1).

In an email dated May 20, 2020, Great American notified McLean that Figg was terminated for default by CAB effective April 7, 2020. (Resp. Ex. H, ECF No. 67-8). Hoffmann, in his declaration, states that this was the first written communication to McLean indicating any type of termination of Figg by CAB. (Resp. Ex. A. ¶ 20, ECF No. 67-1). By letter dated June 15, 2020, Figg notified McLean that Figg's prime contract with CAB had been terminated. (Resp. Ex. I, ECF No. 67-9). Hoffmann affirms that this was the first time Figg notified McLean that the prime

6

contract between CAB and Figg had been terminated on April 7, 2020. (Resp. Ex. A ¶ 21, ECF No. 67-1). Figg did not provide McLean written notice of termination of the prime contract within three business days of termination. (Resp. Ex. A ¶ 21, ECF No. 67-1).

McLean served its payment bond claim dated April 28, 2020 on Great American via certified mail for $2,938,840.52, which Hoffmann affirms were the then-known amounts due and owing under the subcontract. (Resp. Ex. A ¶ 23, ECF No. 67-1; Resp. Ex. J at 1, ECF No. 67-10). McLean further advised Great American that damages would continue to accrue while its work was suspended, including standby costs, demobilization and remobilization, if necessary. (Resp. Ex. J at 2, ECF No. 67-10). Great American acknowledged receipt of McLean's Bond Claim by letter dated May 6, 2020. (Resp. Ex. G, ECF No. 67-7). On June 10, 2020, McLean supplemented its Bond Claim, increasing its Bond Claim to $3,385,443.72. (Resp. Ex. A ¶ 26, ECF No. 67-1).

To date, Great American has issued payments to McLean on the bond claim for $1,810,219.63 and CAB paid McLean its accrued retainage; McLean believes there is a remaining Bond Claim of $781,851.83, plus interest and costs. (Resp. Ex. A ¶ 27, ECF No. 67-1).

## ANALYSIS

### A. Choice of Law

Resolution of Great American's request for summary judgment is ultimately a matter of interpretation of the payment bond contract. The contract provides that any suit under the contract must be commenced "in the state in which the project that is the subject of the Construction Contract is located." (Mot. Ex. B § 12, ECF No. 61-2). That state is Indiana. However, the contract does not specify that Indiana law applies to all suits brought under the payment bond. Great American applies Indiana law to the dispute. *See* (Br. at 3, ECF No. 59 ("Under Indiana law, Great American's liability to McLean must be measured by the strict terms of [its] contract." (internal

7

quotation marks omitted))). McLean also appears to apply Indiana law to the dispute. *See* (Resp. at 9, ECF No. 66 ("Indiana law is clear the surety . . . is liable in the same manner to the subcontractor . . ., and is subject to the same contractual terms, as the principal.")).

In breach of contract disputes, Indiana courts apply the "most intimate contacts" test and evaluate five factors: "(1) the place of contracting; (2) the place of negotiation of the contract; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicile, residence, nationality, place of incorporation and place of business of the parties." *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Standard Fusee Corp.*, 940 N.E.2d 810, 814 (Ind. 2010). The Court is unaware of the places of contracting or negotiation. The place of performance is Indiana, as is the location of the subject matter of the contract. Great American is a citizen of Ohio, Figg is a citizen of Florida, and McLean is a citizen of Delaware and Maryland. Given Great American's and McLean's application of Indiana law, the factors favoring application of Indiana law, and the lack of other factors showing that any other particular state has more intimate contacts, the Court applies Indiana law.

### B. Indiana Contract Law

In Indiana, the interpretation and construction of contract provisions are questions of law for courts to decide. *Neal v. Purdue Fed. Credit Union*, 201 N.E.3d 253, 261 (Ind. Ct. App. 2022). In interpreting unambiguous contract language, courts give effect to the parties' intentions as expressed in the four corners of the document. *Franciscan All. Inc. v. Metzman*, 192 N.E.3d 957, 963 (Ind. Ct. App. 2022). The unambiguous terms are given their plain and ordinary meaning. *Neal*, 201 N.E.3d at 261.

Whether a contract is ambiguous is itself a question of law. *Evans v. Med. & Pro. Collection Servs., Inc.*, 741 N.E.2d 795, 798 (Ind. Ct. App. 2001). A contract is not ambiguous

merely because the parties disagree about the proper interpretation of its terms. *Franciscan Alliance*, 192 N.E.3d at 963. Ambiguity exists where reasonable people could differ as to the meaning of a word or phrase. *Id.* When ambiguity exists because of contract language and not because of extrinsic evidence, resolution of the ambiguity is a question of law. *Id.* at 964.

Here, the particular contract in question is a surety contract. A surety contract creates a "tripartite relation between the party secured, the principal obligor, and the party secondarily liable, and the rights, remedies, and defenses of a surety cannot be disassociated from this relationship." *BMD Contractors, Inc. v. Fid. & Deposit Co. of Maryland*, 679 F.3d 643, 653 (7th Cir. 2012), *as amended* (July 13, 2012) (quoting *Meyer v. Bldg. & Realty Serv. Co.*, 196 N.E. 250, 253 (Ind. 1935)). The contract requires the surety to "answer for the debt, default, or miscarriage of another." *Id.* (quoting *Meyer*, 196 N.E. at 253-54). The surety "cannot be liable where the principal is not." *Id.*

As with insurance contracts, surety contracts are construed strictly against the surety, and ambiguities in the contract are resolved in favor of the party secured. *Id.* (citing *Garco Indus. Equip. Co., Inc. v. Mallory*, 485 N.E. 2d 652, 654 (Ind. Ct. App. 1985)).

### C. Terms of the Contract

The payment bond has Figg as principal, Great American as surety, and CAB as owner. Under this bond, Great American obligated itself to "pay for labor, materials and equipment furnished for use in the performance of the Construction Contract," subject to the terms of the bond. (Mot. Ex. B. § 1, ECF No. 61-2). Great American's obligation to a subcontractor, such as McLean, arises when the subcontractor sends a claim to Great American. *Id.* §§ 5, 5.2, 16.2. When a claim is sent, Great American must answer the claim, identify any disputes, and pay undisputed amounts. *Id.* §§ 7, 7.1, 7.2. The term "labor, materials or equipment" includes, among other

matters, all "items for which a mechanic's lien may be asserted in the jurisdiction where the labor, materials or equipment were furnished." *Id.* § 16.2.

McLean argues that, because it can assert a mechanic's lien for the standby costs, the terms of the payment bond obligate Great American to pay those standby costs. However, Great American's obligation is not for all labor, materials, and equipment conceivable. Instead, the obligation is to pay for these expenses when they are "furnished for use in the performance of the Construction Contract." (Mot. Ex. B. § 1, ECF No. 61-2). The bond defines "Construction Contract" as the prime contract between CAB and Figg. *Id.* at § 16.3.

Great American agrees that "if Figg failed to pay McLean for work that McLean furnished to Figg for Figg's use in the performance of the Construction Contract, then Great American would pay." (Br. at 4, ECF No. 59). Understanding what is encompassed by the phrase "furnished for use in the performance of the Construction Contract" in the payment bond determines the outcome of the instant motion.

Great American contends that it bears no duty to pay for expenses incurred after April 7, 2020, the day on which CAB terminated its construction contract with Figg. After termination of the contract, Great America reasons, it is impossible for labor, materials, and equipment to have been furnished for use in performing the terminated contract. This oversimplifies the matter. A party can *furnish* an item for another party's particular use even where it is impossible for the item to be *actually used* in that particular manner. For example, a person can furnish a bag of cat food to another person for use in feeding the recipient's cat. If, unbeknownst to the furnisher, the cat has sadly died prior to the food being furnished, then the food cannot be actually used for the intended purpose. The fact that the food was furnished for that purpose, however, remains unchanged. Here, the language of the bond does not require that the items provided be "furnished

*and used*" in performing the contract, only "furnished *for use*." The Court finds the contract language to be unambiguous in requiring furnishment *for* use and not (as Great American argues) furnishment *and* use.

When viewing the evidence in the light most favorable to McLean, McLean incurred the standby costs to enable Figg to perform on its contract with CAB. As McLean puts it, it kept its workers and equipment available "in good faith." (Resp. at 10, ECF No. 66). There is evidence that McLean was unaware of the termination of the contract until May 20, 2020, had no written confirmation from Figg of the termination (as required by the subcontract) until June 15, 2020. Evidence also indicates that McLean received a request from Figg to keep the equipment and labor available. McLean had no duty to verify that the CAB-Figg contract was still in effect before taking on the standby costs. The subcontract places the duty on Figg to notify McLean in the event of termination. (Resp. Ex. 3 § 9.4, ECF No. 67-3). Thus, a reasonable jury could decide that some or all of the claimed standby costs McLean incurred from April 8, 2020, forward were being provided by McLean to Figg for use in furtherance of Figg performing on the construction contract. The impossibility of Figg actually using what was furnished for the intended purpose is not determinative.

Great American points to *U.S. for Use & Benefit of T.M.S. Mech. Contractors, Inc. v. Millers Mut. Fire Ins. Co. of Texas*, 942 F.2d 946, 953 (5th Cir. 1991), in support of its position that costs incurred after a prime contract's termination are not furnished for use in performing on the prime contract. In that case, however, the general contractor terminated the subcontract when the prime contract was terminated, so (by inference) the subcontractor had notice of the prime contract's termination and knew that it had no active contractual relationship with the general contractor. *See id.* at 948. The finding there that the labor and material costs incurred were not

11

"work in furtherance of the Contract as the Contract had already been terminated," *id.* at 953, does not mandate the same outcome here, where there is a question of material fact whether the subcontractor had notice of the prime contract's termination.

The circumstances here are somewhat closer to those in *Blakeslee Arpaia Chapman, Inc. v. EI Constructors, Inc.*, 687 A.2d 506 (1997). In that case about a public works construction contract, the Supreme Court of Connecticut determined that a subcontractor was entitled to recover standby labor costs that the subcontractor incurred in good faith. *Id.* at 519. Still, that case concerns a statutory bond, a public works contract, and differences regarding the subcontractor's notice. Further, the Supreme Court of Connecticut's holding does not address Indiana law and is not binding authority on this Court.

Great American further maintains that the arbitration panel finding that CAB breached the prime contract shows that it was ultimately CAB's fault—not Figgs'—that McLean incurred the standby costs. This argument ignores evidence that (1) Figg failed to notify McLean of the termination of the prime contract as mandated by the subcontract and (2) Figg asked McLean to keep the equipment on site and its supervisors available. Because a reasonable jury could find that the claimed costs were furnished for use in the performance of the prime construction contract, this argument regarding fault between CAB and Figg is immaterial to the outcome of Great American's motion on McLean's claims and whether McLean can recover from Great American under the terms of the payment bond.

Great American asserts that the arbitration finding also means that Great American has no duty to indemnify CAB because Great American's duty to indemnify CAB arises only if there is no "Owner default." McLean counters that it is not bound by the arbitration panel's decision because McLean was not a party to that arbitration. Because the instant motion is about whether

the claimed costs fall under costs covered by the payment bond, this argument regarding indemnity of CAB is of no relevance to the present motion's resolution.

In summary, a reasonable jury could determine from the evidence presented that McLean incurred the claimed standby costs by furnishing materials, labor, or equipment for use in Figg performing on its contract with CAB. Thus, the claimed costs fall within the scope of the payment bond. Therefore, the Court denies Great American's request for summary judgment on the payment bond claim.

## CONCLUSION

Based on the above, the Court **DENIES** Defendant Great American Insurance Company's Motion for Summary Judgment [DE 58].

SO ORDERED on May 24, 2023.

s/ Joseph S. Van Bokkelen
JOSEPH S. VAN BOKKELEN, JUDGE
UNITED STATES DISTRICT COURT